FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 03 2003

at 11 o'clock and 16 min. A M
WALTER A. Y. H. CHINN, CLERK

Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON 1126-0
LOUISE K. Y. ING 2394-0
CARL D. SOTO 7809-0
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Telephone: 524-1800
Facsimile: 524-4591
palston@ahfi.com
ling@ahfi.com
csoto@ahfi.com

Attorneys for Defendant/Cross-claimant
THE CIT GROUP/BUSINESS CREDIT, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, Inc., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants,<br><br>and<br><br>CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | Civil No. CV 01 00187 DAE BMK (Tort and RICO)<br><br>**SECOND AMENDED CROSSCLAIM;** CERTIFICATE OF SERVICE<br><br>Trial Date: May 13, 2003 |



**EXHIBIT C**

## SECOND AMENDED CROSSCLAIM

Defendant/Cross-claimant THE CIT GROUP/BUSINESS CREDIT, INC.("CIT"), by and through its attorneys, Alston Hunt Floyd & Ing, Attorneys At Law, A Law Corporation, for its Second Amended Crossclaim against Defendants/Crossclaim Defendants CGBN, INC. ("CGBN"), MICHAEL CLIFFORD ("CLIFFORD"); EDWIN BOWLING ("BOWLING"); FRANCES HALLER BOWLING ("HALLER BOWLING"), KURT GLASSMAN ("GLASSMAN") and RAYMOND IWAMOTO ("IWAMOTO") (collectively "Crossclaim Defendants") and additional Crossclaim Defendants CG Development, Inc. ("CG Development"), F&J Movers, Inc. ("F&J"), and Renee K. Costa ("Costa") (collectively "Additional Crossclaim Defendants") alleges as follows:[1]

### The Parties

1. Defendant/Crossclaimant CIT Group/Business Credit, Inc. ("CIT"), is a New York corporation, with its principal place of business in the State of New York. CIT was engaged in business in the State of Hawaiʻi during all relevant times alleged in this Crossclaim.

2. Defendant/Crossclaim Defendant KURT GLASSMAN is a citizen of the State of California who conducted business in the

---

[1] CIT reserves the right to amend this Second Amended Crossclaim further if its appeal (to be filed) of the Order Granting of Part and Denying in Part Motion for Leave to Amend its First Amended Crossclaim is allowed.

State of Hawaiʻi during all relevant times alleged in this Crossclaim.

3. Defendant/Crossclaim Defendant EDWIN BOWLING is a citizen of the State of Hawaiʻi who conducted business in the State of Hawaiʻi during all relevant times alleged in this Crossclaim.

4. Defendant/Crossclaim Defendant FRANCES HALLER BOWLING is a citizen of the State of Hawaiʻi who conducted business in the State of Hawaiʻi during all relevant times alleged in this Crossclaim. She is and was at all relevant times married to Edwin Bowling and was at all relevant times an attorney.

5. Defendant/Crossclaim Defendant MICHAEL CLIFFORD is a citizen of the State of Hawaiʻi who conducted business in the State of Hawaiʻi during all relevant times alleged in this Crossclaim.

6. Defendant/Crossclaim Defendant CGBN, INC., is a Hawaiʻi corporation with its principal place of business in the State of Hawaiʻi. The principals of CGBN include Crossclaim Defendants Clifford, Bowling and Glassman.

7. Defendant/Crossclaim Defendant RAYMOND IWAMOTO is a citizen of the State of Hawaiʻi who conducted business and practiced law in the State of Hawaiʻi during all relevant times alleged in this Crossclaim. Upon information and belief, at all relevant times, he was legal counsel to MidPac Lumber Co., CG

Investments, dba Maui Home Supply, CGBN, CG Development, Clifford and Glassman.

8. Additional Crossclaim Defendant CG Development, Inc., is a Hawaiʻi corporation with its principal place of business in the State of Hawaiʻi.

9. Additional Crossclaim Defendant F&J Movers, Inc., is a Hawaiʻi corporation with its principal place of business in the State of Hawaiʻi.

10. Additional Crossclaim Defendant Renee K. Costa is a citizen of the State of Hawaiʻi and the former president of one or more of the following entities formed by Glassman: WSpectrum, Inc., CGSpectrum and GSpectrum, LLC, now known as KSG, LLC.

11. Non-parties MidPac Lumber Company, Ltd. ("MidPac") and CG Investments, Inc., dba Maui Home Supply ("MHS") are Hawaiʻi corporations and debtors in Chapter 7 cases in the Bankruptcy Court for the District of Hawaiʻi.

## JURISDICTION AND VENUE

12. This Court has supplemental jurisdiction over this Crossclaim pursuant to 28 U.S.C. § 1367.

13. Venue is proper in the District of Hawaiʻi pursuant to 28 U.S.C. § 1391(b) because this Crossclaim arose in this district.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

14. On March 4, 1998 the Administrative Committee of MidPac approved a Stock Purchase Agreement (the "Agreement")

proposed by Clifford, Glassman and Bowling. The Agreement provided that CGBN Inc., a closely-held corporation wholly owned by Clifford, Glassman and Bowling, would acquire MidPac.

15. Clifford, Glassman and Bowling financed their stock purchase through a series of transactions in which approximately $14 million in MidPac certificates of deposit were to be liquidated and the proceeds loaned to CGBN Inc. to finance the purchase of all outstanding stock held by MidPac's ESOP participants and other shareholders. This leveraged buyout enabled Clifford, Glassman and Bowling to become the sole shareholders, officers and directors of MidPac, with virtually no outlay of their own capital.

16. On March 19, 1998, CIT entered into a loan agreement (the "Loan Agreement") with MidPac. The Loan Agreement established an inventory-based secured loan capped at $8 million. Under the terms of the Loan Agreement, the amount of money that MidPac (the "Borrower") was eligible to borrow was calculated using a percentage of MidPac's eligible inventory.

17. Paragraph 4.1 of the Loan Agreement stated:

> Grant of Security Interest: To secure the payment and performance in full of all Obligations, Borrower hereby grants to Lender a continuing security interest in and lien upon, and a right of setoff against, and Borrower hereby assigns and pledges to Lender, all of the Collateral, including any Collateral not deemed eligible for lending purposes.

18. As defined in paragraph 4.3 of the Loan Agreement, CIT's "Collateral" included, among other things, all acquired rights, titles and interests of MidPac in all: accounts, bank accounts, deposit accounts, cash monies, securities, contract rights, and general intangibles, as well as, all inventory, equipment and fixtures, and all proceeds from the sale of the foregoing assets, wherever located.

19. On March 19, 1998, in order to further secure the payment and performance in full of all Obligations of the Borrower, pursuant to Haw. Rev. Stat. § 9-302(1)(h)(ii), CIT perfected its security interests in the following bank accounts maintained by MidPac:

| Bank | Account | Number |
|---|---|---|
| Bank of Hawaii | Freight | 0080-640676 |
| Bank of Hawaii | Bonding | 0080-640688 |
| Bank of Hawaii | Operating/Collateral | 0080-582560 |
| Bank of Hawaii | Payroll Tax | 0001-219874 |
| Bank of Hawaii | Payroll | 0080-248032 |
| Bank of Hawaii | General | 0080-39836 |
| Bank of Hawaii | General | 0080-640722 |
| Bank of Hawaii | Payroll Benefits | 0080-640706 |
| Bank of Hawaii | Trade | 0080-640692 |
| Bank of Hawaii | Operating | 0080-640684 |
| First Hawaiian Bank | General | 98-018565 |
| First Hawaiian Bank | Bonding | 98-051570 |
| American Savings Bank | Bonding | 45-010503 |
| City Bank | "Savings" | 101293201 |

20. On March 24, 1998, in order to further secure the payment and performance in full of all Obligations of the Borrower, pursuant to Haw. Rev. Stat. § 9-302(1), CIT perfected its security interests in all inventory, equipment and fixtures

of MidPac, as well as, all proceeds from the sale of the foregoing assets, wherever located.

21. Paragraph 6.6 of the Loan Agreement stated:

> Disposition of Assets. Borrower shall not directly or indirectly: (a) sell, lease, transfer, assign, abandon or otherwise dispose of any part of the Collateral or any material portion of its other assets (other than sales of inventory to buyers in the ordinary course of business) or b) consolidate with or merge with or into any other entity, or permit any other entity to consolidate with or merge with or into Borrower or (c) form or acquire any interest in any firm, corporation or other entity.

22. Paragraph 6.12 of the Loan Agreement stated:

> Affiliated Transactions: Borrower will not directly or indirectly: (a) lend or advance money or property to, guarantee or assume indebtedness of...any person, firm, corporation or other entity; or...(b) declare pay or make any dividend, redemption or other distribution on account of any shares of any class of stock of Borrower now or hereafter outstanding; or (c) make any payment of the principal amount of or interest on any indebtedness owing any to any officer, director, employee, shareholder or affiliate of Borrower; or (d) make any loans or advances to any officer, director, employee, shareholder or affiliate of Borrower...

23. CGBN, through its officers, Bowling and Glassman, were also required to provide CIT with accurate monthly financial statements. Even though the Loan Agreement required monthly financial statements and expressly prohibited lending or advancing any money, paying dividends, paying the indebtedness of any officer, or making any loans or advances to any officers, CGBN Inc., Glassman, Bowling, and Clifford ("the Glassman

Group"), devised and participated in a scheme to divert CIT's collateral to themselves and others acting in concert with them. The Glassman Group acted in concert with CG Development, Haller Bowling, Iwamoto, Costa, and F&J to implement this scheme. As MidPac's secured lender, CIT became the victim of those parties' collective actions in furtherance of the fraudulent scheme.

24. In furtherance of this scheme, in or about August through September 1998, Bowling and Haller Bowling caused a Maui law firm to draft stock purchase agreements for the sale of shares in CGBN Inc., CG Acquisitions Inc., CG Development Inc., and CG Investments, Inc. These stock purchase agreements were intended to disguise, as sales of stock, over $2 million in payments by Glassman to Bowling and Haller Bowling from MidPac bank accounts in which CIT held a perfected security interest.

25. The stock purchase agreements were executed in and around September 4, 1998; however, Bowling and Haller Bowling agreed with Glassman to back-date many of these documents to January of 1998. The documents were backdated in order to make it appear as if the stock purchases occurred before the Glassman Group acquired MidPac, before CIT lent any funds to MidPac, and before CIT obtained its perfected security interests in MidPac's bank accounts. By back-dating these documents the Glassman Group and Haller Bowling collectively made ongoing material misrepresentations to CIT concerning MidPac's true financial

state, and collectively concealed from CIT their diversion of MidPac assets over which CIT held a perfected security interest.

26. As further inducement to CIT to make the loan the Glassman Group represented that they were acquiring MidPac with the intention of restructuring the company, such as by reducing expenses, improving handling of accounts receivable, and increasing the efficiency of bonding procedures. In fact, their true intent was to drain the company of its assets for the benefit of themselves and their co-conspirators, to the detriment of and in disregard of the rights of CIT as a perfected lender.

27. The Glassman Group acted in concert with CG Development, Haller Bowling, Iwamoto, Costa, and F&J, to extract large amounts of cash from bank accounts controlled by MidPac and over which CIT held a perfected security interest. In approximately March 1998, Glassman, Clifford and Bowling gained control over a City Bank account which had been used by pre-acquisition MidPac management as a no-interest checking account. They did not disclose to CIT the existence of transfers from that account in violation of the terms and covenants of the Loan Agreement and in derogation to CIT's perfected security interest. The Glassman group misrepresented to CIT that the account was a "savings" account when in fact it was a checking account that was being used to surreptitiously disperse MidPac's cash to the co-conspirators. Between March 1998 and June 1999, they caused a total of over $8.1 million of MidPac's funds to be transferred to

the City Bank account. The Glassman Group then caused over $6.5 million of funds from this City Bank account to be paid out to themselves and the other Crossclaim Defendants and Additional Crossclaim Defendants:

a. Between about April 9, 1998 through about June 19, 1999, Glassman received approximately $2.6 million from the City Bank account, as set forth more specifically in paragraphs 210-256 of Plaintiff's Second Amended Complaint, which are incorporated herein by reference.

b. Between about October 27, 1998 through about May 18, 1999, Clifford received approximately $272,000 from the City Bank account, as set forth more specifically in paragraphs 196-204 of Plaintiff's Second Amended Complaint, which are incorporated herein by reference.

c. Between about March 18, 1998 through about June 8, 1999, Bowling and Haller Bowling collectively received approximately $2,584,000 from the City Bank MidPac account and CGBN, including, but not limited to the following disbursements:

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 2/17/98 | Bowling | 63,000 |
| 3/15/98 | Bowling | 31,500 |
| 4/6/98 | Bowling | 31,500 |
| 4/16/98 | Bowling | $ 20,000 |
| 4/17/98 | Haller Bowling | 250,000 |
| 5/10/98 | Bowling | 31,500 |
| 5/12/98 | Haller Bowling | 300,000 |

| | | |
|---|---|---|
| 5/12/98 | Bowling | 20,000 |
| 5/29/98 | Haller Bowling | 425,000 |
| 6/8/98 | Bowling | 31,500 |
| 6/8/98 | Bowling | 20,000 |
| 7/13/98 | Bowling | 20,000 |
| 8/14/98 | Bowling | 25,000 |
| 8/20/98 | Haller Bowling | 100,000 |
| 11/4/98 | Haller Bowling | 615,000 |
| Total | | $ 1,984,000 |

d. Between about March 24 through about June 4, 1999, F&J Movers, Inc., received approximately $247,500 from the City Bank account, as alleged more specifically in paragraphs 206-209 of Plaintiff's Second Amended Complaint, which are incorporated herein by reference.

e. On or about March 25, 1999, Renee K. Costa, the purported president of Wspectrum, CGSpectrum, and Gspectrum, received approximately $25,000 from the City Bank account, as alleged more specifically in paragraph 205 of Plaintiff's Second Amended Complaint, which is incorporated herein by reference.

f. Between about April 23, 1998 through about May 29, 1999, CG Development, Inc. received approximately $1,520,000, as alleged more specifically in paragraph 257 of Plaintiff's Second Amended Complaint, which is incorporated herein by reference.

28. As a result of these cash transfers from MidPac to Crossclaim Defendants and Additional Crossclaim Defendants, MidPac was deprived of the operating capital needed to conduct business and repay the CIT loan. Accordingly, beginning in approximately early 1999, the Glassman Group, aided by Haller Bowling, Iwamoto, and Additional Crossclaim Defendants, devised and/or participated in a scheme to mislead CIT into believing its loan advances were adequately secured and to mislead CIT into making more loan advances to MidPac. They did so through the following acts, among others:

a. Beginning in or around March or April 1999, Glassman and Bowling caused MidPac to issue false invoices to a related entity, J&J Hardwood ("J&J"), and in June 1999, induced J&J to report to CIT's outside auditors inflated, false figures for accounts payable due from J&J to MidPac.

b. In or around May 1998, Glassman, with the assistance of Iwamoto as incorporator, formed a new corporation FA Movers, now known as F&J Movers, and in early 1999, formed with the assistance of Iwamoto new corporations named Spectrum, Gspectrum, CGSpectrum and WSpectrum. Glassman and Bowling then caused MidPac to issue false sales invoices to one or more of these entities in order to falsely inflate MidPac's

accounts receivables and thereby fraudulently to obtain larger advances from CIT by creating the false appearance of a larger borrowing base.

c. From 1998 and continuing after the filing of the MidPac and MHS bankruptcy petitions, the Glassman Group, Haller Bowling, and Additional Crossclaim Defendants collectively acted to disguise the amounts they improperly received out of the City Bank account. These acts included (i) the Glassman Group's failure to provide CIT's auditors with relevant and accurate MidPac financial statements, bank records, and other documents, and (ii) the Glassman Group's and Haller Bowling's failure to cause MidPac to disclose the use of MidPac funds for the purported stock purchases from Bowling and Haller Bowling.

d. Alternatively, if they were not directly involved in the creation of the false invoices and otherwise misleading CIT into making loan advances based on inadequate collateral, then Bowling and Clifford were co-conspirators with Glassman or aided and abetted the scheme. They did so by (i) lending their name, reputation and credibility to the MidPac and MHS businesses, (ii) agreeing to serve as managers, officers, and/or directors of

MidPac, CGBN and CG Investments, Inc., (iii) accepting excessive and unearned payments from MidPac and MHS, (iv) falsely characterizing these payments as distributions from other entities or tax liability payments, and (v) failing to exercise adequate control and supervision over MidPac, MHS and Glassman. They therefore share collective responsibility for the scheme.

e. Alternatively, if they were not directly involved in the scheme to create the false invoices, then Bowling and Haller Bowling are aiders and abettors or co-conspirators with Glassman in that they knowingly implemented, assisted and/or encouraged the scheme. They did so by, among other things, devising and backdating the stock purchase agreements for the purported sale of their shares in CG Acquisitions, CG Development and CG Investments to Glassman when in fact their true purpose was to benefit personally from MidPac cash reserves. The undisclosed and improper payments made by MidPac to Bowling and Haller Bowling were in derogation of CIT's perfected security interest. Additionally, these improper payments deprived MidPac of cash needed for its business,

thereby increasing MidPac's dependence on CIT's loan advances and creating an environment conducive to false inflation of MidPac's asset base in order to induce further CIT advances. Bowling and Haller Bowling therefore share collective responsibility for the scheme.

f. Alternatively, if they were not directly involved in the scheme to create the false invoices, then F&J Movers and Renee Costa are aiders and abettors or co-conspirators with Glassman in that they knowingly implemented, assisted and/or encouraged the scheme. They did so by (i) agreeing to accept the false invoices without objection; (ii) in the case of Ms. Costa, the purported president of Wspectrum, CGSpectrum, and Gspectrum, by falsely certifying to CIT's auditors that Spectrum owed MidPac $965,258.08 as of May 31, 1999; and (iii) accepting excessive and unearned payments from MidPac as apparent consideration for their cooperation. F&J Movers and Renee Costa therefore share collective responsibility for the scheme.

29. In justifiable reliance on the acts described above, CIT continued to reasonably believe, at least until mid-June 1999, that its loan to MidPac was adequately secured and continued to make loan advances to MidPac.

30. In approximately mid-June 1999, during a routine verification of collateral, CIT became suspicious of the Spectrum receivables when CIT discovered that the entity, one of MidPac's largest purported accounts, had no listed telephone number. Yet, the payables balance for the Spectrum account had dramatically increased from $0 in mid-April 1999 to over $900,000 by the end of May 1999. Further investigation revealed that Spectrum had the same address as Glassman, CG Acquisition, Inc. (majority-owned by Glassman) and CG Investments, dba Maui Home Supply, an entity operated in Kahului, Maui, Hawaiʻi, by Clifford, Bowling and Glassman.

31. Beginning in or around mid-June 1999, CIT thereupon took reasonable steps to protect its secured interest, prevent further loss and collect moneys owed to it by MidPac by (A) freezing its loan advances to MidPac pending the outcome of its investigation; (B) in late June 1999, sending a team of employees to investigate suspected problems with MidPac's collateral and also sending an outside fraud specialist consultant, Ted Phelps, to Hawaiʻi as a workout specialist candidate for MidPac's consideration; (C) recommending to MidPac in late June 1999, that it engage a workout consultant to assist it with financial management, (D) working with an outside inventory consultant to investigate and monitor MidPac's inventory flow, (E) investigating MidPac's sales and invoicing transactions through the use of outside auditors and

(F) cooperating with Glassman and Bowling's efforts to refinance the CIT loan through City Bank.

32. In or around June 23, 1999 and after, Iwamoto wrote CIT's regional general counsel Grace Bowen in an effort to discourage CIT from taking stronger actions against MidPac due to the suspected fraud of MidPac's principals. Although knowing that F&J and Spectrum were owned and/or controlled by Glassman, et al. or their affiliates, he represented that they were independently-owned companies and not controlled by MidPac. He also discouraged CIT from contacting Whirlpool and other vendors, claiming CIT would thereby jeopardize MidPac's relationships with vendors, a valuable asset. CIT relied to its detriment on these representations in determining its course of action as to MidPac's loan and in not taking actions that could have led to MidPac's earlier shutdown. As a result of these misrepresentations CIT was named a defendant by Whirlpool in this lawsuit.

33. In or around June 24, 1999, MidPac, through Glassman, agreed at CIT's recommendation to retain workout specialist Ted Phelps ("Phelps"). Glassman, however, did not cooperate in providing either CIT's auditors or Mr. Phelps with sufficient information to trace the disposition of MidPac's cash, inventory and other CIT collateral.

34. In July 1999, Mr. Phelps, in his capacity as an agent for MidPac, and not CIT, began notifying MidPac's

creditors, including Plaintiff Whirlpool, about MidPac's financial difficulties and CIT's suspension of its loan advances.

35. At Glassman's request, in order to give MidPac time to obtain refinancing of obligations owed to CIT, MidPac and CIT negotiated and entered into a Forbearance Agreement in which MidPac acknowledged various events of default had occurred under its Loan Agreement and CIT agreed to refrain from pursuing collection efforts until September 30, 1999. In consideration for entering into the Forebearance Agreement, CIT obtained a continuing personal guarantee from Glassman. The personal guarantee secured the performance of MidPac's obligations to CIT with a third deed of trust on Glassman's residence in California. As part of the forbearance agreement, CIT resumed making loan advances to MidPac to help fund its payroll and operations until refinancing could be obtained.

36. CIT would not have entered into the forbearance agreement and made further advances had it known the true extent of Crossclaim Defendants and Additional Crossclaim Defendants' misrepresentations and diversion of funds.

37. Despite Phelps' efforts to stabilize MidPac's financial condition and generate sufficient operating funds, MidPac's refinancing efforts through City Bank fell through when Bowling and his associates, including Haller Bowling, failed in September 1999, to contribute their anticipated share of the refinancing funds. Upon information and belief, Bowling and

Haller Bowling had previously agreed with Glassman to repay some or all of the over $2 million they received from MidPac and CGBN if MidPac or CG Investment's financial condition became unstable, but they reneged on that agreement.

38. Consequently, and also as a result of the millions of dollars which Crossclaim Defendants and Additional Crossclaim Defendants had drained from MidPac for their own benefit since 1998, MidPac was ultimately unable to generate sufficient cash to fund its operations, pay CIT's loan and continue as a going concern. In late 1999 and January 2000, MidPac engaged a liquidation company and an auctioneer to liquidate its remaining inventory and other property in an effort to repay its obligations to CIT.

39. On January 18, 2000, certain of MidPac's creditors filed an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code against MidPac, commencing Bankruptcy No. 00-00136 (D. Hawaii). On January 31, 2000, certain of MHS' creditors filed an involuntary petition under Chapter 7 of the Bankruptcy Code against MHS, commencing Bankruptcy No. 00-00323 (D. Hawaii). Relief was ordered under both cases.

40. On January 19, 2000, MidPac directed its auctioneer to conduct the auction. The auction proceeds were held by CIT until the MidPac bankruptcy court granted CIT relief from the automatic stay, at which time CIT applied the proceeds to the MidPac debt.

41. As a result of MidPac's default on the forbearance agreement, CIT took steps to foreclose on Glassman's residence by filing in Los Angeles County, California, on May 4, 2000, a Notice of Default and Election To Sell Under Deed Of Trust. Before the residence could be sold, Glassman and his wife commenced a bankruptcy case, In re Kurt and Susan Glassman, Case No. 00-03599 (D. Hawaii). The bankruptcy case stayed CIT's efforts to complete its foreclosure until February or March 2001, when CIT and the Glassmans stipulated to modify the automatic stay by giving CIT a deed in lieu of foreclosure on the residence "in complete satisfaction of any claims that CIT has against the Glassmans under the Guaranty." The stipulation was approved by the bankruptcy court by Order filed March 13, 2001. Glassman's bankruptcy case has since been dismissed.

**FIRST CLAIM FOR RELIEF**
**CONTRIBUTION/INDEMNITY**
**(Against all Crossclaim Defendants except CG Development)**

42. CIT realleges and incorporates by reference its allegations in paragraphs 1-41 above.

43. Plaintiff WHIRLPOOL CORPORATION ("Whirlpool") filed a Second Amended Complaint against Crossclaimant and Crossclaim Defendants alleging that WHIRLPOOL suffered damages as a result of wrongdoing on the part of Crossclaimant and Crossclaim Defendants arising out of their alleged actions or omissions with respect to MidPac and Whirlpool.

44. If WHIRLPOOL sustained the damages alleged in the Second Amended Complaint, and if such damages were the fault of anyone, they were caused by the fraud, negligence and/or fault of some or all of Crossclaim Defendants, and CIT was not negligent and/or at fault and/or otherwise responsible for WHIRLPOOL's damages.

45. If WHIRLPOOL is entitled to recover, its right of recovery is only against some or all of Crossclaim Defendants and not against CIT.

46. If WHIRLPOOL sustained damages as alleged in the Second Amended Complaint, and if such damages were the fault of anyone, they were the direct and proximate result of the primary negligence, acts, wrongdoing and/or omissions of Crossclaim Defendants, and any acts on the part of CIT was passive and secondary.

47. If any judgment is rendered against CIT, it is entitled to reimbursement, contribution, indemnity from Crossclaim Defendants, and each of them, including but not limited to payment of CIT's attorneys' fees and costs incurred as a result of the lawsuit filed by Whirlpool.

**SECOND CLAIM FOR RELIEF**
**FRAUD CONSPIRACY**
**(Against the Glassman Group, Haller Bowling, and Additional Crossclaim Defendants)**

48. CIT realleges and incorporates by reference its allegations in paragraphs 1-47 above.

49. The Glassman Group, Haller Bowling and Additional Crossclaim Defendants devised and participated in a scheme to acquire MidPac and operate it in order to extract its assets in fraud of CIT. The Glassman Group acted in concert with, and with assistance from, Haller Bowling and Additional Crossclaim Defendants to implement the fraudulent scheme.

50. The existence of an agreement between the Glassman Group, Haller Bowling, and Additional Crossclaim Defendants to commit fraud can be inferred from their conspiratorial actions in transferring, concealing, and dissipating MidPac funds as alleged more specifically in paragraphs 23 through 36 above.

51. The existence of an agreement between the Glassman Group, Haller Bowling, and Additional Crossclaim Defendants to commit fraud is evidenced by:

a. Glassman and Bowling issuing false MidPac invoices, and inducing others to report inflated accounts receivable as alleged more specifically in paragraphs 28(a) and 28(b) above.

b. Glassman's, Clifford's and Bowling's service as managers, officers, and/or directors of MidPac, and CGBN Inc., their acceptance of excessive and unearned payments from MidPac, and their falsely characterizing receipt of MidPac funds as distributions from other

entities as alleged more specifically in paragraphs 28(c) and 28(d) above.

c. Haller Bowling's participation retaining a law firm to draft and backdate the stock purchase agreements as alleged more specifically in paragraphs 24, 25 and 28(e) above.

d. Renee Costa's falsely certifying to CIT auditors that Spectrum owed MidPac $965,258.08 as of May 31, 1999, as alleged more specifically in paragraph 28(f) above.

e. F&J Movers' incorporation by the Glassman Group for the purpose receiving false sales invoices from MidPac, as alleged more specifically in paragraph 28(b) and 28(f) above.

52. In furtherance of their conspiracy to defraud, the Glassman Group, Haller Bowling, and Additional Cross-claim Defendants Costa, and F&J Movers, have committed overt acts to transfer, conceal and dissipate MidPac funds, as alleged more specifically in paragraphs 23 through 36 above.

53. As a proximate result of the Glassman Group's, Haller Bowling's and Additional Crossclaim Defendants' conspiracy to divert collateral over which CIT held a perfected security interest, CIT has suffered damages including but not limited to

the loss of its collateral, as well as costs and expenses incurred by additional investigations that CIT was required to pursue in June 1999 and afterwards as a result of MidPac's suspicious activities, and attorneys' fees and costs incurred by CIT in connection with litigation initiated by third parties, including Whirlpool and the MidPac bankruptcy trustee.

54. The Glassman Group, Haller Bowling and Additional Crossclaim Defendants, knew or recklessly disregarded the fact that CIT would detrimentally rely on the false and misleading statements and omissions complained of herein. Each, by conspiring with the others as described above, did so knowingly or in such a reckless or grossly negligent manner as to entitle CIT to punitive damages against each of them.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against the Glassman Group, Haller Bowling,**
**F&J, Costa and CG Development)**

55. CIT realleges and incorporates by reference its allegations in paragraphs 1-54 above.

56. As alleged above, in order to secure the payment and performance in full of MidPac's obligations, CIT held a perfected security interest in all MidPac "collateral" which included, among other things, all acquired rights, title and interests of MidPac in all: accounts, bank accounts, deposit accounts, and cash monies, wherever located.

57. In derogation to CIT's perfected security interest, the Glassman Group, Haller Bowling, and Additional

Crossclaim Defendants paid themselves over $6.5 million from the City Bank account as alleged more specifically in paragraph 27(a) - (f) above. In so doing Defendants, and each of them, deprived CIT of its collateral, and also deprived MidPac of cash needed for its business. The Glassman Group, Haller Bowling, and Additional Crossclaim Defendants falsely inflated MidPac's asset base in order to induce further CIT advances. They did so with the specific intent of defrauding, hindering or delaying CIT's interests as a secured and perfected lender.

58. The Glassman Group, Haller Bowling, and Additional Crossclaim Defendants, and each of them, did not give MidPac present, reasonably equivalent value in exchange for the aforementioned payments of $6.5 million from the City Bank account and MidPac was insolvent at the time of the transfers, or became insolvent as a result of the transfers.

59. The Glassman Group, Haller Bowling and Additional Crossclaim Defendants, and each of them, have been unjustly enriched at the expense of CIT by the payments and property that the Glassman Group, Haller Bowling and Additional Crossclaim Defendants, and each of them, diverted from MidPac to themselves and their affiliates. CIT is entitled to recover such benefits received by each of the Glassman Group, Haller Bowling and Additional Crossclaim Defendants to the extent CIT has been injured by their wrongful conduct.

**FOURTH CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against Glassman, Bowling, Haller Bowling and Clifford)**

60. CIT realleges and incorporates by reference its allegations in paragraphs 1-59 above.

61. The Loan Agreement, as amended, was a valid contractual relationship between CIT and MidPac. Pursuant to paragraph 6.6 of the Loan Agreement CIT was prohibited from disposing of material portions of its assets.

62. Glassman, Clifford, Bowling and Haller Bowling, and each of them, had knowledge of the contractual relationship between CIT and MidPac.

63. Glassman, Clifford, Bowling and Haller Bowling knowingly and intentionally caused massive cash transfers from MidPac's accounts to themselves and their affiliates for their personal gain, contrary to the interests of MidPac, as alleged more specifically above and in paragraphs 179 - 257 of Plaintiff's Amended Complaint. Glassman, Clifford, Bowling and Haller Bowling thereby caused MidPac to dispose of material portions of its assets and thereby induced MidPac to breach its contract with CIT. In so doing, Glassman, Clifford, and Bowling, although officers, directors or managers of MidPac, were not acting within the scope of any legitimate duty but used their corporate power improperly for personal gain.

64. As a direct and proximate result of Glassman, Clifford, Bowling and Haller Bowling's tortious interference with

the Loan Agreement, as amended, MidPac was unable to pay subsequent creditors, including the indebtedness owed CIT, and has ever since remained, and still is, unable fully to pay such indebtedness. CIT is entitled to recover damages to the extent it has been injured by Glassman, Clifford, Bowling and Haller Bowling's tortious interference.

WHEREFORE, CIT prays as follows:

A. That if WHIRLPOOL is found entitled to judgment under the Second Amended Complaint, such judgment be rendered against Crossclaim Defendants, and each of them, and not against CIT.

B. That if it is determined that CIT is liable to WHIRLPOOL for any damages alleged in the Second Amended Complaint, that CIT have judgment over and against Crossclaim Defendants, and each of them, by way of indemnity or contribution.

C. That if it should be determined that CIT and Crossclaim Defendants, or any of them, are joint tortfeasors as to WHIRLPOOL, that the relative degree of fault of each tortfeasor be determined and that CIT have judgment against Crossclaim Defendants, and each of them, by way of indemnity or contribution for any excess which CIT may pay over and above its pro rata share of such judgment.

D. That CIT be awarded general, special and punitive damages against Crossclaim Defendants and Additional Crossclaim Defendants, and each of them, in an amount to be proven at trial.

E. That the Court grant such other and further relief as is just and equitable.

DATED: Honolulu, Hawaiʻi, February 3, 2003.

PAUL ALSTON
LOUISE K. Y. ING
CARL D. SOTO
Attorneys for Defendant/Cross-claimant
THE CIT GROUP/BUSINESS CREDIT, INC.