Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON 1126-0
LOUISE K. Y. ING 2394-0
THOMAS E. BUSH 4737-0
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai`i 96813
Telephone: 524-1800
Facsimile: 524-4591
palston@ahfi.com
ling@ahfi.com
tbush@ahfi.com

Attorneys for Defendant/Cross-claimant
THE CIT GROUP/BUSINESS CREDIT, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants,<br><br>and<br><br>F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | Civil No. CV 01 00187 MEA-BMK (Tort and RICO)<br><br>**DEFENDANT/CROSS-CLAIMANT THE CIT GROUP/BUSINESS CREDIT, INC.'S FIRST SET OF PROPOSED STIPULATED FACTS**; CERTIFICATE OF SERVICE<br><br>JUDGE: Hon. Marvin E. Aspen<br><br>TRIAL: November 6, 2006 |

**DEFENDANT/CROSS-CLAIMANT THE CIT GROUP/BUSINESS CREDIT, INC.'S FIRST SET OF PROPOSED STIPULATED FACTS**

Pursuant to the Honorable Marvin Aspen's Minute Order, filed December 13, 2005, as amended by Minute Order filed January 30, 2006, Defendant The CIT Group/Business Credit, Inc. ("CIT") respectfully submits its first set of proposed stipulated facts for use in the first phase of trial, set for November 6, 2006.[1] Given the numerous and complex facts in this case and the time the court has allotted for trial (ten days), this proposed set is a work in progress. The parties should work together in good faith in an attempt to get past disagreements about their respective drafts and arrive at a substantial list of mutually acceptable stipulated facts.

1. Whirlpool Corporation (Whirlpool) manufactures and sells household appliances. It was incorporated in Delaware; its principal place of business is in Michigan.[2]
2. The CIT Group/Business Credit, Inc. (CIT) is an asset-based lender. It was incorporated in New York; its principal place of business is in New York.[3]

---

[1] CIT requested an extension of time until April 18 or 19, 2006, to submit these proposed stipulations and confirmed that Plaintiffs' counsel would not object to the extension.

[2] *See Second Amended Complaint, ¶ 1 (for this draft only and not for the final version of any stipulated facts, CIT will cite to the source of certain proposed stipulated facts).*

[3] *See id., ¶ 2.*

3. Since 1974, Raymond Iwamoto has been an attorney licensed in the State of Hawai`i. Since 1986, he has been a partner at the Honolulu law firm of Goodsill Anderson Quinn & Stifel.[4]

4. From 1956 to January 2000, MidPac Lumber Co., Ltd. (MidPac) sold construction materials and appliances to both retail and wholesale customers throughout Hawai`i. MidPac's principal location was in Mapunapuna.[5]

5. MidPac started buying appliances from Whirlpool in 1993.

6. From 1996 until January 2000, Maui Home Supply (MHS) sold lumber, appliance and cabinets to wholesale and retail customers on Maui from two locations, one in Kahului and one in Lahaina.[6]

7. CGBN, Inc. (CGBN), was incorporated in Hawai`i in 1997 under a different name and was renamed CGBN in approximately 1998. Its principal place of business was in Honolulu, Hawai`i. As of February 1998, CGBN's shareholders were Michael Clifford, Kurt Glassman and the Frances Haller-Bowling Trust; each owned a one-third interest in CGBN. CGBN's directors were Messrs. Clifford, Glassman and Edwin Bowling.[7]

---

[4] Iwamoto deposition, at 9.

[5] *See id., ¶ 14.*

[6] *See id., ¶ 13.*

[7] Information from Department of Commerce and Consumer Affairs website, State of Hawai`i (DCCA).

8. On or around March 19, 1998, Messrs. Glassman, Clifford and Bowling acquired MidPac through CGBN.

9. CG Investments was incorporated in Hawai`i in 1995; its principal place of business was in Honolulu, Hawai`i. As of January 1998, CG Investments' shareholders were Mr. Clifford, Mr. Glassman and the Frances Haller Bowling Trust; each owned a one-third interest in CG Investments.[8]

10. Before 1998, CG Investments did business as Monarch Home Center.

11. In ______, 1998, CG Investments changed the name of its business from Monarch Home Center to Maui Home Supply.

12. In December 1995, Whirlpool Financial Corporation ("WFC") entered into a sales and security agreement with Monarch Home Center.

13. On January 8, 1996, WFC recorded a financing statement in the Bureau of Conveyances of the State of Hawaiʻi against debtor "C. G. Investments, Inc. dba Monarch Home Center." The financing statement misspelled CG Investments' name.

14. Whirlpool claims to be the assignee of WFC's security interest.

15. On February 26, 1996, Whirlpool recorded a UCC-1 Financing Statement in the Bureau of Conveyances of the State of Hawaiʻi, against debtor "C G Investment Inc. [sic], dba:

---

[8] Information from DCCA.

Monarch Home Center." The financing statement misspelled CG Investments' name.

16. CIT and MidPac entered into loan agreement on or around March 19, 1998, under which MidPac was allowed to borrow up to $8 million from CIT, depending on the amount of "eligible inventory" held by MidPac.[9]

17. CIT secured its loan by taking a "continuing security interest in all MidPac assets and proceeds from the sale of assets", including MidPac's inventory, "wherever located."[10] CIT filed a financing statement perfecting its security interest on March 24, 1998.[11]

18. As further security for its loan, CIT also obtained security interests in MidPac's bank accounts.

19. Upon starting to receive loan proceeds from CIT, Mr. Glassman, Mr. Bowling and other persons involved in running MidPac immediately began taking money out of MidPac and depositing it into their personal accounts and in Mr. Bowling's case, his spouse's account.[12]

20. Between March 19, 1998, and June 1999, at least $4,173,379.09, was distributed by MidPac to Mr. Glassman,

---

[9] *See Memorandum Opinion and Order, at 3 (filed Dec. 12, 2004)("Order").*

[10] *See Order, at 7.*

[11] *See Order, at 8.*

[12] *See id.*

Mr. Clifford, Mr. Bowling and his wife (Frances Haller-Bowling), CGBN and other related companies and persons.

21. The loan agreement between CIT and MidPac barred MidPac from selling or otherwise transferring loan collateral and other assets away from MidPac, other than through sales made "in the ordinary course of business."[13]

22. Nonetheless, on August 26, 1998, a CIT audit report revealed that MidPac had been selling inventory to MHS.

23. Because such sales were to an affiliate of MidPac, the sales did not constitute sales "in the ordinary course of business."

24. According to the August 26, 1998, audit report, MHS was selling the products from MidPac to MHS' customers "and then collecting the cash, but reimbursing MidPac for the full balance owed to them at each month-end."[14]

25. After discovering the transactions between MidPac and MHS, CIT took two actions to protect its investment. First, in September, 1998, it asked MidPac and MHS to sign a Non-Offset Agreement in which MHS agreed that it would not use debts it incurred from the sale of MidPac goods to MHS to offset pre-existing debts that MidPac owed to MHS.[15] In the agreement, MidPac acknowledged it had sold certain of its

---

[13] *Order, at 8.*

[14] *See id.*

[15] *Id.*

products to MHS, thereby "creating an accounts receivable in favor of" MidPac.

26. Second, on October 27, 1998, MidPac and CIT amended their loan agreement by way of Amendment No. 2. The amendment required MHS to acknowledge that CIT had a first-priority security interest in all of the inventory that had been sent from MidPac to MHS.[16] It also allowed MidPac to borrow from CIT based on a percentage of "eligible" accounts receivable, not just "eligible" inventory.

27. A CIT audit report in March 1999, stated that about $1 million worth of MidPac inventory had been shipped to MHS. To protect its interests further, on March 19, 1999 CIT required MHS and MidPac to sign a consignment agreement confirming that goods had been sent to MHS by MidPac on consignment. MidPac then assigned its rights under the consignment agreement to CIT.[17]

28. Before finalizing these agreements, CIT staff conducted a computerized lien search to determine whether senior liens existed on MHS' inventory. Its search of "CG Investments, Inc." did not reveal Whirlpool's recorded financing statements as to "C.G. Investments, Inc., dba Monarch Home

---

[16] *See id.*

[17] *See id., at 9.*

Center" and "C G Investment Inc., dba Monarch Home Center."[18]

29. On or about March 26, 1999, Whirlpool credit analyst Ernie Matlock raised MidPac's credit line from $600,000 to $800,000, and MHS' credit line from $500,000 to $1.2 million.[19]

30. Mr. Matlock increased MidPac and MHS' credit lines in response to Whirlpool's lengthening MidPac and MHS' payment terms from 60 to 75 days and to MidPac and MHS' increased ordering of Whirlpool goods.[20]

31. On May 24, 1999, one of Whirlpool's credit representatives, Donna Martin, informed Mr. Glassman and Mr. Bowling that MidPac had past due invoices totaling $248,953.16 and MHS had past due invoices totaling $227,023.32.

32. By June 4, 1999, MidPac and MHS together owed Whirlpool $1.9 million.

33. On June 4, 1999, Whirlpool received a phone call from Mr. Bowling and Mr. Glassman proposing a workout on MidPac and MHS' $1.9 million outstanding balance. The parties agreed to a payment plan of $150,000 a week, starting June 4, 1999.

---

[18] *See Order, at 9.*

[19] Whirlpool Ex. 589, 590.

[20] WP Ex. __ (Depo. Ex. 167)

34. MidPac did not send its first payment under the payment plan until June 11, 1999.

35. In the second week of June 1999, CIT began to suspect that MidPac had obtained unauthorized loan advances by overstating its accounts receivable.

36. Shortly thereafter, based upon investigation, CIT confirmed that loan draws were being requested by MidPac based upon falsified invoices issued by MidPac to companies that had been formed by Mr. Glassman and his associates.[21]

37. As a result, on or about June 23, 1999, CIT sent its Los Angeles-based senior vice president Thomas A. Hayes and regional credit manager Robert Brichacek to Hawai`i to investigate. CIT also paid for an outside workout consultant, Ted Phelps, to travel to Hawai`i with Mr. Hayes and Mr. Bricachek.

38. There was no oral or written agency agreement between CIT and Mr. Phelps.[22]

39. As a condition to providing continued loan funding to MidPac, CIT required MidPac to hire a financial consultant to monitor the financial management of MidPac and sales.

40. On June 24, 1999, MidPac hired Mr. Phelps to act as its financial consultant.

---

[21] *See Order*, at 4.

[22] *Id.*, at 13.

41. Ultimately, CIT determined that MidPac had obtained about $3 million in unauthorized loans based upon falsified invoices.[23]

42. On June 25, 1999, CIT notified MidPac that it was in default on its loans.

43. On June 28, 1999, Glassman called Whirlpool's Ms. Martin to inform her that MidPac's June 11, 1999, weekly payment check for $150,762.96 was returned unpaid, due to insufficient funds, and that he would send $300,000 by wire transfer on June 30th.

44. No wire transfer was made by MidPac to Whirlpool on June 30, 1999.

45. On July 8, 1999, Whirlpool's Ms. Martin left an "urgent message" for Glassman asking him to call about the status of the promised wire transfer and to update her on MidPac's refinancing efforts.

46. On or about July 8, 1999, on behalf of MidPac, Mr. Phelps wrote a letter to MidPac's creditors stating, among other things, that MidPac was "out of compliance" with its loan commitments to CIT, that MidPac was unable to pay its past-due debts, and that MidPac intended to make future purchases from vendors only on a cash basis.

47. On July 9, 1999, Whirlpool's Donna Martin had a conference call with Mr. Glassman. During that call, Mr. Glassman told

---

[23] *Id.*, at 4.

Whirlpool that Mr. Phelps was MidPac's new accounts payable contact, that Mr. Glassman would have Mr. Phelps refax Whirlpool a letter that would explain MidPac's "current situation", that Mr. Glassman was proposing immediate payment of new invoices and revising the payment plan for old invoices.

48. Whirlpool contacted Mr. Phelps on July 14, July 15, July 19 and July 21 about not having received the July 8, 1999, letter and to refax it. However, Whirlpool claims that it did not actually receive a copy of the letter until July 23, 1999.

49. During the interim, Whirlpool did not (1) have its local employees obtain a copy of the July 8, 1999, letter from MidPac or visit MidPac, (2) ask for a copy to be sent by mail, or (3) ask for MidPac to read a copy of the letter to Whirlpool's representatives.

50. Whirlpool continued to ship products to MidPac and MHS on credit up to July 23, 1999, when it learned of the contents of Mr. Phelps' July 8, 1999, letter.

51. After receiving the letter, Whirlpool put all orders to MidPac and MHS on hold, stopped sending products to MidPac and sent reclamation notices to MidPac and MHS seeking to reclaim goods that were shipped to MidPac and MHS in the last 15 days.

52. Between June 24 and July 23, 1999, Whirlpool shipped appliances worth a total amount of $311,0245.10 to MidPac and MHS.[24]

53. No employee of CIT directed or influenced MidPac to order Whirlpool product.[25]

54. No CIT employee prevented MidPac from paying Whirlpool for goods that Whirlpool sold to MidPac.[26]

55. No CIT employee asked Whirlpool to ship products to MidPac or MHS.

56. Prior to MidPac filing bankruptcy, no employee of CIT spoke to any employee of Whirlpool.[27]

57. Both Whirlpool and CIT had a policy of not contacting their customer's creditors to discuss their customer's finances.

58. Neither CIT nor Whirlpool contacted creditors of MidPac, and Whirlpool did not contact creditors of MHS, to inform them of Whirlpool and CIT's respective credit problems with those customers.

59. In 1999, Whirlpool's credit policies and practices required that orders not be released to customers who were in default

---

[24] *See Order, at 6, n. 8.*

[25] *See Order, at 18, no. 9.*

[26] *See id.*

[27] *Id., at 9.*

on their payment plan or whose orders exceeded their credit line.[28]

60. The shipments to MidPac and MHS in June 1999 and thereafter were made in violation of Whirlpool's credit policies.

61. Whirlpool's credit analyst Ernie Matlock exceeded his authority when he raised MidPac and MHS' combined credit line to $1.9 million or more.

62. Whirlpool's former employee Janet Rowan was reprimanded and disciplined by Whirlpool for violating Whirlpool's credit policies and exercising poor judgment in releasing orders for shipment to MidPac and MHS.[29]

63. Whirlpool's Ms. Rowan was reprimanded and disciplined for releasing orders for shipment to MidPac and MHS even after they had defaulted on their payment plan and even though the orders exceeded the MidPac and MHS credit lines.[30]

64. After Whirlpool received Mr. Phelps' July 8 letter, Whirlpool required, and MidPac and MHS paid, cash on delivery for all shipments received from Whirlpool.

65. After July 23, 1999, the unpaid balance owed by MidPac and MHS to Whirlpool did not increase.

---

[28] See Carl Smith Rule 30b6 depo. Vol II, at 191; Ex. C6, at A07397, A07451.

[29] See id., at __; W900; Hutcheson memo to J. Rowan, 7/29/99 (Ex. C29 in CIT's First Amended Exhibit List).

[30] Id.

66. On or around July 30, 1999, Whirlpool signed dealer/retailer agreements (ACDR's) with MidPac and with MHS which stated they were effective retroactively to January 1, 1999. The agreements provided that MidPac and MHS could not ship Whirlpool product to other dealers, except that goods could be transferred to MidPac and J&J Hardware.

67. CIT entered into a forbearance agreement with MidPac on or about August 3, 1999, under which it agreed not to exercise its remedies due to MidPac's loan defaults on certain terms and conditions, in order to allow MidPac time to find new loan financing.

68. On October 26, 1999, Ernie Matlock, a Whirlpool credit analyst, had a conversation with Messrs. Phelps and Glassman in which they informed Mr. Matlock that MidPac's efforts at refinancing would not be "going through."

69. On October 29, 1999, Whirlpool filed a lawsuit against MidPac, claiming Whirlpool had been defrauded because MidPac transferred goods to MHS which benefitted affiliates.

70. In ____, CIT exercised its rights under Mr. Glassman's guaranty of the CIT loan and foreclosed on Mr. Glassman's house in California.

71. MidPac filed for bankruptcy in January 2000.

72. CIT filed a claim in MidPac's bankruptcy of over $2,352,000.

DATED: Honolulu, Hawai`i, April 19, 2006.

/s/ Louise K. Y. Ing

PAUL ALSTON
LOUISE K. Y. ING
THOMAS E. BUSH
Attorneys for Defendant/Cross-claimant THE CIT GROUP/BUSINESS CREDIT, INC.