# Exhibit 1

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 28 2004

at 11 o'clock and 13 min. A M
WALTER A. Y. H. CHINN, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

WHIRLPOOL CORPORATION, a Delaware corporation,

Plaintiff,

v.

CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; and KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS, OR OTHER ENTITIES 1-20,

Defendants,

And

CG DEVELOPMENT, INC.; F&J MOVERS; and RENEE COSTA,

Cross-Claim Defendants.

No. CV 01 00187

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Whirlpool Corporation ("Whirlpool") brought suit against several defendants, including CIT Group/Business Credit, Inc. ("CIT"), alleging common law fraud (Count I), fraud conspiracy (Count II), conversion (Count III), tortious interference with contracts (Count IV), and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count V). CIT filed separate motions for summary judgment as to: 1) Counts I and II; 2) Count III; and 3) Count IV. It also filed a motion for judgment on the pleadings or, in the alternative, for summary judgment as to Count V. Whirlpool filed

separate cross-motions for summary judgment as to: 1) Counts II and V and 2) Count III.[1] We address all of the motions filed by CIT and Whirlpool in the present opinion. For the following reasons, we find that there is a genuine issue of material fact for trial as to Counts I, II, III, and IV. However, we grant CIT's motion as to Count V.

## BACKGROUND[2]

### I. The General Scheme

The following facts have been culled from the parties' various Local Rule 56.1 Statements[3] and, unless otherwise indicated, are undisputed.[4] The controversy in this case centers around the alleged fraud committed by the officers and directors of and resulting bankruptcy of two companies: MidPac Lumber Co., Ltd. ("MidPac") and Maui Home Supply ("MHS").[5] The two companies were at all

---

[1]It is not apparent why the parties chose to file several separate motions for summary judgment rather than two comprehensive cross-motions for summary judgment. Although this practice technically does not violate the letter of the local rules, it is not the normal course of conduct, and proceeding in such a manner obviously does violence to the Local Rules' page limits. *See* Haw. L.R. 7.5 (setting limits of 30 pages for memoranda in support of or opposition to a motion and 15 pages for reply briefs). The result unfortunately has been to turn what should have been a reasonably straightforward motion for summary judgment into a voluminous and confusing mass of pleadings. Comprehensive cross-motions for summary judgment with a request to relax within reason the page limits would have been a more straightforward and helpful alternative.

[2]CIT filed a set of Master Exhibits in support of its various motions. The Master Exhibits are hereinafter referenced as "ME." All other exhibits shall be referenced according to the party bringing the motion, the count at which the motion is directed, and the exhibit number.

[3]We note that the vast majority of the parties' statements of facts and responses unfortunately are not facts at all, but inappropriate legal conclusions and arguments without citation to the record.

[4]We consider these facts as undisputed for the purpose of ruling upon the present motions for summary judgment only. Several of the parties who have been implicated by CIT and Whirlpool as participants in the bust out scheme have been or are still defendants in the present action. Our recitation of the facts as Whirlpool and CIT see them has no bearing on the determination of the future liability, if any, of these third parties.

[5]Several of the parties in this case have, at times, operated under different names. Whirlpool is the assignee of an interest in MHS from Transamerica. Transamerica, in turn, received its interest

relevant times owned and operated by Kurt Glassman and Michael Clifford. The parties agree that Glassman and Clifford, operating in conjunction with several of the other defendants,[6] participated in a scheme to "bust out" MidPac.[7]

After purchasing MidPac in 1998, Glassman and his associates approached CIT, an asset based lender, and one other bank to obtain financing. (Compl. ¶ 32.) CIT and MidPac entered into an inventory-based credit agreement under which MidPac was allowed to borrow up to $8 million, depending upon the amount of "eligible inventory" and accounts receivable held by MidPac. (CIT's ME 1.) Upon receiving the loans, Glassman and the other persons involved in running MidPac immediately began siphoning money from the company. (Compl. ¶ 30.) However, to ensure that MidPac looked as if it had a large inventory and accounts receivable upon which to base further loans from CIT, Glassman

---

in MHS by assignment from Whirlpool Financial Corporation. MHS has also operated under the names Monarch Home Supply and CG Investments. MidPac was owned by, and thus is often referred to in conjunction with, CGBN. For the sake of simplicity, we will refer in this opinion only to: Whirlpool, MidPac, and MHS.

[6]Whirlpool's complaint names several parties, not just Glassman and Clifford as being involved in the scheme to bust out MidPac. For the sake of simplicity, however, we refer only to those two participants in the scheme.

[7]The Fifth Circuit has described the basic characteristics of a "bust out" scheme as follows:

> A bust out begins with the formation by the malefactors of seemingly legitimate wholesale business. The fledgling business's first goal is to establish a favorable credit rating . . . . As the business becomes more established, its promoters order considerable amounts of additional merchandise although they have no intention of paying for these goods. A huge inventory, most of it not paid for, is built up. The principals then busy themselves disposing of their purchases at substantial discounts or secreting the unsold portion for later below-cost covert sales. In other words, they "bust out" the business. The company is then petitioned into bankruptcy with the mulcted creditors left to pick over the meatless carcass of an assetless enterprise.

*United States v. Crockett*, 534 F.2d 589, 592 (5th Cir. 1976).

and his counterparts created a series of corporate entities that appeared separate from MidPac, but which were all owned and operated by Glassman and Clifford. Glassman and his associates then created phony shipping invoices to document supposed inventory flowing into MidPac, as well as phony accounts receivables due on sales made by MidPac. Glassman took these actions to ensure that MidPac appeared solvent, even though Glassman and his counterparts were taking huge sums away from the company on an almost daily basis.

CIT first learned of the bust out scheme during the second week of June 1999 when it realized that MidPac had obtained roughly $3 million in unauthorized loan advances by overstating its receivables. (CIT's ME B.) Thereafter, CIT filed a Suspicious Activity Report (SAR) with the authorities, but it continued to do business with MidPac and did not inform Whirlpool of the fraud. (CIT's ME 9.)

The central question raised in the motions for summary judgment is whether, upon learning of the fraud, CIT became involved as a co-conspirator in the ongoing "bust out" directed by Glassman and his associates. CIT maintains that it acted to protect its investment in the company, just as any secured creditor would have done. Whirlpool alleges that CIT did anything that it could to get its money back from MidPac, including helping MidPac hide the ongoing fraud from other creditors and stealing from MidPac and its affiliated companies. Specifically, Whirlpool's complaint alleges that CIT should be held liable for its participation in three separate "schemes," each of which is described in some detail below.

## II. Ordering Goods from Whirlpool

Whirlpool's first claim is that, despite CIT's awareness of the ongoing fraud at MidPac, CIT induced Whirlpool into shipping goods on credit to MidPac, despite its knowledge that MidPac would not be able to pay for the goods. Whirlpool alleges that CIT did so to ensure that MidPac would remain

solvent.

Specifically, Whirlpool represents that it would not have continued to ship products to MidPac after June of 1999 had it not been for the representations of Ted Phelps. Phelps originally became involved in the MidPac affair when CIT sent him to Hawaii as part of a team charged with investigating wrongdoing at MidPac. (CIT's ME D.) Based on CIT's recommendation, MidPac hired Phelps as a financial consultant. *Id.* According to Whirlpool, Phelps directed MidPac to order Whirlpool goods on credit, despite its inability to pay for those goods. (Whirlpool's L.R. 56.1 Statement Count IV Ex. 23.) Phelps also allegedly induced Whirlpool to continue shipping goods to MidPac by misrepresenting MidPac's financial position.

After accepting the consulting position with MidPac, CIT claims that Phelps immediately put MidPac on a cash on delivery ("COD") basis with all of its vendors for a ninety-day period. (CIT's ME 14.) Phelps asserts that he attempted to fax a letter to Whirlpool during July 1999 informing it of this fact, but, after five different attempts, Whirlpool only received the cover page of the fax. *Id.*; (CIT's ME D.) Whirlpool did not follow up on the attempted fax, *id.*, and did not find out about MidPac's troubles with CIT until July 23, 1999. At that time, a representative from Whirlpool spoke with Phelps on the phone. Phelps assured him that he had looked at MidPac's books and there was "no fraud here." (Whirlpool's L.R. 56.1 Statement Count IV Ex. 18.) Phelps denies that he ever misrepresented MidPac's financial condition to Whirlpool. (CIT's ME D.) Nonetheless, once Whirlpool was informed of MidPac's difficulties, it placed all orders from MidPac on hold and commenced reclamation procedures. (CIT's L.R. 56.1 Statement Counts I and II ¶ 20.)

CIT argues that Phelps was not to blame for the fact that Whirlpool continued to ship goods to MidPac after June of 1999, despite knowing of MidPac's troubles. In support of its argument, CIT points out that Whirlpool continued shipping goods to MidPac even though MidPac had exceeded its

credit limit with Whirlpool, had bounced a check, and had failed to comply with a weekly payment plan that Whirlpool had devised to assist MidPac in meeting its obligations. (CIT's ME 63.) Furthermore, despite these lapses, Whirlpool agreed to extend MidPac's credit limit and payment terms from 60 to 75 days. (CIT's ME 32.) In essence, CIT argues that Whirlpool, not CIT, is responsible for the business losses incurred during June and July of 1999.[8]

## III. Continuing the Operation

Whirlpool's next contention is that, upon learning of the ongoing fraud at MidPac, CIT did what it could to ensure that MidPac remained a going concern so as to ensure repayment of its loan advances. In order to do so, Whirlpool claims that CIT concealed the ongoing fraud from MidPac's other creditors, including Whirlpool. CIT allegedly concealed the fraud in three ways.

First, Whirlpool complains that CIT continued to fund MidPac's operations and assisted MidPac in trying to obtain financing from another lender despite its knowledge that MidPac was an empty shell. CIT admits that it provided further financing, but argues that it did so only after taking a third deed of trust on Glassman's home and that it would not have done so had it realized the true extent of the ongoing fraud. (CIT's Second Amended Cross-Claim ("CIT's SAC") ¶¶ 35-36.)

Whirlpool's next contention is that, upon the advice of Raymond Iwamoto (MidPac and Glassman's lawyer), CIT agreed not to contact Whirlpool to inform it of the fraud. CIT admits that it did not contact creditors associated with CIT because it was concerned that in doing so it might incur potential legal liability. (CIT's L.R. 56.1 Statement CIT's Counts I and II ¶ 10.)

Third, Whirlpool claims that CIT misappropriated certain bond funds that were held in trust by MidPac. The misappropriation allegedly caused harm to Whirlpool because the funds subsequently were

---

[8]Between June of 1999, when CIT learned of the ongoing fraud at MidPac, and July 1999, Whirlpool shipped $311,245.10 in inventory to MidPac. (CIT's ME 57.)

used to help MidPac remain a going concern despite its financial difficulties. According to a report written on behalf of MidPac, "[c]onstruction jobs require performance bonds to insure that projects are completed according to plan, sometimes within a certain time frame and lien free. In the state of Hawaii, the accepted practice is for a material house, such as MidPac, to bond the general contractors of these projects . . . [t]he primary responsibility of the bonding agent is to disburse payment to all subcontractors in a timely fashion." (CIT's L.R. 56.1 Statement Counts I and II ¶ 11.) CIT claims that it was MidPac's practice to commingle bond funds with its general operating account. *Id.* Upon learning of the fraud at MidPac, CIT allegedly was concerned that it might inadvertently receive those funds; thus, it required MidPac to place the bond funds into a separate bank account. *Id.* Although CIT admits that it inadvertently swept that bank account and thereby received $47,000, it allegedly returned the money. (Whirlpool's L.R. 56.1 Statement Counts I and II ¶ 13.)

**IV. Inventory Located at MHS**

Whirlpool's final contention is that CIT wrongfully asserted control over property that belonged to MHS. Whirlpool is a secured creditor of MHS, and, at all relevant times, held a security interest in all of the inventory held at MHS as well as proceeds from the sales of Whirlpool's products from MHS. (Whirlpool's L.R. 56.1 Statement Count III ¶ 1, Ex. A.) Thus, by allegedly interfering with MHS's property, CIT also interfered with Whirlpool's rights as a secured creditor.

The scheme by which CIT allegedly interfered with MHS's property requires us to provide some background information about the relationship between CIT and MidPac, as well as that between MidPac and MHS. As stated above, CIT entered into an inventory-based loan agreement with MidPac in March 1999. MidPac secured its loan by granting CIT a "continuing security interest in all MidPac assets and proceeds from sale of assets," including its inventory, "wherever located." (CIT's ME 1.) CIT filed a financing statement which perfected its security interest in MidPac's inventory on March 24,

1988. (CIT's L.R. 56.1 Statement of Additional Facts Count III ¶ C.)

The loan agreement barred MidPac from selling or transferring collateral away from MidPac, other than through sales made "in the ordinary course of business." Nonetheless, an August 26, 1998 audit report revealed that MidPac had been selling inventory to another of Glassman's companies, MHS. (CIT's ME 36.) According to the audit report, MHS was selling the products from MidPac to its customers "and then collecting the cash, but reimbursing MidPac for the full balance owed to them at each month-end." *Id.* CIT claims that these sales were not authorized under the loan agreement. (CIT's Reply Count IV at 12.)

After discovering the transactions between MidPac and MHS, CIT took two actions to protect its investment. First, in September 1998, it requested that MHS sign a Non-Offset Agreement with CIT, pursuant to which MHS stipulated that it would not use debts incurred from the sale of goods from MidPac to MHS to offset preexisting debts that MidPac owed to MHS. In its memoranda, Whirlpool treats the Non-Offset Agreement as an acknowledgment by CIT that MidPac was selling products to MHS. CIT responds that the agreement had to do with only a small amount of product that was discovered to be at MHS in August 1998, and that it did not authorize future sales of inventory from MidPac to MHS. (CIT's Reply Count IV at 12.)

Second, on October 27, 1998, CIT required MidPac to amend its loan agreement with CIT. (CIT's ME 1, "Amendment No. 2.") The amendment required MHS to acknowledge that CIT had a first-priority security interest in all of the inventory that had been sent from MidPac to MHS. *Id.* There is no evidence which demonstrates that MHS ever agreed to Amendment No. 2.

Despite these protections, CIT learned in late March of 1999 that approximately $1 million worth of MidPac inventory had been shipped to MHS. Thus, CIT took further action to protect its investment in the goods. Specifically, it required MHS and MidPac to sign a consignment agreement

to document their belief that the goods had been sent to MHS by MidPac on consignment. (Whirlpool's L.R. 56.1 Statement Count III ¶ 6.) Robert Brichacek, CIT's former regional credit manager, said of the arrangement that "it sounded like a consignment agreement and the documents were drawn up to effect that relationship." MidPac then assigned its rights under the consignment agreement to CIT. (CIT's L.R. 56.1 Statement Count III ¶ 5.) Before finalizing the agreement, CIT allegedly conducted a computerized lien search to determine whether senior liens existed as to MHS's inventory. CIT claims that it did not discover Whirlpool's security interest at this time. (CIT's L.R. 56.1 Statement Counts I and II ¶¶ 6-7.)

On June 25, 1999, CIT notified MidPac that it was in default on its loan payments. (CIT's L.R. 56.1 Statement of Additional Facts Count III ¶ G.) Thereafter, CIT entered into a forbearance agreement with MidPac, under which CIT agreed not to exercise its default rights if, *inter alia*, MidPac liquidated much of its inventory, including all of its inventory located at MHS. (CIT's ME 5.) MHS then sold all of the MidPac inventory located at MHS and remitted the proceeds to MidPac. CIT President Thomas Hayes testified that the money was then "swept into the CIT account." (Whirlpool's MSJ Count III Ex. J. at 116:11-20.)

Whirlpool claims that CIT had no right to direct the sale of the goods from MHS or to take the proceeds from the sale. As a senior secured creditor, Whirlpool maintains it had the legal right to claim the goods located at MHS when MHS became insolvent. By stepping in, directing the sale of goods, and reaping the proceeds, CIT allegedly interfered with Whirlpool's security interest. CIT responds that, because the arrangement by which the goods were sold was a consignment relationship, the goods (though housed at MHS) were owned by MidPac until they were sold. Thus, according to CIT, as MidPac's senior secured creditor, it had every right to the proceeds from the goods once they were sold.

## ANALYSIS

### I. Legal Standard

Summary judgment is proper only when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). Once the moving party has met this burden of production, the nonmoving party "must go beyond the pleadings and designate facts showing an issue for trial." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322-23). However, if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is required. *Celotex*, 477 U.S. at 322. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu*, 198 F.3d at 1134 (citations omitted). At the same time, reasonable doubts regarding the existence of a material fact should be resolved against the moving party, and all inferences are drawn in favor of the non-moving party. *Id.*

CIT has also brought a motion for judgment on the pleadings. Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." A court should only grant a motion for judgment on the pleadings when, "taking all the allegations in the non-moving party's pleadings as true, the moving party

is entitled to judgment as a matter of law." *Fajardo v. County of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999). A court's review is generally limited to the pleadings; however, the court may consider documents attached to the complaint as well as those documents "'whose authenticity no party questions.'" *Employers Ins. of Wausau v. Price Aircraft Co., LLC,* 283 F. Supp. 2d 1144, 1146 (D. Haw. 2003) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998)). "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(c).

## II. CIT's Motion for Summary Judgment as to Count I: Fraud

Whirlpool alleges in Count I that CIT committed fraud by lulling Whirlpool into shipping goods to MidPac on credit despite its knowledge that MidPac was unable to pay for those goods. To establish a claim of fraud under Hawaii law, a plaintiff must show that: 1) misrepresentations were made by the defendant; 2) with knowledge of their falsity (or without knowledge of their truth or falsity); 3) in contemplation of plaintiff's reliance upon the misrepresentations; 4) resulting in actual reliance; and 5) damages. *Hawaii's Thousand Friends v. Anderson*, 768 P.2d 1293, 1301 (Haw. 1989). Whirlpool must establish these elements by clear and convincing evidence. *TSA Intern Ltd. v. Shimizu Corp.*, 990 P.2d 713, 725 (Haw. 1999).

Whirlpool premises its claim of fraud against CIT on alleged misrepresentations made to it by Ted Phelps, whom Whirlpool contends was CIT's agent. According to Whirlpool, had Phelps notified Whirlpool of MidPac's termination of payments on previous debt or remained silent altogether, Whirlpool would not have continued shipping goods to MidPac. This is because Whirlpool contends it had in place internal controls that would have prevented the over-extension of credit. Instead, Phelps made assurances to Whirlpool that he was having fax difficulties only, thereby delaying informing

Whirlpool of MidPac's inability to pay. This stall tactic, according to Whirlpool, lulled it into the continued shipment of goods to MidPac on credit. Whirlpool also contends that Phelps falsely claimed that he had been hired by MidPac to assist with a workout with its lender and that MidPac's financial difficulties arose from being merely out of compliance with its loan. Phelps allegedly represented that MidPac's financial difficulties did not extend to MHS. Whirlpool contends CIT and Phelps knew that these statements would induce Whirlpool to continue to ship goods. Additionally, Whirlpool alleges that CIT and Phelps knew the statements were false because CIT had already discovered fraud at MidPac. Whirlpool contends that it relied on Phelps' misrepresentations to its detriment because it continued to ship goods on credit to MidPac and MHS and delayed taking actions to recover the value of the goods shipped. As a result, Whirlpool incurred over $300,000 in losses.

According to Whirlpool, Phelps' misrepresentations may be attributed to CIT because he was acting as CIT's agent. Furthermore, Whirlpool alleges CIT defrauded Whirlpool because it knew that additional payments for inventory would not be made to Whirlpool but nonetheless directed MidPac to place orders for Whirlpool goods.

Both parties agree that whether Phelps was CIT's agent is key to CIT's liability for fraud because Phelps' representations to Whirlpool cannot be attributed to CIT unless he was acting as CIT's agent. Under Hawaii law, agency may be established in one of two ways, through a showing of actual or apparent authority. *Cho Mark Oriental Food, Ltd. v. K & K Int'l*, 836 P.2d 1057, 1062 (Haw. 1992). We address each method in turn.

**A. Actual Authority**

"Actual authority exists 'only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent so to act.'" *Id.* (citing Restatement (Second) of Agency § 15 (1958)). Actual authority may be created either through an express agreement between

the parties or may be implied from the conduct of the parties or surrounding circumstances. *Id.*

To prove express actual authority, an oral or written agreement must exist between the parties affirming that the principal has delegated authority to the agent and the agent has accepted, thereby authorizing the agent to perform certain acts. *Id.* Whirlpool does not contend that either an oral or written agreement is evidenced here. Therefore, no express actual authority exists.

Implied actual authority exists where, based on the conduct of the principal, the agent reasonably believes that the principal desired the agent to act on its behalf. *Cho Mark Oriental Food*, 836 P.2d at 1062. Analysis of implied authority focuses on "the agent's understanding of his authority." *Id.* In support of its position that Phelps had no actual authority, CIT points to the deposition testimony of Phelps and CIT President Hayes, both of whom testified that Phelps understood he had no actual authority to act as CIT's agent in dealings with MidPac and MidPac's creditors. (CIT's MSJ on Counts I and II, Exs. B at ¶ 9 and D at ¶ 4.)

Whirlpool responds that such self-serving testimony given after the fact is insufficient to refute the evidence in the record which proves that there was an agency relationship between CIT and Phelps. It argues that the following facts raise a genuine issue as to whether Phelps understood he had actual authority to act of CIT's behalf with creditors: CIT hired Phelps to conduct a background check of Glassman; CIT President Hayes acknowledged in an email that Phelps was "our consultant for MidPac"; CIT was hired to be part of a team investigating MidPac on behalf of CIT; CIT paid for Phelps' plane ticket to Hawaii; and CIT admitted in a memorandum about the forbearance agreement that one of the comprehensive controls it implemented over its collateral to reduce the likelihood of further deterioration was "the appointment of Ted Phelps, a management consultant, to oversee the timely and accurate reporting to CIT." (Whirlpool Exs. R, S, U.) Whirlpool also argues that because CIT was reimbursing MidPac for its expenses relating to Phelps, CIT, in effect, was paying for Phelps' services.

(Whirlpool Opp. MSJ Counts I and II Ex. B.) However, it is unclear from the exhibit cited exactly who paid Phelps.

CIT admits that it paid for the initial plane ticket to Hawaii, but claims that all other funds forwarded to pay Phelps were merely loan advances to MidPac. CIT admits that it was aware that part of its loan advances would be used to pay for Phelps' services. CIT emphasizes that MidPac hired Phelps, and that MidPac alone had the right to replace him.

These facts do indicate that, at least at some point, it was reasonable for Phelps to consider himself to be acting on CIT's behalf. The operative question is, however, if his authority to act on CIT's behalf extended to Phelps' dealings with MidPac's creditors once he was hired directly by MidPac and specifically whether he acted according to CIT's directives in dealing with Whirlpool. Whirlpool points to evidence that Phelps continued to report back to CIT despite having been hired by MidPac. For example, Whirlpool offers a letter that Phelps composed to CIT on July 29, 1999, which addresses the forbearance agreement between MidPac and CIT, a possible liquidation of MidPac, and his views on a possible bankruptcy of MidPac. In the letter, he writes: "I have not discussed the contents of this letter with Kurt Glassman, and I do not intend to." (Whirlpool Resp. Counts I and II Ex. AA.) This letter, along with the other evidence cited by Whirlpool, is sufficient to raise a genuine issue of material fact as to whether it was reasonable for Phelps believe that he was acting on CIT's behalf in dealing with CIT's creditors, including Whirlpool. We therefore deny summary judgment on this claim.

### B. Apparent Authority

Whirlpool has not raised a genuine issue of material fact as to whether Phelps had apparent authority to act on CIT's behalf. "Apparent authority arises when 'the principal does something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he was purported to have.'" *Nelson v. Boone*, 890 P.2d 313, 319 (Haw. 1995) (quoting *Cho*

*Mark*, 836 P.2d at 1062). To demonstrate apparent authority, plaintiff must prove: "(1) [t]he principal has manifested his consent to the exercise of such authority . . . ; (2) . . . the third person knew of the principal's actions . . . and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and (3) . . . the third person, relying on such appearance of authority, has changed his position and will be injured or suffer loss if the act done or the transaction executed by the agent does not bind the principal." *Id.* at 320 (quoting *Cho Mark*, 836 P.2d at 1062). In the apparent authority analysis, "the critical focus is not on the principal and agent's intention to enter into an agency relationship, but on whether a third party relies on the principal's conduct based on a reasonable belief in the existence of such a relationship." *Cho Mark,* 836 P.2d at 1062.

Here, Whirlpool focuses the majority of its argument on CIT's knowledge of MidPac's financial condition and on Whirlpool's own interpretation of information it obtained post hoc in discovery, instead of addressing the critical inquiry: whether, at the time of the transaction, it relied on the principal's conduct to form a reasonable belief of an agency relationship between Phelps and CIT. The only relevant evidence that Whirlpool cites which would support a finding of apparent authority is the fact that, after Whirlpool left a message for Mr. Brichacek, CIT's Regional Credit Manager, it was Phelps who returned the call. (Whirlpool's Ex. W. at 286.) In that same phone call, Phelps allegedly informed Matlock that he was CIT's "presence on the island . . . their eyes and ears." Although the call does provide some evidence for Whirlpool's apparent authority argument, its probative value is minimal in light of the fact that Brichacek testified he did not direct Phelps to return Whirlpool's call. Furthermore, the call was made on October 28, 1999, several months after Whirlpool had already learned of MidPac's financial difficulties. Indeed, Whirlpool admits that it finally learned of MidPac's troubles on July 23, 1999, several months before Phelps' call. As such, even if the statement and action by Phelps could demonstrate that Whirlpool "knew of the principal's actions," it occurred well after the transaction and

injury at issue in this case. Whirlpool certainly could not have relied to its detriment on Phelps' October 1999 representations back in July 1999. Whirlpool points to no contacts or conduct by CIT or Phelps in or around June and early July 1999, the time frame at issue here. Accordingly, Whirlpool has not presented evidence satisfying the elements of apparent authority under Hawaii law. Thus, at trial Whirlpool will need to prove that Phelps acted with actual authority.

### C. Justifiable Reliance

Even if Phelps is found to be CIT's agent, CIT nonetheless argues that it is entitled to summary judgment on Whirlpool's fraud claim because Whirlpool did not justifiably rely on Phelps' purported misrepresentations. CIT cites to no Hawaii law in support of its position that Whirlpool's reliance on the actions of the alleged agent must be justified or reasonable. The Hawaii Supreme Court did recently clarify that to prevail on a claim of fraudulent inducement, a plaintiff must prove justifiable reliance, *Matsuura v. E.I. duPont de Nemours and Co.*, 73 P.3d 687, 701 (Haw. 2003); however, it did not state whether its holding would extend to fraud claims. In *Matsuura*, the Court recognized that its "case law has not always required that reliance be reasonable," and specifically cited to the elements of fraud under Hawaii law in support of its assertion. Since the Hawaii Supreme Court's ruling, no court has utilized the *Matsuura* opinion to impose a reasonable or justifiable reliance standard on plaintiffs who are proceeding with a fraud claim. Accordingly, we do not apply a justifiable reliance standard to Whirlpool's fraud claim, and we reject CIT's argument. Therefore, since there is a genuine issue of material fact on Whirlpool's fraud claim–specifically, the issue of Phelps' agency– we deny CIT's motion for summary judgment on Count I.

## III. Cross-Motions for Summary Judgment on Count II: Fraudulent Conspiracy

The parties have filed cross-motions for summary judgment on the fraud conspiracy claim against CIT. Whirlpool relies heavily upon the fact that CIT concedes the existence of a conspiracy to

"bust out" MidPac in its own Second Amended Crossclaim ("CIT's SAC"). Indeed, most of the "facts" cited by Whirlpool in support of its motion are the allegations contained in CIT's SAC. In its own motion for summary judgment and in response to Whirlpool's motion, CIT admits to the existence of a conspiracy but insists that *CIT* was the principal victim of that conspiracy and not a co-conspirator, as alleged by Whirlpool in Count II. Thus, we emphasize that, in assessing Whirlpool's fraud conspiracy claim, we focus on whether there is evidence to suggest that *CIT* joined the alleged conspiracy.

A conspiracy is defined as "a combination of two or more persons [or entities] by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." *Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc.*, 982 P.2d 853, 881 n.28 (Haw. 1999) (citation and quotation marks omitted). Mere knowledge, however, is not enough to constitute conspiracy "absent approval, cooperation, or agreement." *Id.* at 889 n.44. Moreover, there can be no civil claim based on conspiracy alone; if a plaintiff does not "set forth any actionable claim based on deceit, there can be no claim against any alleged joint tortfeasor based solely upon conspiracy to deceive." *Weinberg v. Mauch*, 890 P.2d 277, 286 (Haw. 1995) (citation and quotation marks omitted). Here, it appears from the parties' submissions that the fraud alleged in Count I provides the factual underpinning for the fraud conspiracy claim.

To prevail on its fraudulent conspiracy claim, Whirlpool must demonstrate that CIT and MidPac (or the other alleged co-conspirators) "entered into an agreement to accomplish the objective of the conspiracy." *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 n.3 (9th Cir. 1984) (applying Hawaii law). In other words, Whirlpool must establish not only that CIT was a *victim* of the ongoing conspiracy, but also that it became a participant by agreement in the ongoing conspiracy. Demonstrating that CIT was aware of the ongoing fraud at MidPac is not sufficient to demonstrate agreement. *Robert's Hawaii Sch. Bus,* 982 P.2d at 889 n.44 (observing that mere knowledge is not enough to establish

liability for civil conspiracy). At the same time, Whirlpool need not prove an express agreement; rather, the existence of a conspiracy "may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." *Sunset Bay Assocs. v. Eureka Fed. Sav. & Loan*, 944 F.2d 1503, 1517 (9th Cir. 1991).

Whirlpool alleges that in order to ensure it would continue to be paid, CIT joined in a fraudulent scheme with MidPac and MHS. As part of this scheme, Whirlpool alleges that CIT agreed to help conceal the fraud so that MidPac could continue operating and obtaining goods from Whirlpool. Whirlpool cites to several pieces of evidence in support of its position. First, CIT did not directly inform Whirlpool of its discovery of fraud. This fact is undisputed. Second, Whirlpool points to the fact that MidPac's attorney, Iwamoto, requested that CIT refrain from informing others, including Whirlpool, of CIT's allegations of fraud against MidPac and that CIT actually did refrain from alerting Whirlpool of CIT's discovery of the billing problems at MidPac. (Whirlpool's Ex. I at 3.) Third, CIT agreed to provide loan advances to MidPac until MidPac could obtaining refinancing despite CIT's knowledge that MidPac was fraudulently submitting improper invoices to lenders. Finally, Whirlpool argues that MidPac, under CIT's control, continued to order products from Whirlpool and that CIT prevented MidPac from paying Whirlpool.[9]

CIT does not deny the existence of most of this evidence but argues that it was justified in protecting its investments and that it was not actively assisting MidPac and its owners in defrauding creditors. Indeed, the Ninth Circuit has explained that a plaintiff should not be permitted "to use a

---

[9]To the extent this argument is premised on actions by Phelps, we have already determined that there is a genuine issue of material fact as to whether Phelps was acting as CIT's agent. Whirlpool points to no other evidence that would indicate that CIT ordered, directed MidPac to order, or otherwise influenced the ordering of Whirlpool products by MidPac. Likewise, Whirlpool does not proffer any evidence that CIT prevented MidPac from paying Whirlpool. Thus, if Whirlpool cannot establish an agency relationship at trial, it will be unable to prove that CIT directed MidPac to order products that it could not pay for from Whirlpool.

conspiracy theory to impose liability upon a purchaser who has simply participated in a transaction in which the seller has committed fraud upon the minority shareholders." *Doleman,* 727 F.2d at 1482 n.3. It cautioned that courts must require plaintiffs to submit specific evidence of the agreement to engage in the misconduct. "Without such evidence of the parties' subjective intent, allegations of a conspiracy should not go to a jury lest they mistake traditional negotiating tactics with valid business purposes (e.g., tax, securities, etc.) as evidence of a conspiracy." *Id.* However, the evidence cited by Whirlpool raises a genuine issue of material fact as to whether, in acting to protect its investment, CIT acted with the purpose of assisting any of the participants in the MidPac "bust out" to conceal their fraudulent activities. Whether CIT actually had such an intent is a question that is properly left to the trier of fact. We therefore deny both CIT and Whirlpool's cross-motions for summary judgment as to Count II.

## IV. Cross-Motions for Summary Judgment/ CIT's Motion for Judgment on the Pleadings as to Count V: RICO

We move next to Whirlpool's claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), contained in Count V of the complaint, because those claims are premised on similar factual allegations as those contained in Whirlpool's fraud and fraudulent conspiracy claims. In its complaint, Whirlpool alleges that CIT violated two provisions of the RICO Act, namely 18 U.S.C. §§ 1962(a) and (d), by, once it discovered the ongoing fraud at MidPac: 1) allowing the fraud to continue without notifying Whirlpool; 2) assisting MidPac's officers and directors in obtaining financing to remain a going concern; and 3) misappropriating bond funds that were held in trust by MidPac on behalf of several general contractors. We address each provision in turn.

### A. Whirlpool's 18 U.S.C. § 1962(a) Claim

In its § 1962(a) claim, Whirlpool alleges that CIT used the proceeds from MidPac's alleged racketeering activities to injure Whirlpool. Section 1962(a) provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income . . . in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate commerce.

18 U.S.C. § 1962(a). In other words, § 1962(a) is not concerned with whether a given defendant has engaged in racketeering activity. Rather, the section focuses on the use or investment of proceeds from racketeering activity to operate a RICO enterprise. *Sea-Land Serv., Inc. v. Atl. Pac. Int'l, Inc.*, 57 F. Supp. 2d 1048, 1054 (D. Haw. 1999).

In its motion, CIT argues that Whirlpool lacks standing to bring a claim under § 1962(a) against CIT. A plaintiff has standing to bring a RICO claim only if it can demonstrate that it was "injured in its business or property by reason of a violation of section 1962." *Wagh v. Metris Direct, Inc.*, 348 F.3d 1102, 1109 (9th Cir. 2003). Therefore, to succeed on a § 1962(a) claim, the Ninth Circuit has held that the plaintiff must demonstrate that it was injured by the *use and investment* of racketeering proceeds, and not simply by the predicate acts that created those proceeds. *Id.*; *see also Nugget v. Hydroelectric, L.P. v. Pac. Gas and Elec. Co.*, 981 F.2d 429, 437 (9th Cir. 1992) (holding that "a plaintiff seeking civil damages for a violation of section 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income."). Furthermore, the mere reinvestment of funds into an ongoing enterprise is not sufficient to satisfy the standing requirement. *Wagh*, 348 F.3d at 1110.

In this case, summary judgment[10] is appropriate because Whirlpool has not demonstrated how it was injured by the investment of proceeds derived from racketeering activities. In its complaint, it

---

[10]Because we consider information contained outside of the complaint in considering whether Whirlpool can succeed on its § 1962(a) claim, we treat it as an issue for summary judgment under Federal Rule of Civil Procedure 56 rather than one for judgment on the pleadings pursuant to Rule 12(c).

alleges that CIT: 1) made funds received from alleged racketeering activities available to additional borrowers; and 2) used funds to pay bond claimants so as to deter discovery of the enterprise. (Sec. Am. Compl. ¶ 268.) In its Reply brief on its motion for summary judgment on Count IV, Whirlpool makes the additional allegation that some of the funds were used to pay Phelps. None of these allegations are sufficient to raise a genuine issue of material fact. First, Whirlpool has completely failed to explain how it was injured by CIT's use of funds received from the alleged scheme to pay additional borrowers. With regard to the payment of the bond funds, Whirlpool seems to be arguing that the payment of bond funds helped to cover up the existence of the enterprise and that Whirlpool thereby was injured by its failure to discover the alleged fraud at MidPac earlier. Similarly, Whirlpool seems to argue that the proceeds used to pay Phelps caused injury to Whirlpool because Phelps himself caused harm to Whirlpool. Both of these attempted links between racketeering proceeds and injury to Whirlpool are far too tenuous to support a § 1962(a) claim. Whirlpool does not distinguish how either of these allegations differ from the mere reinvestment of racketeering proceeds into a business and, as stated above, reinvestment into a business alone is not sufficient to create liability under § 1962(a). *See Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952, 961 (N.D. Cal. 2001) (dismissing a claim where "[p]laintiffs merely allege[d] Defendants reinvested the proceeds obtained from its alleged predicate racketeering acts, which then enabled Defendants to increase the same racketeering activities."). Summary judgment is therefore granted in favor of CIT as to Whirlpool's § 1962(a) RICO claim.

**B. Whirlpool's 18 U.S.C. § 1962(d) Claim**

Whirlpool also claims that CIT is liable under § 1962(d) for conspiring to violate RICO. Section 1962(d) provides that: "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). As discussed above, Whirlpool is unable to state a claim under subsection (a). In its complaint, Whirlpool did not make any allegations

under subsection (b), and, although it did allege violations of section (c) by several of the other defendants, it did not allege that CIT violated subsection (c). The case law is well-established that where a plaintiff in a RICO action does not meet the pleading requirements to establish a violation of subsection (a), (b), or (c), he will not survive a motion to dismiss on a subsection (d) claim. *Wagh v. Metris Direct*, 348 F.3d 1102, 1112 (9th Cir. 2003). CIT's motion for judgment on the pleadings is therefore granted as to Whirlpool's claim against CIT under § 1962(d).

## V. Cross-Motions for Summary Judgment on Count III: Conversion

Whirlpool's conversion claim has to do with the transfer of goods from MidPac to MHS, as well as CIT's alleged subsequent liquidation of those goods. Specifically, in Count III Whirlpool claims that CIT committed conversion by forcing MidPac to sell the MidPac[11] inventory that had been stored at MHS's warehouse and then taking the proceeds from that sale. CIT, on the other hand, argues that the inventory, though stored at MHS, actually belonged to MidPac, that CIT had a security interest in all of MidPac's inventory, and thus that it merely took ownership of goods that it was entitled to when it directed the sale of the inventory at MHS.

"The law of conversion is well settled, although case law in Hawaii is scarce." *Matsuda v. Wada*, 101 F. Supp. 2d 1315, 1321 (D. Haw. 1999). The Hawaii Supreme Court defines conversion as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Tsuru v. Bayer*, 25 Haw. 693 (Hawai'i Terr. 1920). "In short, the substance of the tort is wrongful dominion over the property of another." *Matsuda*, 101 F. Supp. 2d at 1321. In *Tsuru*, the Hawaii Supreme Court laid out the basic elements of conversion: "1) A taking from the owner without his consent; 2) an unwarranted assumption of ownership; 3) an illegal use or abuse

[11]For the sake of clarity, we refer to the relevant inventory as "MidPac" inventory. However, this does not amount to a legal conclusion that the inventory belonged to MidPac.

of the chattel; and 4) a wrongful detention after demand." *Tsuru*, 25 Haw. 693 (Hawai'i Terr. 1920). In determining whether a taking amounts to conversion, a court may also consider the extent and duration of the actor's dominion and resulting interference, his intent to assert a right, whether he acted in good faith, whether he did any harm to the chattel, and the inconvenience and expense caused to the party asserting the harm. *Pourny v. Maui Police Dep't,* 127 F. Supp. 2d 1129, 1146 (D. Haw. 2000).

Implicit in the Hawaii Supreme Court's test for conversion is the requirement that the complaining party own the allegedly converted goods. *Cf. Littleton v. Littleton*, 106 B.R. 632, 634-35 (B.A.P. 9th Cir. 1989) (noting that ownership is one element of a claim for conversion under California law); *Cantor v. Anderson*, 639 F. Supp. 364, 369 (S.D.N.Y. 1986) (applying New York law, the court stated that "[t]o maintain a cause of action for conversion a plaintiff must establish legal ownership or an immediate superior right of possession to a specific identifiable thing . . . ."). Although there is nothing in Hawaii law which expressly allows a secured party, as opposed to a true owner, to bring a claim for conversion, such a claim is allowed in California where the true owner defaults and the secured party is allowed to take possession. *See Littleton v. Littleton*, 106 B.R. 632 (B.A.P. 9th Cir. 1989) (citing *Baldwin v. Marina City Props., Inc.*, 79 Cal. App. 3d 393, 410 (1978)); *see also Whirlpool Corp. v. CIT Group/Bus. Credit, Inc.*, 293 F. Supp. 2d 1144, 1151 (D. Haw. 2003) (noting that courts often look to California law for guidance where Hawaiian law is silent). In this case, CIT and Whirlpool disagree over who owned the property in question. Neither party disputes that Whirlpool had a security interest in MHS's inventory. Likewise, neither party disputes that CIT had a security interest in MidPac's goods. The issue before us is who owned (and thus whose security interest extended to) the goods that were shipped from MidPac and held at MHS. To answer this question, we must look to Hawaii's version of the Uniform Commercial Code (U.C.C.) as it stood in 1999, when the alleged conversion took place.[12]

[12]The applicable portions of the U.C.C. and of Hawaii law have since been amended.

There are several different portions of the U.C.C. which the parties argue are at play. We first look to Hawaii Revised Statute § 490:2-326 (1999) (hereinafter "§ 2-326"), which deals with goods that are delivered primarily for resale. Section 2-326 states that, as a general rule, goods delivered primarily for resale are subject to the claims of a buyer's creditors while they are in the buyer's possession. This rule applies even if the "agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment . . . .'" Haw. Rev. Stat. § 2-326(3). The comments to the Rule explain that it was intended to resolve all doubts as to the nature of a transaction in favor of the buyer's creditors, and ,thus, the mere use of words such as "on consignment" should not be able to defeat the rule. § 2-326 cmt. 2. Furthermore, several courts have observed that the purpose of U.C.C. § 2-326 (from which the Hawaiian statute was taken verbatim) is to protect creditors of a consignee from the consignor's hidden liens. *Cantor v. Anderson*, 639 F. Supp. 364, 639 (S.D.N.Y. 1986). Thus, if § 2-326 applies in this case, the goods are subject to MHS's (the buyer's) creditors, including Whirlpool.

The rule does, however, have exceptions which are aimed at cases in which it is plain that a consignee's creditors are aware of the consignment relationship. Specifically, § 2-326 sets forth three situations in which a consignor's claims will prevail over those of a consignee's creditors:

> This section is inapplicable if the person making delivery a) Complies with an applicable law providing for a cosignor's interest or the like to be evidenced by a sign; or b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or c) Complies with the filing provisions of the Article on Secured Transactions (Article 9).

§ 2-326(3)(a)-(c). CIT seems to argue that it falls under the second and third exceptions to the rule.[13] As to the second exception, CIT bears the burden of proof. *In re High-Line Aviation, Inc.*, 149

[13]Neither party argues that MidPac complied with any applicable sign law.

B.R. 730 (Bankr. N.D. Ga. 1992).[14] However, it provides no evidence that MHS was "generally known by [its] creditors to be substantially engaged in selling the goods of others." Rather, CIT relies upon several cases which have extended § 2-326(3)(b)'s exception to cases where the consignee's creditor has actual knowledge that the consignee is holding the goods of another. *See, e.g., First Nat'l Bank of Blooming Prairie v. Olsen*, 403 N.W.2d 661 (Minn. Ct. App. 1987) (collecting cases); *Eurpac Serv., Inc. v. Republic Acceptance Corp.*, 37 P.3d 447, 450 (Colo. Ct. App. 2000) (same); *GBS Meat Indus. Pty, Ltd. v. Kress-Dobkin Co., Inc.*, 474 F. Supp. 1357, 1362-63 (W.D. Pa. 1979) (same). CIT argues that this judicially created exception applies because "Whirlpool clearly knew that MHS held MidPac goods for sale and even sent MidPac goods to MHS." (CIT's MSJ Count III at 9.) In support of its argument, Whirlpool provides evidence of so-called "drop-shipments," whereby Whirlpool allegedly shipped goods to MHS that were paid for by MidPac. However, this does not prove that Whirlpool knew of the alleged consignment relationship between MidPac and MHS. It is equally possible that MidPac was purchasing goods from Whirlpool and immediately reselling them to MHS. Thus, the mere fact of the drop shipments is not sufficient evidence to demonstrate that Whirlpool knew of the sales transactions. Thus, even if we were to adopt the extension of the § 2-326(3)(b) exception as urged by CIT, we would not find that it had satisfied its burden under that exception.

We thus turn to the third exception to the rule stated in § 2-326(3)(c) and consider whether CIT complied with the filing provisions of the Article on Secured Transactions. The method in which CIT is required to file depends on whether the transfer of goods from MidPac to MHS constituted a security

---

[14]All cases cited from jurisdictions outside of Hawaii apply identical versions of the U.C.C. Thus, while they do not constitute mandatory authority, they do provide useful guidance as to the application of the relevant U.C.C. provisions.

interest or whether it amounted to a true "consignment" agreement.[15] The difference is significant because it determines which portions of the U.C.C. should be applied to sort out how to comply with the filing requirements of Article 9. Whirlpool argues that the transaction amounted to a sale on return with the reservation of a security interest in the goods. CIT argues that the parties created a true consignment in which MidPac retained title to the goods even though they were held at MHS's facilities.

A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Haw. Rev. Stat. § 490:1-201(37) (1999). In the case of consignments, the U.C.C. holds that "[u]nless a consignment is intended as a security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales (Section 2-236)." Haw. Rev. Stat. § 490:1-201(37) (1999). Pursuant to § 9-102, a court determines whether a transaction is a true consignment or a secured transaction based on whether the parties intended to create a security interest at the time of contracting. *In re Oriental Rug Warehouse Club, Inc.*, 205 B.R. 407 (Bankr. D. Minn. 1997). "Such intent is to be determined by an objective standard which takes into account the economic realities of the transaction rather than the subjective intent of the parties." *Id.*

One court has compiled a list of factors to be followed in determining whether an agreement was intended as a security interest or a true consignment. The following facts demonstrate that the parties intended to create a security interest: 1) the setting of the price by the consignee; 2) billing the consignee upon shipment; 3) commingling of proceeds; 4) failure to segregate consigned goods from the other

[15]Whirlpool argues that the agreement was a sale and not a consignment agreement at all. However, it has presented no evidence, aside from the use of the term "sale" in one document, which supports this theory. We thus find that the agreement was a type of consignment, and the only distinction we must look to is whether it amounted to the type of consignment that is labeled by the U.C.C. as a "sale or return" or whether it is a "true" consignment agreement. *See In the Matter of High-Line Aviation, Inc.*, 149 B.R. 730 (Bankr. N.D. Ga. 1992).

goods owned by the consignee; 5) the consignor purports to retain title to the goods until paid. *In re Ide Jewelry Co., Inc.*, 75 B.R. 969 (Bankr. S.D.N.Y. 1987). On the other hand, the following factors are indicative of a true consignment: 1) the consignor retained control over the resale price; 2) the consignee was given authority to sell only at the price set by the consignor; 3) the consignor may recall the goods; 4) the consignee received a commission and not a profit from the goods; 5) the consigned property was segregated from the other property of the consignee; 6) the consignor was entitled to inspect the sales records and inventory of the goods; 7) the consignee had no obligation to pay for the goods until they were sold. *Id.*

In this case, neither of the parties has presented any information regarding how the price of the goods was set. We also do not know whether or at what point MHS was billed for the goods or whether it was obligated to pay for the goods before sale. MHS did make repeated payments to MidPac after the signing of the consignment agreement, (CIT's ME 62), but we do not know whether those payments were made pursuant to a general payment plan or whether they were made after the goods were sold.[16] The parties do assert that the proceeds from the sale of the goods by MHS were commingled with the proceeds from MHS's other sales. However, CIT has presented evidence which demonstrates that the goods were segregated from MHS's other inventory. The consignment agreement itself provides that the goods must be physically segregated (Whirlpool's MSJ Count III Ex. F.), and Paul Dybczak's audit report states that "MidPac inventory located at MHS stores consists of lumber, appliances, and cabinets. All items are adequately segregated from MHS's inventory." (CIT's ME 37.) Furthermore, Robert Brichacek testified that he walked through the portion of the MHS warehouse in which MidPac's inventory was segregated from the remainder of the MHS inventory. (Whirlpool's MSJ Count III Ex.

[16]There is some evidence that MHS paid for the goods shipped to MidPac at the end of every month. However, this evidence relates to the goods that were shipped in 1998, not the goods in question here (those shipped in 1999). This evidence is therefore only minimally helpful.

M).[17] Whirlpool contends that its position is supported by the language of the Non-Offset Agreement of September 3, 1998, which refers to the arrangement as a sale. The agreement provides that "Borrower [MidPac] makes *sales* of certain of its products to Account Debtor [MHS], thereby creating accounts receivable in favor of Borrower [CIT]." (Whirlpool's MSJ Count III Ex. E. Non-Offset Agreement ¶ B.) It also argues that, although the parties termed their later contract regarding the transfer of goods from MidPac to MHS as a "consignment agreement," the agreement was created only after CIT discovered the arrangement between MidPac and MHS. It points to the deposition testimony of Robert Brichacek, who stated that: "Based upon Kurt Glassman's representation of the fact that MidPac still owned, held title to the inventory located on Maui; and the way that sales of that inventory from Maui worked, we concluded that it sounded like a consignment arrangement of that inventory and, therefore, the documents were drawn up to effect that relationship." (Whirlpool's MSJ Count III Ex. M, Dep. of Robert Brichacek at 55:17-23.) Furthermore, the existence of the consignment agreement itself is not evidence that the parties intended their relationship to represent a security interest. *See* Haw. Rev. Stat. § 490:9-408 (1999) ("A party may file a financing statement which uses the term "consignment," "but its filing shall not itself be a factor in determining whether or not the consignment or lease is intended as security.").[18]

None of the parties disagree about the existence of any of this evidence. They differ only as to

---

[17]CIT makes much of the fact that the inventory was delivered by "drop shipments," whereby Whirlpool billed MidPac for inventory for goods that were shipped to MHS. Although this provides some evidence of a consignment relationship, it is not conclusive. It is possible that the goods could have been shipped to MHS pursuant to a separate sale agreement between MidPac and MHS.

[18]Whirlpool also points to the fact that CIT did not inform Whirlpool of the consignment agreement, even though it knew about Whirlpool's interest in MHS's inventory as of late June 1999. (Whirlpool's MSJ Count III Ex. K.) Hayes testified that normally CIT would contact the purchase money inventory seller to investigate potential lien conflicts. (Whirlpool's MSJ Count III Ex. J, 50:7-23.) It is not apparent how this fact relates to the question of whether the transaction constituted the creation of a security interest or a true consignment agreement.

its application to the law. We thus find that it is a proper subject for summary judgment. Looking at the evidence as a whole, we conclude that, despite the existence of a purported "consignment" agreement, the parties intended for the arrangement to be a security agreement rather than a true consignment. In so deciding, we rely on the fact that the consignment agreement was drawn up at CIT's insistence only after it discovered that MidPac was sending goods to MHS. This evidences an intent on the part of CIT to ensure that it retained a security interest in the goods rather than an intent to create a true consignment relationship. There is also no evidence regarding the key indicia of a consignment, price setting and sales commission. We have no evidence that either CIT or MidPac set the price of goods sold from MHS; nor do we have evidence that MHS retained a commission upon sale of the goods. In fact, the only evidence that we have of a true consignment arrangement was the fact that the inventory was segregated; however, the proceeds were not. We thus conclude that the transaction between MidPac and MHS was a security arrangement rather than a true consignment.

Having so decided, we must next determine whether CIT complied with the applicable filing provisions of Hawaii's law on secured transactions (contained in Article 9). CIT did file financing statements which reflected MidPac's assignment of the consignment agreement to CIT. Thus, we look to the Article on Secured Transactions to determine whether CIT had a right to the allegedly converted goods. Under Hawaii law, "[c]onflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier . . . ." Haw. Rev. Stat. § 9-312(5)(a) (1999). There is no question that Whirlpool perfected its security interest in the inventory before CIT. Thus, CIT did not have a first priority interest in the goods, and Whirlpool did, so Whirlpool has sufficiently established that it had a first priority interest in the inventory.

CIT next argues that it cannot be liable for conversion because Whirlpool did not demand that

the property be returned. The Hawaii Supreme Court discussed conversion in the case of *Tsuru v. Bayer*, 25 Haw. 693 (Hawai'i Terr. 1920). In *Tsuru*, the court held that a showing of demand is unnecessary "if the act of the defendant is tortious and amounts to a conversion regardless of whether a demand is made." *Id.* Demand is required only where the original taking is lawful or "when the other acts of the defendant are not sufficient to prove" that a conversion occurred. *Id.* (internal quotation marks omitted). Several courts in other jurisdictions have agreed with this analysis. *See, e.g., O.K. Sand & Gravel, Inc. v. Martin Marietta Tech., Inc.*, 36 F.3d 565, 571 (7th Cir. 1994) (finding that, under Indiana law, demand is excused only where the defendant came into possession of the goods unlawfully or where demand would have been futile). CIT argues that MHS paid MidPac for the goods in the ordinary course of business just as it would have paid any creditor. Thus, CIT claims that demand was required because the original taking of the proceeds from the sale of the MidPac inventory was lawful. However, we have already determined that CIT did not own, nor did it have a senior security interest in the inventory. Thus, CIT's assertion of ownership and subsequent sale of the property was unlawful. Furthermore, the fact that CIT may have a security interest in the goods or the proceeds from the goods is not sufficient to negate CIT's misconduct with regard to obtaining the goods. "[A] person cannot steal the property of another because she believes she is owed money by that person." *Matsuda*, 101 F. Supp. 2d at 1323. Accordingly, Whirlpool is not required to demonstrate that it demanded that the property be returned in order to succeed on its conversion claim.

Finally, CIT argues that Whirlpool waived its security interest in the proceeds from the inventory by not requiring the segregation of those proceeds from MHS's general operating account. In essence, CIT posits that MHS owed MidPac money, that MHS paid MidPac just as it would have paid any creditor, and that paying MidPac did not amount to a conversion in the absence of a requirement by Whirlpool that MHS segregate funds that it owed to Whirlpool. In support of its position, CIT cites to

*Littleton v. Littleton*, 106 B.R. 632 (B.A.P. 9th Cir. 1989), in which the court held that a debtor could not be held liable for conversion against his creditor where proceeds were not segregated and were not held in a fiduciary capacity. CIT also cites to *Rasmussen v. Sports Media Sales, Inc.*, 691 F. Supp. 153, 155 (N.D. Ill. 1988), in which the court, applying Illinois conversion law, held that "[f]unds are generally not recoverable under the tort of conversion unless they are 'capable of being described as a specific chattel, although it is not necessary for purposes of identification that money should be specifically earmarked.'" (quoting *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985)).

The resolution of this argument depends on how we view the facts. If we accept as true Whirlpool's claim that CIT moved in, directed the sale of goods from MHS's facility, and then took the proceeds, then CIT's argument regarding proceeds is irrelevant. If CIT directed the sale of the goods, then it was the actual goods that were converted, and the fact that the proceeds were not segregated from the other business accounts does not matter. If, however, we take CIT's view that MHS owed MidPac money from the transfer of goods from MidPac to MHS, and that it paid MidPac as it would any creditor, then no conversion occurred "unless a specific, identifiable sum is involved." *Littleton*, 106 B.R. at 635; *see also ITT Commercial Fin. Corp. v. Bank of the West*, 166 F.3d 295, 305 (5th Cir. 1999) (noting that under comment 2 to U.C.C. § 9-306 "[w]here cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds."). We thus look to the evidence that each side presents in support of its theory to determine whether summary judgment is appropriate.

Whirlpool makes much of the fact that CIT ordered the liquidation of the "MidPac" assets located at MHS. MHS argues that Whirlpool has presented no proof that the proceeds from the sale of the inventory went directly from MHS to CIT. Although there is evidence that CIT took proceeds from the liquidation of the assets *from MidPac*, CIT argues, there is no evidence in the record which would

indicate that CIT ordered the liquidation of the inventory located at MHS or that CIT took the proceeds directly from MHS. We disagree and find that Whirlpool has presented sufficient evidence from which a jury could infer that the transfer of money through MidPac was simply a step in the process of siphoning the proceeds from the sale of the inventory directly from MHS to CIT. For example, Whirlpool submitted a letter from Gary Sampson, CIT's attorney, to Raymond Iwamoto, Glassman's attorney, in regard to an agreement between CIT and MHS to recognize certain inventory at MHS as belonging to MidPac.[19] In the letter, Sampson states: "In section 2 regarding sales, the remittance should be directly to the CIT lock box rather than sending the remittances to MidPac." (Whirlpool's Resp. to CIT's MSJ Count IV Ex. 5.) CIT President Thomas Hayes testified that the inventory was liquidated, that the money was paid to MidPac, and that the money was then "swept into the CIT account. It was deposited directly into the [MidPac][20] Account which CIT swept." (Whirlpool's MSJ Count III Ex. J. at 116:11-20.) His description of CIT "sweeping" suggests that CIT used MidPac simply as a conduit for the MHS funds. Furthermore, there is evidence suggesting that CIT was very concerned about maintaining a security interest in the inventory at MHS, so that it would not lose its claim to those goods. The fact that CIT ordered the parties to draft the consignment agreement after the transfer of property had taken place is a good indication of this concern. Next, Whirlpool presents the evidence from a former MHS employee, Andrew Paul, who claims that CIT took over MHS prior to MHS going into

---

[19]CIT objects to the consideration of this evidence because there is no evidence that the proposals made in the letters ever resulted in a final agreement. However, the letters may be used for the purpose of demonstrating CIT's intent at the time.

[20]In his deposition, Hayes testified that the money was deposited into the *Maui Home Supply* account, which CIT swept. He later clarified that he had meant to say MidPac instead of MHS. (CIT's Opp. to Whirlpool's MSJ Count III Ex. C, Hayes Dep. at 116:24-25.)

bankruptcy.[21] (Whirlpool's Resp. to CIT's MSJ Count III Ex. 7.) Finally, in CIT's Memorandum of Law in support of its motion for summary judgment on Count IV, CIT admits that the funds came through MidPac directly from MHS. Specifically, it argues that "CIT acted legitimately and not in a predatory, improper or abusive manner in requiring MidPac, once it was determined to be in default in June 1999, to remit sales proceeds *immediately* to CIT, even from MidPac goods sold on Maui," *i.e.* goods at MHS. (CIT's MSJ Count IV at 19-20) (emphasis added). We thus believe that there is a genuine issue of material fact regarding whether CIT directed the sale of the inventory at MHS and then reaped the proceeds from the sale. CIT's motion for summary judgment on the conversion claim is therefore denied. At the same time, however, we do not find that Whirlpool has presented sufficient evidence that CIT directed the sale to find, as a matter of law, that CIT committed conversion. Therefore, we deny Whirlpool's motion for summary judgment on its conversion claim, and leave the question to be determined by a jury.

The parties also both request that we enter summary judgment on the amount in controversy in the conversion claim. On the one hand, CIT argues that we should limit damages to the amount that Whirlpool can trace from the sale of goods through MHS to CIT, and argues that this amount is only $39,323.42. In support of this proposition, CIT cites Haw. Rev. Stat. § 490:9-306(2), which provides that a security interest "continues in any identifiable proceeds including collections received by the debtor." CIT also cites to several cases from other jurisdictions in which courts have applied U.C.C. § 306 to competing claims of secured creditors. *See, e.g., In re Oriental Rug Warehouse Club, Inc.*, 205 B.R. 407, 411 (Bankr. D. Minn. 1997). Whirlpool does not respond to this argument, but cites

---

[21]CIT argues that Paul's deposition testimony is based on hearsay, lacks foundation, and that it is misleading. We agree that much of Paul's testimony is inadmissible hearsay. However, much if it is allegedly based on his own observations as an employee of MHS and is thus admissible, at least in part.

established Hawaiian case law regarding conversion. Specifically, in *Roxas v. Marcos*, the Supreme Court of Hawaii affirmed the rule that the proper measure of damages in a conversion claim where the converted property does not fluctuate in value is the "fair reasonable value of the property at the time of conversion." 969 P.2d 1209, 1267 (Haw. 1998) (quoting *Tsuru v. Bayer*, 25 Haw. 693, 699-700 (1920)). Whirlpool cites the testimony of Thomas Hayes for the proposition that the allegedly consigned goods had a total value of "approximately a million dollars." (Whirlpool's MSJ Count III Ex. J.) Neither source of evidence is dispositive, and, in light of the fact that we have declined to grant summary judgment in favor of Whirlpool on the conversion claim, it is premature to decide at this time how to measure damages. However, this is an issue that will require further briefing if, after trial, CIT is found liable for conversion.

The same is true regarding Whirlpool's request for a jury instruction regarding punitive damages. "The purpose of punitive damages is not to compensate a plaintiff, but rather, to punish a defendant 'for aggravated or outrageous misconduct and to deter the defendant and others from similar conduct in the future.'" *Matsuda v. Wada*, 101 F. Supp. 2d 1315, 1325 (D. Haw. 1999) (quoting *Masaki v. Gen. Motors Corp.*, 780 P.2d 566 (Haw. 1989)). In order to prove punitive damages, the plaintiff must demonstrate by clear and convincing evidence "that the defendant has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Id.* (quoting *Kunewa v. Joshua*, 924 P.2d 559 (Haw. 1996)). In light of the fact we have declined to grant CIT's motion for summary judgment on the conversion claim, we do not believe that it is appropriate at this time to decide whether Whirlpool is entitled to a jury instruction on its request for punitive damages.

## VI. CIT's Motion for Summary Judgment on Count IV: Tortious Interference With Contract

CIT has brought a motion for summary judgment on Whirlpool's tortious interference with a contract claim (Count IV)[22] in which Whirlpool alleges that CIT tortiously interfered with two existing contracts. Whirlpool has not filed a cross-motion for summary judgment on that count. We therefore read the facts in the light most favorable to Whirlpool with regard to Count IV.

Under Hawaii Law, the elements of a claim for tortious interference with contractual relations are: 1) the existence of a contract between the plaintiff and a third party; 2) the defendant's knowledge of the contract; 3) the defendant's intentional inducement of a breach of the contract by a third party; 4) without justification on the part of the defendant; 5) the third party's subsequent breach of the contract; and 6) damages to the plaintiff. *Lee v. Aiu*, 936 P.2d 655, 668 (Haw. 1997).

Whirlpool claims that CIT caused MHS to breach its contract with Whirlpool by ordering MHS to liquidate the "MidPac" inventory that was stored at MHS and by subsequently taking the proceeds from the liquidation. It also alleges that CIT induced MidPac to order products from Whirlpool for which it knew MidPac could not pay. We address each contract separately.

### A. Proceeds from the Liquidation of MidPac Goods at MHS

First, Whirlpool argues that CIT tortiously interfered in Whirlpool's security agreement with MHS by forcing MHS to liquidate the MidPac goods held at its facility and by taking the proceeds from that sale. In support of its argument, MidPac cites the same evidence as that cited in its motion for summary judgment with respect to Count III. Once again, CIT argues that it was simply protecting its

---

[22]CIT attaches as Exhibit A to its reply brief a lengthy list of objections to Whirlpool's evidence. This is buried in an attachment, and CIT does not make clear reference to it elsewhere in its motion. Whirlpool did not respond to the list, presumably, because it did not see the list, and it did not have a meaningful opportunity to respond to CIT's objections. In the future, objections to evidence must be filed either in a separate motion to strike, in the text of the summary judgment itself, or in the actual Local Rule 56.1 Statement (not the exhibits attached thereto).

own interest in MidPac's inventory by requiring MidPac and MHS to draft a consignment agreement, and by requiring the liquidation of the MidPac inventory held at MHS. Because CIT believed that it had a continuing security interest in the goods at MHS, it argues that it was justified in preserving that interest.[23] In support of this argument, CIT cites several cases which suggest that a secured party is justified in doing what it can to preserve its security interest, even if those actions cause the creditor to breach its agreements with a third party. *See, e.g., Pankow Constr. Co. v. Advance Mortgage Corp.*, 618 F.2d 611, 616 (9th Cir. 1980) ("[I]f two parties have separate contracts with a third, each may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result will be to cause a breach of the other contract.") (applying California law) (citations and internal quotation marks omitted); *Ford v. C,E, Wilson & Co.*, 129 F.2d 614 (2d Cir. 1942) (finding that a party has a privilege to interfere with contractual relations where it acts "under an equal or superior right" in seeking security) (citations and internal quotation marks omitted); Restatement (Second) of Torts § 773 (1977) ("One who, by asserting in good faith a legally protected interest of his own . . . does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.").

We might agree with CIT's argument if we had found that CIT actually possessed a senior security interest in the goods held at MHS. However, as noted above, Whirlpool's interest in the goods

---

[23]CIT makes a weak argument that it did not know of Whirlpool's security interest in MHS's goods, stating that it performed a U.C.C. search which did not reveal Whirlpool's security interest. However, CIT admits that it learned of Whirlpool's interest in June 1999, and the alleged remission of proceeds from the sale of the goods in question took place after that date. Indeed, Whirlpool provides a copy of a Dun & Bradstreet report regarding MHS which was printed for CIT on June 21, 1999 which lists Whirlpool as a secured party.

CIT also argues repeatedly that it retained a security interest in the MidPac goods located at MHS because its security agreement with MidPac grants it an interest in MidPac's goods "wherever located." This argument only begs the question of who owned the goods, a question to be decided in the present lawsuit.

at MHS took priority over any interest held by CIT. Furthermore, although a claim of bona fide right can be asserted in defense to a claim of intentional interference, *see Kutcher v. Zimmerman*, 957 P.2d 1076, 1090 (Haw. Ct. App. 1998), the Restatement of Torts provides that there must actually be such a right in order for the exception to apply. Restatement (Second) of Torts § 773 cmt. a (1977) (noting that the exception is "of narrow scope and protects an actor only when" he actually has a legally protected interest); *see also* Restatement (Second) of Torts § 766 cmt. i (observing that if the defendant knew of the existence of the contract at issue, "he is subject to liability even though he is mistaken as to [its] legal significance and believes that the agreement is not legally binding or has a different legal effect from what it is judicially held to have."). We thus find that this exception is not sufficient to prevent CIT from liability.

We likewise do not find compelling CIT's argument that Whirlpool has failed to raise a genuine issue of material fact as to whether CIT had the requisite legal malice necessary to prove a claim of tortious interference. Generally, a plaintiff in an intentional interference case must show that the defendant intended to induce the breach of the contract at issue. *See Chow v. Alston*, 634 P.2d 430, 434 (Haw. Ct. App. 1981).[24] Here, Whirlpool has presented sufficient evidence of intent to survive a motion for summary judgment. In particular, we are persuaded by the fact that CIT drew up agreements to effect the alleged consignment relationship only *after* it found out that MidPac was sending goods to MHS. Reading the facts in the light most favorable to Whirlpool, this can be seen as an attempt to assert

---

[24]CIT claims that "[t]he intent necessary to establish a claim of tortious interference can be shown *only* if the actor: (1) desired to bring about the interference; *and* (2) knew it was certain or substantially certain to occur as a result of his or her action." (CIT's MSJ Count IV at 22) (emphasis in original). This misstates the law in Hawaii. In the *Kutcher* case, cited by CIT in support of its assertion, the Intermediate Court of Appeals of Hawaii adopted the rule that "the interference is intentional 'if the actor desires to bring it about *or* if he [or she] knows that the interference is certain or substantially certain to occur . . . ." 957 P.2d 1076, 1088 n. 17 (Haw. Ct. App. 1998) (emphasis added). Thus, a plaintiff may prove intent simply by demonstrating that the defendant desired to bring about the interference. A showing of substantial certainty is not a requirement.

ownership over goods that did not rightfully belong to them, at the expense of MHS's largest and first priority secured creditor, Whirlpool.

CIT's claim that it did not intend to interfere with the contract between MHS and Whirlpool revolves around its assertion of a good-faith belief that the goods housed at MHS actually belonged to MidPac. Specifically, CIT points to: 1) the fact that Glassman reported that the inventory belonged to MidPac; 2) CIT's own audit findings; and 3) Whirlpool's practice of selling goods to MidPac but shipping to MHS. However, as Whirlpool points out, Glassman's assertions to CIT regarding who owned what goods should have been suspect because CIT had already discovered that Glassman was engaged in a scheme to defraud CIT. And while it is true that CIT's own auditor claimed that the goods held at MHS belonged to MidPac, (CIT's ME 37), that audit was a document prepared by CIT itself and thus has little probative value. Finally, although CIT argues that Whirlpool was somehow contributorily negligent by not requiring MHS to segregate or remit the proceeds from the sale of goods to Whirlpool sooner, Whirlpool's practices do not negate CIT's own intent. We thus find that a genuine issue of material fact exists as to whether CIT intended to interfere with the contract.

Next, CIT argues that there is no genuine issue of material fact regarding the causation element of a tortious interference claim. Under Hawaii law, a claim for tortious interference will fail where the defendant's tortious conduct did not cause the breach of the plaintiff's contract with a third party. *Lee v. Aiu*, 936 P.2d 655, 668 (Haw. 1997). CIT argues that it cannot be held responsible where Whirlpool's own conduct contributed to the breach. Specifically, CIT cites to the fact that MHS was not obligated under the terms of its sales contract with Whirlpool to remit proceeds immediately to Whirlpool and to the fact that Whirlpool did not require that proceeds from sales of its goods be placed in a separate cash account. Although these facts may be assessed by the jury at trial, they do not negate the evidence of causation that has been presented by Whirlpool. Specifically, Whirlpool has presented evidence to

support its theory that CIT caused the liquidation of $1 million worth of goods held at MHS and that CIT (through MidPac) took the proceeds from that sale. (Whirlpool's Resp. to CIT's MSJ Count IV Ex. 9.) Again, this is not conclusive proof of causation; in order to succeed at trial, Whirlpool will need to prove that MHS would have been able to make good on its debts owed to Whirlpool had it not been for the alleged liquidation of the MidPac inventory at MHS. However, the evidence does suggest that MHS lost one million dollars worth of inventory as a result of CIT's actions. We therefore find that there is a genuine issue of material fact for trial on the issue of whether the liquidation caused MHS's alleged breach of its contract with Whirlpool.[25]

**B. Ordering Products**

Whirlpool also alleges that CIT tortiously interfered with an existing contract by causing MidPac to order products from Whirlpool, even though CIT knew that MidPac was unable to pay for those products. In its motion for summary judgment, CIT argues that this claim must fail for lack of proof. In support of this argument, CIT cites the declaration of Robert Brichacek, CIT's Regional Credit Manager. Brichacek states in his declaration: "Neither I, nor anyone acting under my direction or supervision ever placed, or caused anyone else to place, any orders for Whirlpool, Roper, or Kitchenaid brand products on behalf of MidPac or MHS . . . . Nor do I have any reason to believe that any officer, agent or employee of CIT ever caused any employee of MidPac or MHS to place orders for Whirlpool products. Given my role as CIT's Regional Credit Manager any such actions would have been brought to my attention." (CIT's ME . A ¶ 5.)

---

[25]CIT argues that Whirlpool is also required to show that CIT's alleged tortious interference proximately caused the damages suffered by Whirlpool. (CIT's MSJ Count IV.) We fail to see how this argument is any different from its argument that Whirlpool failed to demonstrate that CIT caused a breach of the contract between Whirlpool and MHS. There is no question that Whirlpool suffered damages from the breach of its contract with MHS; the only relevant question is whether CIT caused the breach of that contract.

In response, Whirlpool makes only one allegation: that it continued to order products from MHS in reliance of Ted Phelps' statements that there was no fraud going on at MidPac. (Whirlpool's Resp. to CIT's MSJ L.R. 56.1 Statement Count IV Ex. 18, Dep. of Ernest Matlock.) We determined above that there is a genuine issue of material fact regarding whether Ted Phelps acted as CIT's agent, and CIT does not contest the substance of Ted Phelp's alleged statements. Thus, we deny summary judgment as to this claim.

**CONCLUSION**

For the foregoing reasons, CIT's motions for summary judgment as to Counts I, II, III, and IV are denied. CIT's motion for summary judgment as to Count V is granted. Whirlpool's motions for summary judgment as to Counts II, III, and V are denied.

It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: 12/23/04