# Exhibit 4

TO: Louise K.Y. Ing
Alston Hunt Floyd and Ing

FROM: Irwin Teich

DATE: October 28, 2002

SUBJECT: Report – Whirlpool Corp. vs. CIT Group/Business Credit

INTRODUCTION: You asked me to provide my opinions on customs and practices in the asset based lending industry generally and with respect to certain issues involving problem loans. I will first discuss my background and experience in the industry and then give my opinions which are based on my years of experience in asset based lending.

I. Background and experience in asset-based lending and in litigation against lenders.

I have had 39 years of experience in the Asset Based Lending industry. I joined National Acceptance/Walter Heller in 1963 where I was employed for ten years. I began my career in equipment and inventory appraising.

After a few years I moved into field examinations, account executive, sales and liquidation/workout. In 1973 I joined what is now the surviving company, after three mergers, Fleet Capital a subsidiary of Fleet Boston Financial and was employed at Fleet for twenty –nine years until I retired on June 29, 2001. I was Regional Manager for five years and in 1978 I was promoted to Senior Vice President as Division Manager of the East Coast and continued in this position until 1984.

Through each promotion, my responsibilities broadened and I became more involved in credit responsibilities. These include approving the structuring of new loans over $15 million and determining the strategy for and disposition of problem loans involving out-of-court workouts, Chapter 11 and receiverships. Some of these cases included defending lender liability lawsuits. Most of these problem loan cases were caused by fraud or poor business decisions by the borrower and resolved through successful workouts (defined as the company being rehabilitated), refinancing with another lender, finding equity investors or sold or merged with another company.

Throughout my career I was involved in the negotiations and the development and implementation of strategies in these problem loan cases. Due to my many years of experience, I managed workout loans of every type, and in almost every industry and business. In many of these cases fraud was involved. Some examples of cases involving fraud are: a) when a borrower kept the collections received from its account debtors which should have been turned over to the lender; b) the borrower would inflate its accounts receivable by submitting accounts receivable (that the lender would lend

against) for goods that were never shipped; c) invoice affiliates (companies the borrower had an ownership in and therefore were not valid accounts receivable); d) re-invoice the same account debtor for the same goods; e) inflate its inventory by reporting more inventory than it had; f) bring in consignment inventory (inventory it does not have title to) that a lender would lend against.

Because of the vast size of the portfolio and the geographical and industry diversification of the borrowers, my experience at Fleet Capital encompassed every one of the situations discussed above with loans ranging from $5 million to $300 million.

In 1984, I was promoted to President and in 1998 to Chief Executive Officer. My responsibilities were expanded to all of North America with 26 offices in all major cities. I was now responsible for the strategic direction of the company along with all the managerial and leadership responsibilities. However, because of the influences on profits due to non-earning loans and write-offs, I continued to monitor the strategies, direction, and the financial and collateral progress of workout loans through monthly problem loan meetings. Each account executive submitted a written report and presented his or her loans. During my tenure as President and Chief Executive Officer our company grew from net outstanding loan balances of $300 million to $10 billion. For additional information, I am enclosing my resume. Based on my 39 years in virtually all aspects of the asset based lending industry, I render the following opinions on customs and practices in the industry.

II. What is asset based lending?

Asset based lending is secured lending similar to bank lending. Both industries manage their loans through covenants; however, asset based lenders differentiate their lending procedures and practices by specifically monitoring their collateral through daily, weekly or monthly reporting, periodic field examinations and appraisals to determine the quantity, quality and value of their collateral. An asset based lender's first priority is its collateral and throughout the relationship the lender requires frequent reporting to monitor its collateral. Asset based lenders focus on collateral and character of the borrower. Their customers borrow frequently during the month against their accounts receivable and inventory based on agreed formulas by wiring funds directly into the borrowers account. These advances are based usually on a 75-85 percent advance on accounts receivable and 30-60 percent advance on inventory. The range of these formulas can be higher or lower depending on the quality of the collateral. Collections during the month are submitted by the account debtors directly to the bank in a dominion or blocked account that is the borrowers' account but allows the lender to notify the bank to hold proceeds if a default has occurred. A second alternative is to have the account debtors submit their collections to a lockbox. Borrowers' account debtors are notified on the borrowers' invoices or by written notice to send their checks to a bank lockbox. The bank deposits all checks from the lockbox to the controlled account and sweeps the funds to the lender. The lender does not know which individual account debtors have paid. The bank sends copies of all payments to the borrower who in turn performs the reconciliation.

It is virtually impossible to duplicate the accounting records of the borrower due to the volume of loans monitored by the lender and the volume of transactions generated by the

borrowers, therefore, the lender can only track the accounts receivable on a bulk basis (not by individual account debtors) and apply collections to the total loan. The borrower tracks each individual account debtor and at the end of each month sends an accounts receivable aging to the lender. It is at that point that the lender knows which account debtors have become delinquent. However, the only way the lender can determine which account debtors have paid, is by conducting a field examination at the borrower's place of business.

III. What types of borrowers customarily use asset based lending?

The typical borrowers are middle market companies (sales of $10 million to $500 million) that are either manufacturers, wholesalers, distributors or retailers, usually privately owned and leveraged above the average for their industry. Companies frequently require asset based lending because they have expanded faster than their earnings can support; have had financial problems and are in a turnaround mode; are acquiring or merging with another company or they are acquiring a product line.

IV. What is an asset based lender's custom and practice in dealing with its borrower?

Because collateral is the primary focus of an asset based lender, the lender manages its relationship with the borrower through intense monitoring procedures. The following procedures are generally adhered to for the following types of financing:

A. Accounts Receivable Financing:

1. Accounts receivable collateral (invoices or sales ledgers) and collections are remitted daily to the lender which increases or decreases the amount of the collateral and loan balances. This determines the availability of collateral which can be borrowed against.
2. Eligible collateral to borrow against is determined and influenced by: a) the age of the accounts receivable; b) concentrations (a lender will not advance on any one customer if that customer's account balance exceeds a certain percent of the total accounts receivable); c) percent of returned merchandise; d) accounts receivable turnover (number of days the account debtors take to pay); e) excess cross aging (if the borrower continues to ship goods even if its existing accounts receivable are delinquent, thereby building up weak collateral), f) contras (when the borrower is selling to and buying from the same company, and the lender had to collect, the accounts receivable would be offset against the accounts payable by the account debtor resulting in worthless accounts receivable); and g) selling to affiliates of the borrower.
3. Frequent reporting for monitoring purposes is always required which may include sales ledgers, invoices, collections, borrowing certificates (summary of activity), credit memos, accounts receivable, accounts payable aging and financial statements.
4. Additional tools used for ongoing monitoring are Dunn & Bradstreet ratings for larger account debtors, accounts receivable reconciliations, written or phone verifications of the account

debtors and verification of reporting by the borrower through a field examination of the books and records to determine the quantity, quality and value of the collateral.

B. Inventory Financing:

1. Inventory balances are submitted daily, weekly or monthly to determine availability to borrow against based on established advance rates.
2. Eligible collateral is established based on inventory levels, mix, type, age, location and ownership.
3. If inventory is a commodity or published by an outside source, the costs are monitored daily and the inventory value adjusted daily i.e., logs, gold, oil, etc.
4. The inventory is periodically inspected by the account executive, field examiner, or an appraiser. Field examinations are also conducted on the borrowers' books and records. These functions are to monitor the quantity, quality, value and location of the inventory. The only way fraud in the inventory can be detected is by a visit from the lender's field examiner to audit the books and records and visually inspect and count the inventory.

The experience of the account executive, the quality of the reporting, the financial strength of the borrower, and the trust and relationship with the borrower all influence the number of visits to and field examinations of a particular borrower.

V. What factors affect the asset based lender's ability to detect fraud by its borrower?

An asset based lender's ability to detect fraud is very limited despite all the precautions the lender takes. The lender can never prevent fraud and how quickly the lender detects fraud will be determined by the information received from the borrower and the behavior and conduct of the officers of the borrower. If the officers of the borrower are experienced or have a background in accounting, they understand what lenders look for and know how to manipulate the reporting and the truth through false communications. Through my experience, I have learned that detecting fraud not only depends on all the issues I discussed above, but also on how quickly the fraud builds and the historical turnover of the collateral compared to the present period. Accounts receivable turnover is a critical factor in detecting fraud. If the account debtor pays in 45 days and begins slipping to 60-90 days, that is a strong indication that something unusual has happened and requires further investigation by the lender through a field examination. From my experience, it will take at a minimum 60-90 days to detect fraud and sometimes as long as a year.

VI. What is an asset based lender's custom and practice in protecting its interest upon discovery that its inventory collateral has been moved to a location not belonging to its borrower?

A lender generally takes the following steps in the following order:

A. More closely monitor by putting a field examiner on site or requesting the company to hire a consultant.
B. Secure a lien on the inventory moved.
C. The inventory becomes ineligible to borrow against and if availability exists in the other collateral, the loan is reduced or a long-term payment program is worked out.
D. Request additional corporate or personal collateral to make up the short fall.
E. Increase reporting frequency.
F. Reduce advance rates.
G. If all of the above are not successful and the loan continues to deteriorate, the lender will stop funding and liquidate.

VII. What is an asset based lender's custom and practice in protecting its interest upon discovery that borrower is inflating its accounts receivable?

A lender generally takes the following steps in the following order:

A. Put a field examiner on site or request the borrower hire a consultant.
B. Request additional corporate or personal collateral to make up the short fall.
C. Notify the borrower's account debtors to pay the lender directly.
D. Reduce advance rates.
E. If the above is not successful and the loan continues to deteriorate, the lender will stop funding and liquidate.

VIII. What is an asset based lender's custom and practice in managing its relationship with a borrower who denies misconduct but expresses a willingness to cooperate with lender?

When fraud is involved the relationship is strained and the lender and the trade creditors can no longer trust the borrower. At this point, the first consideration of the lender is to assess the collateral "dilution" and takes steps to acquire accurate information. The only way this can be achieved is to place an employee of the lender on the premises of the borrower on a full-time basis or request the borrower to bring in an independent party everyone can trust, i.e. a consultant. When the consultant is in place for a period of time he or she will then determine the possibility of the company surviving and will workout a potential long-term solution.

The lender is motivated by wanting to bring its loan back in formula (collateral to agreed loan ratio) which places the company back into a positive liquidity position so it can pay all its debts as agreed, including the trade creditors. The lender will conduct itself in a fair and reasonable manner because this achieves the best results for all concerned. It is reasonable for a lender in this situation to request the borrower to get help through a consultant. The decision as to which consultant to hire is up to the borrower, but the lender will recommend those that have a good reputation or ones they have worked with in other cases. A lender is very cautious not to influence the business decisions of the borrower because lenders recognize they can't interfere with how a business runs or how it is managed. The lender will maintain an arms length relationship with the consultant

because it is the borrower the consultant serves. It is the borrower who has the responsibility and accountability to make the decisions that run its business, not the lender. A consultant can defuse the strain between the borrower and its lender and creditors. The consultant will review bank accounts, cash disbursements and receipts, work out budgets, cash flow projections, creditor arrangements, better asset management and focus on building liquidity for the company. Many times the solution for the company is a merger or sale of the company in which the consultant can add know-how and support.

Bankruptcy or receivership is always an alternative, but in my opinion it is a last resort. Bankruptcy can detrimentally affect the company's sales, will carry additional court expenses, and the decisions that are needed to run the business are difficult to make. Timing of making decisions is an important factor particularly in these stressful times. The court slows down the decision process because of the bankruptcy procedures and the court's and receiver's availability. If a receiver is appointed, the borrower does not have any influence on the selection. My experience has been that receivers can be overloaded with cases or may not have experience in the borrower's industry or business; therefore, only a small percentage of businesses survive receivership.

IX. What is asset based lender's custom and practice in communicating with a borrower's other creditors, particularly during a loan workout period?

During my career I was involved in hundreds of syndicated loans with Fleet Capital leading the transaction and we bought into loans with other lenders serving as lead lender. This gave me the opportunity to observe other lenders in workout situations. The following represents my observations of the industry's customs and practices:

A. Before lenders give out any information to trade creditors they will require the borrower's permission.
B. Assuming they have the borrower's permission, all communication should be in writing.
C. Lenders should understand the specific purpose of the inquiry.
D. The information given out is usually general and limited:
   1. Number of years doing business.
   2. Overview as to type of loan, i.e. asset-based.
   3. Size of credit facility, i.e. mid-seven figures.
E. If the borrower is in default, lenders do not want to talk to creditors, however, if fraud is suspected or discovered, a lender is even more reluctant to talk to creditors.

In my experience and practice, the lender does not want to be in a position of filtering information or interfering with the relationship (good or bad) the borrower has with the creditors. Usually the borrower will not approve of the lender talking to its trade creditors and if it does, it will give the lender specific instructions as to what information can be given. Lenders are very much aware that it is the borrower's responsibility to manage the information shared with their trade creditors.

X. Data considered in forming opinions:
In rendering my opinions, I did not base my opinions on any particular documents. Rather, my opinions are based on knowledge I acquired and observations I made during my 39 years in virtually all aspects of the asset based lending industry. I was asked to give my opinions in response to questions posed to me by CIT's attorneys.

XI. Compensation disclosure:
I am being compensated at a flat fee of $10,000 plus expenses for preparing my report, and having my deposition taken. Any further work will be compensated at the rate of $250 per hour plus expenses.

Respectfully submitted,

Irwin Teich

# IRWIN TEICH



Irwin Teich retired as President and Chief Executive Officer of Fleet Capital, the Commercial Finance Division of FleetBoston Financial (one of the 10 largest banks in the U.S.). Fleet Capital has offices in 26 cities and provides commercial and industrial financing to middle market companies. Mr. Teich held a number of key positions since joining its predecessor company in 1973. He was appointed President in 1984 and CEO in 1998 and established a culture that built customer and employee loyalty that became a way of life throughout the company. Under his leadership and vision, assets grew from $294 million to $10 billion and profits grew at an annual compounded growth rate of 15%.

Mr. Teich served on the Board of Directors, Executive Committee and was Chairman of the Systems and Audit Committees. He was the Chairman of the Commercial Finance Association and Executive Vice President of the Commercial Finance Division of the City of Hope. He also serves on the Vision Committee of Eagle Ranch for Boys and Girls.

Mr. Teich is a graduate of Roosevelt University in Chicago, Illinois. He and his wife, Shirl, have two grown children and reside in Atlanta, Georgia.