# Exhibit
# 5

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 30 2004

at 4 o'clock and 30 min. P M.
WALTER A. Y. H. CHINN, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; and KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS, OR OTHER ENTITIES 1-20,<br><br>Defendants,<br><br>And<br><br>CG DEVELOPMENT, INC.; F&J MOVERS; and RENEE COSTA,<br><br>Cross-Claim Defendants. | No. CV 01 00187 |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

As part of its complex case against several parties arising from the alleged "bust-out" of MidPac Lumber Company, Ltd., Plaintiff Whirlpool Corp. ("Whirlpool") has brought three claims against Defendant Raymond Iwamoto: (1) fraud conspiracy under Hawaii law; (2) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 28 U.S.C. § 1962(c); and (3) RICO conspiracy under 18 U.S.C. § 1962(d). Presently before us is Iwamoto's motion for summary judgment on all claims against him. For the reasons set forth below, we grant Iwamoto's motion for summary judgment on the RICO § 1962(c) claim, but we deny summary judgment on the fraud conspiracy claim and the RICO conspiracy claim.

## BACKGROUND[1]

### I. The MidPac "Bust-Out" Scheme

This action stems from the MidPac Lumber Company, Ltd. ("MidPac") "bust-out" scheme[2] in which Whirlpool was allegedly defrauded of large sums of money and inventory. The claims against Iwamoto relate to his alleged role in the fraudulent scheme. Iwamoto is a partner at the law firm of Goodsill, Anderson, Quinn & Stifel. In 1995, he began representing Kurt Glassman, Michael Clifford, Edwin Bowling, and certain entities of which those three individuals were the principals. One of these entities was CGBN, Inc. ("CGBN"). In addition to providing legal services, Iwamoto was an officer of CGBN. (Pl.'s Exs. 41, 43.)

In March 1998, Glassman, Clifford, and Bowling–acting through CGBN–purchased MidPac. After the acquisition, MidPac was in the business of selling appliances and cabinets. MidPac also acted as a surety for bonded construction projects by receiving funds in trust from financial institutions. These

---

[1]These facts are culled from the parties' Local Rule 56.1 statements of facts and supporting exhibits.

[2]The Fifth Circuit has described the basic characteristics of a "bust out" scheme as follows:

> A bust out begins with the formation by the malefactors of seemingly legitimate wholesale business. The fledgling business's first goal is to establish a favorable credit rating . . . . As the business becomes more established, its promoters order considerable amounts of additional merchandise although they have no intention of paying for these goods. A huge inventory, most of it not paid for, is built up. The principals then busy themselves disposing of their purchases at substantial discounts or secreting the unsold portion for later below-cost covert sales. In other words, they "bust out" the business. The company is then petitioned into bankruptcy with the mulcted creditors left to pick over the meatless carcass of an assetless enterprise.

*United States v. Crockett*, 534 F.2d 589, 592 (5th Cir. 1976).

funds were to be held and used only to pay contractors for goods and services relating to bonded construction projects. Iwamoto served as a director of MidPac starting in January 1999.

Shortly after purchasing MidPac, Glassman approached CIT Group/Business Credit, Inc. ("CIT"), an asset based lender, to obtain financing. MidPac and CIT reached an inventory based credit agreement under which MidPac could borrow up to $8 million, depending on MidPac's eligible accounts receivables and inventory. By Whirlpool's account, Glassman and his associates immediately began siphoning money from MidPac upon receiving this line of credit.

In order to preserve its credit line with CIT, MidPac needed to maintain the appearance of having a large inventory and significant accounts receivables. To accomplish this, Glassman and his partners formed a series of corporate entities that, while appearing separate from MidPac, were actually owned and operated by Glassman and Clifford. Iwamoto, as Glassman's attorney, was involved in the creation of these entities, F&J Movers[3] ("F&J") and Spectrum, Inc.[4] (Pl.'s Ex. 5.) Glassman and others then created phony accounts receivables due on supposed sales by MidPac to F&J and Spectrum. (Second Am. Compl. ¶¶ 56-57.) This maintained MidPac's appearance of solvency and its credit line with CIT. Whirlpool claims that Iwamoto was also involved in this false invoicing activity. (Pl.'s Exs. 6, 10.)

## II. CIT's Alleged Involvement

In June 1999, CIT became suspicious of MidPac's activity. (Pl.'s Ex. 1.) CIT learned that Spectrum had the same address as CG Acquisitions, Inc., a company also owned by Glassman. *Id.* CIT also discovered that two of F&J's payments to MidPac originated from MidPac's own bank account. *Id.* To address these suspicions, CIT requested a meeting with Glassman. This meeting occurred on

---

[3]F&J was originally formed as FA Movers. (Pl.'s Exs. 1, 5.)

[4]Iwamoto disputes the nature and scope of his involvement in the formation of these entities.

June 18, 1999. Iwamoto's billing statements show that he discussed Spectrum with Glassman on June 17, 1999. (Pl.'s Ex. 10.)

At the June 18 meeting, Glassman tried to explain several discrepancies regarding MidPac's activities to CIT. For instance, Glassman explained that Spectrum and F&J were legitimate companies that existed and operated independently of MidPac. (Pl.'s Ex. 1.) He also attempted to clarify a $900,000 accounting discrepancy in F&J's account with MidPac.[5] *Id.* Glassman further admitted to CIT that MidPac had "inadvertently" double-billed Spectrum. *Id.* The "double" invoices were both submitted to CIT as documentation for loan advance purposes. This effectively resulted in CIT over-advancing funds to MidPac. *Id.*

Unconvinced by Glassman's explanations at the June 18 meeting, CIT froze MidPac's cash assets. After conferring with Glassman, Iwamoto sent a letter to Grace Bowen, Vice-President and Regional Counsel for CIT. (Pl.'s Ex. 15.) The letter made several points. First, Iwamoto, as Glassman had done at the June 18 meeting, emphasized the "inadvertent" nature of the Spectrum double-billing. *Id.* Second, Iwamoto acknowledged Glassman's involvement in the incorporation of Spectrum and F&J, but he reiterated that Spectrum and F&J were "independent business entities" beyond Glassman's control. *Id.* Finally, Iwamoto discouraged Bowen and CIT from contacting MidPac's mainland suppliers, including Whirlpool, about CIT's investigation of F&J and Spectrum. In this regard, Iwamoto wrote, "As for the mainland suppliers, Whirlpool, Kraftmaid, Stanley and others, the relationship that MidPac has with these companies are . . . vital assets that should not be jeopardized by CIT's inquiries." *Id.*

---

[5]MidPac had billed F&J for $1.3 million worth of Whirlpool appliances. Glassman indicated that F&J's payment to MidPac was due upon F&J's resale of the appliances. At this time, however, F&J had only $400,000 worth of appliances in its inventory, but the $900,000 difference had not been remitted to MidPac.

Subsequently, CIT ***did not*** contact MidPac's suppliers. Whirlpool claims that this decision not to contact MidPac's suppliers, after Iwamoto's request, demonstrates an agreement between CIT and the MidPac principals, including Iwamoto, to continue defrauding Whirlpool so that (a) the "bust-out" would continue, and (b) CIT could recoup some of its losses. As a result of this alleged agreement and CIT's failure to contact MidPac's suppliers, Whirlpool continued to ship large amounts of inventory to MidPac on credit between mid-June 1999 and July 23, 1999. MidPac never paid for these appliances.

In July 1999, Iwamoto began negotiating a forbearance agreement with CIT. Discussion of the relevant events concerning this agreement requires some background information on Maui Home Supply ("MHS"). MHS was also owned and operated by Glassman and Clifford. It was engaged in the wholesale and retail sale of appliances and lumber. MidPac had been selling its inventory to MHS in violation of MidPac's loan agreement with CIT.[6] After learning of these sales, CIT took several steps to protect its security interest. Most significantly, CIT required MidPac and MHS to sign a consignment agreement documenting that the goods sent by MidPac to MHS were delivered on a consignment basis. MidPac then assigned its rights under the consignment agreement to CIT. Whirlpool alleges that this arrangement was created so that CIT could wrongfully reap the proceeds from MHS's sale of inventory. According to Whirlpool, by designating this transaction as a consignment agreement, CIT was attempting to shut out creditors like Whirlpool that had previously perfected security interests in MHS's inventory.

In negotiating the forbearance agreement, CIT struck language from a July 12, 1999 draft that would have required MidPac to secure an inter-creditor agreement from Whirlpool regarding Whirlpool's interest in the inventory at MHS. (Pl.'s Ex. 17.) Whirlpool claims that this edit constitutes

---

[6]The CIT loan agreement barred MidPac from selling or transferring collateral other than through sales made in the "ordinary course of business." Sales to an affiliated company or a company with common ownership, such as MHS, were prohibited.

further evidence of an agreement to keep Whirlpool from discovering the fraud. Furthermore, in a July 27 e-mail from Iwamoto to CIT's counsel, Iwamoto requested that language relating to the cause of CIT excess advances under the loan agreement be altered. Specifically, Iwamoto wanted the cause of the excess advances to be identified as "consignment" rather than "affiliate sales." (Pl.'s Ex. 20.) Iwamoto noted in the e-mail that "[t]he focus on affiliates was okay at a point in time when CIT didn't really know what was going on but now it may be different." *Id.* Whirlpools argues that the July 27 e-mail and the red-lined July 12 draft demonstrate Iwamoto's complicity with CIT in the scheme to defraud Whirlpool.

On August 3, 1999, prior to signing the forbearance agreement, Glassman and Iwamoto met with Ted Phelps, a workout specialist consulting for CIT on the MidPac case. During this meeting, Glassman complained of CIT's reluctance to advance additional funds. (Pl.'s Ex. 3, Phelps Dep. 44:13-45:10.) Phelps explained that CIT's reluctance was based on its belief that Glassman had defrauded it. *Id.* Glassman first denied that any fraud took place, but he later admitted that CIT received some "bad paper" from Spectrum.[7] *Id.* Phelps and Iwamoto both told Glassman that the "bad paper" from Spectrum was the fraud. *Id.* Whirlpool contends that this demonstrates Iwamoto's knowledge of the fraudulent scheme.

In September 1999, Iwamoto took steps to secure new financing for MidPac from City Bank. (Def.'s Ex. A, Iwamoto Dep.at 187:13-21.) Iwamoto drafted a letter to City Bank detailing MidPac's history with CIT. (*Id.* at 189:5-7.) An early draft of this letter mentioned that CIT suspected MidPac of fraudulent activities. (Pl.'s Ex. 26.) The final draft, however, omits any reference to CIT's suspicion of fraud. (Pl.'s Exs. 27, 28.) According to Whirlpool, Iwamoto's removal of the this reference demonstrates his agreement to conceal MidPac's fraudulent activities.

---

[7]Presumably, this "bad paper" was in the form of phony accounts receivables.

By November 1999, CIT had not yet released money to MidPac for bond funding despite a previous agreement to do so.[8] In an internal e-mail to colleagues at his firm regarding the MidPac bond funding problem, Iwamoto stated, "CIT has to bite the bullet and fund the bonding monies or the *bond situation could bring the whole thing down*." (Pl.'s Ex. 38.) (emphasis added) Whirlpool claims that this e-mail highlights Iwamoto's knowledge and involvement in the entire fraudulent affair and, particularly, the alleged bond fraud.

In the Fall of 1999, Iwamoto also had two phone conversation with Carl Smith, Whirlpool's National Credit Manager. The first conversation concerned how MidPac could repay Whirlpool (Pl.'s Ex. 4, Smith Dep. 39:15-41:6.) In the second conversation, Iwamoto pressed Smith about the possibility of Whirlpool resuming shipments to MidPac so that MidPac could fulfill its contractual obligations with third parties. (*Id.* at 42:8-43:3.) Whirlpool never resumed shipments to MidPac. (*Id.* at 43:4-16.)

## ANALYSIS

### I. Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

---

[8] Recall that MidPac also acted as a surety for bonded construction projects. Apparently, MidPac had improperly commingled bond funds with its operational accounts. Furthermore, Whirlpool alleges that CIT wrongfully seized these bond funds in order to satisfy its security interest. As to how this relates to Iwamoto, Whirlpool alleges that Iwamoto was aware of and participated in the "bond fraud."

(quotation marks omitted). Once the moving party has met this burden of production, the nonmoving party "must go beyond the pleadings and designate facts showing an issue for trial." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322-23). However, if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is required. *Celotex*, 477 U.S. at 322. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu*, 198 F.3d at 1134 (citations omitted). At the same time, reasonable doubts regarding the existence of a material fact should be resolved against the moving party, and all inferences are drawn in favor of the non-moving party. *Id.*

## II. Fraud Conspiracy

Count II of Whirlpool's Second Amended Complaint alleges that Iwamoto conspired with, *inter alia*, CIT and Glassman to defraud Whirlpool. Whirlpool argues that summary judgment is inappropriate on the fraud conspiracy claim because genuine issues of material fact exist.

A conspiracy is "a combination of two or more persons [or entities] by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means." *Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc.*, 982 P.2d 853, 881 n.28 (Haw. 1999). Mere knowledge of wrongdoing, however, is not enough to constitute conspiracy "absent approval, cooperation, or agreement." *Id.* at 889 n.44. An express agreement, however, need not be proven; rather, the existence of a conspiracy "may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." *Sunset Bay Assocs. v. Eureka Fed. Savings & Loan*, 944 F.2d 1503, 1517 (9th Cir. 1991).

Because there is a triable issue of fact as to whether Iwamoto conspired to defraud Whirlpool, we deny summary judgment on this claim. To be sure, Whirlpool does not have a "smoking gun" that definitively establishes Iwamoto's agreement to participate in the fraud. Furthermore, Iwamoto presents plausible explanations for his conduct that would negate a claim for fraud conspiracy.[9] Whirlpool, however, is not required to present such definitive evidence because circumstantial evidence alone can support an inference of conspiracy. *See Sunset Bay Assocs.*, 944 F.2d at 1517. Whirlpool has presented a wealth of circumstantial evidence regarding Iwamoto's involvement in the fraudulent scheme: (1) Iwamoto's billing statements show his involvement in setting up the corporate entities allegedly used to perpetrate the fraud, (Pl.'s Ex. 5); (2) Iwamoto's billing statements show that he discussed MidPac's "double billing" (i.e., false invoicing) with Glassman, (Pl.'s Ex. 6); (3) Iwamoto drafted a letter to CIT's Vice-President and Regional Counsel discouraging CIT from contacting Whirlpool about MidPac's financial irregularities, (Pl.'s Ex. 15); and (4) in an e-mail to colleagues at his law firm regarding the precarious MidPac bond situation, Iwamoto stated, "CIT has to bite the bullet and fund bonding monies or the bond situation could bring the whole thing down." (Pl.'s Ex. 38.) Taken together, this evidence would allow a jury to infer that Iwamoto was part of a conspiracy to defraud Whirlpool. *See id.* Therefore, after considering the evidence in the light most favorable to Whirlpool and drawing all reasonable inferences in its favor, we deny summary judgment on the fraud conspiracy claim.

---

[9]For instance, Iwamoto claims that when he formed F&J and Spectrum he did not know of Glassman's intent to use these companies in the "bust-out" scheme. He further states that he relied on Glassman's representations that MidPac was financially strong when he urged CIT not to contact MidPac's suppliers. In short, much of Iwamoto's argument is that he relied on Glassman's representations, was unaware of any financial improprieties with MidPac, and merely provided legitimate legal services.

## III. RICO § 1962(c)

Whirlpool also claims that Iwamoto's role in the MidPac "bust-out" violated § 1962(c) of the RICO Act. Section 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Iwamoto has moved for summary judgment on the § 1962(c) claim against him.

The parties' arguments on this claim focus primarily on whether the evidence of Iwamoto's alleged involvement in the "bust-out" scheme satisfies the "operation or management" test adopted by the Supreme Court in *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993). In *Reves*, the Court narrowed the scope of § 1962(c) by limiting liability to those defendants who had "participated in the operation or management of the enterprise itself." *Id.* The Court noted that § 1962(c) liability is "not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.* at 179 (emphasis in original). Applying this test, the Court found that accountants who had knowingly overvalued certain corporate assets so that the corporation would remain solvent did not violate § 1962(c) because they played no role in directing the enterprise's affairs. *Id.* at 185-86.

Two Ninth Circuit cases have applied the "operation or management test" in similar contexts. In *Baumer v. Pachl*, the Ninth Circuit upheld the district court's dismissal, pursuant to Rule 12(b)(6), of a § 1962(c) claim against an attorney. 8 F.3d 1341, 1344 (1993). Plaintiff alleged that the defendant attorney prepared two letters and a false partnership agreement that were designed to conceal and advance a fraudulent investment scheme. *Id.* at 1342-43. The court noted several key facts: (1) the defendant's involvement in the eleven-year scheme was sporadic; (2) defendant had no formal role in the partnership involved in the scheme; and (3) the defendant's role was limited to providing legal

services. *Id.* at 1344. Accordingly, the court held, under the "operation or management" test, that plaintiff had failed to allege a § 1962(c) cause of action. *Id.*

Similarly, in *Webster v. Omnitrition Int'l, Inc.*, the Ninth Circuit affirmed the district court's grant of summary judgment for the defendant, an attorney, on plaintiff's § 1962(c) claim. 79 F.3d 776, 789 (1996). The court recognized that the defendant attorney in *Webster* played a greater role in the alleged enterprise than the defendant in *Baumer*. *See id.* Specifically, the defendant in *Webster* was the "Assistant Secretary" of the alleged RICO enterprise. *Id.* The defendant had also made several misleading statements promoting the fraudulent scheme. *See id.* Despite the defendant's title and promotion of the fraud, however, the court held that summary judgment for the defendant was proper because he did not participate in the "operation or management" of the enterprise. The court specifically noted that the uncontroverted evidence showed that defendant's role as an officer was "purely ministerial in nature."

Other courts faced with the question of attorney liability under § 1962(c) have generally found that attorney defendants did not satisfy the "operation or management" test. *See Nolte v. Pearson*, 994 F.2d 1311, 1317 (8th Cir. 1993) (affirming directed verdict for attorney defendants where there was no evidence that they participated in the operation or management of the enterprise); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521-22 (2d Cir. 1994) (affirming summary judgment for defendant attorney where record showed that he merely represented the enterprise in fraudulent transactions); *see also Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants*, 832 F. Supp. 585, 591-92 (S.D.N.Y. 1993) (granting summary judgment for attorney defendant and holding that defendant did not satisfy "operation or management" test even though he might have intentionally aided a scheme to defraud). We recognize, however, that a minority of cases have found attorneys liable under § 1962(c) where the attorney's conduct satisfied the "operation or management" test. *See, e.g., Napoli v. United States*, 32 F.3d 31 (2d

Cir. 1994) (upholding criminal convictions under § 1962(c) where evidence showed that attorney defendants directed the enterprise, a law firm).[10]

Given these precedents and the evidence regarding Iwamoto's conduct, summary judgment is appropriate on Whirlpool's § 1962(c) claim. The evidence certainly supports the notion that Iwamoto knew that his services were being used in a scheme to defraud. However, the evidence also shows that it was Glassman, not Iwamoto, who was truly managing and directing the affairs of the alleged RICO enterprise. Based on the record before us, Iwamoto's actions on behalf of MidPac were consistently taken at the behest of Glassman. Thus, although Iwamoto provided services for the alleged enterprise, there is no evidence to suggest that he managed or operated it. Whirlpool argues that Iwamoto participated in the "management or operation" of MidPac because he was a director of the company. The Ninth Circuit in *Webster* made clear, however, that mere titles are not a sufficient basis for finding that one participated in the "management or operation" of an enterprise. 79 F.3d at 789. Therefore, in light of the evidence before us and the Ninth Circuit's decisions in *Baumer* and *Webster*, we grant summary judgment for Iwamoto on Whirlpool's § 1962(c) claim.

---

[10]As one court explained:

> Reves did not establish a *per se* rule that one cannot operate or manage an enterprise via the provision of legal services. A person may violate § 1962(c) if he conducts the affairs of an enterprise, even though he does so through the provision of professional services. [While this is not often the case], there are situations in which the professional services provided strike at the very core of the enterprise and therefore the lawyer . . . providing the services is managing or operating the [enterprise].

*Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 555-56 (D. Md. 1998).

## IV. RICO Conspiracy, § 1962(d)

Whirlpool's Second Amended Complaint also states a RICO conspiracy claim against Iwamoto under 18 U.S.C. § 1962(d).[11] Iwamoto has moved for summary judgment on this claim..

To find a defendant liable under § 1962(d), plaintiff must prove the existence of "an agreement that is a substantive violation of RICO or that the defendant[] agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. America Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). A plaintiff need not show that a defendant actually committed any predicate acts; rather, "it suffices that [the defendant] adopt the goal of furthering or facilitating the . . . endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997); *see also Beck v. Prupis*, 529 U.S. 494, 506-07 (2000) (emphasizing that a defendant may violate § 1962(d) without violating any substantive provisions of § 1962, including § 1962(c)). Therefore, "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." *United States v. Fernandez*, 338 F.3d 1199, 1230 (9th Cir. 2004) (quoting *Smith v. Berg* 247 F.3d 532, 538 (3d Cir. 2001)).

Whirlpool has presented enough evidence to create a triable issue of fact as to whether Iwamoto knowingly agreed to facilitate the alleged RICO enterprise.[12] As in the context of the fraud conspiracy claim, we rely on the following pieces of evidence to support this conclusion: (1) Iwamoto's billing statements show that he was involved in setting up the corporate entities allegedly used to perpetrate the fraud, (Pl.'s Ex. 5); (2) Iwamoto's billing statements show that he discussed MidPac's "double billing" (i.e., false invoicing) with Glassman, (Pl.'s Ex. 6); (3) Iwamoto drafted a letter to CIT's Vice-President

---

[11]Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)." 18 U.S.C. § 1962(d).

[12]In his motion for summary judgment, Iwamoto has not argued that the MidPac "bust-out" scheme does not constitute a RICO enterprise.

and Regional Counsel discouraging CIT from contacting Whirlpool about MidPac's financial irregularities, (Pl.'s Ex. 15); and (4) in an e-mail to colleagues at his law firm regarding the precarious MidPac bond situation, Iwamoto stated, "CIT has to bite the bullet and fund bonding monies or the bond situation could bring the whole thing down." (Pl.'s Ex. 38.) Again, Iwamoto insists that his role in these events was limited to providing legitimate legal services and that he was unaware of the MidPac "bust-out." Given the evidence presented, however, Iwamoto's knowledge and intent are issues for a jury to decide. Accordingly, we deny summary judgment on Whirlpool's RICO conspiracy claim under § 1962(d).

## CONCLUSION

For the foregoing reasons, we grant Iwamoto's motion for summary judgment as to the RICO claim under § 1962(c). We deny Iwamoto's motion for summary judgment as to the fraud conspiracy claim and the RICO conspiracy claim under § 1962(d). It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated 12/27/04