**DRAFT**

Elaine letter to Clifford K. Ogata Senior Vice President & Chief Lending Officer
Corporate Banking Division

Dear Cliff:

It was a pleasure meeting with you and Kurt Kunihiro this morning. You and Kurt met with Kurt Glassman, Ed Bowling, Ted Phelps and me to go over MidPac's request for financial assistance from City Bank. On behalf of MidPac, we appreciate your willingness to give our request serious consideration. In that connection, you asked that MidPac summarize for City Bank, the current status and chronology of its loan from CIT.

MidPac closed its loan with CIT on March 19, 1998. CIT, in essence financed the acquisition of MidPac by Kurt Glassman and Mike Clifford. After this change of ownership and new management, the company (that had been losing money for years) started making money. Business was booming and the company was on a roll. It needed to buy more and more inventory because it was selling well. In my opinion the momentum of this business success is what got out of hand and ultimately caused the loan with CIT to became unbalanced.

The tremendous success of the company led to certain practices that were not permitted under the CIT loan agreement. For bonafide business reasons, MidPac entered into varying arrangements with affiliated companies, such as Maui Home Supply and others. These arrangements ran afoul of CIT's loan documents. Bear in mind that CIT audited MidPac's receivables and kept funding advances and then there was a change in personnel at CIT that implemented tighter interpretations of what MidPac was entitled to borrow. Before the change in CIT personnel, I believe that CIT got caught up in MidPac's business success just as MidPac did. Unfortunately once CIT realized this, they have had only one thing in mind and that is to reduce their exposure even if it means that the extremely profitable business will be destroyed in the process. This is a small loan for CIT and decisions are being made out of New York City. They could care less about this Hawaiian company or its employees.

The arrangement with CIT is for CIT to advance funds based on formulas for specified percentages of inventory and qualified accounts receivables. In June of this year, CIT became aware of over advances and on June 25, 1999, issued its default letter to MidPac, stating that CIT had advanced funds based on receivables from affiliates of MidPac that were not bonafide receivables and had advanced funds based on receivables that were not eligible receivables because they were based on consignment arrangements. The eligible accounts of MidPac at that time was estimated by CIT to be overstated by $3.5 million, causing a loan over advance of approximately $3 million. With this default notice, CIT ceased all advances and took over the company's cash flow through lock box arrangements and except for the most minimal operating requirements, such as payroll, CIT applied all cash towards reducing its exposure. With the cash cut off, remarkably the company still managed to make sales in the amount of $ for the months of ________. However obviously this cannot continue and the company has suffered losses estimated at $_________ for MidPac and $_______ for Maui Home Supply.

SEP - 1 1999



General:281074.1

G02835

EXHIBIT A

Maui Home Supply is entwined in this because there is considerable inventory of MidPac's at Maui Home Supply. As Maui Home Supply sells this inventory, the sales proceeds all go towards paying down CIT's loan. The sales proceeds do not go towards allowing Maui Home Supply to purchase more inventory. If Maui Home Supply could purchase this inventory from MidPac at cost then their sales of the same, in excess of cost, would be available to Maui Home Supply for the replenishment of inventory and its business could continue to flourish. CIT's intervention in capturing the cash has depleted the inventory and restricted Maui Home Supply's ability to do more business.

Prior to this, CIT administered this loan with some degree of flexibility in interpretation of the loan requirements. But as soon as they realized that the loan was out of formula, their interpretation became ultra strict. They were worried that money had been stolen from them by virtue of fraud. They recommended that MidPac consider hiring an experienced and qualified work out specialist who would also be able to determine if fraud had been committed and whether the company was a viable company. They recommended that MidPac hire Mr. Ted Phelps. MidPac did. CIT recommended that MidPac put in place a control warehousing agency to take control of the inventory. MidPac engaged the services of Collateral Risk Management and they currently control all of the inventory.

CIT sent personnel to Honolulu to audit the books. As a result of all of this, CIT finally on August 3, 1999 entered into a Forbearance Agreement with Kurt Glassman. As part of this Forbearance Agreement, Kurt Glassman gave CIT a mortgage on his personal residence. This went a long ways in convincing CIT that there was no fraud. In the meanwhile, with CIT capturing all of the cash, the loan balance owing to CIT has now been reduced to $4.9 million. It was approximately $7 million in June of 1999.

Unfortunately the Forbearance Agreement is based on a budget which was negotiated and agreed upon. That budget did not provide for curing the Damon Estate's back rent. It was and is CIT's position that it will not advance unsecured funds to pay unsecured debt, such as back rent. CIT has an agreement from the Damon Estate that if the Damon Estate were to cancel MidPac's leases, CIT will have 90 days in which to liquidate the inventory and other collateral. CIT is comfortable with this happening for it has no regard whatsoever for the fact that this is a viable profitable company with many loyal employees that will lose their jobs.

This stems from the fact that they are an asset based lender and their sole focus is on their collateral. MidPac desperately needs to replace CIT with a more traditional cash flow lender that will permit MidPac to utilize cash to buy more inventory so that it can continue its highly successful business.

MidPac has a cadre of lumber suppliers, and appliance and cabinet suppliers that have appeared ready to support the company and give MidPac a chance to enter into arrangements with another lender even though these suppliers are owed money from MidPac on an unsecured basis. If MidPac is successful in replacing CIT or neutralizing CIT with another lender that will permit the cash flow to be used to purchase new inventory and permit MidPac to be successful

again, it appears more than likely that beneficial arrangements to pay these trade creditors can readily be accomplished.

Attached please find a copy of Mr. Ted Phelps' resume. He has worked with more than 150 distressed companies and he will tell you that in his professional opinion, MidPac is a profitable company if it could replace or neutralize CIT. Mr Phelps has provided cash management services to MidPac since being hired and is intimately familiar with MidPac's business and somewhat familiar with Maui Home Supply's business. MidPac is a company that is worth saving. It has a tremendously loyal trained cadre of employees and a tremendous customer base. All it needs is cash flow with which to buy more inventory.

We believe that if City Bank would advance $4.5 million to MidPac, with $4 million paid to CIT and $500,000 for working capital, it would be possible to neutralize CIT and place them in the role of a subordinate participant. CIT's share of the total debt of $4.9 would be $900,000. We further believe that if City Bank provided this financial assistance, there is a good possibility that MidPac could restructure its rental obligations with the Damon Estate thereby further improving MidPac's financial strength.

We understand that we are asking City Bank to increase its loan exposure to the Maui Home Supply, MidPac group of companies. We sincerely believe that in doing so, City Bank will enhance the security of its current exposure on its loan with Maui Home Supply and that such further lending by City Bank will be a prudent move on City Bank's part. If City Bank will take out CIT at least to the extent of making CIT a minor participant, City Bank and its participants will have financed a viable entity with proven ability to repay its debt and in doing so, will have brought that company and Maui Home Supply back to profitability. Both Mr. Glassman and Mr. Clifford believe this and are willing to stand behind MidPac and provide City Bank with the financial guarantees that it will need.

Ultimately MidPac and Maui Home Supply would be merged and financing arrangements entered into with a normal lender such as City Bank and the seminal problem of inter company sales of inventory between affiliated companies with different lenders will no longer exist. We stand ready to answer any questions and to continue to discuss this with you and your participants at any time. We sincerely appreciate your willingness to give our request serious consideration.