IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, Inc., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants.<br><br>and<br><br>CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | NO. CV 01 00187 DAE BMK (Tort and RICO) |

DEPOSITION OF DONNA LYNN MARTIN

Taken on behalf of the Defendant/Cross-claimant, The CIT Group/Business Credit, Inc. at Alston Hunt Floyd & Ing, 18th Floor, Pacific Tower, 1001 Bishop Street, Honolulu, Hawaii, commencing at 9:22 a.m. on Monday, December 16, 2002, pursuant to Notice.

BEFORE: SHARON L. ROSS, CSR No. 432 EXHIBIT C

1999?

A. Correct.

Q. And do you recall the extent or how much they were past due as of that point?

A. No.

Q. Do you recall whether the past due was within, as you call it, reasonable payment terms or beyond that?

A. At that time they were within reasonable past due, but they were up to their credit line.

Q. When you say, with respect to Midpac and Maui Home, "reasonable past due," what range of past due were you referring to as of February, March of 1999?

A. Within 30 days past due of their noted payment terms.

Q. As of February or March of 1999, was that a frequent situation or something -- or occasional?

A. That was occasional. They paid very well.

Q. So, when you say they "paid very well," how quickly would they pay within their -- how quickly would they normally pay as of the February, March, 1999 time frame?

A. They paid within acceptable terms.

Q. Okay. Meaning that they paid, what, on or within the payment terms that had been set up for their

accounts?

A. Correct.

Q. Do you recall in February or March, 1999 whether they were ever in excess of their credit limit?

A. I'm sorry. During what date?

Q. February to March of 1999.

A. Yes, possibly.

Q. Okay. And when was that?

A. Around March of '99, toward the end.

Q. What happened?

A. A request was made to Ernie to review the file and see if an increased credit line could be determined.

Q. Who made that request?

A. I believe I did. I may not have been the only one.

Q. Do you know if anybody else made that request to Ernie?

A. I don't know.

Q. Okay. Had a request been made to you to review the -- well, had a request been made to you that generated your request to Ernie to review the file?

A. No.

Q. Okay. Why did you make that -- the request to Ernie at that time to review the file to determine

11:47 whether to increase the credit line?

11:47 A. I had orders that needed to be released but not enough credit line to support it.

11:47 Q. Why at that time did you ask Ernie to review the file for the purpose of determining whether to increase the credit line rather than simply holding on to the orders and not releasing them?

11:48 A. Because my job responsibility was to try to support the business, and this trade partner gave me no concern to hold their orders if a credit line increase could be determined.

11:48 Q. When you say it was your job to support the business, are you referring to the trade partner's business or to --

11:48 A. Yes, in respect to our release.

11:48 Q. Right. I want to show you Exhibits 157 and 158.

11:49 MR. HOGAN: If you could, just have the Bates stamps on the record.

11:49 MS. ING: For the record, Exhibit 157 is A 01218. 158 is A 01217. And they are both entitled Marketing Order Processing System scratchpad.

11:49 Q. (BY MS. ING) Ms. Martin, have you seen these documents or the contents of them before?

11:49 A. Yes.

12:01 Q. Do you recall whether those orders that you were deciding whether to release as of March 26th -- whether they related to Maui Home Supply versus Midpac?

12:01 A. No, it could have been either. I can't identify this account from these notes.

12:02 Q. Had you had any prior discussions with Mr. Matlock or anyone else in Whirlpool about increasing the credit line for either Midpac or Maui Home?

12:02 A. Prior to March of '99?

12:02 Q. Right, prior to March 26th of '99.

12:02 A. I don't recall.

12:02 Q. Referring you to Exhibit 158, which is A 1217, and the entry -- the second-from-the-bottom entry for March 26th, 1999, it says "set permanent line from" 500,000 -- "500 K temp to 1.2 million perm." Were you aware that that had been done for either Maui Home or Midpac?

12:03 A. Yes

12:03 Q. And did you become aware of it through this scratchpad system or any other means?

12:03 A. Probably from a return phone call from Ernie or e-mail --

12:03 Q. Okay.

12:03 A. -- acknowledging the increased credit line.

12:03 Q. And then you -- at that point you released

14:25 your fax to Mr. Souza?
14:25 A. I'm sorry. What's "upshot"?
14:25 Q. I'm sorry. What was the result of your fax
14:25 to Mr. Souza?
14:25 It's a legal term. You're referring back to
14:25 your ARK --
14:25 A. I'm looking at my ARK notes. I would have to
14:25 relook at my notes to be able to see if I made a
14:25 notation of what was the result.
14:25 Q. Okay.
14:25 A. It looks like Janet Rowan received
14:26 information from Mike Souza that he would be sending a
14:26 payment.
14:26 Q. What are you looking at to say that?
14:26 A. Page 3 of Document A 07375 dated June 7th,
14:26 1999.
14:26 Q. Okay. And that -- that's Exhibit 169, for
14:26 the record; and that is the note that says Mike Souza is
14:26 mailing a check today for 149,000-and-some-odd dollars
14:26 and cents?
14:26 A. Correct.
14:26 MR. HOGAN: I'm sorry. Oh, okay. Thank you.
14:26 Q. (BY MS. ING) June 7th. Now, between the
14:26 time that you had talked to Myrtle about sending payment
14:26 and then having to send this fax to Mike about the

14:27 account being past due, the May 24th fax, do you recall whether there were orders that you released to Midpac and Maui Home Supply?

14:27 A. I probably would have released orders during that time frame.

14:27 Q. Okay. And why would you have done that even though -- well, let's take it from, say, May 21st when the -- when you hadn't received the promised for payments to June 7th, do you recall if there were orders that you released in that time frame?

14:27 A. Yes, probably so.

14:27 Q. Okay. And why would you have done so even though payments had not been made as promised?

14:28 A. Because there wasn't a concern with the account. Myrtle was communicating with me. When a trade partner says 500,000 or any dollar amount, it may not be to the penny; but they indicate a payment's coming. And I was expecting a payment, and I hadn't had any problem before. So, there was no reason not to believe that it was forthcoming.

14:28 Q. Now, on June 4th, the ARK notes reflect that Janet released 17 pending orders. Do you see that?

14:29 A. This is June --

14:29 Q. Referring to document exhibit -- or Depo Exhibit 169.

14:29 A. Actually the statement says "per Janet released all 17 pending orders."

14:29 Q. Oh.

14:29 A. That actually meant I released it per her direction.

14:29 Q. All right. Now, as of that date, you had not received all of the promised for payment of 500,000 that Myrtle said would be sent on May 14th and no $500,000 payment for the end of the month of May. Did you have any hesitation about releasing those 17 pending orders on June 4th?

14:29 A. No.

14:29 Q. Okay. And why not?

14:29 A. Because we have received one payment. Again, it didn't have to be to the penny. And since we hadn't had any reason not to believe Myrtle's promises in the past, we were still communicating. So, we were still trying to support their business.

14:30 Q. During that period of June 4th, '99, early June, were you getting pressure from Midpac or Maui Home Supply to release those orders?

14:30 MR. HOGAN: Objection, vague as to the term "pressure."

14:30 Q. (BY MS. ING) You can answer if you understand the question.

14:37 Q. Okay. Were you involved in internal discussions in Whirlpool as far as whether or not to set up a payment plan?

14:37 A. No.

14:37 Q. Did you become aware -- well, you did become aware at some point that a payment plan had been set up between Whirlpool and Midpac and Maui Home Supply?

14:37 A. Yes.

14:37 Q. And how did you become aware of that?

14:37 A. I believe I received a voice mail from my supervisor.

14:37 Q. From Janet Rowan?

14:37 A. Correct.

14:37 Q. Okay. And is that what would have given rise to your June 2nd, 1999 note on Exhibit 169?

14:37 A. Correct.

14:38 Q. Now, as far as the weekly payments that were promised per that note as reflected in your note of June 7th, 1999, do you know if Whirlpool, in fact, received those weekly payments?

14:38 A. I believe they only received the first payment of the 149,000 --

14:38 Q. Okay.

14:38 A. -- 550.

14:38 Q. And what happened after that?

A. There was a check for 150,000-and-some dollars that was mailed in, but it eventually came back NSF.

Q. And how did you become aware that the check came back NSF?

A. I believe, at the end of June I got a call from Kurt Glassman advising that it was going to be coming back.

Q. End of June. Look at Exhibit 170.

A. And my date may be off.

Q. I think -- if you look at 170, I think it does reflect June 28th, 1999. That's the Janet Rowan notes. And referring you to 170, which is A 03518 and 19, do you see that entry of June 28th?

A. Yes.

Q. And that's what you're referring to as the call you got from Kurt informing you that -- of the insufficient funds check?

A. Yes.

Q. Okay. As of that June 28th, do you know if there were pending orders to be released for Midpac or Maui Home Supply?

A. Probably.

Q. Okay. And do you know if you would have decided to release those orders?

14:40 A. Based on this check? Yes.
14:40 Q. Okay. Why is that?
14:40 A. Because when Kurt talked to me, he indicated that the check was NSF but that he would be sending more money to cover it. And, again, that is in my process working with me and I had no reason to believe that he wasn't going to make good on the payment and I would have continued to release orders.
14:41 Q. Okay. By that June 28th, how many weekly payments were you expecting to have received from Midpac and Maui Home Supply?
14:41 A. One a week from --
14:41 Q. From --
14:41 A. -- from June 4th, I believe.
14:41 Q. And you got the first week, which was 149,000?
14:41 A. Correct.
14:41 Q. Okay. And then as of the end of June, you had not received any further payments; is that correct?
14:41 A. Correct.
14:42 Q. But in your judgment, so long as Kurt called you and said he was mailing another check, that was sufficient for the purpose of releasing orders?
14:42 A. It would have been because when the check came back NSF, my normal practice was to call the trade

partner and ask, "Why is it NSF?" It could have been a bank issue. It could have been a time delay on a deposit.

And when I called him and he was going to make restitution and -- within a reasonable amount of time as well as making his next payment, there was no indication for me not to feel that he was still meeting his repayment plan.

Q. At that point when you learned of the insufficient funds check, did you take any actions with respect to this account or the -- rather, not this account, but the Midpac and Maui Home Supply accounts?

A. I probably would have advised Janet Rowan.

Q. Okay. Did you advise anybody else in the credit department?

A. I don't believe so.

Q. Is that the type of information that you would normally have advised persons in the credit department besides Janet Rowan about?

A. No.

Q. Do you recall if you and Janet had any discussion about the insufficient funds check and what to do?

A. I don't recall. I could speculate but --

Q. I want to get your best recollection.

C E R T I F I C A T E

STATE OF HAWAII )
) SS:
CITY AND COUNTY OF HONOLULU )

I, SHARON ROSS, Notary Public, State of Hawaii, do hereby certify:

That on Monday, December 16, 2002, at 9:22 a.m., appeared before me DONNA LYNN MARTIN, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not attorney for any of the parties hereto, nor in any way concerned with the cause.

DATED this 20th day of December, 2002, in Honolulu, Hawaii.

NOTARY PUBLIC SHARON ROSS STATE OF HAWAII

Sharon Ross

SHARON ROSS, CSR NO. 432
Notary Public, State of Hawaii
My Commission Expires: 4/8/05