IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; et al.,<br><br>Defendants,<br><br>and<br><br>F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | Civil No. CV 01 00187 MEA-BMK (Tort and RICO)<br><br>**MEMORANDUM IN SUPPORT OF MOTION** |

**MEMORANDUM IN SUPPORT OF MOTION**

This motion seeks to preclude Whirlpool from arguing to the effect that "CIT has admitted to taking $1 million Whirlpool collateral located at Maui." *Plaintiff's Objections to [CIT's] Second Proposed Jury Instructions (filed 3/15/06), at 19. See also Whirlpool Trial Ex. W926, answers to interrogatory nos. 10, 20, attached as Ex. 1.*

It is anticipated that Whirlpool will attempt to mischaracterize deposition testimony of CIT's Thomas Hayes, as well as audit findings by CIT's Paul Dybczak (*Ex. 2, excerpts of Whirlpool Trial Ex. W324, at CA23659-660*), as admissions by CIT that it converted $1 million of Whirlpool's collateral at Maui

Home Supply ("MHS") and is liable to Whirlpool for that amount in conversion damages. Such argument should be barred under FRE 403 because it misrepresents CIT's testimony.

## I. BACKGROUND

Whirlpool bases its conversion claim against CIT on the allegations that CIT forced MHS to sell collateral in which Whirlpool had a prior security interest and then pocketed the proceeds. *Second Amended Complaint, ¶¶ 135-138.* Whirlpool has been unable to quantify with any detail the amount of its conversion damages. *Ex. 1 (Whirlpool's answers to interrogatory nos. 20, 21.)* Instead, it has relied on testimony by CIT's Thomas Hayes estimating that "MidPac's collateral in Maui" "had a book value of approximately a million dollars" (*Ex. 3, Thomas A. Hayes Rule 30(b)(6) Deposition, at 115:20-116:10*), of which Mr. Hayes estimated that $450,000 in book value consisted of Whirlpool, Roper and Kitchen-Aid inventory. *Id., at 117:14-18.* Mr. Dybczak's audit indicates that as of March 25, 1999, MidPac reported about $1 million in MidPac inventory located in Maui on MidPac's perpetual inventory reports. *Ex. 2 (W324, at CA23660).*

An undisputed report by CIT's forensic accounting expert Thomas E. Hayes (not to be confused with CIT executive Thomas A. Hayes) opines that the unpaid invoices on which Whirlpool bases its damages in its Second Amended Complaint (*Ex. A, B to SAC*) reflected a striking frequency of drop shipments by MidPac to MHS and vice versa that were "not

consistent with normal business practice" (*Ex. 4, Whirlpool Trial Ex. W894, at 2)* and indicate "that Whirlpool sent billings to MidPac or Maui Home Supply depending on which credit line was open at the time of shipment." *Id., at 3.* Whirlpool has proffered no expert to controvert CIT's expert.

Although this Court noted "that the mere fact of the drop shipments is not sufficient to demonstrate that Whirlpool knew of the sales transactions" (*Opinion, at 25*), it should also be noted that Whirlpool saw enough significance in the commingling of inventory between its two customers that it sought to use that commingling theory to its advantage against CIT in the Second Amended Complaint ("SAC"). There, Whirlpool alleged that "the commingling of Whirlpool product between MidPac and the secured Maui Home Supply inventory evidences that, **more likely than not**, sales to the Navy of Whirlpool product [by MidPac] are subject to Whirlpool's security interest." *SAC, ¶49* (emphasis added). The pattern of drop shipments and commingling is relevant to the issue of whether, assuming MidPac's transfers to MHS are deemed a sale, CIT's security interest in the MidPac inventory remained intact because MHS was not a buyer in the ordinary course of business under former HRS § 490:9-307 (buyer takes free of a security interest in seller's property if he buys "in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party." *Comment 2.*)

Even assuming all of MidPac's inventory at MHS were deemed subject to Whirlpool's security interest (an issue which CIT respectfully does not concede), the sales proceeds which MidPac realized from the sale of inventory at MHS were just a fraction of the $1 million book value estimate testified to by Thomas E. Hayes. Between late July and mid-December 1999, Maui Home Supply faxed daily sales reports to Ted Phelps, showing daily sales of lumber, appliances and cabinets, as well as daily and total amounts remitted to MidPac. *See, e.g., Ex. 5 & 6 (Whirlpool Trial Ex. W793, W795); Ex. 7 (excerpt from CIT Trial Ex. C31, AL002490, CT008792-93)*. A summary prepared by CIT counsel's staff of Maui Home Supply daily sales reports, as well as of Maui Home Supply's checks to MidPac and MidPac's deposit slips, show that Maui Home Supply had total net sales for July 26, 1999 through December 13, 1999, of $567,954.00, of which approximately $369,461.00 had been remitted to MidPac. *Ex. 8*. A Maui Home Supply sales report for December 11, 1999, showed a total remittance that was close to the summary's MidPac remittance figure: $377,987. *Ex. 5 (Ex. W793 at AL000801)*. Thus, regardless of estimated book value, the total net amounts yielded from the sale of MidPac inventory in Maui was considerably less than the $1 million or even $450,000 book values.

## II. ARGUMENT

While courts will allow some latitude in argument, argument will be deemed improper if it is "prejudicial in such degree as to result in manifest injustice. *Ginoza v. Takai Elec. Co.*, 40 Haw. 691, 703 (1955).

In this case, it would be prejudicial and improper for Whirlpool to be allowed mischaracterize CIT representatives' testimony or findings about the book value of MidPac inventory located at MHS as admissions by CIT of converting or taking $1 million of Whirlpool's collateral at MHS. Such an argument would be misleading because:

1. The argument would misrepresent CIT's state of mind and state of knowledge at the time. Although this Court, with the benefit of hindsight, has held that CIT took the goods unlawfully, CIT believed at the time that it retained a legitimate, first priority security interest in MidPac's inventory in Maui because the goods were sold or transferred to a related entity, or at least a right to proceeds of the inventory, even as a junior creditor, because Whirlpool had not restricted MHS' use of sales proceeds.

2. The argument would mispresent the burden of proof to which Whirlpool is still subject in order to prove conversion. This Court has ruled that Whirlpool must still prove that "CIT directed the sale of inventory at

MHS and then reaped the proceeds from the sale" in order to prevail on its conversion claim. *Opinion, at 33.* Although CIT respectfully submits that this Court was premature in ruling that "CIT's assertion of ownership and subsequent sale of the property was unlawful" (*id., at 30*), that finding alone does not give rise to liability for conversion. According to this Court, if it found that CIT did not direct the sale, then Whirlpool is still faced with another hurdle: tracing its proceeds to "a specific, identifiable sum" in order to prove conversion. *Opinion, at 31.*

3. The argument would misrepresent Whirlpool's burden to show the amount and value of goods actually converted. Even assuming CIT were ultimately found liable for conversion, the book value of the MidPac inventory in Maui, assuming it actually was $1 million, is not the proper measure of conversion damages. The measure of damages is "the fair reasonable value of the property at the time of conversion." *Tsuru v. Bayer, 25 Haw. 693, 699 (1920).* Therefore, evidence of (A) the amount of MidPac inventory at MHS that constituted Whirlpool collateral, (B) the amount of MidPac inventory on Maui that was sold to MidPac customers and collected by MidPac and (C) the amount for which the Whirlpool

collateral actually sold or was worth, in July to December, 1999, would be more probative of the "fair reasonable value" of Whirlpool's collateral "at the time of conversion" than any alleged admission by CIT regarding estimates of "book value."

**III. CONCLUSION**

For the foregoing reasons, Whirlpool should be precluded from making arguments that CIT admitted converting or taking $1 million of Whirlpool's collateral located at Maui Home Supply or words to that effect.

DATED: Honolulu, Hawaii, June 13, 2006.

/s/ Louise K. Y. Ing
PAUL ALSTON
LOUISE K. Y. ING
THOMAS E. BUSH
ALLISON KIRK
Attorneys for Defendant/Cross-claimant THE CIT GROUP/BUSINESS CREDIT, INC.