1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

WHIRLPOOL CORPORATION, a Delaware corporation, ) Civil No. 01-00187DAE BMK (Tort and RICO)

Plaintiff,

vs. ) Volume I

CIT GROUP/BUSINESS CREDIT INC., a New York corporation; CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,

Defendants,

and

CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,

Additional Crossclaim Defendants.

DEPOSITION OF CARL SMITH

Taken on behalf of Defendant, RAYMOND IWAMOTO, at the Law Offices of Ayabe, Chong, Nishimoto, Sia & Nakamura, 1001 Bishop Street, Suite 2500, Pauahi Tower, Honolulu, Hawaii, commencing at 9:00 a.m., on Tuesday, December 17, 2002, pursuant to notice.

REPORTED BY: CAROL E.M. SUGIYAMA, C.S.R. #295
Notary Public, State of Hawaii

PAGE 2

2

APPEARANCES:

TIMOTHY HOGAN, ESQ.
Lynch Ichida Thompson Kim & Hirota
1132 Bishop Street
Suite 1405
Honolulu, Hawaii 96813

For Plaintiff WHIRLPOOL CORPORATION

CALVIN YOUNG, ESQ.
GARY MIYAMOTO, ESQ.
Ayabe Chong Nishimoto
Sia & Nakamura
2500 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813

For Defendant ROY IWAMOTO, INC.

LOUISE K.Y. ING, ESQ.
CARL SOTO, eSQ.
Alston Hunt Floyd & Ing
1800 Pacific Tower
1001 Bishop Street
Honolulu, Hawaii 96813

For Defendant CIT GROUP/BUSINESS CREDIT, INC.

ROGER MOSELEY, ESQ.
CHRISTOPHER J. MUZZI, ESQ.
Case Bigelow & Lombardi
2600 Mauka Tower
Pacific Guardian Life Center
Honolulu, Hawaii 96813

For Defendants MICHAEL CLIFFORD, CGBN, INC., and Third-Party Defendant CG DEVELOPMENT, INC.

PAGE 3

3

MARGERY S. BRONSTER, ESQ.
JEANNETTE HOLMES, ESQ.
Bronster, Crabtree & Hoshibata
1001 Bishop Street
Suite 2300, Pauahi Tower
Honolulu, Hawaii 96813

For Defendants EDWIN BOWLING and FRANCES HALLER-BOWLING

Also Present: Deb Clawson, Esq.

PAGE 4

4

I N D E X


| EXAMINATION BY: | PAGE |
|---|---|
| MR. YOUNG | 5 |
| AFTERNOON SESSION | 120 |
| MS. ING | 149 |
| MS. BRONSTER | 257 |

| EXHIBITS FOR IDENTIFICATION | | PAGE |
|---|---|---|
| 195 | Plaintiff's Response to CIT Group Business Credit, Inc.'s First Request for Answers to Interrogatories | 210 |
| 196 | Calculations | 249 |




EXHIBIT B

89

A Restate that, please.
Q If a file review had not been conducted and a 300,000 line of credit had been granted and approved, you would agree with me that that would not be good business practice?
A I agree that that would not be good business practice. But I also want to qualify that we don't know that a file review was not done, either.
Q And if a file review was conducted, it should have been conducted under your direction and responsibility; is that right?
A The 300,000 for Maui would have been under my area of responsibility; however, it would have been within Ernie's authority to make that decision.
Q That's right. I didn't say authority; I said direction and responsibility.
A Yes.
Q You would agree that if it was conducted, it would be pursuant to your direction and responsibility?
A Yes. I guess I'm a little confused as to where you're going or what you're asking here.
Q Well, you're not supposed to be able to understand that, sir.
A Okay.

PAGE 90

90

Q Do you know what attempts Whirlpool made to obtain any type of UCC filing with respect to MidPac Lumber Company?
A Restate that, please.
Q Do you know what attempts Whirlpool ever made to obtain a UCC filing with respect to MidPac Lumber Company?
MR. HOGAN: Objection. Vague as to time.
MR. YOUNG: I said "any," so that means ever.
MR. HOGAN: Going back into the '50s?
Q (By Mr. Young) Do you have any information, sir, as to whether or not Whirlpool has ever attempted to obtain a UCC filing with respect to MidPac Lumber Company?
A Well, Whirlpool Corporation did ask MidPac to sign a security agreement giving Whirlpool a security interest in the inventory of MidPac.
Q When was that?
A I don't recall.
Q Was it during the time that you had responsibility?
A Yes.
Q And who made that request, to your knowledge?
A Ernie Matlock.
Q And who did he make that request of?

PAGE 91

91

A I believe it was Ed Bowling, but I'm not sure.
Q And do you know what Mr. Bowling's response was to Mr. Matlock?
A Ernie has told me that we were unable to get the filing because it would conflict with the asset-based lending arrangement that CIT had.
Q And --
A And, therefore, they would not sign.
Q Was this request made in writing or verbal?
A I believe it was verbal.
Q Was it ever followed up with a written request?
A I don't know the answer to that. I'm sorry. I don't recall.
Q Did you ever attempt -- strike that.
Did Whirlpool ever attempt to obtain information regarding CIT's arrangement with MidPac Lumber Company?
A Yes.
Q What information did Whirlpool obtain?
A Whirlpool contacted CIT sometime in the fall of 1999 to discuss the situation and particularly the different arrangements that were going on because of the proposed workout or ideas of getting

PAGE 92

92

Whirlpool paid off to see how the CIT arrangement was working. And Whirlpool attempted to contact CIT.
Q Do you know if Whirlpool ever attempted to obtain information regarding CIT's arrangement with MidPac Lumber Company at any time other than that request in the latter part of 1999?
A I don't recall.
Q Do you know if Mr. Matlock or anyone else on behalf of Whirlpool attempted to obtain any further background information regarding CIT and MidPac Lumber Company after this supposed conversation between Mr. Matlock and Mr. Bowling?
MR. HOGAN: Objection. Vague as to time.
MS. BRONSTER: Objection. Misstates the testimony.
Q (By Mr. Young) You can answer the question.
A Please restate the question.
Q I would like to know if you have any knowledge of whether or not Mr. Matlock, or anyone else on behalf of Whirlpool, ever attempted to obtain information regarding CIT and its agreement with MidPac Lumber Company after Mr. Matlock and Mr. Bowling had that exchange?
MR. HOGAN: Objection. Vague.

understand that in 1995 or thereabouts, that was when a credit line was approved for MidPac Lumber Company; is that right?
**A I believe so, yes.**
Q Do you know if there had been prior approved credit lines for MidPac Lumber Company prior to 1995?
**A No, I don't know the answer to that.**
Q Can you tell me whether or not there has to be some sort of agreement in writing prepared and agreed to by the parties when a credit line is approved by Whirlpool?
**A Restate that, please. I'm not following you.**
Q When your department approves a credit line for a trade -- prospective trade partner or an existing trade partner, is there some sort of written agreement that is entered into between the parties?
**A Not necessarily.**
Q Well, is there ever a written agreement entered into between the parties?
**A A security agreement would be a written agreement; so, yes, there is at times.**
Q Is there any other type of agreement that is entered into?



**A On occasion.**
Q When a credit line is approved?
**A On occasion, there could be.**
Q And what types of agreements would those be?
**A There are occasions where there are inter-creditor agreements. There are occasions where there are addendums to security agreements. There are, at times, written agreements that a customer will abide by specific terms.**
Q With respect to these two entities, MidPac Lumber Company and Maui Home Supply, do you have any personal knowledge of any creditor agreements being entered into between those entities and Whirlpool?
**A Any creditor agreement. With Maui we had a security agreement signed. With MidPac we did not have a security agreement signed. And I can't recall any others.**
Q What was the nature of the security agreement, as you understood it, between Whirlpool and Maui Home Supply?
**A The security agreement gives Whirlpool the rights to personal property of Maui Home Supply.**
Q Can you tell me how that agreement came to be; what was the background behind that?



**A As we were setting up the line of credit for Maui, we asked them to sign the security agreement. And it was signed.**
Q And do you know if that agreement was ever filed?
**A I believe it was, yes.**
Q Where was it filed?
**A It should have been filed in Hawaii.**
Q Are you referring to the transfer of the UCC filing that was in favor of TransAmerica, or are you referring to a different agreement?
**A I'm referring to a different agreement.**
Q Do you know if there were any other agreements, other than that one that you are talking about right now, that was entered into, regarding security between Maui Home Supply and Whirlpool?
**A I don't recall others. As I recall reviewing some documentation -- let me back up here. I'm recalling that there was a security agreement signed. And I don't recall who at Maui that signed it, but the Whirlpool representative was a gentleman named Todd Pierce. But I don't recall the date that that was signed.**
Q Within this document, again, on Exhibit 156,



if you will take a look on page 2, the first paragraph after -- in bold, it states, "MidPac Lumber," third line. Are you with me, sir?
**A Yes.**
Q Actually, on the previous line, it states, "The two noticeable changes have been in management and improved pay performance." Do you see that, sir?
**A Point me to it again, please.**
Q You see in bold, it says, "MidPac Lumber"?
**A Yes, I do.**
Q If you start at the end of the second line --
**A Okay. I got you.**
Q -- Mr. Matlock wrote, "The two noticeable changes have been in management and improved pay performance." Do you see that, sir?
**A Yes.**
Q To your understanding, was Mr. Matlock stating that MidPac Lumber used to pay more than six days beyond terms, but now they had improved the six days beyond terms?
**A I believe that to have been my understanding, yes.**
Q Did you happen to take a look at that time at any Whirlpool documentation regarding MidPac Lumber

STATE OF HAWAII )
) SS.
)

I, CAROL E.M. SUGIYAMA, C.S.R., a Notary Public in and for the State of Hawaii, do hereby certify:

That on December 17, 2002, at 9:00 a.m. appeared before me CARL SMITH, the witness, whose testimony is contained herein; that, prior to being examined, the witness was, by me, duly sworn or affirmed; that the proceedings were taken in computerized machine shorthand by me and were thereafter reduced to print under my supervision; that the foregoing represents, to the best of my ability, a correct transcript of the proceedings had in the foregoing matter;

That, if applicable, the witness was notified through counsel by mail, or by telephone to appear and sign; that if transcription is not signed, either the reading and signing were waived by the witness and all parties, or the witness has failed to appear and the original is therefore kept on file without signature pursuant to Court rules.

I further certify that I am not counsel for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

DATED: ______________________________.

CAROL E.M. SUGIYAMA, C.S.R. #295
Notary Public, State of Hawaii
My commission expires 3/27/2003