NOV 26 2002



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO, and KURT GLASSMAN, DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants.<br><br>and<br><br>CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Cross-Claim Defendants. | Civil No. CV01-00187 DAE BMK<br><br>(Tort and RICO) |

DEPOSITION OF RAYMOND S. IWAMOTO

Taken on behalf of Plaintiff Whirlpool Corporation, at 2300 Pauahi Tower, 1001 Bishop Street, Honolulu, Hawaii, 96813, commencing at 9:05 a.m., on Tuesday, November 12, 2002, pursuant to Notice.

REPORTED BY: JANIS K. FLOATE, RPR, CSR 254
Notary Public, State of Hawaii

EXHIBIT A

not one of their sales managers. Might have been maybe not quite a general manager but perhaps something like a general manager.

Q. Did you have contact with him, speak to him?

A. Yes.

MR. HOGAN: Eleven, which is a written consent, G 00067.

(Exhibit 11 marked for identification.)

BY MR. HOGAN:

Q. Mr. Iwamoto, you have been handed a one-page document marked as Exhibit 11, bearing the Bates stamp G 00067. Have you ever seen this before, sir?

A. Yes.

Q. What is this?

A. It's board resolution of Midpac Lumber.

Q. It purports to bear your signature at the bottom of it, sir?

A. Yes.

Q. Were you a director of Midpac Lumber at any time?

A. Yes.

Q. When were you a director of Midpac Lumber?

A. I became a director, I believe, effective

January 1, 1999.

Q. When you say effective, is what you mean you may have actually performed the paperwork at a different time to note that?

A. To the best of my recollection, after I was informed that Mr. Bowling had resigned as being a director, I had noticed that the bylaws of the company required three directors. So I agreed that I would serve that function until we could amend the bylaws to change it so that only two directors would be required.

Q. Is it fair to say that that decision to have you replace Mr. Bowling actually occurred in June of 1999?

A. I think that was about right, yeah. I think what this is is a resolution to replace Mr. Bowling with Mr. Fujioka, in those positions.

Q. As a vice president and treasurer?

A. Yes.

Q. Was it your understanding Mr. Clifford was a director of Midpac at this time as well?

A. Yes.

Q. Is it your understanding Mr. Clifford was not an officer of Midpac at that time?

A. He may have been. I'm not sure.

Q. Did you know who she was?
A. No.
Q. Did anyone ever tell you who she was?
A. No.
Q. Then it talks about Whirlpool. Did you have any understanding of what was meant by the use of the word Whirlpool?
A. No.
Q. Did anyone ever discuss F&J Movers in relation to Whirlpool?
A. No one at Midpac or at any of these companies ever discussed with me anything about Whirlpool until after June of 1999. I had no involvement whatsoever with any operational aspects of the company, with any vendors, any products or how they would sell products or how they would buy products. I provided no services in connection with that. I had just no involvement whatsoever with any of that.
Q. Now, do you have any idea when you came back from the mainland in June of 1999?
A. As I recall, it wasn't a long trip. Maybe soon after this.
Q. When you came back, did you have any opportunity to discuss any of these corporations

paralegal or an attorney?

A. She is my secretary.

Q. Is she still your secretary?

A. Yes.

Q. How long has she been your secretary?

A. I brought her over from Carlsmith actually.

Q. You go way back.

A. Way back.

Q. You're saying: Yvonne, for Kurt please check the CG files. Here's what we want to do. Ed Bowling will resign as director and officer from the various corporations, including Midpac.

Now, do you recall having a discussion with Kurt Glassman on or before June 10th, 1999, regarding that?

A. Yes.

Q. And when was that?

A. I don't know exactly when. You said on or before. It might have been on June 10th.

Q. Was it a telephone conversation with him?

A. I don't recall whether it was telephone or face-to-face.

Q. Do you recall having any meetings with Mr. Glassman on or about June 10th, 1999, face-to-face?

A. Depending when the CIT crisis occurred, then I did have face-to-face meetings with him.

Q. Do you understand why you're trying to move this matter forward and having Mr. Bowling resign as an officer and director?

A. I was informed that he had resigned.

Q. He had resigned?

A. Yes.

Q. Who informed you of that?

A. Mr. Glassman.

Q. What were the circumstances of him informing you of that?

A. I don't recall what the circumstances were.

Q. Okay.

A. Other than we have to document the resignation.

Q. Now, had you had any dealing with Mr. Bowling in 1999 prior to this?

A. My recollection is that my dealings with Mr. Bowling had ended before '99, best I can recall.

Q. Now, do you have any recollection of why it was important to back-date his resignation as far as you could in 1999?

A. I use the word back-date here, although

it's not really a back-dating because I was told that that's when it happened; but as corporate attorney, I wanted to make sure that we had an effective date that didn't complicate with any, for example, corporate resolutions that he had signed as a director after January 1.

So I instructed the paralegal to check these records out just to make sure that we're not going to be doing something inconsistent here.

Q. Now, at the same time that you're discussing the recordation or the memorialization of Mr. Bowling's resignation, had you had discussions with Mr. Glassman regarding CIT?

A. The CIT thing happened in June. Whether it was before June 10th or after June 10th, I don't quite recall.

Q. You don't have any recollection, then, that Mr. Glassman was concerned about CIT when he had asked you about Mr. Bowling's resignation?

A. No. I never linked the two together. This may have been when at the same time that he told me that he had bought Mr. Bowling out.

Q. Now, the second paragraph talks about appointing Mike Clifford to take Ed's officer position. Do you see that?

under CIT financing. I speak to my client. My client tells me it's all inadvertent, there's plenty collateral, company is doing great guns, it's in fine shape.

Now, I'm talking to CIT and saying be careful, because our relationship with our vendors is very important, a very valuable asset. So you cannot make false accusations to these vendors that will stop them from supporting the company. I'm fighting to keep this company going. I'm believing that this company -- up to this point and I believe it, this company was making tons of money. You know? And the employees, you know, hundreds of employees would have lost their jobs and everything. I'm fighting for this company.

Q. Did you discuss with Kurt Glassman the issue of having CIT inquire regarding, say, Whirlpool and call Whirlpool to verify payables, that sort of thing?

A. I don't recall. You mean before this letter when I was writing this letter?

Q. Obviously Whirlpool was an important customer or supplier, vendor. Did Kurt ever say anything to you about not letting this get back to Whirlpool?

go around saying that there has been fraud when you don't know if there is fraud.

Q. Now, did you do any other investigation other than to talk to Kurt Glassman to verify that there was no fraud prior to writing this letter?

A. I trusted my client. I did not investigate whether he was lying to me or not.

Q. Why is that?

A. Because I trusted him.

Q. Now, at the same time -- let me make sure. Were you aware that you had formed W Spectrum, that documents had just a couple weeks before been prepared for that company, and is it your testimony that you didn't feel any need to go and investigate any further regarding the CIT allegations that would be pointed directly at Mr. Glassman as having been a participant in a fraud to verify, in fact, if CIT was correct?

MR. PETTIT: Objection, form of the question.

MS. ING: Join in the objection.

BY MR. HOGAN:

Q. You had documents that showed that you had just formed Spectrum two weeks before.

A. Yes.

A. I don't know. I was never involved with their operations or vendors or how much was owed or how they were owed with any of these vendors.

Q. On the second page it says the consultant; I presume that means Mr. Phelps?

A. Uh-huh.

Q. And Tom Hayes had gained much comfort after visiting Honolulu and Maui --

A. See, that's Phelps. He was here already.

Q. Right. Do you understand what was meant when you said that they gained much comfort?

A. Yes.

Q. What was that?

A. Oh, you know, this Hayes fellow and I think Inbum, a fellow named Inbum after coming in and looking at the situation, examining the books and examining the situation, doing an audit maybe, they felt pretty comfortable that things were not bad. And that more and more reinforced my faith in my client that nothing wrong had been done.

Q. Did you ever discuss the inventory that was over in Maui with Mr. Phelps?

A. I don't think I did that at this time. I think subsequently I found out that, Jesus Christ, inventory was mixed up here and there, but I had no

A. No. Only -- I recall after your lawsuit was filed that there was some discussions. But nothing before.

Q. Okay.

A. Remember now, prior to June maybe and prior to July nobody tells me anything about any of the operational things, where the inventory is or that. I have no knowledge whatsoever about those things.

Q. Do you recall -- I may have asked you this. I want to make sure I'm clear on it, that there was an Exhibit A created.

A. I don't recall. I'm just reading the letter. The letter mentions an Exhibit A.

Q. And you have no knowledge of the existence of it, as we sit here today?

A. That's right.

MR. HOGAN: Why don't we take a quick break.

(Brief recess.)

MR. HOGAN: Next one is on Orrick Herrington's letterhead, G 01811.

(Exhibit 37 marked for identification.)

MR. HOGAN: For the record I'll state that this is Exhibit 37. It's Bates stamped G 01811

those words ever being used?

MR. PETTIT: I'll object again because you're attempting to utilize the information contained in Ted Phelps' Rule 2004 examination and simply recharacterizing the question. Same objection.

MR. HOGAN: You believe it's abusive process to ask a question --

MR. PETTIT: I've stated my objection, counsel.

MR. HOGAN: Were you aware that your client was noticed in this 2004 examination prior to this?

MR. PETTIT: I don't think the purpose of this deposition is to argue the legal points.

BY MR. HOGAN:

Q. How many discussions have you had with Kurt Glassman in which Ted Phelps was present?

A. Several.

Q. In any of those discussions were the issues regarding Spectrum raised and discussed?

A. As far as I can remember, for a very, very long time Mr. Glassman maintained that everything had been done properly, that there was inadvertent mistakes, there was no fraud whatsoever. Later on

C E R T I F I C A T E

STATE OF HAWAII )
) SS.
CITY AND COUNTY OF HONOLULU )

I, JANIS K. FLOATE, Notary Public, State of Hawaii, do hereby certify:

That on November 12, 2002, appeared before me Raymond S. Iwamoto, the witness whose deposition is contained herein; that prior to being examined, the witness was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

DATED this ______ day of____________,2002, in Honolulu, Hawaii.

____________________________________
JANIS K. FLOATE, RPR, CSR 254
Notary Public, State of Hawaii
My Commission Exp: December 12, 2005