NOV 26 2002



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO, and KURT GLASSMAN, DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants.<br><br>and<br><br>CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Cross-Claim Defendants. | Civil No. CV01-00187 DAE BMK<br><br>(Tort and RICO) |

DEPOSITION OF RAYMOND S. IWAMOTO

Taken on behalf of Plaintiff Whirlpool Corporation, at 2300 Pauahi Tower, 1001 Bishop Street, Honolulu, Hawaii, 96813, commencing at 9:05 a.m., on Tuesday, November 12, 2002, pursuant to Notice.

REPORTED BY: JANIS K. FLOATE, RPR, CSR 254
Notary Public, State of Hawaii

EXHIBIT A

Q. Did you know who she was?
A. No.
Q. Did anyone ever tell you who she was?
A. No.
Q. Then it talks about Whirlpool. Did you have any understanding of what was meant by the use of the word Whirlpool?
A. No.
Q. Did anyone ever discuss F&J Movers in relation to Whirlpool?
A. No one at Midpac or at any of these companies ever discussed with me anything about Whirlpool until after June of 1999. I had no involvement whatsoever with any operational aspects of the company, with any vendors, any products or how they would sell products or how they would buy products. I provided no services in connection with that. I had just no involvement whatsoever with any of that.
Q. Now, do you have any idea when you came back from the mainland in June of 1999?
A. As I recall, it wasn't a long trip. Maybe soon after this.
Q. When you came back, did you have any opportunity to discuss any of these corporations

under CIT financing. I speak to my client. My client tells me it's all inadvertent, there's plenty collateral, company is doing great guns, it's in fine shape.

Now, I'm talking to CIT and saying be careful, because our relationship with our vendors is very important, a very valuable asset. So you cannot make false accusations to these vendors that will stop them from supporting the company. I'm fighting to keep this company going. I'm believing that this company -- up to this point and I believe it, this company was making tons of money. You know? And the employees, you know, hundreds of employees would have lost their jobs and everything. I'm fighting for this company.

Q. Did you discuss with Kurt Glassman the issue of having CIT inquire regarding, say, Whirlpool and call Whirlpool to verify payables, that sort of thing?

A. I don't recall. You mean before this letter when I was writing this letter?

Q. Obviously Whirlpool was an important customer or supplier, vendor. Did Kurt ever say anything to you about not letting this get back to Whirlpool?

A. I don't know. I was never involved with their operations or vendors or how much was owed or how they were owed with any of these vendors.

Q. On the second page it says the consultant; I presume that means Mr. Phelps?

A. Uh-huh.

Q. And Tom Hayes had gained much comfort after visiting Honolulu and Maui --

A. See, that's Phelps. He was here already.

Q. Right. Do you understand what was meant when you said that they gained much comfort?

A. Yes.

Q. What was that?

A. Oh, you know, this Hayes fellow and I think Inbum, a fellow named Inbum after coming in and looking at the situation, examining the books and examining the situation, doing an audit maybe, they felt pretty comfortable that things were not bad. And that more and more reinforced my faith in my client that nothing wrong had been done.

Q. Did you ever discuss the inventory that was over in Maui with Mr. Phelps?

A. I don't think I did that at this time. I think subsequently I found out that, Jesus Christ, inventory was mixed up here and there, but I had no

refrigerator? I have no idea.

Q. Could CIT sell it?

MS. ING: Objection.

A. Not unless it had an interest in it.

MS. ING: Excuse me. Let me object. Incomplete hypothetical.

MR. HOGAN: Let's move on to the next exhibit. It's G 04224.

(Exhibit 39 marked for identification.)

BY MR. HOGAN:

Q. This is a series of warehouse receipts that is G 04224. I'll state for the record this is Exhibit 39. It is a document that says Midpac Lumber Company Limited, the address, and then warehouse receipts, G 04224 and it goes through 4235.

Have you ever seen these before?

A. Yes.

Q. When did you first see these?

A. We were asked to create -- we were asked whether we had a form of warehouse receipts, and I said yes, and we produced the form, and then I directed my paralegal to discuss with the client about filling out the forms or creating the forms.

Q. Do you know when that was?

A. No.

Q. Do you have any knowledge of whether this was after CIT became closely involved in June of 1999?

MS. ING: Object. Lacks foundation, mischaracterizes evidence.

A. My recollection is that we were asked to do this before I became aware of any problems. That would be my recollection. But it also tells me that this is probably when I first became aware that there was inventory of one company stored at another company, and that's what these receipts were for.

MR. HOGAN: Next will be exhibit my 52, and it's AL 000152 and this will be 40.

(Exhibit 40 marked for identification.)

MS. ING: It's the transmittal on the sublease?

MR. HOGAN: For the record, it's a Goodsill Anderson Quinn & Stifel facsimile transmittal letter, dated Friday, July 16, 1999.

It has across from that, CGBN, Inc., hyphen, Whirlpool. It is to Bill Holtz and then there's a paren HNL and then underneath that Midpac, and it's from Raymond S. Iwamoto.

BY MR. HOGAN:

A. No. Only -- I recall after your lawsuit was filed that there was some discussions. But nothing before.

Q. Okay.

A. Remember now, prior to June maybe and prior to July nobody tells me anything about any of the operational things, where the inventory is or that. I have no knowledge whatsoever about those things.

Q. Do you recall -- I may have asked you this. I want to make sure I'm clear on it, that there was an Exhibit A created.

A. I don't recall. I'm just reading the letter. The letter mentions an Exhibit A.

Q. And you have no knowledge of the existence of it, as we sit here today?

A. That's right.

MR. HOGAN: Why don't we take a quick break.

(Brief recess.)

MR. HOGAN: Next one is on Orrick Herrington's letterhead, G 01811.

(Exhibit 37 marked for identification.)

MR. HOGAN: For the record I'll state that this is Exhibit 37. It's Bates stamped G 01811

C E R T I F I C A T E

STATE OF HAWAII )
) SS.
CITY AND COUNTY OF HONOLULU )

I, JANIS K. FLOATE, Notary Public, State of Hawaii, do hereby certify:

That on November 12, 2002, appeared before me Raymond S. Iwamoto, the witness whose deposition is contained herein; that prior to being examined, the witness was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

DATED this ______ day of____________,2002, in Honolulu, Hawaii.

______________________________________
JANIS K. FLOATE, RPR, CSR 254
Notary Public, State of Hawaii
My Commission Exp: December 12, 2005