SHEET 1 PAGE 1

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

WHIRLPOOL CORPORATION, a Delaware corporation, Plaintiff, vs. CIT GROUP/BUSINESS CREDIT INC., a New York corporation; CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20, Defendants, and CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA, Additional Crossclaim Defendants.

Civil No. 01-00187DAE BMK (Tort and RICO)

Volume I

DEPOSITION OF CARL SMITH

Taken on behalf of Defendant, RAYMOND IWAMOTO, at the Law Offices of Ayabe, Chong, Nishimoto, Sia & Nakamura, 1001 Bishop Street, Suite 2500, Pauahi Tower, Honolulu, Hawaii, commencing at 9:00 a.m., on Tuesday, December 17, 2002, pursuant to notice.

REPORTED BY: CAROL E.M. SUGIYAMA, C.S.R. #295
Notary Public, State of Hawaii

PAGE 2

2

APPEARANCES:

TIMOTHY HOGAN, ESQ.
Lynch Ichida Thompson Kim & Hirota
1132 Bishop Street
Suite 1405
Honolulu, Hawaii 96813

For Plaintiff WHIRLPOOL CORPORATION

CALVIN YOUNG, ESQ.
GARY MIYAMOTO, ESQ.
Ayabe Chong Nishimoto
Sia & Nakamura
2500 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813

For Defendant ROY IWAMOTO, INC.

LOUISE K.Y. ING, ESQ.
CARL SOTO, eSQ.
Alston Hunt Floyd & Ing
1800 Pacific Tower
1001 Bishop Street
Honolulu, Hawaii 96813

For Defendant CIT GROUP/BUSINESS CREDIT, INC.

ROGER MOSELEY, ESQ.
CHRISTOPHER J. MUZZI, ESQ.
Case Bigelow & Lombardi
2600 Mauka Tower
Pacific Guardian Life Center
Honolulu, Hawaii 96813

For Defendants MICHAEL CLIFFORD, CGBN, INC., and Third-Party Defendant CG DEVELOPMENT, INC.

PAGE 3

3

MARGERY S. BRONSTER, ESQ.
JEANNETTE HOLMES, ESQ.
Bronster, Crabtree & Hoshibata
1001 Bishop Street
Suite 2300, Pauahi Tower
Honolulu, Hawaii 96813

For Defendants EDWIN BOWLING and FRANCES HALLER-BOWLING

Also Present: Deb Clawson, Esq.

PAGE 4

4

I N D E X

EXAMINATION BY:

| | PAGE |
|---|---|
| MR. YOUNG | 5 |
| AFTERNOON SESSION | 120 |
| MS. ING | 149 |
| MS. BRONSTER | 257 |

EXHIBITS FOR IDENTIFICATION

| | | PAGE |
|---|---|---|
| 195 | Plaintiff's Response to CIT Group Business Credit, Inc.'s First Request for Answers to Interrogatories | 210 |
| 196 | Calculations | 249 |



EXHIBIT A

SHEET 3 PAGE 9

9

I do have one rule, though. If I have a question pending to you, I would appreciate it if you would answer that question before we take a break. Quite frankly, if we take a break, I'll never remember what I was trying to ask you about. So when you come back and you answer the question, I won't, myself, understand whether or not you fully answered my question or not.

There are a number of other rules that I want to make sure that you understand. There may be objections being made from time to time. If those objections are made, I would ask that you try to keep the question in mind and respond to the question. Unless you are instructed not to answer a question, I would like you to answer every question to the best of your ability.

Please do not guess. If you make a flat out guess, we don't want it. But if you are able to answer the question by making reasonable and considered response, we would like that. Even if you feel that it's at most a response with a small degree of certainty, that's still better than a wild guess. Just tell us that you are qualifying your answer.

Now, lastly, I want to tell you that you may

PAGE 10

10

find that some of the questions we're asking you may be irritating or annoying. You may also feel that some of these questions are intrusive. You may even feel that we're prying into some of the private aspects of your life.

Please understand that Whirlpool Corporation has filed very serious claims against my client and the other parties who have attorneys present today. We consider the allegations to be very serious. We believe we are doing our jobs by asking you questions. And we would please ask that you keep that in mind when you answer the questions that are being posed to you.

I want to clear something up before we start. Is Mr. Hogan acting as your attorney today?

A **Yes, he is.**

Q Again, if Mr. Hogan places an objection on the record, we would like you to try to keep the question in mind. If you forget the question, we can always have the court reporter read it back. Unless Mr. Hogan instructs you not to answer, we will expect for you to give us your full and complete answer.

All right. Let's go ahead and get started. We had a little issue yesterday because Donna

PAGE 11

11

Martin wasn't feeling very well. So, first of all, I'd like to know, are you well today, sir?

A **Yes, I am.**

Q Do you feel that you are able to go forward with the deposition and answer all the questions posed to you?

A **Yes.**

Q Have you taken any prescription medication in the last 24 hours?

A **No.**

Q Now, you told us that this prior deposition that you had given was 20 years ago; is that right?

A **Approximately, yes.**

Q Why don't you tell me how long you have been an employee of Whirlpool?

A **Twenty-nine years.**

Q And can you tell me who your current employer is?

A **Whirlpool Corporation.**

Q Have you been an employee of Whirlpool Corporation for the last 29 years?

A **Yes, I have.**

Q I understand that there are related entities to Whirlpool. During that 29-year period, have you ever been an employee of any of those related

PAGE 12

12

entities?

A **I misspoke a moment ago. Yes, I have.**

Q All right. Maybe we can clear that up, sir.

Can you tell me, during the 29 years, which entities, either Whirlpool or related, that you have been an employee of?

A **Employee of Whirlpool Corporation and of Whirlpool Financial Corporation.**

Q Please tell me when – during what period of time you were an employee of Whirlpool Financial Corporation?

A **I don't recall the exact dates.**

Q Can you tell me generally how many years you were an employee of Whirlpool Financial Corporation?

A **I believe that to be a year and a half.**

Q Do you recall when that year-and-a-half period ended?

A **Again, I would have to guess at that. I could be close, but I would have to guess.**

Q Can you tell me if it was during the '90s or the '80s?

A **It was during the '90s.**

Q What is your current job title?

A **I have two job titles, the first being**

national manager of Trade Partner Financial Services; second being compliance coordinator for Whirlpool's Money Laundering Prevention Program.
Q The second title you said was the company coordinator for Whirlpool's Money Laundering Prevention Program?
A If that's what I said, I should have said compliance coordinator.
Q I'm sorry. I believe you did say compliance coordinator.
A I believe it may also include Trade Partner Financial Service compliance coordinator?
Q What do you do as compliance coordinator?
A I'm responsible for overseeing the processes and things involved in reviewing Trade Partner practices to see if there appears to be money laundering transactions going on.
MR. YOUNG: Off the record.
(Off-the-record discussion was held.)
MR. YOUNG: Back on the record.
Q In the course of being involved with any matter pertaining to MidPac Lumber Company and Maui Home Supply, did any issues of money laundering ever come to your attention?
MR. HOGAN: Objection. Vague as to what time



period we're talking about.
Q (By Mr. Young) I'm talking about anytime.
A Restate the question, please.
Q Yes. During your involvement at any time with respect to Maui Home Supply and MidPac Lumber Company, has the issue of any possibility of money laundering ever came to your attention?
A Yes.
Q When?
A I'm not sure I can identify the exact date.
Q Well, can you tell me a time period?
A 2000 or 2001.
Q Have any criminal charges been filed?
A I'm unable to answer that.
Q Why are you unable to answer that?
A I don't know the answer to that.
Q Can you tell me circumstances under which you have been aware that there is a money laundering issue, to your understanding, pertaining to MidPac Lumber Company and/or Maui Home Supply?
A Yes.
Q Can you tell me?
A As we began investigating more and gathering information to understand why our balances that were owed were unpaid, we've uncovered information



that would lead us to believe that there may have been predicate acts to money laundering situations.
Q When you say, "we," who are you talking about?
A I'm talking about Whirlpool Corporation.
Q Can you tell me who has been involved in that investigation on behalf of Whirlpool Corporation?
A Yes. That would be Ernie Matlock, Jean Penwell, Deb Clawson and Tim Hogan, as well as myself.
Q Can you please tell me how much money you believe is involved with respect to the money laundering issue?
A No, I'm unable to.
Q Can you tell me when you believe money laundering first started at Whirlpool -- I'm sorry -- at Maui Home Supply or MidPac Lumber Company?
A At the moment, I would only be giving you a guess without reviewing the records.
Q Can you please define for me what you mean by money laundering, how you are using the term, please?
A Money laundering. The money laundering laws have identified a number of predicate acts to money



laundering, and there are a variety of different ones that could be in there.
Q Well, why don't you tell me, first of all, which laws are you talking about?
A I believe, in particular, the ones that we would be talking about here would be the ones of conversion of collateral.
Q Any others?
A At the moment, that's all I can recall.
Q Are these federal or state laws or county laws or all of them?
A I'm not sure I know the answer to that.
Q Who first discovered, to your knowledge -- or let me strike that.
Who first determined, to your knowledge, that a money laundering issue was presented by the facts that were being uncovered?
MR. HOGAN: I'm going to object to the extent that it calls for the divulging of attorney/client communications. If it does not, he can answer the question.
THE WITNESS: You said go ahead and answer?
MR. HOGAN: As long as it doesn't involve divulging attorney/client communications.
THE WITNESS: Deb Clawson and Tim Hogan.

companies, have attended?
A No, I have not.
Q Have you attempted to engage in any dialogue, either verbal or written, with any other companies, who have similar individuals like yourself designated to review issues such as money laundering?
A **Yes, I have.**
Q And for which cooperation?
A **Maytag Corporation.**
Q What about GE?
A **Yes, GE. Phillips Electronics. And I believe that to be all.**
Q As a result of becoming an industry leader in the area of money laundering, did Whirlpool, to your knowledge, change any of its practices or procedures by which it dealt with its trade partners?
A **Yes.**
Q Can you tell me what changes took effect?
A **A rather large number of changes. But the initial credit investigation -- and a credit investigation is not the correct answer. The review of the trade partner complying with the federal laws or federal expectations on "know your**



**customer." The review of payment applications, review of sales transactions, review of ordering transactions. Did I mention payment transactions? I believe we need to include payment transactions as well.**
Q When you say that there were changes made, are you saying that there was an increased amount of oversight over those respective types of transactions?
A **Yes.**
Q By oversight, what type of oversight was being conducted by Whirlpool prior to those changes taking effect?
A **Prior to those changes, we were not reviewing any of those transactions from the standpoint of predicate acts of money laundering transactions.**
Q I see. So are you saying that prior to those changes, payment history, payment performance by a trade partner would be taken at face value without any type of review to look at whether or not money laundering issues may exist?
A **Yes.**
Q After the changes, was a periodic review conducted of trade partners to determine whether or not any money laundering issues may be there?



A **Yes.**
Q And is this on a random selected basis?
A **No.**
Q Is it required for all trade partner accounts?
A **No.**
Q Can you please tell me when a review is conducted after the changes?
A **We have identified certain markets as high risk markets. In those particular markets, all payment transactions are reviewed. We have also identified certain red -- what we consider to be red flag transactions. And if a trade partner outside of the high risk area demonstrates a transaction that appears to be a high risk transaction, then we would do the reviews.**
Q Can you tell me if in 1998 these changes had already taken effect?
A **Very difficult. You're hitting right at the timetable when we began this process. I believe that it was either 199- -- mid-1998 or early 1999 when we began this process. So you are hitting a particular time frame that it's difficult to answer because it may not have been 1998, it may have been 1999.**



Q Who on behalf of Whirlpool Corporation, to your knowledge, conducted any such review of any transactions involving Whirlpool and either MidPac or Maui Home Supply?
MR. HOGAN: I object to the extent that the witness is going to give information obtained solely from an attorney. To the extent that he has other independent knowledge, he can answer the question. I would ask him not to answer if it's only from an attorney.
THE WITNESS: Then I can't answer the question.
MR. YOUNG: All right.
Q Can you tell me whether or not MidPac Lumber Company or Maui Home Supply falls into the category of these certain markets that Whirlpool has identified to be at risk for money laundering issues?
A **They do not.**
Q Did you tell me whether or not, to your knowledge, any transaction, whether it be sales or payment, fits into the category of red flag transactions for money laundering purposes in Whirlpool's view?
A **I'm unable to answer that for attorney/client**

**privileged information.**
Q All right. Would it be fair to say that prior to 2000, the year 2000, that you were not aware of any, quote, unquote, red flag transactions pertaining to Maui Home Supply and MidPac Lumber Company that would have raised, in your mind, money laundering issues?
**A Again, I don't believe I can answer that for divulging attorney/client privileged information.**
Q Okay. So are you saying, then, that you may have been aware of knowledge in 1999 that there were money laundering issues, in your mind, pertaining to transactions which may have taken place at either Maui Home Supply or MidPac Lumber Company?
MR. HOGAN: Objection. I do not believe it states the witness' testimony accurately. Object to the characterization.
Q (By Mr. Young) Are you able to answer the question?
**A Please rephrase the question. I'm not sure I understand what you're asking.**
Q My prior question was whether or not -- if you could tell me whether or not it was true that your knowledge with respect to red flag





transactions was gained sometime after 1999?
I'm trying to find out when you first learned that there were, quote, unquote, red flag transactions possibly having taken place?
**A I believe it would have been late '99 or early 2000. Again, I'm guessing at the timeframes on that, but that would be somewhat close.**
Q Can you tell me what type of transactions you consider to be red flag transactions?
MR. HOGAN: Objection. Vague as to what context is that in? In the Maui/MidPac context or in general?
MR. YOUNG: Well, I think we're talking about money laundering transactions.
MR. HOGAN: In general.
THE WITNESS: There's a myriad of transactions. But transaction where you're receiving payment from one person paying another person's bills; you're receiving payments from an offshore bank that does not seem to have any connection to the customer; receiving payment out of a country in which a customer does not base his operation; receiving payments that are scheduled to stay below the bank monitoring system on payments where they would have to do the reporting of





transactions -- and I'm talking about the $10,000 level; payments where customers would be obviously scheduling payments to avoid money laundering payments; situations where customers would be paying with money orders; situations where customers would be paying with bank drafts.
Again, it's a very lengthy list. I think I've gone over the highlights of it. I may have missed a few, but I think I've covered it.
Q (By Mr. Young) And with respect to Maui Home Supply and/or MidPac Lumber Company, which of these different types of transactions do you believe are present with respect to those companies?
**A I don't believe I can answer that without divulging attorney-client-privileged information.**
Q When you first became aware of this information, sir, were you conducting a specific investigation, on behalf of Whirlpool Corporation, to determine whether or not money laundering transactions had taken place?
**A No.**
Q When you first became aware of the possibility of these transactions having taken place, have you attempted to report to any law





enforcement official the existence of those types of transactions?
MR. HOGAN: I'm going to object. A company or individual is required not to divulge whether or not they've made that type of reporting. By federal law they cannot divulge it. So I would ask the witness to not answer the question.
MR. YOUNG: I was asking him whether he had made any report or if he is aware of any report having been made to any law enforcement official that such money laundering transactions had taken place.
MR. HOGAN: Again, to the extent that it's going to reveal the reporting requirements under the statutes and under the federal rules of CFR, I would ask the witness not to answer the question.
MR. YOUNG: I disagree.
Q But are you going to answer the question?
**A He has asked me not to; so, no, I'm not.**
Q He hasn't directed you not to.
MR. HOGAN: I'm directing him not to answer the question.
MR. YOUNG: Well, I just want it to be clear. Because when you ask somebody something that's --
MR. MOSELEY: Excuse me. Could you give us a

cite for your objection?
MR. HOGAN: I can, after the break, when we come back from lunch.
MR. MOSELEY: Thank you.
MS. ING: Off the record.
(Off-the-record discussion was held.)
Q (By Mr. Young) During the course of your involvement in any investigation Whirlpool has conducted with respect to any money laundering transaction, have you identified any individuals that you believe were involved those transactions?
A **Are we talking about Maui/MidPac, or are we talking about a broader scale?**
Q We're only talking about Maui Home Supply and MidPac with respect to that question.
A **I'm unable to answer that because it would be revealing attorney-client-privileged information.**
Q The first title you told me you had at Whirlpool was the national manager of Trade Partners --
A **-- Financial Services.**
Q How long have you been the national manager of Trade Partner Financial Services at Whirlpool Corporation?
A **That's difficult to answer because my title**





**has changed over the years without the responsibility necessarily changing. That particular title I've had since, I believe, 1997.**
Q Maybe, then, without trying to put a label on it, can you tell me what your responsibility is in that position? Then you can tell me how long you had that responsibility.
A **Sure. My responsibility is overseeing the credit decision-making process, including the credit underwriting; overseeing collections responsibilities within certain areas of the company; overseeing customer payment application within certain areas of the company.**
**And on the broad scale that it covers today, that goes back to 1991.**
Q So since 1991, you have overseen credit decisions?
A **Credit underwriting, yes.**
Q Credit underwriting, collection --
A **Yes.**
Q -- and credit application processes?
A **Yes. And, again, qualify that with certain areas of the company.**
Q Since 1991, with respect to these four general areas, sir, have you supervised a group of





individuals who have performed these tasks under your direction?
A **Yes.**
Q And is it a department, or is there a title for that department?
A **It doesn't have a specific title because the department is not a department; it's multiple departments.**
Q Can you please tell me which departments, since 1991, you have had responsibility for?
A **Retail credit, credit underwriting. I believe that covers it.**
Q All right. What is retail credit responsible for?
A **Retail credit is responsible for managing the open account trade partner receivables for the retail dealerships.**
Q What do you mean by "retail dealerships"?
A **Dealerships who are in the business of purchasing appliances from Whirlpool with the intentions of reselling them to the ultimate consumer.**
Q What if a dealer that you are doing business with sells retail and sells contracts to specific large purchasers, does that fall under that





department's responsibility, also?
A **Possibly.**
Q In this particular situation, MidPac Lumber and Maui Home Supply, did those two companies fall under the responsibility of retail credit?
A **No, they didn't.**
Q Which department or section did those two companies fall under?
A **Contract credit.**
Q And do you have any responsibility with respect to contract credit?
A **Yes.**
Q How is contract credit different from retail credit? Is it just the type of companies that it deals with, or is it broader?
A **Primarily you've identified it as different companies.**
Q And by "different companies," it's the type of business that that company engages in?
A **That's correct.**
Q So who had responsibility for overseeing contract credit?
A **Contract credit. I had the responsibility for the credit underwriting portion of it, which is the credit decision-making portion. Susan**

SHEET 38 PAGE 149

149

EXAMINATION

BY MS. ING:

Q Good afternoon, Mr. Smith. My name is Louise Ing, and I am the attorney for CIT Corporation in this case.

Let me go back to your discussion this morning about the changes that were made in dealing with trade partners that you described earlier. And you described a number of things involving basically the know-your-customer aspect. And you mentioned that this related to the way payments were applied, handling sales transactions, order transactions and payment transactions. Do you recall that?

**A I remember talking about payment transactions. I don't recall that it was how payments were applied, but I remember talking about payment transactions, yes.**

Q I think the term you used was "pay application"?

**A Okay.**

Q Anyway, going back to that, I wanted to get more detail from you on what types of changes were made with respect to those -- you termed them generally know-your-customer types of transactions.

PAGE 150

150

**A The types of changes that were made did not have any bearing on credit decision-making. Let me make sure that we understand that these are all separate responsibilities, separate jobs.**

**The changes that were made were changes to comply with Whirlpool's money laundering prevention policy. And these changes were -- gee, I think we discussed them, but they were to review payments that come -- that are received from trade partners. And your question was, as I recall, focused on payments; right?**

Q Well, there will be a number of things, but why don't we focus on payments first.

**A Okay. To look at the method that the customer is paying, the way that the customer's payment is coming in, and possibly the way they are structuring their payment transaction, to see that it doesn't raise red flags or give some indication that there may be a money laundering transaction going on.**

Q And that particular change, when was it implemented at Whirlpool?

**A I don't recall the date.**

Q Was it after 1999?

**A I believe it was in the year of 1999. But,**

PAGE 151

151

**again, I don't recall the exact date or the exact year.**

Q Do you recall whether that was in effect as of July 23rd, 1999, when you became more involved?

**A Again, I don't recall the exact time.**

Q Did that change have anything to do with Whirlpool's experience with the MidPac/Maui account?

**A No, it did not.**

Q Did those changes -- or would they have affected the way that payment transactions with regard to the MidPac/Maui account were examined?

**A No, they would not. But let me answer that differently, please. In July, they would not, knowing what we knew at the time. Information that we have gathered later would possibly have changed -- that would probably have changed that.**

Q What information did you gather later that would have changed your statement?

**A I'm afraid if I answer that, I would be divulging attorney-client-privileged information.**

Q Okay. So you are not going to answer that at this point?

MR. HOGAN: If it's going to violate the attorney-client privilege, I'll direct him not to

PAGE 152

152

answer.

Q (By Ms. Ing) Were you aware -- well, let me ask you: Did you ever become aware that Whirlpool was receiving payments from Maui Home Supply or both MidPac and Maui Home accounts?

**A You asked did I ever become aware of that?**

Q Yes.

**A Yes, I did become aware of that.**

Q When did you become aware of that?

**A I don't recall the exact date of that.**

Q Was that before or after July 23, 1999?

**A That was after July 23, 1999.**

Q How did you become aware of it?

**A I don't recall exactly how I became aware of it.**

Q Was that from a source other than attorneys for Whirlpool?

**A Again, as I say, I don't recall how I became aware of it, but I believe that it was sources other than Whirlpool attorneys.**

Q Do you recall whether it came from Donna Martin or people up that connection's chain?

**A I don't recall.**

Q Do you recall when after July 23rd, 1999, you became aware of it?

A **No, I don't.**
Q Did you also become aware at some point that MidPac was paying bills for both -- bills that had been billed to both Maui and MidPac?
A **I became aware of both of those at the same time.**
Q Do you recall seeing any documents relating to that issue at the time you became aware?
A **Yes, I recall seeing checks from MidPac paying Maui invoices, and I recall seeing checks from Maui that were paying MidPac invoices.**
Q Did that cause you any concern when you saw that documentation and became aware of the payment pattern or the payment transactions?
A **Yes -- initially, no. I think later, yes. But initially, no.**
Q What changed your views?
A **Again, that's information I can't discuss because it's attorney-client-privileged information.**
Q So initially, when you became aware of that, did it raise any red flags for you, that either of those entities had been paying invoices of both entities?
A **Not initially.**





Q Okay. Also, with respect to -- let me ask it this way: The other areas you mentioned with respect to the know-your-customer issues that are involved with the money laundering policies, do any of those apply to the MidPac/Maui Home account situation?
A **Please restate your question. I'm not sure I understand.**
Q With respect to those other transactions that you say are reviewed as part of the Money Laundering Prevention Program, what I'm trying to determine is whether, when applying those types of reviews to the MidPac/Maui Home account, any of those procedures would have come into play?
MR. HOGAN: Objection. Vague.
THE WITNESS: I don't believe that any of the transactions at that time in and unto themselves would have come into play.
Q (By Ms. Ing) Did you later gain any information that would have led you to have changed your views on that?
A **Yes.**
Q How did you change your views? What transactions later raised concerns for you?
A **Again, at this time I can't discuss that**





**because it would be divulging attorney-client privilege communications.**
Q Going back, then, to the money laundering prevention policies, when you say that part of the changes of this know-your-customer approach deal with sales transactions, what -- how did that process change of examining sales transactions?
A **How did that process change? Restate that question, please.**
Q How did the -- did Whirlpool do anything differently as a result of the money laundering prevention policies in terms of looking at sales transactions or handling them?
MR. HOGAN: Vague as to time.
MS. ING: I'm just talking generally.
THE WITNESS: In general, yes, the policies have changed. The policy and the procedures have changed over the years.
Q (By Ms. Ing) Okay. I'm asking specifically with respect to the Money Laundering Prevention Policy?
A **And that's what I'm specifically talking about; that the Money Laundering Prevention Policy has changed.**
Q How did that change in terms of what





Whirlpool did with respect to sales transactions?
A **Sales transactions are -- and I would have to go back and review the policy to give you all the details and actually compare the two policies. But it did change in reviewing sales transactions.**
**I'm sorry. I just don't recall.**
Q By the way, with respect to application of payments, under your new procedures for review of those payment transactions, who would be reviewing those transactions?
A **The payment transactions?**
Q Right, the money laundering type of concerns.
A **Payment transactions would be reviewed by people in the Credit Department.**
Q Would that involve someone like Ernie Matlock or Donna Martin?
A **Donna Martin, yes.**
Q So is that part of her job today?
A **Yes. Part of her job to watch the red flag transactions, yes.**
Q With respect to the review of order transactions, what changes were implemented under the Money Laundering Prevention Policy?
A **In the entire policy for a change that's been implemented? At one point in time our Order**

225

**Ernie Matlock and Janet Rowan as well as Deb Clawson.**
Q And then the last sentence of that paragraph, where it says, "The total amount of goods shipped during this period was at least $311,245." And unless you have an objection, I am going to represent that the period involved was June 23rd to July 23rd, 1999. Do you have any information or knowledge of that statement, as I explained it, other than what you obtained from Whirlpool's attorneys?
**A I don't recall the exact dollar amount during that time period.**
Q Do you know what Whirlpool employees, if any, have knowledge of that dollar amount?
**A I would expect that Ernie Matlock, Janet Rowan and Donna Martin.**
Q The next paragraph says, "The allegations of misrepresentation in paragraph 99 of the Second Amended Complaint to not -- I think it means -- "do not encompass the total universe of misrepresentations made by Mr. Phelps."
Do you have any personal knowledge of that statement?
**A No, I do not.**



226

Q Do you know if any Whirlpool employee does?
**A Yes, I do.**
Q Who would that be?
**A Deb Clawson.**
Q Anybody else?
**A Not that I know of.**
Q The next sentence in paragraph -- the Answer to paragraph 13 on page 7, says, "These include" -- and that's misrepresentations -- "include, but are not necessarily limited to Mr. Phelps" -- exclamation -- "to Ernie Matlock sometime in the summer 1999 to the effect that I am a certified fraud examiner, and I've seen no fraud here."
Were you part of that conversation?
**A Not that I recall.**
Q Do you ever recall Mr. Phelps stating in a phone conversation in which you were involved that he was a certified fraud examiner?
**A Yes, I do.**
Q And when was that?
**A In the summer of '99.**
Q Do you ever recall in a phone conversation you had with Mr. Phelps him saying that he had seen no fraud here?
**A I don't recall that statement.**



227

Q Did you ever discuss that statement, or did Mr. Matlock ever tell that you Mr. Phelps had made that statement to him?
**A I don't recall.**
Q If Mr. Phelps had made such a statement to Mr. Matlock, would that be the type of information that you and Mr. Matlock would have discussed?
**A I'm not sure. I don't know for sure the answer to that.**
Q Did you and Mr. Matlock discuss, during this summer of 1999 or fall of 1999 period, the possibility that there may have been any fraud committed at MidPac or Maui Home Supply?
**A I don't --**
MR. HOGAN: Objection. What was the time?
MS. ING: Summer and fall of '99.
MR. HOGAN: Vague as to the date.
You can answer.
THE WITNESS: Let me get you to be more specific on the time.
Q (By Ms. Ing) Well, I've had a problem because you haven't been very specific on the time due to lack of memory, so I'm just trying to be broad.
And so the question is -- well, at any time



228

again -- let me ask it again.
Do you recall, in the summer of '99, you and Mr. Matlock discussing the possibility that there may have been fraud committed at MidPac or Maui Home Supply?
**A No.**
Q Do you recall having that discussion with Mr. Matlock at any point?
**A Yes.**
Q When was that?
**A In the fall of '99.**
Q How did that conversation arise?
**A Just as we were discussing what was going on on the account and events that were occurring.**
Q And what was it that led you and Mr. Matlock -- or led you to suspect that perhaps fraud had been committed?
**A That becomes information that I have been directed not to discuss as attorney-client privilege communications.**
Q Because the discussions were based on facts or information that you got from attorneys?
**A Correct.**
Q Okay. Did you and Mr. Matlock, aside from any information that you got from attorneys,

Whirlpool attorneys, have any discussions about the possibility of fraud being committed?
A Between ourselves, no. That was done in conversation with the attorneys.
Q Okay. And when you say, "fall of '99," can you be more specific about when in the fall?
A Later on in the fall is about as specific as I can be.
Q Would that be like September or October?
A The fall would be like more in the November, December timeframe, I believe.
Q So after Whirlpool had filed its suit against MidPac in October of 1999?
A I believe so, yes.
Q So you say November or December of 1999?
A Correct.
Q Going on to the next sentence, do you have any information about one million dollars in Whirlpool's collateral at Maui Home Supply supposedly being liquidated and paid to CIT?
A I have no personal knowledge of that.
Q Do you know if there is any Whirlpool employee who does?
A Yes.
Q Who?





A Deb Clawson.
Q Going on to No. 14. It's a paragraph that starts, "Without waiving these objections..."
And, again, my question is, do you have any knowledge or information of the statement, "Had Whirlpool known the truth, it could have sought the imposition of a court-appointed receiver to take control of Maui Home Supply to protect its collateral." Do you have any knowledge or information about that statement?
MR. HOGAN: Object. Calls for a legal conclusion. But to the extent about what he knows about the facts in the statement, he can answer.
THE WITNESS: Again, I don't have any personal knowledge of that.
Q (By Ms. Ing) Have you ever been in a situation where, as credit manager, you'd have to participate in a decision on whether to have a receiver appointed for one of Whirlpool's trade partners?
A No, I haven't.
Q Were you involved in any discussions whether Whirlpool should have a receiver appointed for Maui Home Supply?
A Not that I recall. There were discussions





about an involuntary bankruptcy. Is that the same as having a receiver appointed? I'm not sure I know the answer.
Q With whom did you have discussions within Whirlpool about an involuntary bankruptcy?
A Deb Clawson, Jean Penwell and Ernie Matlock.
Q And was that in the context of whether Whirlpool should put MidPac and Maui Home Supply into involuntary bankruptcy?
MR. HOGAN: I object to the extent it seeks to invade the attorney-client privilege, and I'm going to ask the witness not to answer.
Q (By Ms. Ing) And I'm not asking you to say what your attorneys had discussed, but whether it's really with a nonattorney Whirlpool employee.
MR. HOGAN: If there was an attorney present in the discussion, I would like the witness not to answer.
MS. ING: That's fine.
THE WITNESS: These discussions occurred with an attorney present.
Q (By Ms. Ing) Would that have been Deb Clawson?
A Yes.
Q Were you involved in any discussions within





Whirlpool about whether to assert a prejudgment garnishment over Maui Home's accounts? I'm referring to the second sentence of the third paragraph in answer to paragraph 14.
A No, I was not.
Q Do you know who, if anyone, at Whirlpool was involved in such discussions?
A I do not.
Q Do you have any information about the total amount of damages referred to in the last sentence of that paragraph, being no less than $450,000 appliance inventory? Again, other than what you have obtained from Whirlpool's attorneys.
A I do not.
Q Do you know what, if any, Whirlpool attorneys have information about that statement?
A I do not.
Q Going on to the next paragraph, it describes a conversation that Ernest Matlock had -- or it describes Mr. Matlock's efforts to call CIT's Mr. Brichacek in the Fall of 1999, and then that Mr. Phelps returned the call and told Mr. Matlock that he was CIT's presence in Hawaii and their eyes and ears. Do you have any personal knowledge of that statement?

STATE OF HAWAII )
) SS.
)

I, CAROL E.M. SUGIYAMA, C.S.R., a Notary Public in and for the State of Hawaii, do hereby certify:

That on December 17, 2002, at 9:00 a.m. appeared before me CARL SMITH, the witness, whose testimony is contained herein; that, prior to being examined, the witness was, by me, duly sworn or affirmed; that the proceedings were taken in computerized machine shorthand by me and were thereafter reduced to print under my supervision; that the foregoing represents, to the best of my ability, a correct transcript of the proceedings had in the foregoing matter;

That, if applicable, the witness was notified through counsel by mail, or by telephone to appear and sign; that if transcription is not signed, either the reading and signing were waived by the witness and all parties, or the witness has failed to appear and the original is therefore kept on file without signature pursuant to Court rules.

I further certify that I am not counsel for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

DATED: ______________________________.

CAROL E.M. SUGIYAMA, C.S.R. #295
Notary Public, State of Hawaii
My commission expires 3/27/2003