09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04 09:04

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

---------------------------------------- ORIGINAL

WHIRLPOOL CORPORATION, a Delaware corporation,
Plaintiff,

vs. CIVIL NO. CV01 00187 DAE BMK

CIT GROUP/BUSINESS CREDIT, INC., a New York corporation, CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING, RAYMOND IWAMOTO, and KURT GLASSMAN, DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,
Defendants.

and

CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,
Additional Cross-claim Defendants.

----------------------------------------

30(b)(6) DEPOSITION OF ALEX HOLTON

VOLUME I

Taken on behalf of the Defendant/Cross-claimant The CIT Group/Business Credit, Inc., at the office of Alston Hunt Floyd & Ing, Pacific Tower, Suite 1800, 1001 Bishop Street, Honolulu, Hawaii 96813, commencing at 9:07 a.m., on November 15, 2002, pursuant to Notice.

EXHIBIT 1

BEFORE: DENNIS J. YANKEE, CSR NO. 285
Certified Shorthand Reporter

APPEARANCES:

For Defendant/Cross-claimant The CIT Group/Business Credit, Inc.: LOUISE K.Y. ING, ESQ.
Alston Hunt Floyd & Ing
Pacific Tower, Suite 1800
1001 Bishop Street
Honolulu, Hawaii 96813

For Plaintiff: TIMOTHY J. HOGAN, ESQ.
Lynch Ichida Thompson & Kim
1132 Bishop Street, Suite 1405
Honolulu, Hawaii 96813

For Defendants Edwin Bowling and Frances Haller-Bowling: JEANNETTE E. HOLMES, ESQ.
Bronster Crabtree & Hoshibata
2300 Pauahi Tower, 1001 Bishop St.
Honolulu Hawaii 96813

For Defendant Raymond S. Iwamoto:
CALVIN E. YOUNG, ESQ.
Ayabe Chong Nishimoto Sia Nakamura
Pauahi Tower, Suite 2500
1001 Bishop Street
Honolulu, Hawaii

For Defendants Michael Clifford, CGBN, Inc. and CG Development, Inc.:

CHRISTOPHER J. MUZZI, ESQ.
Case, Bigelow & Lombardi
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawaii 96813

Also Present: Debra Clawson, Senior Counsel
Whirlpool Corporation

-oOo-

I N D E X


| EXAMINATION BY: | PAGE |
| --- | --- |
| MS. ING | 5 |
| MR. YOUNG | 86 |
| MS. HOLMES | 107 |
| MR. MUZZI | 120 |
| MR. HOGAN | 132 |
| MS. ING | 135 |
| MR. MUZZI | 137 |


-oOo-

INDEX OF EXHIBITS


| | PAGE |
| --- | --- |
| Exhibit 60: CIT Group/Business Credit, Inc.'s 1st Amended Notice of Taking Deposition | 6 |

09:31 A. No.
:31 Q. Who did that?
09:31 A. Andy Roland.
09:31 Q. And what was his position?
09:31 A. The same as mine.
09:31 Q. So you took over for him with respect to Hawaii?
09:31 A. Correct.
09:31 Q. And for other markets as well?
09:31 A. Just Hawaii.
09:31 Q. Do you know, with respect to the quota for 1999, how much of that, if you know, was attributable to projected sales for Mid-Pacific Lumber?
:31 A. You're referring to Mid-Pac/Maui Home Supply?
09:31 Q. Is that how you would refer to the customer?
09:31 A. Yes.
09:32 Q. So you considered both Mid-Pac Lumber and Maui Home Supply together in terms of --
09:32 A. -- that's correct --
09:32 Q. -- I guess, calculating or anticipating sales?
09:32 A. That's correct.
:32 Q. Why did you consider them together?

09:32 A. They were presented to me as one company.
09:32 Q. Who represented them to you as one company?
09:32 A. Mr. Ed Bowling. When I was introduced to him in February, he was in charge of overall sales.
09:32 Q. And so your meeting with him in February was your first, well, you first met with him in February of 1999 then?
09:32 A. Correct.
09:32 Q. We'll get to that on another topic. So with respect to Mid-Pac/Maui Home Supply, how big a factor were their anticipated sales in setting the quota for 1999, if you know?
09:33 A. They were a reasonable share of the total quota.
09:33 Q. Do you know how much of the total quota they were?
09:33 MR. HOGAN: I'm going to object that we're clear about we're talking about retail sales?
09:33 MS. ING: Oh, no. Contract sales.
09:33 MR. HOGAN: I'm sorry, contract sales, okay.
09:33 MS. ING: Thank you.
09:33 A. Roughly it was anticipated they'd be maybe 1.5.
09:33 BY MS. ING:

Q. When you say "to some extent," what do you mean?

A. To the extent they would allow him to be involved and possibly make joint sales calls.

Q. Did he have any role in terms of monitoring Mid-Pac/Maui Home Supply's payment on Whirlpool contract sales accounts?

A. No.

Q. That was handled separately by other Whirlpool staff?

A. Yes.

Q. What if any role did you have with respect to the Mid-Pac/Maui Home Supply account for 1999 and 2000?

A. Mostly an ambassador.

Q. Meaning what kind of things would you do?

A. Again, relationship building between our management and their management, discussing the issues, concerns they might have with our support to them, the input they have about our products.

Q. As division, division manager, division director?

A. Division director.

Q. Okay. What information did you get with respect to customer's payment history if any for your

:04
10:05
10:05
10:05
10:05
10:05
:05
10:05
10:06

Hawaii customers?

A. Very little.

Q. Would you have any role in monitoring whether they were current or behind on payments?

A. No.

Q. When you say "very little," what kind of payment information would you get in 1999 and 2000 for Hawaii customers?

A. Only if there was a problem in payment.

Q. And what kind of problems would generate information going to you, I mean, how far would they have to be in arrears or what other problems would generate information going to you?

A. I couldn't speak if there's a precise percentage that they use. When it was important or a concern in the credit department's mind, they would get me involved.

Q. With respect to Mid-Pac/Maui Home Supply's, did the credit department ever get you involved with respect to, or provide you with information, payment information, for Mid-Pac/Maui Home Supply because of perceived problems?

A. Nothing in detail other than in this October time frame when I was made aware that they were past due.

10:06 Q. Was the October time frame the first time you were made aware they were past due?

10:06 A. That I recall. It was somewhere between, yeah, somewhere in that, in that quarter, as I best recollect.

10:06 MS. ING: Do you want to take a break now?

10:06 MR. HOGAN: I think it would be a good time.

10:06 (Break taken from 10:06 a.m. to 10:12 a.m.)

10:12 MS. ING: Back on the record. I am going to have the court reporter mark the next, a December 14th letter as Exhibit 63.

:12 (Deposition Exhibit 63 marked.)

10:13 BY MS. ING:

10:13 Q. Mr. Holton, I'm showing you what has been marked as Exhibit 63, which is a letter, an unsigned letter that's dated December 14th, 1999 from Alex Holton to Al "G", and I'll ask you to take a look at that and let me know when you're done.

10:14 Ready?

10:14 A. Yes.

10:14 Q. All right. Did you write this letter?

10:14 A. Yes, I did.

:14 Q. And the version we have is an unsigned one.

10:22 Q. Under any circumstances?
:22 A. I don't know the exact details of the limit.
10:22 Q. I'm going to go on to topic number 13. Okay, 13, you and Mr. Higgins have been designated for to testify about dealings with, meaning Whirlpool's dealings with Mid-Pac/Maui Home Supply and Maui Home Supply for sales, delivery and shipment of product between January '98 and January 2000.
10:23 Again, is it my understanding that you are the designee for the contract sales end of that topic?
10:23 A. For the period of February '99 through January 2000, yes, that's correct.
10:23 Q. With respect to sales by Whirlpool to Mid-Pac/Maui Home Supply from February '99 to January of 2000, what was the procedure by which sales were made by Whirlpool to Mid-Pac/Maui Home Supply in the contract sales area?
10:24 A. Are you asking the specific process that was undertaken to place orders?
10:24 Q. Right.
10:24 A. To the extent I understood it, Ed Bowling would create orders with the assistance of Al "G", and those orders were placed with Whirlpool, although

10:24 I couldn't say how they were specifically administered through our system.
And we delivered those orders, as I understood at the time, to Mid-Pac's location on Oahu. And they were disseminated to Maui Home, some portion of those shipments were disseminated to Maui Home to fulfill their customers' needs as well.
10:24 Q. Was that procedure in place, as far as delivery to Mid-Pac and then dissemination out to Maui Home, was that the procedure in place for February of 1999 and the remainder of 1999, to your knowledge?
10:25 A. To my knowledge.
:25 Q. Okay. And I gather with respect to the year 2000, were there any sales made in the contract sales area to Mid-Pac/Maui Home Supply?
10:25 A. I don't believe so.
10:25 Q. Now, you said Al "G" was the manager for the Maui Home Supply showroom. Was there a manager, to your knowledge, in 1999 for the Mid-Pac --
10:25 A. There was. I can't recall his name.
10:25 Q. But it was somebody separate from Ed Bowling?
10:25 A. Correct. He reported to Ed Bowling.
10:26 Q. The orders that Mid-Pac Maui created, to

10:53 Q. Do you know how much in sales Whirlpool was making to Mid-Pac for the Navy contract in 1999?

10:54 A. I don't know the exact figure, no.

10:54 Q. Would the Navy contract that Whirlpool had come under the contract sales side of Whirlpool?

10:54 A. Yes, it would.

10:54 Q. Do you know how far into 1999 Whirlpool was making sales to Mid-Pac for the Navy contract?

10:54 A. Up until the time that the credit department raised the past due.

10:54 Q. And when would that -- how far into 1999 was that, to your understanding?

10:54 A. I believe it was late in the second quarter.

10:54 Q. So about summer of '99?

10:54 A. I believe so, yes.

10:54 Q. And was it your understanding that after summer of '99 no further sales were made by Whirlpool to Mid-Pac for the Navy contract?

10:55 A. That's my understanding, yes.

10:55 Q. Do you know if there were any negotiations between Whirlpool and Mid-Pac with respect to resuming sales for the Navy contract after summer of '99?

:55 A. All I can say is that they wanted to try to

11:03 A. Yes. That we would speak to our sales people and redouble our efforts and work harder to meet his needs.

11:03 Q. Does in paragraph 2, it looks like the topic is Coverage at Mid-Pac/Maui Home Supply, and it discusses, refers to calls on Oahu and Maui by Wayne and Harris.

11:03 A. Uh-huh.

11:03 Q. Does that appear to be the solution or the resolution that you reached after having discussions with Ed Bowling?

11:03 A. As I recall it, yes.

11:03 Q. And before that how often was, were the Whirlpool sales staff meeting with Mid-Pac/Maui Home Supply?

11:03 A. I couldn't say precisely, but they were in there at least once or twice a week, but maybe different days of the week.

11:03 Q. So was the meeting schedule reflected in number 2 had increased or the same level as what it had been previously?

11:04 A. I think it was just more an attempt to have a regimented schedule, not an increase.

11:04 Q. Do you know if that was adhered to for 1999?

11:04 A. As far as I know it was.
:04 Q. You refer to, well, after the -- I gather that from your understanding the credit problems with Mid-Pac/Maui Home Supply surfaced around the summer of '99, was that your understanding?
11:04 A. That's my recollection, yeah.
11:04 Q. Did those sales calls continue after the summer of '99?
11:04 A. Yes. We continued calling on the account.
11:04 Q. And what was the purpose of the sales calls after the summer of '99?
11:04 A. To continue support and sales with the assumption that we would be able to continue doing business together.
11:05 Q. Under item three there is a reference under 3-A to Builder/Retail Mid-Pac, Maui. Do you know what that's referring to?
11:05 A. It looks pretty generic. I couldn't speak to what the thought process of the specifics were.
11:05 Q. There is a reference also to number 4 Sears, national accounts. Do you know what that was referring to?
11:05 A. I don't.
11:05 Q. Do you know if Mid-Pac/Maui, did they do any distribution to Sears for Hawaii or on the

11:19 A. Yes, she is.
11:19 Q. When did Harris start -- stop servicing that account, Harris Fujita?
11:19 A. When he left the company. And, again, I'd have to go back in my records to get that date. You'd asked me earlier about that.
11:19 Q. Do you know why Harris Fujita left Whirlpool?
11:19 A. Yes. He was terminated.
11:19 Q. Why was he terminated?
11:19 A. For not conducting his duties.
11:19 Q. What duties did he not conduct?
11:19 A. Specifically, very bad communication, poor follow-up with his trade, not returning phone calls, not returning e-mails.
11:19 Q. Any other reasons?
11:20 A. Those are the major ones.
11:20 Q. In 1999, do you know whether Whirlpool was making sales directly to J&J or making sales through another customer?
11:20 A. My understanding is J&J was set up on a C.O.D. basis, and they were purchasing some goods from us on a C.O.D. basis. Beyond that, I'm not sure what else they were purchasing from other suppliers or distributors.

12:36 C E R T I F I C A T E

12:36 STATE OF HAWAII )
12:36 ) SS.
12:36 CITY AND COUNTY OF HONOLULU )

12:36

12:36 I, DENNIS J. YANKEE, do hereby certify;

12:36 That on November 15, 2002, at 9:07 a.m. appeared before me ALEX HOLTON, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

12:36 That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewritten form under my supervision; that the foregoing represents to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

12:36 I further certify that I am not attorney for any of the parties hereto, nor in any way concerned with the cause.

12:36 DATED this 16th day of November, 2002, in Honolulu, Hawaii.

12:36

12:36

12:36 ______________________________

12:36 DENNIS J. YANKEE, CSR 285