IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO, and KURT GLASSMAN, DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants.<br><br>and<br><br>CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Cross-Claim Defendants. | Civil No. CV01-00187 DAE BMK<br><br>(Tort and RICO)<br><br>30(b)(6) |

__30(b)(6) DEPOSITION OF JOE HIGGINS__

Taken on behalf of Defendant CIT Group/Business Credit, Inc., at 1800 Pacific Tower, 1001 Bishop Street, Honolulu, Hawaii, 96813, commencing at 9:15 a.m., on Tuesday, January 21, 2003, pursuant to Notice.

EXHIBIT 5

REPORTED BY: JANIS K. FLOATE, RPR, CSR 254
Notary Public, State of Hawaii

APPEARANCES:

For Plaintiff Whirlpool Corporation:

TIMOTHY J. HOGAN, ESQ.
Lynch Ichida Thompson Kim & Hirota
1132 Bishop Street, Suite 1405
Honolulu, Hawaii 96813

-and-

DEB CLAWSON, ESQ.
Whirlpool Corporation
Legal Department
2200 M63
Mailbox No. 2200
Benton Harbor, Michigan 49022

For Defendant CIT Group/Business Credit, Inc.:

LOUISE Y.K. ING, ESQ.
Alston Hunt Floyd & Ing
1800 Pacific Tower
1001 Bishop Street
Honolulu, Hawaii 96813

For Defendants Michael Clifford, CGBN, Inc., and Additional Cross-Claim Defendant CG Development, Inc.:

TED N. PETTIT, ESQ.
CHRISTOPHER J. MUZZI, ESQ.
Case Bigelow & Lombardi
2600 Mauka Tower
737 Bishop Street
Honolulu, Hawaii 96813

For Defendant Raymond Iwamoto:

CALVIN E. YOUNG, ESQ.
Ayabe Chong Nishimoto Sia & Nakamura
2500 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813

marketplace.

You had a huge downturn here in the economy. Hawaii was, I think, hurt big time from the mid '90s until today in terms of the economic activity. Then Maui Home Supply went out of business and that was a big hit, too, because they were a pretty large account for us as well. And Maui Home.

So all those things combined forced the total decline in the market here to the point today where it's doing a couple million dollars less than at its peak.

Q. In terms of 1998 and 1999 when you had the best years, how much of that was attributable to the Midpac Lumber and Maui Home Supply sales?

A. In 1998 those two accounts did about five million dollars. They did about three and a half in '99. So they represented -- of the sales I gave you, they represented a pretty good portion of that.

Q. Was the three and a half million in '99 what Whirlpool projected for the Maui Home Supply and Midpac sales in that year? Or was it below projections?

A. No. That was probably pretty close to what we thought they were going to do.

Q. During those years, Whirlpool considered those two companies to be the business -- or the businesses that would grow its business in Hawaii; isn't that correct?

A. It appeared from the growth that they had, the past growth that they had, that if they continued on the trend that they had been on, that they would be, yeah, our largest accounts on the retail and contract side, the two largest accounts that we do business with. They looked like that. Excluding national accounts.

Q. Okay. In terms of making that assessment of the importance of Midpac Lumber and Maui Home Supply to Whirlpool sales in Hawaii, who was part of that process of identifying the importance of Midpac and Maui Home Supply?

A. That would be Steve Singer and myself at the time. Then Andy Roland.

Q. Did you, meaning Whirlpool as sales, do anything to try to foster or help that trade partner become a large part of Whirlpool sales in Hawaii?

A. Well, just what we would normally do for any trade partner. We helped them with advertising, gave them direction on how to run ads and how to do promotions. We trained their people as well as we

agreements or dealings with the trade partner that you would, as sales, go to credit to get less?

MR. HOGAN: Objection. Vague. If you understand the question, you can answer.

A. What are the kind of things you're talking about?

BY MS. ING:

Q. I'm just trying to get an idea. Other than payment terms -- let me try this.

With respect to if you were working out a payment agreement with a trade partner, they were behind in their payments, what role would you have in terms of working out a payment agreement versus credit?

A. With credit, we give direction. We say -- we would normally carry the message from an account and say they are asking us for certain payment terms; can you guys accommodate that. That's our function in that. We would carry the message and maybe plead for the case for them to do something.

We're the sales function. We want to get as much credit and as many terms as we can and get as much business as we can. Within a good business sense, of course. We would carry that to the credit department and then it's hands off at that point.

Q. Yes. You say it much more succinctly.
A. Than they were prior to a certain period?
Q. Right. And let me ask you generally. Has the credit department gotten stricter with credit terms over the years, say, between '95 and the present?
A. Credit terms or credit limits?
Q. Credit limits, payment terms.
MR. HOGAN: Objection. Compound. Are you asking him on terms or credit limits?
BY MS. ING:
Q. Do you need for me to break it down? How would it be different? Let me just ask you generally. Has the credit department gotten stricter over the years?
A. You know, I wouldn't say they have. We run a credit department that is responsible for sales. I can't say that I have seen any difference in any of the years that I have been there in terms of the way we follow up on credit. If someone is not paying us, we stop shipment. If someone is paying us, we let it go.
To me, it's fairly black and white. It's not like all of a sudden we have seen them jumping all over us because one account has a problem. This

it. I can't demand -- I mean if someone is past due, I can't demand you ship it to them. They say, hey, they haven't paid their bill. I don't have that kind of authority.

Q. So you are the one making the request on behalf of a trade partner to get shipments as opposed to saying don't ship?

A. Right, unless I know -- see, if I know someone has a credit problem, then I wouldn't tell them, oh, yeah, ship this anyway. That would be suicide on my part, for us, for me, and for the company. I live within the best business practices we have. My loyalty is to Whirlpool and not outside Whirlpool.

Q. With respect to Midpac and Maui Home Supply, did there ever come a time where you recommended to Whirlpool, to the credit department, that they not ship or continue to sell to Midpac or Maui Home Supply?

A. I think it was stopped way before. They had made the decision to stop selling way before I would have ever made a recommendation like that.

Q. At what point did Whirlpool make the decision to stop selling to Midpac and Maui Home Supply?

A. I believe it was in the mid summer area of '99. I'm not sure.

Q. You said that they made that decision before you would have made it. Did you agree that Whirlpool should have stopped at that point or did you think that more sales should have been made?

A. No. They explained the problem to me and how deep it was. At that point I agreed with them.

Q. At what point did you become aware that there was a problem with Midpac and Maui Home Supply?

A. Summer of '99, mid summer '99.

Q. How did you become aware?

A. Probably through discussions. Again I don't have a lot of recollection. But probably through my discussions with Carl or Ernie when we were talking about some of the payment problems they were having.

Q. As a practice, as a division manager, again, in the '98 to '99 time frame, how much were you kept abreast of the payment history or the payment practices of the trade partners that you dealt with or that your division dealt with?

MR. HOGAN: Objection. Vague and compound. Practices and history.

typically it would come from inside the account versus outside Whirlpool. Unless an order was turned down. That's where they would get closer, because if, as you described earlier, they cut it off at that point, the first person to know is the account manager because the trade partner will call the account manager before they would call me.

Q. With respect to orders from Midpac and Maui Home Supply, you mentioned that Al Gee and Ed Bowling were the main contact persons. Are you aware of whether there were any other persons who placed orders to Whirlpool on behalf of Midpac and Maui Home Supply?

A. No.

Q. Are you aware of whether -- are you familiar with CIT?

A. Yes.

Q. Are you aware of whether anybody from CIT ever placed orders on behalf of Midpac and Maui Home Supply to Whirlpool?

A. No.

Q. Are you aware of whether anybody from CIT directed Al Gee or Ed Bowling to place orders to Whirlpool?

A. No.

C E R T I F I C A T E

STATE OF HAWAII )
) SS.
CITY AND COUNTY OF HONOLULU )

I, JANIS K. FLOATE, Notary Public, State of Hawaii, do hereby certify:

That on January 21, 2003, appeared before me Joe Higgins, the witness whose deposition is contained herein; that prior to being examined, the witness was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting under my supervision; that the foregoing represents to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

DATED this 31st day of Jan, 2003, in Honolulu, Hawaii.

Janis K. Floate
JANIS K. FLOATE, RPR, CSR 254
Notary Public, State of Hawaii
My Commission Exp: December 12, 2005