IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; et al.,<br><br>Defendants,<br><br>and<br><br>F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | Civil No. CV 01 00187 MEA-BMK (Tort and RICO)<br><br>**MEMORANDUM IN SUPPORT OF MOTION** |

**MEMORANDUM IN SUPPORT OF MOTION**

Defendant/Cross-Claimant The CIT Group/Business Credit, Inc. (CIT) seeks in this motion to preclude Whirlpool from eliciting testimony or arguing that the July 29, 1999, letter from Ted Phelps to CIT's Robert Brichacek (*listed as Trial Ex. W611, W613; W613 attached as Ex. 1*), proves Phelps was CIT's agent. The letter says nothing about the subject of agency. Phelps only says, "I have not discussed the contents of this letter with Kurt Glassman and I do not intend to." Whirlpool contends that statement proves Phelps was CIT's agent when he dealt with Whirlpool and MidPac's other creditors starting in late June 1999.

In denying both Whirlpool and CIT's cross-motions for partial summary judgment on Whirlpool's fraud claim, this Court cited the letter as one of the items of evidence that were "sufficient to raise a genuine issue of material fact as to whether it was reasonable for Phelps [to] believe that he was acting on CIT's behalf in dealing with CIT's [sic] creditors, including Whirlpool." *Memorandum Opinion and Order, at 14 ("Opinion")*. However, the letter says nothing that enables the court or jury to draw any conclusions about the existence, scope or duration of any "agency", especially when viewed in light of Mr. Phelps's testimony that Whirlpool has designated for trial.

The letter is therefore not probative and moreover, would lead to unacceptable jury confusion and unfair prejudice.

## I. BACKGROUND

Whirlpool's fraud claim against CIT depends on Whirlpool proving among other things, that Mr. Phelps acted as CIT's agent between June 23 and July 23, 1999 when he allegedly made misrepresentations to Whirlpool to induce continued shipments on credit. Phelps started work in Hawai`i on June 23, 1999. Whirlpool admits it learned of MidPac's financial difficulties and stopped credit sales to MidPac and Maui Home Supply (MHS) on July 23, 1999.

This Court has ruled that Whirlpool must show Mr. Phelps had "implied actual authority" from CIT; that is,

Mr. Phelps reasonably believed that between June 23 and July 23, 1999, he was acting on CIT's behalf. *Opinion, at 13.*

One of the bases for Whirlpool's agency argument is a letter from Mr. Phelps to a CIT account executive, Robert Brichacek, dated July 29, 1999. This letter was written six days **after** Whirlpool stopped shipping to MidPac and MHS on credit. In the letter, Mr. Phelps (A) refers to CIT's "continuing. . . evaluat[ion of] its position with respect to forbearance in the Midpac matter", (B) states his purpose of making CIT "aware of a number of facts that may serve to assist you in clarifying your position", (C) refers to Mr. Phelps' "continuing position as a consultant to Midpac Lumber", (D) discusses the pros and cons of a MidPac liquidation versus allowing it to continue in business, and (E) ends by urging CIT to "allow the company to continue in business, which will require the funding of operating expenses and purchases of inventory." *Ex. 1(Trial Ex. W613).* A plain reading of the letter shows that it is an advocacy piece for MidPac, not a report from a CIT agent.

Mr. Phelps was engaged by MidPac as a financial consultant on June 24, 1999. Although CIT did require MidPac to retain a financial consultant in late June 1999, it is undisputed that CIT did not insist that MidPac hire Mr. Phelps. Mr. Phelps testified in response to questioning by Whirlpool's counsel on December 7, 2000, before Whirlpool had filed this lawsuit that:

> It [his engagement] occurred officially on June 24th when CIT told them that in order to continue with the

> company and help it, allow it to try to straighten itself out, that they wanted certain things. They wanted a consultant and they didn't insist that it be me, and they offered to provide a list of other people that they had dealt with or that they had approved of, and they also wanted Collateral Risk Management installed to become custodians of the inventories. I don't mean that in a legal sense. He wanted them to monitor the ins and outs of the inventory and report to them in an independent basis. . . . And, of course, they wanted a forbearance agreement that would be negotiated later in order to continue with financing the company.

*Ex. 2, Rule 2004 Examination of Theodore G. Phelps (taken in In re MidPac Lumber Company, Inc., 12/7/04) ("Phelps Exam."),* at 53:11-25. Mr. Phelps testified that it was MidPac and MHS president Kurt Glassman who decided to retain him for MidPac, even though Mr. Phelps initially came to Hawai`i in another capacity:

> Now, at that point in time, when they offered to give Glassman a list of other consultants because I think it was Tom Hayes that said, "It doesn't have to be Ted. We brought him down here to help us on this, but if you want somebody else," and Kurt said, "No, no. I'm happy with Ted. That's fine."

*Id., at 54:1-6.*

Mr. Phelps understood his work at MidPac was "as a work-out consultant, a turnaround consultant. That's what I thought that I was there for." *Id., at 85:18-20.* Although Mr. Phelps was "forbidden" by Kurt Glassman to conduct a fraud examination, Mr. Phelps "primarily. . . was trying to. . . keep the company alive until Glassman or Bowling would put the money back in because that's what I thought had happened, that they had

taken the money, that they had it available, and had put it back." *Id., at 84:2-84:9.*

Whirlpool's counsel questioned Mr. Phelps about his July 29, 1999 letter, but not about Mr. Phelps' statement that he had not discussed the contents of the letter with Mr. Glassman. Mr. Phelps testified that CIT's response to the letter "was they continued to finance the company on a limited basis" (*id., at 121:24-25*), he did not "recall a written or verbal response" (*id., at 121:25-122:*2); CIT "did comment that they thought that some of my analysis was way off." *Id., at 122:7-10.*

Mr. Brichacek testified that CIT did not take Mr. Phelps' suggestions into consideration in determining CIT's course of action on the MidPac loan because CIT's credit professionals and counsel, "were competent to determine our own course of action without the receipt of unsolicited advice from Mr. Phelps." *Ex. 3, Deposition of Robert Brichacek (11/21/02), at 276:8-16.*

## II. ARGUMENT

### A. The July 29, 1999, Letter is not Probative of Whether Mr. Phelps was CIT's agent

The trial of this case, which already will be dense with alleged facts, transactions, testimony and exhibits, should not be further muddied with marginal evidence and misleading arguments. According to the Ninth Circuit Court of Appeals, two distinct requirements are implicit in definition of relevance under FRE 401: "(1) The evidence must be probative of the

proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." *United States v. Click*, 807 F.2d 847, 850 (9th Cir. 1987).

This Court has ruled that the linchpin to Whirlpool's fraud case against CIT is whether Mr. Phelps was CIT's agent during June 23 to July 23, 1999, when Whirlpool claims it was defrauded into shipping goods on credit to MidPac, *Memorandum Opinion and Order (filed 12/28/04), at 12,* and whether Mr. Phelps had "implied actual authority"from CIT to act as CIT's agent. *Id., at 13.* The July 29, 1999 letter is not probative of whether CIT's conduct led Mr. Phelps reasonably to believe himself CIT's agent between June 23 to July 23, 1999, or even later.

The rules regarding establishment of implied actual authority are simply stated. As the Hawai`i Supreme Court said in *Cho Mark Oriental Food v. K&K Int'l, 73 Haw. 509, 515, 836 P.2d 1057 (1992)*, in determining the existence of such authority, this Court must focus on the agent's understanding of his authority because **"the relevant inquiry is whether the agent reasonably believes, <u>because of the conduct of the principal</u> . . . that the principal desired him to so act."** (emphasis added; internal quotations and citations omitted).

This, in turn, requires an examination of what powers "the agent reasonably relieves himself to possess **as a result of representation by the principal or of acts of the agent permitted**

**by the principal over a course of time in which the principal has acquiesced."** *In re Ballard,* 100 B.R. 526 (Bk Nev. 1989). *Accord Global Poly, Inc. v. Fred's Inc.,* 2004 U.S. Dist. LEXIS 21881 (N.D. Ill. 2004)(principal's words or actions must lead a reasonable person in the position of the alleged agent to believe he/she was authorized to act).

These cases show that actual implied authority depends upon the agent's understanding based upon the acts of the principal-not the acts of the agent. The letter cannot be used to establish the existence of an alleged agency relationship between Mr. Phelps and CIT, for it says nothing about the scope of any agency, any conduct by CIT that would lead Phelps reasonably to believe that he was CIT's agent and any representations by CIT that it considered Phelps its agent.

Moreover, Phelps' testimony designated by Whirlpool (from a bankruptcy court examination taken before this action was filed) makes clear that Mr. Phelps understood himself to have been engaged by MidPac as of June 24, 1999. Mr. Phelps explained in testimony designated by Whirlpool the reason for communicating with CIT outside of Mr. Glassman's presence:

> Q. Now, was there any understanding at the time that you were engaged that you were going to be able to have discussions with CIT that Mr. Glassman would not be a party to?
> A. Well, yes, because when I talked to Kurt about it, he was very rarely at MidPac. He flew home almost every single Friday afternoon or sometimes on Thursdays, and he would arrive, he would come back to Honolulu on either Monday or Tuesday. So I specifically said to him that, "It's going to be

> impossible for me to operate here unless I have your permission to talk to these people outside of your presence."

*Ex. 2, Phelps Depo., at 55:10-22.*

In addition, Mr. Phelps made the point in the letter that new, post-Glassman controls were in place at MidPac:

> We have effective controls in place at this moment to prevent inventory from "walking" away, and there are other measures in place to prevent a recurrence of the accounts receivable problems.

*Ex. 1, W613, at 4.* The discussion of "controls" indicates that the purpose of the letter was not to report to an alleged principal; rather, Mr. Phelps was reporting to a creditor concerned about suspected accounts receivable fraud that had been perpetrated by Mr. Glassman and about whether controls were in place to prevent recurrence of bad acts by Mr. Glassman.

### B. Even If Marginally Relevant, The Evidence Should Be Excluded Under FRE 403.

Even assuming that Whirlpool could make a showing that Mr. Phelps' letter is of marginal relevance on the agency issue, any such evidence or argument should be excluded under FRE 403 on the ground that its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FRE 403.

According to the Ninth Circuit Court of Appeals, the U.S. Supreme Court has instructed district courts to balance "the

probative value of a given evidentiary item against its prejudicial potential" using a two-step process. *United States v. Merino-Balderrama*, 146 F.3d 758, 761 (9th Cir. 1998). First, the court must "'decide whether a particular item of evidence raise[s] a danger of unfair prejudice.'" *Id.* (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). Second, the court must "evaluate the degrees of probative value and unfair prejudice, not only for the item in question but for any actually available substitutes as well. If an alternative [is] found to have substantially the same or greater probative value but a lower danger of unfair prejudice,'" the probative value of the proffered evidence should be "'discounted.'" If the discounted probative value is "'substantially outweighed by the unfairly prejudicial risk,'" the evidence must be excluded. *Id.* at 761-62 (quoting *Old Chief v. United States*, 519 U.S. at 180).

Here, any marginal relevance of the July 27, 1999 letter is substantially outweighed by the danger of confusion and unfair prejudice. Lacking any real evidence of agency, Whirlpool will seek to confuse the jury by a single statement in a four-page letter ("I have not discussed the contents of this letter with Kurt Glassman") out of context and mischaracterizing the purpose of the letter, rather than focusing on(A) Mr. Phelps' reasonable understanding his role during the critical June 23 to July 23, 1999 period when he was allegedly inducing Whirlpool, on behalf of CIT, to ship goods on credit and (B) whether there was

any conduct or representations by CIT during that critical period that would reasonably have led Mr. Phelps to believe he was acting as CIT's agent. At a trial where time is already limited, CIT would be required to consume considerable time eliciting testimony and evidence about the purpose and background of the July 29, 1999 letter in order counter misleading characterizations of it by Whirlpool and minimize the chances of any jury confusion.

Further, "[o]nce the probative value of a piece of evidence is found to be outweighed by the danger of unfair prejudice, there is no other evidentiary rule that can operate to make the same evidence admissible." *United States v. Benavidez-Benevidez*, 217 F.3d 720, 725 (9th Cir. 2000). Here, any marginal relevance of the letter is substantially outweighed by the danger of unfair prejudice to CIT. The appropriate focus for determining the existence of any agency relationship is Mr. Phelps' understanding and CIT's actions during June 23 to July 23, 1999, not on a letter which sheds no light on whether conduct or representations by CIT reasonably led Mr. Phelps to believe he was CIT's agent.

## III. CONCLUSION

For the foregoing reasons, CIT's motion should be granted and Whirlpool should be precluded from eliciting evidence

or making arguments that Mr. Phelps' July 29, 1999 letter to CIT's Mr. Brichacek illustrates that Mr. Phelps was CIT's agent.

DATED: Honolulu, Hawaiʻi, June 13, 2006.

/s/ Louise K. Y. Ing
PAUL ALSTON
LOUISE K. Y. ING
THOMAS E. BUSH
ALLISON KIRK
Attorneys for Defendant/Cross-claimant THE CIT GROUP/BUSINESS CREDIT, INC.