**PHELPS ASSOCIATES**
501 W. Glenoaks Blvd. Suite 226
Glendale, California 91202
(800) 572-8352 (800) 453-9415 (Fax)

*tphelps@phelpsnet.com (email)*
*http://phelpsnet.com*

July 29, 1999

Mr. Robert Brichacek
The CIT Group/Credit Finance
300 S. Grand Ave. Suite 300
Los Angeles, CA 90017

VIA TELECOPIER

Dear Robert:

In light of our numerous conversations over the past two days wherein it has become clear that CIT is continuing to evaluate its position with respect to forbearance in the Midpac matter, I think it incumbent upon me to make you aware of a number of facts that may serve to assist you in clarifying your position. In doing so, I wish to stress a number of points. First, it is my continuing position as a consultant to Midpac Lumber Co., Ltd. that if a liquidation is inevitable, it is best for all concerned, i.e., employees, creditors and ownership, that the liquidation be voluntary and peaceful, thereby maximizing to the greatest extent the relevant recoveries. This remains my position and in the event that you determine that you want to liquidate this company, I will do my utmost to convince the ownership to voluntarily comply with your decision. Second, I have not discussed the contents of this letter with Kurt Glassman, and I do not intend to do so. Finally, in outlining what I think could be possible responses by Mr. Glassman to a decision on your part not to go forward, please be assured that this is not coming from Mr. Glassman or his attorneys. This is simply my own attempt to forecast the probable actions on the part of Mr. Glassman, advised by competent counsel in the event that he decides to oppose any decision on your part to move toward liquidation. In like manner, please don't read anything that I write here as a threat coming from me. Again, my only purpose is to make sure that you have considered every possibility before reaching a decision that for all intents and purposes is irreversible.

First, you should be aware that a number of lumber vendors led by Forest Grove and including Weyerhauser, Kluepenger Lumber, and Scott Lumber have been meeting with a representative from N.A.C.M. They have indicated that they will work with us in accordance with the letter that I sent to the twenty-three largest unsecured creditors on July 8. These creditors represent about $2 million, or approximately one third of the trade debt.

None of these people are indicating at this time that they would like to see Midpac in a bankruptcy proceeding, indicating that they are convinced that their only hope of recovery is by means of a workout. They are obviously interested in Midpac's ongoing negotiations with CIT, and they call me every other day for an update. I have had no indication that this group is represented by counsel, but they are sophisticated people and have a lot at stake, so I must assume that they are. In the event that CIT moves aggressively I think that this group could be

J00362

EXHIBIT 1

persuaded to put the company into an involuntary Chapter 11 by a bankruptcy attorney using arguments such as the following:

1. Bankruptcy is the only arena whereby CIT's secured position can be fully and completely evaluated and possibly challenged.

2. The leveraged buyout whereby CGBN acquired Midpac might have been a fraudulent conveyance. Bankruptcy provides a forum for examining this possibility.

3. It is possible that the large paydowns achieved by CIT over the past 45 days were preferences. Unless Midpac is in bankruptcy, this cannot be determined and/or exploited.

4. If CIT liquidates Midpac, you will have no chance of recovery. You have nothing to lose by putting Midpac into bankruptcy since the majority of the costs will be borne by the estate.

It is not my intention to comment on the validity, if any, of these arguments. I will say, however that they are very persuasive to creditors who are sitting with nothing watching a bank get all of the proceeds of a liquidation. I have seen them work in the past and there is no reason to think that they will not work in this instance.

I have given some thought to what might happen in the event of either a voluntary or involuntary filing on the part of Midpac Lumber. Again, it is not my place to offer legal advice either to Midpac or to CIT, but I believe based on my experience that competent bankruptcy counsel would explore some or all of the following issues:

1. It is possible that by bringing additional collateral into the case, namely the Maui real estate interest, the court could be persuaded that CIT's position would be adequately protected, thereby allowing CIT's interest to be "primed" to that of another lender.

2. Recent transfers of inventory by Maui Home Supply to Midpac Lumber to satisfy obligations of MHS to Midpac would clearly be deemed to be preferences in the event of a subsequent bankruptcy of Maui Home Supply. Accordingly, and particularly if I were Whirlpool's credit manager, I would immediately put Maui into bankruptcy to recover that preference, to my sole benefit because of my UCC-1 filing. I have not determined what the effect of this would be, but it is a substantial number.

3. It is possible that because of the manner in which business has been conducted between MHS and Midpac that a motion for substantive consolidation might be successful, thereby further muddying the waters as to the ownership of assets and the priority of secured claims. This would not inure particularly to the benefit of Mr. Glassman, who could possibly not end up with any position in the assets at the end of the day. The point here is that there is no way that this will be beneficial to your own position.

4. From Kurt Glassman's perspective, he has very little at this point to lose by attempting a reorganization, apart from the possibility of MHS being pulled under and the subsequent consolidation of the two cases. Even if that were to occur, he still has the possibility of contributing significant new value, vis a vis the Maui leasehold and effecting a successful cramdown. If on the other hand, he were significantly committed by way of his personal guarantee, which would include the Maui property, his house and other

assets, he might be persuaded later that a voluntary liquidation is the way to go in the event that projections are not being met.

5. Presently, cash is flowing from Maui Home Supply to Midpac for the sales of Midpac owned inventory at Maui. Over the past three days that figure has totaled approximately $28,000. Also, over the past couple of weeks, Maui Home Supply has purchased inventory from Midpac on a COD basis to the tune of about $60,000. All of this money has come to CIT. These sources of repayment will be questionable in the event of the bankruptcy of one or both of the entities.

It is clear, at least from my perspective that a bankruptcy will not be advantageous to your position. I am not convinced that it would be advantageous to Kurt Glassman, but I am fairly certain that one would ensue in any event in response to a decision on your part to liquidate because of the situation with the vendors that I described earlier.

I would like to shift gears at this point to inform you of some positive things that have been achieved over the past few weeks. First, it appears that the majority of the vendors who received my letter of July 8 are willing to participate in a workout. I have informed them that in the event of a refinancing, they will be asked to sign a subordination agreement. I have also informed them that they are looking at a twelve to twenty-four month payout . While this has not made any of them happy, it has not at this point tipped over the apple cart. It is good that so much of the trade debt (85%) is concentrated in such a small number (under 25) of vendors. This is a manageable number of individuals to deal with, and most of them are larger companies who are going to take an **unemotional** approach to the problem and to its solution.

A number of the vendors have expressed an interest in setting up a consignment arrangement whereby they can put inventory into Midpac under the control of a consignee such as Collateral Risk Management who can guarantee that they will be paid before inventory is released. The beneficial effect of such an arrangement cannot be overstated in that if effectively obviates inventory lead times and could in fact give Midpac a competitive advantage in the short run.

A situation arose yesterday when I was compiling the list of immediate purchases wherein KraftMaid Cabinets has six containers on the dock in Honolulu, one of which contains material that has already been paid for. I called KraftMaid and informed them that I could not borrow money for merchandise that has already been paid for because in effect it would represent a conversion of CIT collateral to the benefit of an unsecured creditor, namely the customer who had paid for it in advance. I also informed them that if we did not deliver those cabinets, we would jeopardize the sales of the contents of the other five containers since the same contractors were involved. Finally I suggested that the best solution was to allow us to pay for five containers and give us the sixth one on open account. They agreed, and provided we go forward, that is what will happen. I think that this is illustrative of the level of cooperation that the majority of the vendors in this case are displaying at this point in time.

Sometime tomorrow, we are expecting a letter of intent from either or both First Hawaiian Bank and/or City Bank concerning the refinancing that Kurt Glassman has been pursuing. I understand and in fact share the skepticism that CIT will be refinanced out of this problem by a pair of local banks. Notwithstanding, it could happen, and I think it should have some limited bearing on your overall decision as to how to proceed.

To sum this all up, I can well understand your reluctance to pay large amounts into the operations of this company after the loan has experienced a significant reduction. In particular I can understand your concern about the large rent payment that is due, and your possible exposure

in the event that the Damon Trust were to place you on notice after receiving the payment that Midpac is now requesting. Notwithstanding, if any of the more onerous ramifications of either a voluntary or an involuntary bankruptcy were to come to pass, you might be facing several times that amount in legal expenses and/or loss of priority in your collateral position. We have effective controls in place at this moment to prevent inventory from "walking" away, and there are other measures in place to prevent a recurrence of the accounts receivable problems.

In the meantime, traffic in the store is extremely strong, particularly in the cabinet area. The projections of sales that I have sent to you are much lower than historic levels and should be exceeded provided that we can get product in here to sell. I have submitted a list of purchases that I intend to make if we go ahead with the forbearance arrangement. Nearly all of this material can be sold in a month or less, so there is very little risk in advancing funds to add these items to inventory. I have computed break even to be about $2.3 million, and historically sales have been over $3 million. In short, there is everything here to indicate the probability of a successful workout.

Based upon the level of cooperation that I am receiving from Midpac's vendors, its employees and from Kurt Glassman, I am convinced that the best way to maximize the return on your assets in this case is to allow the company to continue in business, which will require the funding of operating expenses and purchases of inventory. In exchange for doing that you will be acquiring additional collateral, there is at least the possibility of a refinance, and in the event that the company demonstrably cannot succeed, you will have an owner who will at that time have reasons to be cooperative, which is not the case at this point in time.

I trust that the foregoing will be of help to you in reaching a decision as to Midpac. Should you have any questions please feel free to call me at any time.

Very truly yours,

Theodore G. Phelps