IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF HAWAII

In re )
)
)
)
MIDPAC LUMBER COMPANY, INC., ) Case No. 00-00136
) (Chapter 7)
)
)
)
____________________________________)

EXAMINATION OF THEODORE G. PHELPS
TAKEN ON
THURSDAY, DECEMBER 7, 2000

Reported by: MARLA GORLICK
CSR No. 3767



EXHIBIT 2

Page 50

Q. Do you understand the procedures that are followed to conduct an audit, both an internal or even a tax audit?
A. Yes, I'm aware of the procedures.
Q. Would that audit or an audit, either a tax audit or internal audit, be in any way inhibited by the fact that you didn't have a general ledger to rely on?
A. Yes, it would be.
Q. How would that be? Could you describe to me what you would not be able to accomplish in the audit without a general ledger?
A. Without a self-balancing trial balance of accounts, it would be possible to be maintaining accounts that could be left out of reports, and there would be no way of knowing it. In other words, it would be possible, for example, to have bank accounts that would not be put on a balance sheet. It would be possible to write down sales that could not be determined from the general ledger as to whether or not that figure was valid.
Q. In this case, did you ever have any suspicions that Midpac or Mr. Glassman or anybody associated that had access to bank accounts that weren't being reflected in their reporting?
A. I knew that to be the case.
Q. What specifically are you referring to?

Page 51

A. I asked on many occasions Mr. Glassman to provide to me the records of the account to which CIT had wired funds so that I could determine where those funds went. And he never provided that account or any information about it to me.
Q. As we are sitting here today, sir, do you know whether anyone ever got a hold of that account to either take a look at it or people related to CIT?
A. Not to my knowledge.
Q. Was there any point in these early discussions where that problem was brought to CIT's attention?
A. Yes, they were trying to trace some sort of a payment, and that's about all I can tell you. I can't remember what it was or what they were trying to do, but they could not -- they could not find it. They had even contacted various banks in trying to trace it.
Q. Can you be more specific about is this a single payment that we're talking about?
A. Yes. But I'm sorry, I just cannot remember the details of it.
Q. But can you recall that it was an amount of over $100,000?
A. I believe it was.
Q. Was it less than a million?
A. Yes.

Page 52

Q. Now, was this a single payment that they, to your understanding, were just never able to trace?
A. That's correct.
Q. That was a withdrawal from this account?
A. I'm not certain. I'm sorry.
Q. I appreciate you have a memory like the rest of us, and you have done pretty well with it.
Were those issues discussed early on in the June meeting, the issues regarding the inability to trace the monies that were coming into Midpac through this credit facility?
A. Not to the best of my knowledge.
Q. When, if you can recall -- I know it would be an approximate date, but do you recall when that issue became something that people were discussing or concerned with?
A. Well, to the best of my recollection, and it's very hazy, this issue of the payment that they were trying to trace was going on very early, but it was not something they were discussing with Glassman.
Q. Were they discussing it with you?
A. Not really. I became aware of it, but it wasn't -- see, I think, maybe I can simplify this a little bit. The meeting with Glassman on the 23rd and 24th of June, from Glassman's point of view seemed to be

Page 53

to put on a dog and pony show for CIT to assure them that everything was going to be all right. From CIT's standpoint, it was to get some controls in place so that whatever had gone on would stop, and that possibly they could find out where the money had gone. So there were competing agendas here. If that's helpful to you.
Q. At some point you were engaged to go to work and start dealing with Midpac; isn't that correct, sir?
A. That's correct.
Q. When, in your understanding, did that occur?
A. It occurred officially on June 24th when CIT told them that in order to continue with the company and help it, allow it to try to straighten itself out, that they wanted certain things. They wanted a consultant, and they didn't insist that it be me, and they offered to provide a list of other people that they had dealt with or that they had approved of, and they also wanted Collateral Risk Management installed to become custodians of the inventories. I don't mean that in a legal sense. He wanted them to monitor the ins and outs of the inventory and report to them in an independent basis. So those are two of the things they wanted. And, of course, they wanted a forbearance agreement that would be negotiated later in order to continue with financing the company.

Page 54

Now, at that point in time, when they offered to give Glassman a list of other consultants because I think it was Tom Hayes that said, "It doesn't have to be Ted. We brought him down here to help us on this, but if you want somebody else," and Kurt said, "No, no. I'm happy with Ted. That's fine."
Q. Had you had any other previous dealings with Mr. Glassman or anyone related to Midpac?
A. No. I found out way later that Mr. Glassman had been associated with an accounting firm that one of my clients had used back in the eighties sometime, but I don't think he was part of that firm at that time. I found out later that they had been -- it wasn't the national firm he was affiliated with. He had been affiliated with another firm, and one of the accountants there had been the accountant for a construction company that had been my client. But I had no real contact with them.
Q. Okay.
A. And never any contact with Mr. Glassman.
Q. Now, you didn't have an engagement letter of any kind?
A. No.
Q. Was it ever discussed that although Mr. Glassman may not choose you, but was there any discussion as to

Page 55

whether or not the person that was chosen would have to be a fraud examiner?
A. They put it in the forbearance agreement that if Glassman decided to replace me, he could, but that any person that they replaced me with would have to be a certified fraud examiner.
Q. And someone that they approved of?
A. I don't know if that was in the forbearance agreement or not.
Q. Now, was there any understanding at the time that you were engaged that you were going to be able to have discussions with CIT that Mr. Glassman would not be a party to?
A. Well, yes, because when I talked to Kurt about it, he was very rarely at Midpac. He flew home almost every single Friday afternoon or sometimes on Thursdays, and he would arrive, he would come back to Honolulu on either Monday or Tuesday. So I specifically said to him that, "It's going to be impossible for me to operate here unless I have your permission to talk to these people outside of your presence." And he agreed. There was no problem.
Q. What I'm really getting at: Was it your understanding that you could have a secret with CIT that you did not have to share with Mr. Glassman?

Page 56

A. I never heard anything put in that context. I was pretty open with him about everything that was going on, and I never had a confidence shared with me by CIT that I did not -- that I felt that I could not pass on to Mr. Glassman.
Q. Regarding the accounting system, I think we talked about the fact that the way that he was maintaining, Mr. Glassman was maintaining it, would not facilitate an audit. Was there any discussion made that Midpac after you became involved, that Midpac should start using another accounting system including a general ledger so that auditing could be facilitated?
A. No.
Q. There was no discussion of it at all?
A. No. There was nobody at the company that had an accounting background who could have assisted me in that. And what I did, instead of trying to establish a general ledger at that time, was to do pretty much what is done in a case, in a bankruptcy case, and that's to just establish some very basic records on a go forward basis. And Glassman continued to keep the various cash disbursements journals, and he would -- and whatever other records he was using for tax returns and such that I never really saw except on one occasion he brought me several file folders that had just Excel listings of

Page 57

checks that were drawn. And that was pretty much it.
The one thing I did change was he had tied all of the bank accounts together so that they would all drain into a concentration account at night and then the next day money would flow out to cover presentments, and I felt that that obscured any kind of audit trail that could happen, and it also allowed bonding money, money on bonding to be commingled with operating funds, and I stopped that. I wanted to get those untied as quickly as I could.
Q. Could you elaborate on the bonding fund issue? It's my understanding that this company was used to facilitate sort of construction bonds in Honolulu.
A. Yes. And it's something I had never seen before. Midpac was able to issue a material houseman's bond that would assure, that would give assurance that subcontractors and material men were being paid on various construction projects, and I think this is unique to Hawaii. I've never seen it any place else. But basically if somebody took out a construction loan, the lender would deposit funds from a draw request with Midpac, and it was then Midpac's responsibility to pay subcontractors and other material houses and themselves.
Q. Were these funds being segregated in any way in an account that was identified as bonding funds?



WISHNOW.TEARNEY.KILLION, A LegaLink Company
(818) 986-5270 (323) 465-3370 (310) 837-8700 (800) 826-0277

Q. About how long ago was that?
(Mr. Kim entered the deposition room.)
A. '95, I guess.
Q. Did you participate in any way as a witness?
A. No, they pled out.
Q. They did.
A. Yeah.
MR. KIM: Tim, can we stop for a second and go off the record.
(Discussion held off the record.)
MR. HOGAN: We were on the record before and Ms. Clawson was not with us. She is presently on the telephone line. Let the record reflect that.
Q. Mr. Phelps, we were talking about a company in which you had been involved with in doing some of your work. It was a food company. What was the name of it, sir?
A. Kold Kist.
Q. And that ended up in a federal -- was it a federal prosecution?
A. Yes.
Q. And I believe you mentioned there were two cases. What was the other case?
A. The other one was Steve Curran Sales. That's C-u-r-r-a-n.



Q. What were the facts surrounding that case?
A. Primarily a fellow who had factored -- well, not factored, but pledged invoices to more than one financial institution, and he was out of trust on two or three different flooring lines that he had and various other -- he got -- I think the thing that he was arrested for, if I'm not mistaken, was check kiting where he was actually -- was actually kiting checks.
Q. Where was that case?
A. That was in Marina del Rey. I don't know what court it was prosecuted in. I was never a witness. I was -- I gave information to the FBI.
Q. Okay. Have you ever been in a case in which there was an allegation of mail fraud?
A. Possibly. It's possible that Kold Kist had a mail fraud count to the indictment.
Q. It was a several-count indictment.
A. Yeah.
Q. You are not certain, but it could have been?
A. There were faxes used for wire fraud.
Q. As part of your job, do you look for things of a criminal nature when you do a fraud examination? Are you looking for those elements of a crime?
A. Well, understand first off I wasn't really engaged by Kold Kist to perform a fraud examination.



Q. Okay.
A. And as a matter of fact, I was forbidden from doing it by Kurt Glassman. Nonetheless, obviously I kept my ears open and I looked around at things. But primarily what I was trying to do was keep the company alive until Glassman or Bowling would put the money back in because that's what I thought had happened, that they had taken the money, that they had it available, and had put it back.
MR. WOLF: I'm going to interrupt, and I would like the court reporter to read the question back, please.
(The record was read by the reporter as follows:
"Q. As part of your job, do you look for things of a criminal nature when you do a fraud examination? Are you looking for those elements of a crime?")
THE WITNESS: The answer to that is no.
BY MR. HOGAN:
Q. And you are saying you were prohibited from doing a fraud examination in this case by Mr. Glassman?
A. Yeah. As a matter of fact, to go back to those case notes in Tab 1, just a second. I'm trying to find where I'm pretty sure I wrote it down here that he said



he wouldn't -- yeah. In the third line, specifically he would not discuss Spectrum and forbade any kind of forensic investigation.
Q. Did he say that in the presence of representatives of CIT?
A. At that time, yes.
Q. Did he give an explanation of why that was so?
A. He was concerned that that type of activity would upset his plans of merging the companies and getting the loan from City Bank to take everybody out in refinancing the whole deal.
Q. Was there any discussions with CIT about you conducting some form of an examination regarding those entities?
A. Not really, no. I need to explain. The engagement evolved as events unfolded.
Q. Right.
A. My work there was to -- was as a work-out consultant, a turnaround consultant. That's what I thought that I was there for.
Q. You testified that you thought there was money that --
MR. WOLF: Tim, I'm going to interrupt again. I would ask the court reporter to read back that prior question because I'm not sure there was an answer to it.

Page 118

Inburn left, and thereafter I don't know the name of the person.
Q. Do you know when Inburn left CIT?
A. No, I don't. I knew when it happened, but I don't remember exactly when it was.
Q. Do you know where he is presently, where he is working presently?
A. Yes.
Q. Where is that?
A. Coast Business Credit.
Q. That's in Los Angeles?
A. Yes.
Q. Other individuals, Robert Brichacek, have you spoken to him any time recently?
A. Oh, probably in the last four months I may have made a call. He's with G.E. Capital.
Q. That's also in Los Angeles?
A. Yes.
Q. Did you ever discuss the reason that he is no longer working for CIT?
A. No.
Q. Did you ever discuss the reason that Inburn is no longer working with CIT with him?
A. No. Those are sensitive things. I wouldn't do that.

Page 119

Q. Have you heard from somebody else the reason?
A. No.
Q. Why don't we go back to the documents now. I'm just going to go through it and try to move along to a few of these.
A. I want to go to the bathroom first.
MR. HOGAN: Why don't we take 10. Why don't we all stay on the line, though, so we don't lose each other. We'll go off the record.
(Brief recess.)
MR. HOGAN: We will go back on the record then. Everyone is still here so I don't need to note anyone's appearance. I haven't lost anyone.
Q. I guess what we will look at now will be the binder that was marked Volume 2. I think that should be somewhere handy.
A. I've got it.
Q. And I'm going to just go through this in theory so we don't get off the track, and I will go to Tab 11 which is a letter dated July 29th, 1999 on Phelps Associates letterhead. I'm going to ask you to look at it, and you are welcome to read the whole thing, we can take the time to do that, but I'm going to focus on the second page, the paragraph that begins after the second half of the page numbers one and two there, specifically

Page 120

Number 2.
A. Okay.
Q. That's where I'm headed so I will let everyone take a moment. Just let me know when you are ready to proceed.
A. Okay, I have read it.
Q. Mr. Phelps, you have been asked to look at a letter dated July 29, 1999, addressed to Mr. Robert Brichacek, CIT Group/Credit Finance. I have asked you to look at the second page of that document at Tab 11 in your book, Volume 2, the first Roman numeral. And the second page beyond the half of the page, second half of the page, Number 2, it says:

"Recent transfers of inventory by Maui Home Supply to Midpac Lumber to satisfy obligations of MHS to Midpac would clearly be deemed to be preferences in the event of a subsequent bankruptcy of Maui Home Supply. Accordingly, and particularly if I were Whirlpool's credit manager, I would immediately put Maui into bankruptcy to recover that preference, to my sole benefit because of my UCC-1 filing. I have not determined what the effect of this would be, but it is a substantial number."

Do you see that?

Page 121

A. Yes, I do.
Q. Can you tell me what a substantial number meant to you at that time, what number we were talking about?
A. As I sit here today, no, I can't. My sense is it was in the low hundreds, not millions, but I honestly can't give you anything better than that.
Q. What would you have based your understanding on?
A. Right now I don't recall. I think it was possibly the reports that I was getting from CRM, but beyond that, I just don't know.
Q. Did you ever get a response from Mr. Brichacek regarding this letter?
A. Well, the only response I got was that I wrote this letter because it looked like they were --
MR. WOLF: I'm going to ask that the court reporter read the question, please.
(The record was read by the reporter as follows:
"Q. Did you ever get a response from Mr. Brichacek regarding this letter?")
THE WITNESS: Yes.
BY MR. HOGAN:
Q. What was that response?
A. The response was they continued to finance the company on a limited basis. As far as a written or

Page 122

verbal response, I don't recall a written or verbal response.
Q. So the response you are saying was that they continued to finance the company, but he did not specifically write back or --
A. Nobody responded to this letter point by point.
Q. Did they ever comment that that Paragraph 2 that I read was erroneous?
A. No. They did comment that they thought that some of my analysis was way off.
Q. Was it related to this particular part of your analysis?
A. I don't know.
Q. Were they specific at all about what they meant by way off?
A. No.
Q. When did they tell you that?
A. Right about the time -- just shortly after I wrote them the letter.
Q. Was this letter kept by you in the regular course of your business?
A. I'm sorry, I don't understand your question.
Q. Is this a document that you created and maintained in the regular course of your business?
A. Yes.

Page 123

Q. Is it unaltered from the time it was created?
A. Yes.
Q. Was this letter recorded at or near a time when you received information from people with knowledge regarding the facts contained in this record?
MR. WOLF: I'm sorry. I'm going to ask that the question be read back.
(The record was read by the reporter as follows:
"Q. Was this letter recorded at or near a time when you received information from people with knowledge regarding the facts contained in this record?")
MR. WOLF: I don't know what you mean when you say recorded, and I don't think there is any foundation for any testimony regarding its recordation.
BY MR. HOGAN:
Q. All right. Did you write this letter, sir?
A. Yes.
Q. And this is your signature on the last page of the letter?
A. Yes.
Q. Do you recall writing the letter?
A. Generally, yes.
Q. And you believe you sent it to Mr. Brichacek?

Page 124

A. Yes, I sent it to him.
Q. Did you ever have a discussion back from Mr. Brichacek regarding any of the facts that were stated in this letter?
MR. WOLF: That question has been asked and answered.
MR. HOGAN: You asked me to lay a foundation.
MR. WOLF: Well, he has already told you that he got no written or verbal response to this.
BY MR. HOGAN:
Q. But you did send it to Mr. Brichacek at least as you understand it?
A. Yes.
Q. Is it your custom and practice to keep records of this type in the regular course of your business?
A. If you are talking about this letter, yes.
Q. This letter.
A. Yes.
Q. Let's move to the next page. At the top of that, look at Paragraph 5. Let's take a look at that. I will give you a chance to read it.
A. Okay. Okay, I have read it.
Q. At the bottom of that paragraph, you say, "These sources of repayment will be questionable in the event of the bankruptcy of one or both of these entities."

Page 125

Do you see that?
A. Yes.
Q. What did you mean by that?
A. I meant that while what was happening here was proper in the ordinary course of business, that a bankruptcy trustee may look at something like that and tempt to use his powers of --
Q. Avoiding powers.
A. The avoiding powers to undo the transaction or recover the money. I didn't know -- I was not saying that that was a correct thing for the trustee to do; I was just saying that it's possible that a trustee might do that.
Q. Were you aware at this time, when this thing was written, this letter, which is at your Tab 11, the July 29th letter -- were you aware at this point of at least the existence of a Whirlpool security filing, security interest filing in regard to Maui Home?
A. I honestly don't remember whether I was aware of it at that time or not.
Q. Maybe we did go through this, but do you recall CIT informing you of the existence of that or was that something you independently discovered?
A. I may have picked it up independently. I don't remember.

Page 194

THE WITNESS: I will.
MR. HOGAN: Why don't we put that on the record then.
THE WITNESS: My address?
MR. HOGAN: Yes, where you want things mailed. Maybe your business address, sir.
THE WITNESS: I was going to give her my home address.
MR. HOGAN: We can keep that off the record then. You can do that off the record. You will be given a copy and an errata sheet to review and then suggest errors in the errata sheet, which will be returned to the court reporter? Is that the understanding?
MR. KIM: No, the errata sheet will come back to me.
MR. HOGAN: And you will get a copy to Mr. Wolf as well.
MR. KIM: That's correct.
MR. HOGAN: And then the original will go to Mr. Kim.
MR. KIM: That's correct.
MR. HOGAN: And I believe counsel already has arranged with the court reporter for their copy. Is that correct, Mr. Wolf?
MR. WOLF: Yes.

Page 195

MR. HOGAN: Is that everything?
MR. KIM: That is everything.
MR. HOGAN: Okay, why don't we go off the record.
(Discussion held off the record.)
THE REPORTER: Counsel, you want a copy and a condensed and disk?
MR. WOLF: Yes.
(Examination concluded at 4:30 p.m.)

Page 196

DECLARATION

I hereby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof, and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe it to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed on the _____ day of ______________ 2000, at ____________________, California.

____________________
WITNESS

Page 197

I, MARLA GORLICK, CSR No. 3767, a Certified Shorthand Reporter for the State of California, do hereby certify:

That prior to being examined, THEODORE PHELPS, the witness named in the foregoing examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth pursuant to Section No. 2093 of the Code of Civil Procedure;

That said examination was taken before me pursuant to Notice, at the time and place therein set forth, and was taken down by me in shorthand and thereafter reduced to typewriting via computer-aided transcription under my direction;

I further certify that I am neither counsel for, nor related to, any party to said action, nor in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name this ____ day of ____________, 2000.

____________________
MARLA GORLICK
CSR No. 3767