# DEFENDANT/CROSS-CLAIMANT THE CIT GROUP/BUSINESS CREDIT, INC.'S TRIAL BRIEF

Defendant/Cross-Claimant The CIT Group/Business Credit, Inc. ("CIT") files this Trial Brief on all significant disputed issues of law, including foreseeable procedural and evidentiary issues, in accordance with the Minutes filed January 30, 2006, Rule 16.8(a) of the Rules of the United States District Court for the District of Hawai`i, and Federal Rule of Civil Procedure 16.

## I. INTRODUCTION

Whirlpool's case against CIT is at heart a commercial dispute between two creditors of MidPac Lumber Company, Ltd. ("MidPac") who, like MidPac's other creditors, were victimized by the machinations of the principals of sister companies--MidPac Lumber Company, Ltd. ("MidPac") and CGBN, Inc., dba Maui Home Supply ("MHS")--primarily Kurt Glassman and Edwin Bowling. The circumstances that embroiled MidPac's secured lender (CIT) and MHS' secured creditor (Whirlpool) in this litigation were engineered by the self-enriching schemes of Glassman and Bowling, assisted by other related parties. Messrs. Glassman and Bowling created various devices to divert over $8 million in MidPac funds to themselves, family and affiliates in 1998 and 1999, while misleading CIT, through manipulations of CIT's collateral (accounts receivable and inventory), into over-advancing millions of dollars of loans to MidPac.

MidPac and MHS, Whirlpool's largest customers in Hawai`i, became seriously delinquent on their account balances

with Whirlpool. Then, they entered into and promptly breached a payment plan with Whirlpool in June, 1999. Nevertheless, Whirlpool continued to ship on credit to both companies until July 23, 1999, and thereafter continued to make cash sales to both companies throughout the Summer of early Fall of 1999. It did not take any collection or legal action against the companies until it filed suit against them on October 29, 1999 for commingling inventory.

CIT discovered part of MidPac's fraud (the creation of phony invoices to inflate receivables) in June 1999, soon declared MidPac in default and exercised its lender's remedies under its Loan Agreement, as amended ("Loan Agreements").

When MidPac ultimately filed for bankruptcy in January 2000, CIT was one of MidPac's largest creditors, while Glassman and Bowling had diverted over $8 million to themselves, their families and their affiliates. Because documentation for the City Bank account was never given to CIT or its auditors, the extent of the diversions went undetected by CIT until after Whirlpool filed suit.

Whirlpool filed suit against CIT, the MidPac/MHS principals and MidPac's lawyer Raymond Iwamoto on January 23, 2001. This Court dismissed Whirlpool's RICO claims against CIT in a Memorandum Opinion and Order, filed December 28, 2004, but left pending, among other claims, Whirlpool's tort claims against

CIT for fraud, fraud conspiracy, conversion and interference with contract.

## II. DISPUTED ISSUES OF LAW

### A. Law Relevant to Whirlpool's Fraud Claim (Count I)

#### 1. No Duty of Disclosure Owed by Lender to Borrower's Creditors

One of Whirlpool's objections to CIT's proposed jury instruction no. 10 on the elements of fraud (*see Second Proposed Set of Jury Instructions of Defendant/Crossclaimant The CIT Group/Business Credit, Inc., filed 3/1/2006 - "CIT Instructions")* is that the instruction should address the withholding of known facts from Whirlpool ("Glassman's fraud") by CIT and its purported agent, Ted Phelps. *Plaintiff Whirlpool Corporation's Objections to Defendant Crossclaimant CIT Group/Business Credit, Inc.'s Second Proposed Jury Instructions (filed 3/15/2006)("Whirlpool's Objections"), at 6*. CIT briefed extensively in its Renewed Motion for Partial Summary Judgment as to Count I (Fraud) and Count II (Fraud Conspiracy) (filed 2/2/04), the proposition that CIT owed Whirlpool no duty to disclose information it had about MidPac, either directly or indirectly through its purported agent Mr. Phelps. *Memorandum in Support of Renewed Motion re Count I, at 20-23* (citing *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987)("Absent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure

to disclose cannot be the basis of a fraudulent scheme.”); *In re 200 Woodbury Realty Trust*, 99 B.R. 184, 188 (Bankr. D.N.H. 1989); *Crowder v. Allen-West Com. Co.*, 213 F. 177, 184 (8th Cir. 1914)(“A creditor of an insolvent debtor is a competitor of all his other creditors. He stands in no fiduciary or contractual relation to them and owes them no duty to inform them of his debtor's financial condition, his insolvency, or of the amount of his indebtedness to him”); *In re W.T. Grant Co.*, 699 F.2d 599, 610 (2d Cir. 1983) (“The permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act; apart from these there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims”), *cert. denied*, *Cosoff v. Rodman*, 464 U.S. 822 (1983); *In re Prima Co.*, 98 F.2d 952, 965 (7th Cir. 1938), *cert. denied*, *Keig of Prima Co. v. Harris Trust & Savings Bank*, 305 U.S. 658 (1939) (rejecting claim that two secured bank lenders mismanaged debtor through a general manager they induced debtor to hire by threatening to call the loan, finding that the relation between parties was solely debtor/creditor and that recommending a manager was not sufficient to create a fiduciary relationship. A debtor has a right to call its loan when due and to enforce collection lawfully).

In *Shaw v. Santa Monica Bank*, 920 F. Supp. 1080 (D. Hawaii 1996), the District Court looked to the law of other jurisdictions in concluding that in Hawai`i, "no fiduciary relationship can exist between a lender and a third party unless special facts exist which give rise to such a duty." *920 F. Supp. at 1087.* The *Shaw* court found that no such special relationship existed as a matter of law between plaintiff property owners who had a co-tenancy agreement with defendant bank's borrowers/owners, even though the bank had knowingly entered into and recorded a mortgage agreement that violated the co-tenancy agreement. The court reasoned that plaintiffs had never had a relationship with the bank, so no legal duty arose.

Likewise, while CIT and MidPac were in privity of contract, there was no legal relationship between CIT and Whirlpool–nor between Mr. Phelps and Whirlpool. Therefore, neither CIT nor Mr. Phelps (assuming he was CIT's agent) had any fiduciary or special relationship with Whirlpool and thus, no duty to make disclosures about MidPac to Whirlpool.[1]

Nor does a lender's ability to control disbursement of loan proceeds give rise to a duty towards borrower's creditors. *Butts v. Atlanta Federal Sand L.*, 152 Ga. App. 40, 42, 262 S.E.2d 230, 232 (1979), *cited in F.C. Imports, Inc. v. The First*

[1] And, Whirlpool cannot demonstrate any misleading half-truths on the part of CIT or Phelps. Whirlpool's whole claim about the "missing fax" is based upon the premise that they had no idea what Phelps was trying to communicate.

*National Bank of Boston*, 816 F.Supp. 78, 91 (D.P.R. 1993).

More recent cases decided either shortly before or after this Court's decision on the summary judgment motions underscore the fact that lenders are not obligated to be "Good Samaritans" to other lenders and competitors. Continuing to fund a troubled borrower (as CIT did in continuing to advance funds to MidPac declaring MidPac in default in June 1999) does not give rise to liability. "[I[]t makes no sense to punish a lender for continuing to extend credit that keeps a borrower operating when the Bankruptcy code itself is based on the accepted notion that a business is worth more to everyone alive than dead." *Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group LLC), No. 01-15666 (SMB), 2004 WL 2480185 (Bankr.S.D.N.Y. Nov. 4, 2004).*

"There is little good Samaritan tort liability in general, and none that requires businesses to assist their competitors." *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 476 (7th Cir. 2005)(applying Illinois law). In *B.E.L.T.*, the court of appeals affirmed a district court's dismissal of a lawsuit by creditors of a bankrupt borrower against borrower's lender, noting that there is "no duty at all for banks to notify other lenders." *Id.* The creditors unsuccessfully tried to impose liability on the bank because it took money from a borrower it suspected of fraud, knowing that the source of funds for repayment came from another lender. The creditors were also rebuffed in their effort to sue the lender for, among other

things, *failing* to notify the United States Treasury Department about "any known or suspected Federal criminal violation." *Id.* *Accord Schwan's Sales Enterprises, Inc. v. Commerce Bank & Trust Co.*, 397 F. Supp. 2d 189, 195 (Mass. 2005)("the law generally protects commercial lenders from liability for the debts of their borrowers"; "[a]s a general rule lenders are not fiduciaries when it comes to collection on their claims").

This case is governed by the same rules. CIT was pursuing its right to be paid, just as Whirlpool had tasked certain of its employees with getting money from MidPac and MHS.[2] CIT owed no duty to Whirlpool or any other creditor to disclose information about its borrower's financial condition. Even Whirlpool followed a policy of not disclosing financial information about its customers to its customers' creditors, instead referring those creditors back to the customer in question.[3]

---

[2] Carl Smith Depo. Vol. 1 (12/17/03), at 177:20-25:

Q So was it basically your job -- your and
Ernie's job to go out and get Whirlpool's money
back, if you could?
A To try to develop a plan to get Whirlpool
repaid, yes.

[3] *Id.* at 200:11-17:

A We have a practice that we do not discuss the
financial condition of a customer with other

### B. Applicable law to determine implied actual authority of agent

This Court has already found that Whirlpool cannot prove that Mr. Phelps had express or apparent authority to serve as CIT's agent. The only issue for trial on agency is whether he had implied actual authority. The rules regarding establishment of implied actual authority are simply stated. As the Hawai`i Supreme Court said in *Cho Mark Oriental Food v. K&K Int'l, 73 Haw. 509, 515,836 P.2d 1057 (1992)*, in determining the existence of such authority, this Court must focus on the agent's understanding of his authority because **"the relevant inquiry is whether the agent reasonably believes, <u>because of the conduct of the principal</u> . . . that the principal desired him to so act."** (emphasis added; internal quotations and citations omitted).

This, in turn, requires an examination of what powers "the agent reasonably believes himself to possess **as a result of representation by the principal or of acts of the agent permitted by the principal over a course of time in which the principal has acquiesced."** *In re Ballard,* 100 B.R. 526 (Bk Nev. 1989). *Accord Global Poly, Inc. v. Fred's Inc.,* 2004 U.S. Dist. LEXIS 21881

---

vendors or other creditors.
Q Do you know the reason for that practice?
A First of all, we feel it would be a breach of confidentiality to do that, and it's not a good practice to do that.

(N.D. Ill. 2004) (principal's words or actions must lead a reasonable person in the position of the alleged agent to believe he/she was authorized to act).

"The essential test to be applied in determining whether an implied agency exists, is whether the principal has the right to control the conduct of the agent, and whether the agent has the right and authority to represent or bind the principal." *Houston Exploration Co. v. Halliburton Energy Servs.*, 359 F.3d 777, 780 (5th Cir. 2004). "More specifically, implied agency is created when 'the agent is deemed to have permission from the principal to undertake certain acts which are reasonably related to the agent's position and which are reasonable and necessary concomitants of the agent's express authorization.'" *Id.* (citations omitted).

Thus, to show that Mr. Phelps had a reasonable belief that he was CIT's agent for the purpose of ordering product from Whirlpool, Whirlpool is required to demonstrate that CIT caused Mr. Phelps to believe that he was CIT's agent, that CIT had the right to control his conduct, and that he had the right or authority to represent or bind CIT. Then, Whirlpool must show that Phelps' belief was reasonable. Failing one or both of these tests, Whirlpool cannot establish any agency between Phelps and CIT.

Whirlpool argues that language on ratification should be included in the instruction. However, the language of CIT's

instruction no. 9, including the language on "acquiescence", is taken from Hawai`i's model instructions, Hawai`i Civil Jury Instruction No. 15.18, and there is no reason to change it. In any event, acquiescence appears to be a form of ratification. The Restatement (Second) of Agency, § 43 (Acquiescence by Principal in Agent's Conduct) defines acquiescence as:

> Acquiescence by the principal in conduct of an agent whose previously conferred authority reasonably might include it, indicates that the conduct was authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance.

### C. Justifiable reliance is a proper element of Whirlpool's fraud claim

CIT respectfully requests the Court to exercise its discretion not to follow the law of the case on the degree of reliance required to prove a fraud claim under Hawai`i law[4] and to rule instead that a justifiable reliance standard is an appropriate element of Whirlpool's fraud claim under *Matsuura v. E. I. DuPont de Nemours and Co.*, 102 Haw. 149, 163, 73 P.2d 687, 701 (Haw. 2003). *See Opinion, at 16.*

#### 1. Reasonable Reliance is an element of a fraud claim under Hawai`i law

The *Matsuura* case actually clarified that reasonable reliance **is** an element of a fraud claim. The *Matsuura* court stated that "case law has not always required that reliance be

---

4 *Delta Savings Bank v. United States*, 265 F.3d 1017, 1027 (9th Cir. 2001) (court has discretion not to apply law of the case where decision is clearly erroneous and its enforcement would work a manifest injustice).

reasonable," and cited to *Shoppe v. Gucci Am. Inc.*, 94 Haw. 368, 386, 14 P.3d 1049, 1067 (2000). It then pronounced that the Court was now "tak[ing] this opportunity to clarify that, under Hawai'i law, to prevail on a claim for fraudulent inducement, plaintiffs must prove that their reliance upon a defendant's representation was reasonable." *Id.*, at 163, 73 P.2d at 701.

In fact, *Shoppe* did not discuss whether reliance was or was not an element of a fraud claim as the plaintiff could not even prove a false statement had been made. The court simply stated that there must be reliance, citing to *TSA International, Ltd. v. Shimizu Corp.*, 92 Haw. 243, 990 P.2d 713 (1999). In *TSA International, Ltd.*, however, the Hawaii Supreme Court specifically ruled that **reliance must be reasonable**, holding that plaintiff TSA could not show fraud because it could not have reasonable relied upon representations allegedly made by defendant Shimizu. *Id.* at 256, 990 P.2d at 726. Thus, it is clear that Hawaii law requires reasonable reliance. Indeed, justifiable reliance has been a standard element of a fraud claim in Hawaii since well before the *Shoppe* and *Matsuura* cases. *Bulgo v. Moniz*, 853 F.2d 710, 716 (9th Cir. 1988) (listing "justifiable reliance" as an element of a fraud claim, citing *In re Hawaii Corp.*, 567 F. Supp. 609, 630 (D. Haw. 1983) (misrepresentation case); *Stahl v. Balsara*, 60 Haw. 144, 149, 587 P. 2d 1210 (1978)(ruling that it was "utterly unreasonable for appellant to rely upon such representations"-prognostications).

**2. Even if Hawai`i law is unclear on whether justifiable reliance is a required element of a fraud claim, the court should look to California law for guidance**

Even if one reads the *Matsuura* case as throwing into doubt whether Hawai`i law requires the element of justifiable reliance for fraud claims, the next appropriate step would be to look to other sources of legal authority traditionally followed by Hawai`i courts. California is such a source. Indeed, Whirlpool's jury instructions include justifiable reliance as an element of its fraud claim. *Plaintiff Whirlpool Corporation's Second Proposed Set of Jury Instructions (filed 2/27/06), No. 10, Fraud and Deceit-Intentional Misrepresentation (citing BAJI 12.31); No. 15, Fraud and Deceit-False Promise (citing BAJI 12.40); No. 20, Fraud and Deceit-Right to Rely (citing BAJI 12.52).*

When precedent is lacking, "[t]he general trend of Hawaiian courts is to look to California law in the absence of Hawaiian authority." *Locricchio v. Legal Services Corp.*, 833 F.2d 1352, 1357 (9th Cir. 1987); *Sutherland v. Kaonohi Ohana, Ltd.*, 776 F.2d 1425, 1427 n.4 (9th Cir. 1985) ("the courts of Hawaii frequently look to decisions from California when deciding cases of first impression").

Under California law, either "justifiable" or "reasonable" reliance is a required element of fraud. *See, e.g., Moore v. Brewster*, 96 F.3d 1240, 1245 (9th Cir. 1996) ("[t]he

indispensable elements of a fraud claim include[s] . . . justifiable reliance”); *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1117 (9th Cir. 1999) (“[t]o prevail on [a] fraud claim, RTC must demonstrate . . . [actual[] and reasonabl[e] reli[ance] on the misrepresentations”); *Alliance Mortgage Co. v. Rothwell*, 900 P.2d 601, 608 (Cal. 1995) (“the necessary elements of fraud [include] . . . justifiable reliance”). Thus, even if a party relies on false representations, recovery will be denied unless its reliance is either justifiable or reasonable. *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1031 (9th Cir. 1992) (applying California law) (although an investor did rely on false representations, his reliance was found to be unjustified).

“[I]f the conduct of the complaining party in light of his own intelligence and information, or ready available information, [i]s manifestly unreasonable, [recovery] will be denied.” *San Francisco v. Philip Morris*, 1998 WL 230980 (N.D. Cal.). *See In re Amjad*, 87 F.3d 1082, 1091 (9th Cir. 1996) (a creditor who extends credit despite being put on notice of a debtor’s intent not to repay, cannot later claim justifiable reliance on the basis of fraud). “Reasonable reliance, judged ‘in light of plaintiff’s intelligence and experience,’ remains the standard in fraudulent misrepresentation actions.” *Atari Corp.*, 981 F.2d at 1031.

### 3. The court should find guidance in the fact that the element of justifiable or reasonable reliance is a required element of fraud in most jurisdictions

In addition to California, numerous other states also require either "reasonable" or "justifiable" reliance in order for a plaintiff to prevail on a fraud claim. Some states, such as New York, appear to use the term interchangeably. For example, in *Crigger v. Fahnestock*, 443 F.3d 230, 234 (2d Cir. 2006), the Second Circuit stated that "[u]nder New York law, [one of] the five elements of a fraud claim [is] reasonable reliance on the part of the plaintiff." *See also Manning v. Utilities Mut. Ins.*, 254 F.3d 387, 401 (2d Cir. 2001) (fatal to the plaintiff's fraud claim was his "failure to allege reasonable reliance on [the] misrepresentations"); *Shams v. Fisher*, 107 F. Supp. 2d 266, 283 (S.D.N.Y. 2000) ("[t]o prevail on a cause of action for fraud under New York law, a plaintiff must demonstrate . . . justifiable reliance. . . "). Kansas also uses both terms, and appears also to *require* both in a fraud case. *Quinn v. City of Kansas City, Kan.*, 64 F. Supp. 2d 1084 (D. Kan. 1999) (when determining reliance in a fraud case, courts must determine "whether [the] reliance was 'reasonable, justifiable, and detrimental").

Many state courts hold that a required element in a fraud claim is justifiable reliance on a misrepresentation. *See, e.g., In re Absolute Res. Corp.*, 76 F. Supp. 2d 723, 730 (N.D. Tex. 1999) ("in order to establish a claim for fraud under Texas

law, the plaintiff must show that . . . [he] acted in justifiable reliance upon [a material misrepresentation]") (applying Texas law); *Clardy Mfg. Co. v. Marine Midland Bus. Loans*, 88 F.3d 347, 358 (5th Cir. 1996) (even on negligent misrepresentation claims in Texas, a "plaintiff must [still] prove 'justifiable reliance' on the misrepresentation"); *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998) ("[f]raud is . . . justifiable reliance upon the representation or concealment"); *Fed. Deposit Ins. Corp. v. High Tech Med. Sys.*, 574 So. 2d 1121, 1123 (Fla.Dist.Ct.App. 1991) ("without evidence of justifiable reliance there can be no actionable fraud"); *Kezer v. Mark Stimson Assoc.*, 742 A.2d 898, 905 (Me. 1999) (plaintiff purchasers of real property could not justifiably rely on the defendant's (broker's) false statement that no neighborhood hazard existed, if the plaintiffs learned of the hazard before closing on the property); *Fin. Sec. Assurance v. Stephens*, 2006 U.S. App. LEXIS 13399 ("[u]nder Georgia law, a plaintiff alleging fraud must demonstrate . . . justifiable reliance by the plaintiff"); *Templeton v. United Parcel Serv.*, 2005 Ark. LEXIS 663, 10 ("[t]o establish fraud, a plaintiff must prove . . . justifiable reliance upon the [false] representation"); *Retrofit Partners v. Advanced Executive Aircraft*, 201 F.3d 155, 163 (2d Cir. 2000) (the court followed Connecticut case law, and found that the plaintiff's reliance on prior statements by the defendant was not reasonable or justified, due to the fact that a

subsequent agreement had been made between the parties); *Wohlers v. N. Am. Life and Cas. Co.*, 969 P.2d 949, 957-58 (Nev. 1998) ("fraud must be proven by clear and convincing evidence as to . . . plaintiff's justifiable reliance upon the misrepresentation"); *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000) ("[t]he elements of fraud under Delaware law are well established. A party claiming fraud must allege . . . the plaintiff's action or inaction taken in justifiable reliance upon the representation"); *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 957-58 (Nev. 1998) ("fraud must be proven by clear and convincing evidence as to . . . plaintiff's justifiable reliance upon the misrepresentation").

Alabama, Illinois, Oregon, and Colorado require reasonable reliance in fraud cases. *Baker v. Metro. Life Ins. Co.*, 907 So. 2d 419 (Ala. 2005) ("the 'justifiable reliance' standard . . . should be replaced with the 'reasonable reliance' standard [because it] allow[s] the factfinder greater flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction); *Mantiply v. Mantiply*, 2006 Ala. LEXIS 96 (although the Court was discussing a "fraudulent inducement" claim, it nonetheless affirmed that "[a]n essential element of any fraud claim is 'reasonable reliance'"); *Kennedy v. Venrock Assoc.*, 348 F.3d 584, 592 (7th Cir. 2003) (the Court stated that there was no actionable fraud, because a failure to read clear language is not a reasonable reliance); *Or.*

*Pub. Employees' Ret. Bd. v. Simat*, 83 P.3d 350, 361 (Or. Ct. App. 2004) ("Oregon case law adheres to a consistent principle [that] [r]eliance in fact must be reasonable, but such reasonableness is measured in the totality of the parties' circumstances and conduct"); *Brush Creek Airport v. Avion Park*, 57 P.3d 738, 749 (Colo. 2002) ("[c]laims for fraud or misrepresentation require reasonable reliance . . . [and] [r]eliance is not justified when [a] party is on inquiry notice").

We respectfully submit that this Court should not distinguish between fraud and fraud inducement and should rule that both claims for relief require the element of justifiable reliance.

**4. Moreover, WP's fraud claim is based on fraudulent inducement, and justifiable reliance element therefore must be satisfied**

Even if this Court does not change its ruling that Hawai`i law treats differently the elements of fraud and fraudulent inducement, the justifiable reliance standard should apply because Whirlpool's fraud claim is essentially one of fraudulent inducement. Hawaii courts include fraudulent inducement is described as a form of tort. *See Francis v. Lee Enterprises*, 89 Haw. 234, 238 (1999). Whirlpool proposes jury instructions on its fraud claim that are based on false promise, as well as misrepresentation and nondisclosure. The gravamen of its fraud claim against CIT is that through false promises, misrepresentations and concealment, Mr. Phelps, as CIT's alleged

agent, fraudulently induced Whirlpool to continue shipping goods on credit to MidPac and MHS. *Second Amended Complaint, ¶¶ 96-106.* Whirlpool's claim is, therefore, a fraudulent inducement claim for which justifiable reliance should be an element under the Court's reading of *Matsuura.*

**D. Law Relevant to Fraud Conspiracy (Count II)**

**1. The Proper Standard of Proof for Fraud Conspiracy is Clear and Convincing Evidence**

In its Jury Instruction Objections, Whirlpool disagrees with CIT's jury instruction on burden of proof for fraud conspiracy and argues that the burden of proof for civil conspiracy is preponderance of the evidence. *Whirlpool's Objections, at 10, 12.* This is erroneous.

In *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480 (9th Cir. 1984), one of the few cases shedding light on Hawai`i civil conspiracy law, the 9th Circuit Court of Appeals noted that "an alleged civil conspiracy must be established by *clear, cogent,* and convincing evidence." *727 F.2d at 1483 n. 3.* Such a standard makes sense given the broad scope of potential liability that comes with a conspiracy claim:

> courts should be especially careful to require that plaintiffs provide specific evidence of the alleged co-conspirators' agreement to engage in conduct designed to breach a fiduciary duty. Without such evidence of the parties' subjective intent, allegations of a conspiracy should not go to a jury lest they mistake traditional negotiating tactics with valid business purposes. . . as evidence of a conspiracy.

*Id.*

Likewise, Whirlpool should properly have imposed on it a clear and convincing burden of proof for its claim that CIT's efforts to exercise its lender's rights and protect what it believed to be its collateral should be viewed as part of a grand conspiracy with the defaulting borrower, its principals and affiliates.

**2. Intent to assist in conspiracy vs. protecting legitimate interests**

Whirlpool objects to CIT's jury instruction no. 15 that "if a defendant has no rational economic motive to conspire and if its conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Second Proposed Set of Jury Instructions, No. 15, at 18.* However, that proposition is taken directly from controlling case law on conspiracy.

In *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1985), the United States Supreme Court adopted the principle that courts do not lightly infer conspiracies and grand schemes: "if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." In *Matsushita*, the U.S. Supreme Court concluded that Japanese television firms did not have any rational economic motive to conspire for twenty years to undercut prices in order to drive American firms from the market, stating that "...the absence of

any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e)." *Id.* at 596.

**3. To prove conspiracy, Whirlpool must prove that the alleged conspiracy was for the purpose of harming Whirlpool and resulted in harm to Whirlpool**

Whirlpool has objected to the fourth and fifth elements of CIT's jury instruction no. 14 on civil conspiracy which states that the conspiracy must have been "(4) for the purpose of harming another; and (5) which results in damage." *Second Proposed Set of Jury Instructions of Defendant/Crossclaimant The CIT Group/Business Credit, Inc., at 17.* Whirlpool argues that those elements are contrary to this Court's ruling in its Opinion "that did not require [such] proof." *Whirlpool's Objections, at 11.*

This Court made no such ruling limiting the elements of a conspiracy claim, and such elements are consistent with Hawai`i law. Under *Doleman*, the court articulated the elements of conspiracy as "a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Doleman, 727 F.2d at 1482 n.3 (quoting Collins v. Union Federal Savings & Loan Association*, 99 Nev. 284, 288, 662 P.2d 610, 622 (1983)).

Whirlpool's objection misinterprets the Court's opinion. This Court's opinion focused on the need for Whirlpool

to prove that "*CIT* joined the alleged conspiracy" (*Opinion, at 17*), not just awareness of an alleged fraud, because "[d]emonstrating CIT was aware of the ongoing fraud at MidPac is not sufficient to demonstrate agreement." *Dolman,* 727 F.2d at 1482 n.3. However, this Court's silence on the remaining elements articulated by *Doleman* should not be misinterpreted by Whirlpool as excusing Whirlpool from showing that the conspiracy was for the purpose of harming Whirlpool and did harm it.

**E. Law Relevant to Whirlpool's Conversion Claim (Count III)**

CIT respectfully requests that the Court not adopt as the law of the case its finding that "CIT's assertion of ownership and subsequent sale of the property [MidPac inventory located at MHS] was unlawful." *Opinion, at 30.* The Court bases its finding on a determination that CIT's security interest in MidPac inventory in Maui was junior to Whirlpool's. However, that is not the end of the inquiry and should not automatically lead to a finding of unlawfulness. Before making such a finding, the Court should instead consider the effect of the following: (A) CIT's senior security interest in MidPac inventory could only have been discharged by a sale or consignment to MHS and only if MHS qualified as a "buyer in the ordinary" course under the version of HRS § 490:9-307 (1) applicable in 1999, and (B) even if CIT's security interest in MidPac inventory was discharged upon transfer to MHS and CIT's interest was junior to Whirlpool, CIT could still realize proceeds of that inventory as a junior

secured creditor if it received proceeds as a holder in due course, that is, if it took the proceeds in good faith.

**1. Assuming MHS bought the goods from MP, CIT's security interest would only be discharged if MHS were a holder in due course under former HRS § 490:9-307**

Former HRS § 490:9-307(1) provided that "A buyer in ordinary course of business . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." A "buyer in the ordinary course" is defined as "one who 'buys in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party." *Id., comment 2.*

The fact that Kurt Glassman was the president of both MHS and MidPac and controlled both are relevant in determining whether MHS was a buyer in the ordinary course. Having signed the CIT loan agreement and various loan amendments, and having shown CIT representatives the inventory at MHS which he represented belonged to MidPac, it is reasonable to conclude that Mr. Glassman was well aware of CIT's security interest in the MidPac inventory and could not have caused MHS to buy inventory from MidPac as a buyer in the ordinary course. Thus, even if MidPac inventory was deemed sold to MHS, CIT's security interest was not discharged if MHS was not a buyer in the ordinary course.

**2. Even if CIT's security interest was discharged, it could realize proceeds as a junior lienholder if CIT is a holder in due course; that is, if it took the proceeds in good faith and in the ordinary course of business**

Even assuming CIT's security interest in the MidPac inventory was subordinated upon the transfer or sale to MHS and its interest was junior to Whirlpool, this does not prevent CIT from legitimately and lawfully receiving proceeds of that inventory, as a junior lienholder. Whirlpool's jury instruction objections to the contrary (*Whirlpool's Objections, at 17)*, there is well-established case law cited by CIT in its partial summary judgment briefings on conversion, and noted by the court, which hold that junior creditors can rightfully receive proceeds from the sale of secured collateral if those proceeds are not segregated and are instead deposited into the payor's general account. *See, e.g., Littleton v. Littleton, 106 B.R. 632 (B.A.P. 9th Cir 1989); Rasmussen v. Sports Media Sales, Inc., 691 F. Supp. 153, 155 (N.D. Ill. 1988); ITT Commercial Fin. Corp. v. Bank of the West, 166 F.3d 295, 305 (5th Cir. 1999) (citing comment 2 to UCC § 9-306).*

More recently, in *G.E. Capital Corp. v. Union Planters Bank*, 409 F.3rd 1049 (8th Cir. 2005), the court of appeals held that senior secured creditor GECC could not recover from junior lienholder Union Planters proceeds of GECC's equipment collateral which were deposited into borrower's general operating account and used to pay bills, including Union Planters' sweeps of those

accounts to pay down borrower's line of credit. Both GECC and Union Planter had liens on same collateral, and Union subordinated its lien to GECC. The court held that payments in the ordinary course of business could not be recovered unless the recipient actually knew it was wrongfully receiving proceeds or recipient was in collusion with the borrower. The court reasoned that to hold otherwise would be far too heavy a burden on commerce.

Such a holding is consistent with the spirit of the UCC. The court noted that the current version of UCC 9-332 (analogous to current HRS § 490:9-332) "supports this result. . . . And we agree with those courts that have held that this comment effectively delineates those circumstances when tracing is appropriate when the payee receives funds 'out of ordinary course or otherwise in collusion with the debtor." *Id., at 1055 (citing Harley-Davidson Motor Co. v. Bank of New England, 897 F.2d 611, 622 (1st Cir. 1990)).* The court ruled that it is not enough that the junior creditor or lienholder receiving funds knew of prior security interest, for:

> "[A] transferee's knowledge of a prior security interest in proceeds does not, by itself, indicate that the transfer of these proceeds occurred outside the ordinary course of the debtor's business." [Citations omitted.] We . . . conclude that the phrase 'in the ordinary course,' means that the plaintiff must establish more than a defendant's knowledge of a superior security interest: It must establish either a lack of good faith or that the payee 'knows . . . that the [payment] is in violation of some term in the

security agreement not waived by the words or conduct of the secured party."

409 F.3d at 1056 (citations omitted).

Moreover, former § 490:9-502(1)(revised HRS 490:9-607(a)), a secured party (CIT), after default, may notify its debtor's (MidPac's) account debtor (MHS) to make payment to the secured party. CIT declared MidPac in default on June 25, 1999. Thereafter, CIT had a right to demand that MidPac's account debtors, including MHS, pay CIT directly for MidPac collateral that MidPac sold to MHS. The UCC does not require that each time a secured creditor of debtor wants to collect monies owing from an account debtor, it must first conduct a UCC search and ask account debtor's senior secured creditor for permission to allow account debtor to pay a payable. Nor is there any requirement that a creditor refuse to take funds which the debtor remains free to use because it has not been sequestered by another more senior secured creditor.

Thus, the Court's articulation of the issue for trial, "whether CIT directed the sale of the inventory at MHS and then reaped the proceeds from the sale", *Opinion, at 33*, appears to relate to the issue of whether CIT received the MHS sale proceeds in the ordinary course, and only if there is a finding against CIT should its assertion of ownership over the proceeds be deemed unlawful - not before such a finding.

**3. Standards for Determining Whether CIT Directed or Controlled MHS' Sales**

This Court found that in order to prove its claim of conversion, Whirlpool must show that "CIT directed the sale of the inventory at MHS and then reaped the proceeds from the sale." *Opinion, at 33.* Whirlpool has objected to CIT's proposed instruction no. 20a on Conversion-No Unwarranted Assumption of Ownership - Waiver of Security Interest on the grounds it ignores CIT's "control over Glassman" and CIT and CRM's "activities at Maui Home Supply." *Whirlpool's Objections, at 16.* However, that is for Whirlpool to prove, according to standards set by relevant precedent.

*Schwan's Sales Enterprises, Inc. v. Commerce Bank & Trust Co.*, 397 F. Supp. 2d 189(D. Mass. 2005), provides guidance on the degree of lender control that must be found to give rise to liability. In *Schwan's*, the court granted the defendant bank, an asset-based lender, summary judgment in a suit by one of bankrupt borrower's creditors for breach of fiduciary duty, agency theories of lender liability and tortious interference with contract. Schwan's had paid advances to purchase marketing services from the borrower that were forwarded to a lockbox controlled by borrower's lender and used by the lender to repay its loan. The borrower went bankrupt after receiving the last installment payment from Schwan's but before the borrower performed any marketing services. The court held that the lender was not liable to Schwan's because although lender's control over

borrower's finances was "powerful and ultimately severe", *id., at 196*, the control was based on the exercise of powers under lender's loan agreement. "A lender does not assume the requisite degree of control over its borrower simply by making advances and reducing funding in accordance with the terms of a loan agreement." *Id.* The Court found that Schwan's had "not presented any evidence to suggest that the loan documents were negotiated at anything other than arm's length or that they were atypical of loan documents used in similar asset-based financing arrangements." *Id. (citations omitted).*

The *Schwan's* court articulated the following steps for determining whether the lender exercised sufficient control over its borrower to be held liable:

> consider the sum of [the bank's] conduct with respect to [borrower], total up all the indicia of control, and determine whether the cumulative conduct has tipped the scales. *[Citations omitted.]* Schwan's [the plaintiff] must show that the bank "assumed actual, participatory, total control of" the borrower. *[Citations omitted.]* The leverage the bank may have had as a practical consequence of the lending relationship itself is not dispositive, because it is not "the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender."

*Id. (citations omitted).* The court reiterated the principle that "[a]s a general rule lenders are not fiduciaries when it comes to collection of their claims." *Id.*

Here, as in *Schwan's*, the actions of which Whirlpool complains were taken by CIT pursuant to the terms of its Loan and

Forbearance Agreements, which were negotiated at arm's length and which CIT and as CIT's expert Irwin Teich will testify (*Trial Ex. C24*), typical of asset-based lender remedies. Whirlpool has proffered no expert testimony to the contrary. The evidence will show that CIT did not act in collusion with MHS or MidPac to deprive Whirlpool of proceeds of its alleged collateral. Rather, CIT was pursuing its lender's rights to have its borrower arrange to sell and remit proceeds of inventory that had been improperly delivered to MHS in violation of MidPac's loan agreement. CIT, as MidPac's secured creditor, had no reason to allow MidPac's inventory to be sold by MidPac's related and jointly-controlled company MHS unless CIT received assurance it would obtain the proceeds. There were no agreements between MHS and Whirlpool restricting the use of proceeds from the sale of Whirlpool collateral at MHS. If MHS, MidPac, Mr. Glassman or any of their agents had indicated to CIT that proceeds of the inventory should not be remitted to CIT because of restrictions by Whirlpool on the proceeds, CIT's representatives would not have allowed MHS to sell the MidPac inventory.

**4. If CIT is found not to have controlled or directed MHS' sales, then Whirlpool must trace its security interest in proceeds to a specific, identifiable sum**

Whirlpool also objects to CIT's proposed Instruction no. 20a on the grounds that the portion of the instruction on waiver of security interest in proceeds is inconsistent with this

Court's written opinion and contrary to the UCC. *Whirlpool's Objections, at 16-17.* Whirlpool is wrong.

The Court's Opinion states that if CIT is found not to have directed MHS sales and it is found instead that "MHS owed MidPac money from the transfer of goods from MidPac to MHS, and that it paid MidPac as it would any creditor, then no conversion occurred 'unless a specific, identifiable sum is involved.'" *Opinion, at 31.* Thus, a finding in CIT's favor on the issue of whether CIT directed sales at MHS will then require Whirlpool to prove liability by identifying a specific, identifiable sum that was allegedly converted.

Whirlpool argues that the "1999 Haw. Rev. Stat. § 490:9-114 makes it clear that CIT cannot rely on tracing its alleged interest into an alleged commingled account where its claim to proceeds arise from the consignment interest of MidPac as consignor and MHS as consignee" and that CIT should have perfected its interest. Whirlpool argues that the UCC does not otherwise require segregation of proceeds. *Whirlpool's Objections, at 17.* However, as indicated by the discussion of the *Littleton, G.E. Capital* and other cases above, as well as the codification of their rulings in current HRS § 490:9-332, Whirlpool is wrong.

### F. Law Relevant to Tortious Interference with Contract Claim (Count IV)

#### 1. Applicable elements under Hawai`i law

Whirlpool objects to CIT's proposed jury instruction no. 22 on tortious interference on the grounds that Whirlpool's BAJI instruction is "preferable as a more neutral statement of the law and more nearly tracks the Court's Order." *Whirlpool's Objections, at 20.* The Objection is groundless. Actually, the Court and CIT's formulation of the elements of tortious interference track Hawai`i law, and Whirlpool's BAJI-based instruction does not.

Hawai`i has a strict formulation of tortious interference with contract that is reflected in CIT's jury instruction no. 22. That language is similar to the standards in this Court's Opinion (at 35): (1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach the contract; (4) the absence of justification on the defendant's part; (5) the subsequent breach of the contract by the third party; and (6) damages to the plaintiff. CIT's Second Proposed Jury Instruction No. 22. *See Lee v. Aiu*, 85 Haw. 19, 936 P.2d 655 (1997); *Weinberg v. Mauch*, 78 Haw. 40, 50, 890 P.2d 277, 287 (1995); *Beclar Corp. v. Young*, 7 Haw. App. 183 (1988)(articulating the foregoing elements, citing *Burgess v Arita*, 5 Haw. App. 581, 704 P.2d 930 (1985)).

**2. Intentional inducement of breach of contract**

This Court found "that a genuine issue of material fact exists as to whether CIT intended to interfere with the contract." *Opinion, at 38.* Unlike most states, Hawai`i requires plaintiff to show that the defendant intentionally induced the third party to breach the contract, not merely encouraged the breach. *See Burgess v. Arita,* 5 Haw. App. at 594*(*"To prevail in their tort claim, Sellers had to prove that Hasegawa intentionally induced the breach of the contract involved") (citing *Chow v. Alston*, 2 Haw. App. 480, 634 P.2d 430 (1981)). "It must be shown that the third party acted with intent and legal malice, i.e., the intentional doing of a harmful act without legal or social justification or excuse, or, in other words, the wilful violation of a known right." *Chow v. Alston*, 2 Haw. App. at 484, 634 P.2d at 434.

The element of knowing inducement is not met where the allegedly interfering party had a legal, contractual right to take the challenged action. Thus, the *Burgess* court ruled with respect to the element of knowing inducement of a breach of contract:

> We find no evidence in the record of intentional inducement on the part of Hasegawa.[*Footnote omitted.*] We find instead an officer asserting his corporation's contractual right to withhold the corporation's consent to the sale and transfer of the leasehold, **and we cannot find tortious interference where a corporation is legally permitted to exercise such right.**

*Burgess v. Arita,* 5 Haw. App. at 594 (emphasis added).

The *Schwan's Sales Enterprises, Inc.* case (cited above in section A.1.), which involved an asset-based lender defendant, is also instructive on factors for determining knowing or intentional inducement of breach of contract. *Schwan's* involved an application of Massachusetts law which like Hawai`i law requires as an element of interference with contract claims that "the defendant knowingly induced the third party to break that contract." *397 F. Supp. 2d at 198.*

The *Schwan's* court found that even though (a) plaintiff Schwan's had entered into a contract with defendant bank's borrower, (b) the borrower breached the contract and (c) Schwan's suffered "substantial financial harm as a result", there was no interference liability as a matter of law because the bank neither knowingly induced the breach, nor was the interference "intentional and improper in motive." *Id.* The *Schwan's* court found that these acts did not constitute knowing inducement: the bank pressuring borrower to move aggressively to obtain prepayment of advances from Schwan's or the bank would "choke" its borrower; the bank seizing the proceeds paid by Schwan's and applying them to its loan, leaving borrower unable to perform obligations to Schwan's; the bank "improperly" freezing borrower's credit line; the bank's actions leaving borrower unable to perform its duties under its contract with Schwan's. The court reasoned that none of these acts, although harsh, constituted knowing inducement because the bank had the

contractual right to collect, demanded "no more than was owed" (*397 F. Supp.2d at 199*), applied payments in a manner consistent with the terms of the loan agreement, and had itself advanced money to the borrower as required under the loan agreement (albeit based on Schwan's collateral. That the borrower "did not use that money to perform its obligations to Schwan's is not attributable to the bank." *Id.*

In so holding, the *Schwan's* court followed the lead of *In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005), which upheld dismissal of a claim against defendant bank for aiding and abetting breaches of fiduciary duty due to plaintiff's failure to show knowing inducement, even though the bank "arranged quietly" for repayment of the loan from proceeds of new loans from unsuspecting lenders. *Id. at 47.* The court reasoned:

> No doubt, a request for repayment does exert some sort of pressure, and any pressure can be seen as an inducement, at least incrementally. But that is an unhelpfully broad reading of inducement in this context. The demand at issue was for no more than was owed: repayment of Sharp's outstanding debt to State Street. State Street had a right to foreclose (as the complaint alleges); yet State Street evidently did not expect foreclosure to be efficacious. **Under the circumstances, the demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability.**

*Id.*, at 199 (emphasis added).

Likewise, CIT's actions in continuing to advance loan funds to MidPac conditioned on MidPac identifying its inventory at MHS, retaining an inventory management firm to monitor its inventory in Honolulu and Maui, requiring MHS to remit payment to

MidPac for MidPac's inventory sold on Maui, and requiring MidPac to remit those proceeds to CIT were all actions within the scope of the loan agreements, amendments and Forbearance Agreement between MidPac and CIT. CIT obtained no more than that to which it was contractually entitled. Finally, that MHS failed to pay CIT is not attributable to CIT. Whirlpool will have to show that MHS would have paid it past-due balance to Whirlpool even in the absence of the MidPac requiring remittance of the sales proceeds from its inventory at MHS. Whirlpool conveniently ignores the fact that even though the remittances to MidPac began only in late July 1999, MHS had established a pattern (a) months before that of not paying its balances due and (b) by early June 1999, of defaulting on its promises to perform under a payment plan.

**3. Absence of Justification**

In Hawai`i, showing absence of justification is part of plaintiff's prima facie case for tortious interference claims. *Kutcher v. Zimmerman*, 87 Haw. 394, 407-08, 957 P.2d 1076 (Ct.App. 1998). Hawai`i courts equate the "absence of justification" element to the "improper purpose" or "improper means" element found in other states' formulation of the tortious interference with contract claim. *Meridian Mortgage, Inc. v. First Hawaiian Bank,* 109 Haw. 35, 44 (Ct. App. 2005); *Kutcher v. Zimmerman*, 87 Haw. at 402, 957 P.2d 1076 (Ct.App. 1998). In *Schwan's*, the court interpreted "improper means" as requiring a showing that defendant acted with actual malice, meaning "any spiteful,

malignant purpose, unrelated to the legitimate corporate interest." 397 F. Supp.2d at 201 (citations omitted). The court found that "all of the bank's actions represented 'the legitimate advancement of its own economic interest . . . which is not improper for purposes of a tortious interference claim." *Id.*

Likewise, Whirlpool will be unable to show that CIT acted with absence of justification, improper means, improper motive or actual malice. CIT's requirements that MidPac arrange to sell its inventory at MHS and remit the proceeds to CIT were a legitimate advancement of its economic interests under the Loan Agreement and Forbearance Agreement.

**4. Subsequent breach and damages**

Whirlpool objects to CIT's jury instruction no. 24 on Tortious interference - Subsequent breach, on the grounds that CIT seeks to create a new element. *Whirlpool's Objections, at 31.* However, in Hawai`i, "subsequent breach" of the contract is a necessary element of tortious interference with contract. "the plaintiff must show that a breach has occurred and must separately establish damages." *Weinberg v. Mauch*, 78 Haw. 40, 50, 890 P. 2d 277, 287 (1995), *quoted in Meridian Mortgage v. First Hawaiian Bank,* 109 Haw. at 44. "Damages are not inferred from the commission of the breach" and must be actual damages. *Kutcher v. Zimmerman,* 87 Haw. at 405 (citations omitted).

## III. ANTICIPATED PROCEDURAL ISSUES

### A. CIT is Not Precluded From Asserting Its Defense That it Received Proceeds via MidPac from Sales of Goods at MHS in the Ordinary Course

Whirlpool objects to any jury instructions on the issue that CIT received proceeds in the ordinary course. *Jury Instruction Objections, at 18.* Whirlpool is wrong again. On September 24, 2002, CIT filed an Amended Answer to Second Amended Complaint which includes the affirmative defense:

> THIRTEENTH DEFENSE
>
> 57. Plaintiff's conversion claim fails to state any cognizable claim for damages because to the extent, if any, that CIT received proceeds from the sale of Plaintiff's collateral, said proceeds were remitted in the ordinary course of business.

### B. It is Appropriate for the Court to Give Jury Instructions on Bifurcation

Whirlpool has objected to CIT's two proposed jury instructions (Nos. 2 and 3) on bifurcation on the grounds that "it provides jurors with the option of deciding liability against Whirlpool and thereby cutting short the time that they are required to spend in jury service." *Jury Instruction Objections, at 2, 3.*

"The purpose of an instruction is to furnish guidance to the jury in their deliberations, and to aid them in arriving at a proper verdict. . . . The chief object of the court's instructions is to explain the law of the case, to point out the essentials to be proved on one side or the other, and to bring into view the relation of the particular evidence adduced to the

particular issues involved." *McKeague v. Talbert*, 3 Haw. App. 646, 657 (1983).

CIT's Jury Instruction Nos. 2 and 3 are appropriate in order to provide guidance to the jury, explain the scope of issues they will be asked to decide on (liability not damages) and aid them in arriving at a verdict focused on liability, not damages.

**IV. ANTICIPATED EVIDENTIARY ISSUES**

CIT has filed the following motions in limine:

1. Motion in Limine to Preclude Whirlpool from Eliciting Evidence of the Contents of CIT's Suspicious Activity Report and to Limit References to Such Filing
2. Motion in Limine to Preclude Use of or Argument about Ted Phelps' July 29, 1999 Letter as Evidence of Agency
3. Motion in Limine to Preclude Use of and Argument Re: The "Bond Funds Fraud" as Evidence of CIT's Liability
4. Motion *in Limine* to Preclude Evidence of and Argument Based upon Ted Phelps' Alleged October 28, 1999 Statement to Ernest Matlock Regarding Phelps' Relationship with CIT
5. Motion in Limine to Preclude Use of and Argument Re: Ted Phelps' August 11, 1999 Email
6. Motion in Limine to Preclude Evidence of and Argument Re: Alleged Bankruptcy Fraud by CIT

7. Motion in Limine to Preclude Use of and Argument Re: CIT's Second Amended Crossclaim as Evidence of CIT's Liability for Fraud Conspiracy

8. Motion in Limine to Preclude Plaintiff Whirlpool from Offering Witnesses or Evidence That Is Inconsistent with the Testimony of its Rule 30(b)(6) Designees

9. Motion in Limine to Preclude Argument That CIT Admitted to Taking $1 Million of Whirlpool's Collateral in Maui

The evidentiary issues relating to these motions are briefed in each of the motions.

DATED: Honolulu, Hawai`i, June 14, 2006.

/s/ Louise K. Y. Ing
PAUL ALSTON
LOUISE K. Y. ING
THOMAS E. BUSH
ALLISON KIRK
Attorneys for Defendant/Cross-claimant THE CIT GROUP/BUSINESS CREDIT, INC.