# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT STATE OF HAWAII

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, INC, a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants.<br><br>And<br>CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | CIVIL NO. CV 01-00187 DAE BMK<br><br>COPY<br><br>THIS TRANSCRIPT IS WORK PRODUCT. DISTRIBUTION OF DUPLICATES IS NOT AUTHORIZED. |

Deposition noticed by: THOMAS E. BUSH, ESQ.

DEPOSITION OF EDWIN BOWLING

DEPOSITION OF EDWIN BOWLING

DEPOSITION OF EDWIN BOWLING

Taken on behalf of Defendant/Cross-Claimant The CIT Group/ Business Credit, Inc., at Iwado Court Reporters, Inc., 2233 Vineyard Street, Wailuku, Maui, Hawaii, commencing at 1:05 p.m. on March 11, 2003, pursuant to Notice.

REPORTED BY: JEANNETTE W. IWADO, RPR/CSR #135

A P P E A R A N C E S

For the Plaintiff:

TIMOTHY J. HOGAN, ESQ.
Lynch, Ichida, Thompson & Kim
1132 Bishop Street, Suite 1405
Honolulu, Hawaii 96813

For the Defendant/Cross-Claimant The CIT Group/Business Credit, Inc.:

THOMAS E. Bush, ESQ.
Alston, Hunt, Floyd & Ing
1001 Bishop Street
18th Floor, ASB Tower
Honolulu, Hawaii 96813

For the Defendants Edwin and Frances Bowling:

MARGERY S. BRONSTER, ESQ.
JEANNETTE E. HOLMES, ESQ.
2300 Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813

APPEARANCES CONTINUED

For Defendants Michael Clifford, CGBN, Inc., and CG Development, Inc:

CHRISTOPHER JAMES MUZZI, ESQ.
(Appearing telephonically)
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813

For Defendant Raymond S. Iwamoto:

STEVEN GOTO, ESQ.
Ayabe Chong Nishimoto Sia & Nakamura
Suite 2500, Pauahi Tower
1001 Bishop Street
Honolulu, Hawaii 96813

Also Present:

DEBRA CLAWSON, ESQ.

because now MidPac owns certain goods?

A. No, I didn't know that. I don't ever remember that.

Q. Now what I'd like to do is to -- you know, Counsel have represented that they don't have much time to ask questions. I want to ask about the stock purchases by Glassman, but I'd like you guys to ask your questions now, so if I have a beef with Margery at least it's just between me and Margery rather than the rest of you folks.

EXAMINATION

BY MR. HOGAN:

Q. This is Tim Hogan. I have just a few questions, Mr. Bowling. Did you ever know a person by the name of Ted Phelps?

A. I knew who he was.

Q. You knew who he was. Did you ever speak to him at all?

A. Maybe three times.

Q. Did you ever see Mr. Phelps have any involvement in ordering product, did he have any input at all?

A. I wasn't around at all.

Q. Did he ever tell you who he worked for?

A. No.

Q. Do you recall earlier I conducted an examination, it was on February 1, 2001, a 2004 examination

in a bankruptcy case of CG Investments, do you remember that?

A. Yes.

Q. Mr. Farmer was representing you at the time?

A. Yes.

Q. And I asked you a question. The question was on page 173.

Question: "At this point was Mr. Phelps -- who did Mr. Phelps appear to be working for to you, at least as far as you understood it? Who did he tell you he was working for?"

And you answered, "He told me he was working officially for CIT, being paid by Glassman."

A. Yes.

Q. Do you recall that, sir?

A. Yes, I recall it now.

Q. Do you recall him ever saying that?

MR. MUZZI: Objection on the record as to the use of the 2004 examinations.

MR. BUSH: Same objection here.

MR. GOTO: Join.

Q. (By Mr. Hogan) You can answer the question, sir.

A. Yes, I think when I was introduced to him.

Q. You believe -- go ahead, sir, you can finish.

A. My understanding was, and all I can do is tell you my recollection, is that he worked for CIT.

Q. Okay. And why do you believe that?

A. You know, I believe Glassman told me he worked for CIT. I wish I could remember more.

Q. Now, did you ever see Mr. Phelps in the company of anybody from CIT?

A. When he -- I think the first time I met him. When I was asked by Glassman to meet him he was with CIT people.

Q. At the time were you able to observe the way he interacted with the people from CIT?

A. No.

Q. Can you recall the circumstances of when you met him?

A. I think it was on Maui.

Q. It was on Maui. Do you know where you were at the time?

A. Maui Home Supply.

Q. And was it a meeting, a prearranged meeting of some sort that you were with him?

A. Yes. My understanding was that, as I remember that, that they all came over to see Maui Home Supply and Glassman asked me to be there to meet them.

Q. So were you in a room in which there was

Mr. Phelps and people from CIT were also present at the same time?

A. No, I think it was out in the middle of the floor, the sales floor, as I remember.

Q. But were they all present in the same place at the same time with you?

A. I don't remember.

Q. Did Mr. Phelps ever say anything to you about who he was working for?

MR. BUSH: Objection, asked and answered. He already testified, he said he never said who he worked for.

MS. BRONSTER: I believe that misstates his testimony.

Q. (By Mr. Hogan) Answer the question, sir, if you understand it.

A. I think he told me he reported to CIT, I think.

Q. And do you have any idea when that might have been that he said that?

A. That would have been the last part of June.

Q. Now, in the period after June were you present much in the store on Maui?

A. No.

Q. Can you give me an estimate of how many times say in the month of July you might have been there?

A. I don't recall very often at all. Maybe once.

I don't remember.

Q. Okay. Is it fair to say -- who would you, if you had something at that time that you wanted to have a friend to get help in the store, is there somebody there that you considered to be the one in charge on the floor in say July of 1999?

A. Where was that?

Q. In Maui. Let's say you wanted to get to the guy or who was in charge?

A. Andy Paul.

Q. It would be Andy Paul?

A. Yes.

Q. What did you call Andy Paul for his job, how would you refer to him?

A. He was the manager of the store.

Q. The manager. Did you ever discuss the issue of CIT taking bond funds with anyone, did you ever discuss that with Mr. Glassman, for instance?

A. No, not that I remember.

Q. Did you have any knowledge of that?

A. No.

Q. Any suspicion of it?

A. No.

Q. Remember I asked you a question, sir -- again, I expect an objection -- it was at page 167 of the 2004 exam,

sir, and I'll start at 166 at line 22. I asked, "At any time were you ever apprised of a problem with MidPac's bonding accounts on or about the June period?" And your answer was "No."

And I asked the question, "Was there any time where anybody informed you that there was a problem with the bonding, a serious problem that had to do with CIT?" Your answer was, "After CI took over, yeah."

And I said, "Why was that?" And then you said, "Because I understand, because what I understand is CIT took all the money."

MR. BUSH: Objection to the use of the -- objection to the use of the debtor exam.

MR. HOGAN: I'll state for the record the judge has already ruled it's a prior sworn statement.

Q. (By Mr. Hogan) So you can answer the question.

A. During the time that I had the management there I had no knowledge of CIT taking bond funds.

Q. While you were there you had no knowledge of that happening?

A. That's correct.

Q. But afterwards did you ever hear, after you left, did you ever hear or have any knowledge that that had happened?

A. Yes.

Q. When did you hear that?
A. You know, I think one of the employees told me that.
Q. One of the Maui employees or MidPac?
A. MidPac. The employees told me that.
Q. That they believed that CIT had taken bond funds?
A. Yes.
Q. Was this in the period of time while you were out of the management there, sir?
A. Yes, I was gone.
Q. And did you ever have an opportunity to discuss that with Mr. Glassman?
A. No.
Q. With Mr. Phelps?
A. No.
Q. Did you know of a company called CRM, Collateral Risk Management, did you ever hear of them?
A. I heard of them when I got papers from the attorneys, and that was in I think 2001.
Q. But during the period after June of 1999 you weren't aware that they were on Maui's property?
A. No.
Q. From the time when you were at Maui, prior to say June, would you have an estimation of how many times a

week you might or a month you might be on the property?
A. On Maui?
Q. Say from the period -- let's break it down say from January to March of 1999.
A. During the week anywhere from three. Sometimes I was there once a week, sometimes I was there as much as three times a week. And what I did was I'd try and get in early on a plane or leave a little later.
Q. Now after March did you have an opportunity to be there in the period from say March to June of 1999?
A. No, I was too busy on the computer.
Q. In the time when you had an opportunity to be there, say from January to March, did you ever have an opportunity to look at the Whirlpool inventory that was in the warehouse area?
A. No. I didn't notice any inventories.
Q. That wasn't part of your function?
A. No. I just didn't look at the inventories.
Q. Were you aware of any signage on the property that said like there's a MidPac store there, a place that had a sign saying MidPac Lumber, as if it had an actual selling presence inside the Maui Home facility?
A. I don't remember that.
Q. At any time?
A. I don't remember that.

C E R T I F I C A T I O N

STATE OF HAWAII )
                ) SS.
COUNTY OF MAUI  )

I, JEANNETTE W. IWADO, C.S.R. 135, Notary Public in and for the State of Hawaii, do hereby certify:

That on March 11, 2003 appeared before me EDWIN BOWLING, the witness whose deposition is contained herein; that prior to being examined the witness was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to print under my supervision by means of computer-assisted transcription; that the foregoing represents, to my best ability, a true and correct transcript of the proceedings had in the foregoing matter.

The witness, if applicable, was notified that the deposition was available a period of thirty days for review, signature and corrections, if any. If not signed, the reading and signing of the deposition were waived or the witness failed to appear. The original has, therefore, been sealed and is on file without signature, pursuant to court rules.

I further certify that I am not an attorney for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

Dated this 17th day of March, 2003.

NOTARY PUBLIC, State of Hawaii
My commission expires 2/5/04