Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON 1126-0
LOUISE K. Y. ING 2394-0
THOMAS E. BUSH 4737-0
ALLISON KIRK 8156-0
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Telephone: 524-1800
Facsimile: 524-4591
palston@ahfi.com
ling@ahfi.com
tbush@ahfi.com
akirk@ahfi.com

Attorneys for Defendant/Cross-claimant
THE CIT GROUP/BUSINESS CREDIT, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE | ) | Civil No. CV 01 00187 MEA-BMK<br>(Tort and RICO)<br><br>**DEFENDANT THE CIT GROUP/BUSINESS CREDIT, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF WHIRLPOOL CORPORATION'S MOTION IN LIMINE NO. 1 REGARDING EVIDENCE RELATED TO THE ALLEGED CONSIGNMENT, FILED 6/13/06;** DECLARATION OF LOUISE K. Y. |

| | | |
|---|---|---|
| PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants,<br><br>and<br><br>F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | ING; EXHIBITS A-J; CERTIFICATE OF SERVICE<br><br>JUDGE: Hon. Marvin E. Aspen<br><br>TRIAL: November 6, 2006 |

**DEFENDANT THE CIT GROUP/BUSINESS CREDIT, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF WHIRLPOOL CORPORATION'S MOTION IN LIMINE NO. 1 REGARDING EVIDENCE RELATED TO THE ALLEGED CONSIGNMENT, FILED 6/13/06**

Defendant The CIT Group/Business Credit, Inc. ("CIT") opposes Whirlpool's request to exclude introduction of evidence "related to an alleged consignment." *Motion in Limine ("MIL"), at 2.* Whirlpool seeks to exclude introduction of evidence "to support its [CIT's] claim, which the Court has already rejected, that it possessed consignment rights or rights as a senior secured creditor in products located at MHS." *Whirlpool's Memorandum in Support of Motion in Limine ("MIS"), at 2.* While the Court has concluded "that the transaction between MidPac and MHS was a security arrangement rather than a true consignment", *Memorandum Opinion and Order, (filed 12/28/04) ("Opinion") at*

*29,* and that "Whirlpool has sufficiently established it had a first priority interest in the inventory", *id.*, those conclusions should not prevent CIT from presenting evidence (A) of the circumstances leading to the preparation of, and the purpose of, the consignment agreement and related papers between MidPac and MHS in order to show CIT's state of mind and intent, and (B) that assuming the MidPac inventory was deemed sold to MHS when shipped to MHS, CIT had or thought it had a first priority security interest in MidPac inventory at MHS, under the 1999 version HRS §490:9-307(1).[1] *See discussion in CIT's Trial Brief, at 22, which is incorporated herein by reference.*

## I. Evidence of the Consignment Arrangement is Relevant to CIT's Defenses to Conversion, Interference, and Conversion

CIT should be allowed to present evidence of the circumstances leading to the preparation and the purpose of the March 1999 consignment agreement between MidPac and MHS and related documentation, including the in-house lien search conducted of CG Investments by CIT in March 1999. Even if the Court has ruled that the legal effect of the transaction was to create a security interest, not a consignment, evidence of circumstances giving rise to the

[1] The 1999 version of that statute provided that "A buyer in ordinary course of business . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." *HRS § 490:9-307(1).*

consignment documentation is relevant to CIT's defenses against Whirlpool's conspiracy, conversion, and interference claims.

CIT will show at trial that CIT's various agreements with MidPac about the treatment of MidPac's inventory at Maui Home Supply was part of an effort to do the right thing under the circumstances - to balance the lender and borrower's respective interests - when CIT could simply have required MidPac to return all inventory on Maui and stop all transfers to Maui. The preparation of the consignment documentation was part of that response. In short, CIT will offer evidence showing that it was focused on protecting its interests within the context of its Loan Agreement, as amended and supplemented; not on joining a conspiracy or harming Whirlpool. To show its state of mind, intent and motivation, CIT will elicit the following evidence, among others:

1. Although CIT's March 19, 1998, Loan Agreement with MidPac based its $3 million line of credit on a percentage of MidPac's "Eligible Inventory" *(Whirlpool Trial Ex. W151, § 2.1(b), at 1, attached as Ex. A)* and although the Loan Agreement required MidPac's "Eligible Inventory" to be located at MidPac, *id., §2.1(e), at 2; §10.6(e), at 20*, MidPac started shipping appliances to its sister company MHS for sale, contrary to the terms of the Loan Agreement, within months, as CIT auditors later discovered. *Ex. B, 8/28/99 A/R Collateral Review, Whirlpool Trial Ex. W220, at CT040048-*

*49; Ex. C, 3/26/99 Field Examination Comments, W324, at CA23647.* The auditors also noted MHS was an affiliate of MidPac and that they had common ownership. *Id.*

2. Throughout late 1998 and the summer of 1999, CIT representatives tried to understand the scope and nature of the transfers of MidPac inventory to MHS and how best to protect CIT's secured interest. On October 27, 1998, CIT and MidPac amended their Loan Agreement to allow only $150,000 in MidPac's inventory at MHS to be considered eligible collateral. *Ex. D, Whirlpool Trial Ex. W230, at 2.*

3. In March 1999, a CIT auditor reported that there was additional MidPac property stored on Maui and there was also over $700,000 in proceeds due from MHS for the sale of MidPac goods. MidPac explained to CIT that "MHS sells lumber, appliances and cabinets on behalf of MidPac. *Ex. C, Trial Ex. W324, at CA23647.* CIT's understanding that the MidPac inventory on Maui was segregated was supported by the auditor's report that MHS kept a separate subsidiary inventory list tracking "only MidPac's inventory" which was forwarded to MidPac weekly "along with vendor invoices" to be posted on MidPac's inventory list. *Id., at CA23658.* CIT's understanding that the goods remained MidPac's until sold, was supported by the auditor's report that "[a]t month end Mr. Glassman writes a check

from MHS to MidPac" for amounts MHS collected on the sale of MidPac inventory. *Id., at CA23659.*

4. CIT held discussions with Kurt Glassman about the goods being stored at MHS. He "represented to us [CIT] that certain inventory belonging to Midpac was located at Maui Home Supply", *Ex. E, Deposition of Robert Brichacek, at 52:16-18,* and "that MidPac still owned . . . the inventory located on Maui." *Id., at 55:18-19.* "[T]he way that sales of that inventory from Maui worked, we concluded that it sounded like a consignment arrangement of that inventory and, therefore, the documents were drawn up to effect that relationship." *Id., at 55:19-23.* MidPac's representations were confirmed by the CIT auditor's inspection of inventory at MHS in March 1999, and report that "[a]ll items are adequately segregated from MHS's inventory", as well as segregated "on a secondary perpetual [inventory]." *Ex. C, Trial Ex. W324, at CA23660.*

5. On March 19, 1999, MidPac and MHS signed a consignment agreement with MidPac as the consignor and MHS as consignee. *Trial Ex. W315, W321, Consignment Agreement.* MidPac assigned all of its consignor's interest under that agreement to CIT, and CIT recorded a financing statement describing its assigned interest *(Trial Ex. W323 (UCC-1));* and gave notice of the consignment to City Bank, which it understood from

Glassman and from CIT's in-house lien search in March 1999 to be the sole senior secured creditor of MHS. *Ex. F, Rule 30(b)(6) Deposition of Thomas A. Hayes (11/19/02) ("Hayes 30b6, Vol. I"), at 38:10-22; Ex. E, Deposition of Robert Brichacek (11/21/02), at 62:13-63:9.*

6. CIT declared MidPac in default under its loan on June 25, 1999, *Ex. G, Trial Ex. W484,* and had a right thereafter to exercise its default rights and remedies. Therefore, its intent after that point was not to create "a paper trail" to defraud Whirlpool, as Whirlpool contends, but to enforce CIT's lender remedies.

7. CIT's strategy at that point in and before late June 1999, was to protect the collateral that remained and to realize proceeds from it by having MidPac collect proceeds from MHS as the goods were sold in the ordinary course of business and remit them to MidPac for remittance to CIT. Although a secured creditor of MHS, Whirlpool had not put any restrictions on MHS' use of its sales proceeds, even after MHS defaulted on its payment plan and even after Whirlpool put MHS on a cash basis from and after July 23, 1999.

8. Consistent with the statements of Glassman that the MidPac inventory had not been sold to MHS, Ray Iwamoto drafted and sent to CIT on July 9, 1999, his proposed agreement for the liquidation of MidPac inventory at MHS. *Ex. H, Whirlpool Trial Ex. W542.* Although the agreement was

never signed, it was Iwamoto who drafted the initial agreement that recited the "Inventory is owned by MidPac" and that MHS, as agent for MidPac, would remit proceeds directly to MidPac's lender, CIT. *Ex. H, at G01645, ¶ 1.*

9. Consistent with Iwamoto's draft agreement, at no time did he state or indicate that Whirlpool had a prior lien on the MidPac inventory or had restricted use of MHS' proceeds. If MidPac inventory had not been sold to MHS and was merely stored there, then Iwamoto's draft agreement appropriately stated that the sales proceeds should be remitted to CIT.

10. CIT had two choices: it could seek to have all the MidPac merchandise returned to Oahu or allow it to be sold by MHS. If it allowed the inventory to be sold by MHS, it had to be assured that MidPac would be paid for that inventory and that those proceeds would go to CIT to pay down the loan balance, pursuant to the Loan Agreement. MHS was in the business of selling the type of inventory that constituted the MidPac inventory and to CIT's knowledge, Whirlpool had taken no action to restrict sale of the inventory or use of the sales proceeds by MHS. Had Glassman or Iwamoto indicated that inventory proceeds could not be remitted to CIT because the MidPac inventory was already property of MHS whose proceeds were

restricted by Whirlpool, CIT would not have allowed MHS to sell MidPac inventory.

11. Documents from Collateral Risk Management, the inventory management company jointly retained by MidPac and CIT to monitor MidPac's inventory show that CRM's charge was to track and report on inventory that MidPac believed it owned at MHS. *See Ex. I, Trial Ex. W568, at CT009195-97* (CRM's "thoughts on going forward at MidPac" included with regard to "Inventory Movement", "Differentiate product from that of Maui Home Supply" and its expectation that "CRM will not have an active operation at Maui Home Supply. It will record sales of the existing Midpac inventory as reported by MHS and do monthly physical counts to ascertain accuracy of reported data"); *Ex. J, Trial Ex. W578, at AL002164* (CRM's "Agency Instructions" for MHS described the purpose of a "Report of Daily Activity" as being a "record of any inventory purchased by Midpac for delivery to [MHS or the Lahaina store] . . . the sale of any inventory located at Maui or Lahaina, which Midpac owns", as well as transfers of inventory between the Maui and Lahaina stores).

As shown by the legal authority cited by CIT in its Trial Brief, whether a lender was acting in proper and rational, as opposed to abusive, ways to protect its legitimate interests is relevant to whether it had the intent to join a

conspiracy, *see Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97, *cited and discussed in CIT's Trial Brief (filed 6/14/06), at 19-20 (all references to Trial Brief are incorporated herein by reference),* and to whether CIT acted for the purpose of harming Whirlpool. *See CIT's Trial Brief, at 20.*

With respect to Whirlpool's conversion claims, the case authority cited by CIT shows that whether a lender was enforcing collection actions pursuant to the terms of its lending relationship with its borrower, even if its collection actions hurt other creditors claiming a prior security interest in moneys collected, is relevant to whether the lender received funds from its borrower in the ordinary course of business or colluded with borrower to exert improper control to obtain such funds. *See CIT's Trial Brief, at 26-28.*

Whether CIT had a legal, contractual right to take the actions Whirlpool is now challenging is also relevant to whether it intentionally induced MHS to breach its contract with Whirlpool and did so with or without justification, that is, for a proper or improper purpose or means. *See CIT's Trial Brief, at 34-35.* In short, the agreements that CIT entered into with MidPac pursuant to their loan relationship (including the consignment agreement and related documents), the reasons for those agreements and whether CIT enforced its

rights within the bounds of those agreements all bear on CIT's ability to defend itself against Whirlpool's conspiracy, conversion and interference claims.

**2. CIT Should be Allowed to Present Evidence That it Thought it Held a First Priority Security Interest in MidPac Inventory Shipped to Maui**

It is unclear whether Whirlpool's motion in limine is limited to excluding only evidence of consignment or also evidence that CIT had a prior security interest in the MidPac goods at MHS. To the extent Whirlpool's motion is broader than just seeking exclusion of consignment evidence, CIT should also be allowed to elicit evidence that even assuming MidPac's goods were deemed sold to MHS, CIT nevertheless had or thought it had a first priority security interest in MidPac inventory at MHS, under the version of HRS §490:9-307(1) in effect in 1999. *See fn. 1 above.* That is, CIT should be allowed to offer evidence and argue that because the transfer of goods from MidPac to MHS was between two affiliates, controlled by the same individual and having common shareholders (*Ex. C, at CA23647*), it was reasonable for CIT to conclude (and should be reasonable for the jury to conclude) that MHS was not a buyer in the ordinary course with respect to any sale from MidPac, and CIT's security interest therefore followed the goods, even after they were sold to MHS. A "buyer in the ordinary course" is defined as "one who 'buys in good faith and without knowledge that the

sale to him is in violation of the ownership rights or security interest of a third party." *9-307(1), cmt. 2. See CIT's Trial Brief, at 22, § 1.*

**3. As an Alternative, the Parties Should Work on Appropriate Stipulations as a Means of Expediting Trial**

To the extent Whirlpool is truly concerned about jury confusion and expediting trial, it should work with CIT, with assistance from the Court as needed, to reduce confusion by stipulating to facts regarding the circumstances leading to and the purpose of the consignment and related documents. Due to the sheer amount of facts and documents involved and the divergence of the parties' position, Whirlpool, CIT and Iwamoto have been unable to agree on meaningful stipulated facts to date, but should make a renewed effort, with the Court's assistance as needed, to do so.

**4. Conclusion**

For the foregoing reasons, this Court should deny Whirlpool's motion and allow CIT to present evidence about the circumstances leading to and the purpose of the Consignment Agreement and related papers.

DATED: Honolulu, Hawaiʻi, June 26, 2006.

/s/ Louise K. Y. Ing
PAUL ALSTON
LOUISE K. Y. ING
THOMAS E. BUSH
ALLISON KIRK
Attorneys for Defendant/Cross-claimant THE CIT GROUP/BUSINESS CREDIT, INC.