Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON 1126-0
LOUISE K. Y. ING 2394-0
THOMAS E. BUSH 4737-0
ALLISON KIRK 8156-0
18th Floor, ASB Tower
1001 Bishop Street
Honolulu, Hawai'i 96813
Telephone: 524-1800
Facsimile: 524-4591
palston@ahfi.com
ling@ahfi.com
tbush@ahfi.com
akirk@ahfi.com

Attorneys for Defendant/Cross-claimant
THE CIT GROUP/BUSINESS CREDIT, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE | ) | Civil No. CV 01 00187 MEA-BMK (Tort and RICO)<br><br>**DEFENDANT CIT GROUP/BUSINESS CREDIT, INC.'S REPLY TO WHIRLPOOL CORPORATION'S OPPOSITION TO CIT'S MOTION IN LIMINE TO PRECLUDE ARGUMENT THAT CIT ADMITTED TO TAKING $1 MILLION OF WHIRLPOOL'S COLLATERAL IN MAUI HOME SUPPLY;** |

| | | |
|---|---|---|
| PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants,<br><br>and<br><br>F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | ) | DECLARATION OF LOUISE K. Y. ING; EXHIBIT 9; CERTIFICATE OF SERVICE<br><br>JUDGE: Hon. Marvin E. Aspen<br><br>TRIAL: November 6, 2006 |

**DEFENDANT CIT GROUP/BUSINESS CREDIT, INC.'S REPLY TO WHIRLPOOL CORPORATION'S OPPOSITION TO CIT'S MOTION IN LIMINE TO PRECLUDE ARGUMENT THAT CIT ADMITTED TO TAKING $1 MILLION OF WHIRLPOOL'S COLLATERAL IN MAUI HOME SUPPLY**

Defendant CIT Group/Business Credit, Inc. hereby responds to Whirlpool Corporation's Opposition to CIT's Motion in Limine to Preclude Argument that CIT Admitted to Taking $1 Million of Whirlpool's Collateral in Maui Home Supply ("Opposition"). If Whirlpool is arguing in its Opposition that it is premature in the liability phase of the trial to elicit evidence of a CIT's auditor's finding that as of March 1999, "MidPac's collateral in Maui" "had a book value of approximately a million dollars" (*Ex. 3 to Motion in Limine, Thomas A. Hayes Rule 30(b)(6) Deposition, at 115:20-116:10)*, then CIT agrees and the parties should so stipulate or the Court should so order. If, however,

Whirlpool plans to elicit the foregoing evidence and unfairly and inaccurately argue that they constitute admissions by CIT that it converted $1 million of Whirlpool's collateral at Maui, then it is the unfair and inaccurate argument and related questioning that CIT's motion seeks to preclude, not admission of the evidence itself.

The pending motions in limine are tools at the Court's disposal to manage not just the admission of relevant and fair evidence at trial, but also fair argument and questioning that do not misrepresent the evidence. In its zeal to blame others for its lack of diligence and vigilance, Whirlpool has regularly favored general, vague and inflammatory argument with little regard for the actual record or each of the elements Whirlpool has the burden to prove. Allowing unfair and inaccurate argument will only serve to prolong trial unnecessarily by forcing CIT to spend additional time presenting evidence and argument showing, for instance, that the auditor's March 1999 findings and CIT representatives' testimony arising from those findings were not admissions of conversion but rather, (A) stated CIT's estimated book value of the inventory in March 1999; (B) focused on book value and that is different from "the fair reasonable value of the property at the time of conversion" *Tsuru v. Bayer, 25 Haw. 693, 699 (1920),* (C) reflected CIT's state of mind, motivation and intent at the time (regardless of

this Court's subsequent findings) which was that it was MidPac, not Maui Home Supply ("MHS"), which owned the inventory that MidPac had shipped to MHS.

Whirlpool's Opposition is a case in point of its inability to interpret evidence and the law fairly and accurately or even to read accurately. Its use of CIT's testimony would be misleading and inaccurate because:

- The point of CIT's recitation of background facts in its memorandum supporting its motion in limine was to show the substantial evidence for its good faith belief, notwithstanding and with due respect to this Court's much later findings, that either (A) MidPac owned the unsold inventory at Maui Home Supply ("MHS") that it had shipped there and that CIT had a security interest in that inventory "wherever located" or alternatively, (B) assuming MHS was deemed to have bought MidPac's inventory at the time of shipment, the sale was to an affiliate which was commonly owned and controlled and therefore, the sale was not to a buyer in the ordinary course which took "free of a security interest created by his seller [MidPac]." *See former HRS § 490:9-307(1), discussed in CIT's Trial Brief, at 22.*

- Whirlpool inaccurately and unfairly argues that CIT "has nothing to evidence MidPac's ownership except hearsay representations made by Mr. Glassman when CIT caught him." *Opposition, at 3.* Yet, the same March 1999 Dybczak audit report that Whirlpool trumpets as proving its $1 million

conversion damage claim, carefully documents the separate inventory tracking of MidPac inventory shipped to MHS, as well as the tracking and payment to MidPac of sales proceeds from that inventory. *See CIT's Memorandum in Opposition to Plaintiff Whirlpool Corporation's Motion in Limine No. 1 Regarding Evidence Related to the Alleged Consignment (filed 6/26/06) ("CIT MIO re Consignment"), at 5-6, and Ex. C, at CA23647, CA23658-59.*

- The point of CIT's discussion about Whirlpool's confusing "bill to A, ship to B" invoices is that through its own billing and shipment practices, as well as Whirlpool having treated MidPac and MHS as one company (*see, e.g., Ex. 1 to CIT's Motion in Limine re Rule 30(b)(6) Testimony (filed 6/13/99), Alex Holton deposition, at 21:11-22:4*), Whirlpool created and assumed the risk that there would be confusion over which entity owned which goods and whose security interest was senior. CIT's expert Thomas E. Hayes found numerous invoices where MidPac was billed and paid for goods that were shipped to MHS, supporting CIT's understanding that MidPac owned goods shipped to MHS. *Ex. 4 to CIT's Motion in Limine re: $1 Million, T.E. Hayes Report, at Ex. 3, at 7-10.* Whirlpool may have "multiple invoices and account statements evidencing its sales to Maui Home" (*Opposition, at 3*), but it also has multiple invoices and account statements evidencing sales to MidPac with deliveries going to various non-MidPac locations. *Id., Ex. 3 to Report, at 7-13.* With due respect

to the Court's finding that the "mere fact of the drop shipments is not sufficient evidence to demonstrate that Whirlpool knew" of a MidPac/MHS consignment relationship, *Opinion, at 25*, these drop shipments were not isolated incidents of which Whirlpool could claim ignorance or an anomaly. Therefore, they should be deemed relevant for the purpose of showing that CIT should not be deemed to have admitted to conversion when ownership of goods at MidPac and MHS was so confused and commingled, thanks in good part to Whirlpool's shipping and billing practices.

- Supporting the reasonableness of CIT's belief at the time and its focus on protecting its interests, not invading Whirlpool's, MidPac's attorney Raymond Iwamoto testified about his understanding of the ownership of MidPac goods at MHS, in answer to Whirlpool's question, "At the time you were negotiating with CIT, had you told CIT, based on what you were getting from them, that hands off of Maui Home, it's Whirlpool and City Bank's collateral, you can't touch it?" Mr. Iwamoto answered:

> All I recall, the only thing I recall about the fact -- as part of the forbearance agreement, the only thing I recall is just being refreshed by looking at these documents that there was some Midpac product or appliances or inventory or whatever at Maui, and this is that agreement or confirm on what basis it was there.
>
> * * *
>
> Now, I don't recall any discussions that this is important because of Whirlpool. I don't recall any of that. It was just clarifying why that was there.

*Ex. 9, Deposition of Raymond Iwamoto (taken), at 176:16-24, 177:2-5.*

- Whirlpool provides no evidentiary or legal support for its argument that "[t]he reasonable value is the value that CIT placed on it [the Midpac inventory at MHS] when it took control of it, not the value that is got after it ran Maui Home into the ground at a bust-out fire sale." *Opposition, at 3.* Its statement is typical of Whirlpool's propensity for unsupported hyperbole. In fact, the MidPac/CIT Forbearance Agreement called for MidPac to "[s]ell or cause to be sold . . . in the ordinary course of business" goods MidPac claimed it owned in Maui. *Ex. 5 to CIT's Motion in Limine re July 29, 1999, Letter, Forbearance Agreement, at 1-2, ¶ 3(b).* Moreover, a Whirlpool Rule 30(b)(6) designee testified that Whirlpool personnel visited MidPac and MHS one to two times weekly. Yet, they did not report on business out of the ordinary at either location until early November 1999. *See CIT's Memorandum in Opposition to Plaintiff Whirlpool Corporation's Motion in Limine No. 5 Regarding Evidence of Reasonable Reliance (filed 6/26/06)* (*"CIT MIO re Reliance"*), *at 6-7.* Specifically, Whirlpool's Hawai`i-based personnel, Harris Fujita and Wayne Miyake, made weekly visits or twice weekly to MidPac and MHS throughout June to December 1999, according to one of Whirlpool's sales managers. *Id., Ex. D, Rule 30(b)(6) Deposition of Alex Holton (11/15/02), at 39:20-40:10.* Mr. Fujita's only documented observation of anything out of the ordinary was a November 3, 1999,

memorandum in which he reported on MidPac's plans for a liquidation sale and his concerns that proceeds from MidPac's sale of appliances "would go to pay down the CITI [CIT] debt and not Whirlpool's." *Id., Ex. E, Trial Ex. W766.* This memorandum, showing Mr. Fujita's ability to observe and report on matters outside the ordinary course of business, undercuts Whirlpool's theory that CIT was controlling sales at MidPac and MHS without Whirlpool being in a position to discover such unusual and alarming circumstances.

- Whirlpool ignores conversion damage formulations under Hawai`i law with respect to the meaning of "the fair reasonable value of the property" and "at the time of conversion." *Tsuru, 25 Haw., at 699* (although the property was taken at an earlier point in time, the court found that the conversion occurred at the time of sale, where the sale was unauthorized). Likewise, it is CIT's position that assuming it is found liable for conversion, the time of conversion was the point at which converted goods were sold and proceeds remitted to CIT via MidPac and that sales made in the ordinary course of business are the best indicator of the "fair reasonable value of the property." Although this issue may be premature until the liability phase of the trial has been completed and decided, Whirlpool hopes to confuse issues by blurring the timing of book value valuations and actual sales. The valuations reflected in Mr. Dybczak's audit report were reported in March 1999, based on shipments that must have occurred even

earlier than that. Actual sales of MidPac inventory at MHS reported by MHS to Mr. Phelps did not occur until late July 1999 through mid-December 1999.[1] Whirlpool has made no showing of the value or identity as of late July 1999 of the property at MHS claimed by both Whirlpool and CIT to be their collateral.

In short, Whirlpool has no basis for drawing incorrect conclusions and making misleading arguments that CIT admitted to conversion, based on taking out of context a CIT auditor's findings in March 1999 and a CIT representative's testimony of his understanding based on those findings.

---

[1] Whirlpool misread the MHS-reported sales dates for MidPac goods at MHS, discussed in page 4 of CIT's memorandum in support of motion in limine. In its Memorandum in Support of Motion, CIT had compared sales figures as of December 13, 1999 and December 11, 1999, from two different sources and pointed out that they were close and therefore, indicative of the value of goods sold by MHS in which MidPac claimed an interest. However, Whirlpool misread "December 13, 1999", as "September 13, 1999", resulting in its cryptic and irrelevant musing in its Opposition about "what the other Maui Home Supply sales reports say for the period from September 14, 1999 through December 10, 1999." *Opposition, at 4.*

For the foregoing reasons, Whirlpool should be precluded from arguing to the jury in the liability phase of the trial to the effect that CIT admitted converting or taking $1 million of Whirlpool's collateral located at Maui Home Supply.

DATED: Honolulu, Hawai'i, July 3, 2006.

/s/ Louise K. Y. Ing
PAUL ALSTON
LOUISE K. Y. ING
THOMAS E. BUSH
ALLISON KIRK
Attorneys for Defendant/Cross-claimant THE CIT GROUP/BUSINESS CREDIT, INC.