# FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT ("Agreement"), dated as of August 3, 1999, is entered into between THE CIT GROUP/CREDIT FINANCE, INC. ("CIT") and MIDPAC LUMBER CO., LTD. ("Borrower") in reference to the following agreed upon facts:

A. Borrower and CIT are parties to that certain Loan and Security Agreement dated as of March 19, 1998, as amended pursuant to which CIT has extended financial accommodations to Borrower ("Loan Agreement"). Various Events of Default under the Loan Agreement have occurred and are continuing.

B. Borrower has requested CIT to forbear from exercising certain of its default rights and remedies as provided under Loan Agreement or by law. CIT is willing to temporarily forbear from exercising certain default rights and remedies but only on the terms and conditions and for the time period set forth below.

NOW THEREFORE, the parties hereto agree as follows:

1. Definitions. Capitalized terms herein, unless otherwise defined herein, shall have the meaning set forth in the Loan Agreement.

2. Forbearance. On the terms and subject to the conditions hereof, CIT shall forbear from exercising its default rights and remedies until the earliest of (a) the occurrence of a new Event of Default, (b) CIT becoming aware of the existence or continuation of an Event of Default of which CIT did not have actual knowledge as of the date hereof, (c) the failure of Borrower to achieve by a margin of ten percent (i) for any month, the monthly budget attached hereto as Exhibit 1 and by this reference incorporated herein as though set forth in full or (ii) for any week, the weekly budget, which weekly budget shall be delivered to CIT not later than the fifth business day of each calendar month and must otherwise be acceptable to CIT in the exercise of its reasonable business judgment, and (d) September 30, 1999. Upon the occurrence of any event or condition above which terminates the forbearance of CIT, CIT shall be entitled to thereupon exercise all of its default rights and remedies without further notice.

3. Affiliate Sales. Borrower's loans from CIT are currently in excess of the advance rates set forth in the Loan Agreement, possibly as a result of certain sales and/or consignments of inventory to customers which are affiliates of Borrower. In order to aid in the repayment of such loans, Borrower has agreed to do the following:

(a) Sell as rapidly as practical the cabinet inventory described on Exhibit 2 and by this reference incorporated herein as though set forth in full which inventory is located at Borrower's office at 1001 Ahua Street, Honolulu, Hawaii 96819.

(b) Sell or cause to be sold in the ordinary course of business the inventory located in Maui, Hawaii at 400 S. Hana Highway, Kahului, Maui, Hawaii 96732,

100

DOCSLA1:311575.4
6894-103 GDS

C00008

EXHIBIT 5

which Borrower has represented to CIT is inventory owned by Borrower and is in a facility of Borrower leased from CG Development, Inc. (the "Maui Facility").

(c) Cause the return from F & J Movers of Borrower's inventory and sell that inventory in the ordinary course of business.

(d) Collect as rapidly as possible the accounts receivable due from McLeod Enterprises, Inc. dba J&J Hardware ("J&J Hardware") to Borrower.

(e) All proceeds generated from the sale or collection of inventory and accounts in subsections (a) through (d) above shall be remitted in kind to CIT and one hundred percent of those collections will be applied by CIT to the Obligations.

(f) Borrower agrees not to purchase any replacement inventory for the inventory sold in subparagraphs (a) through (d) and not to further sell, consign or otherwise transfer any inventory to CG Investments, Inc. dba Maui Home Supply ("Maui Home Supply"), J&J Hardware, F & J Movers, Spectrum, Inc. or any other affiliate of Borrower or of Kurt S. Glassman (collectively "Affiliates"). All newly purchased inventory of Borrower shall only be located at Borrower's office at 1001 Ahua Street, Honolulu, Hawaii 96819.

4. Compliance With Loan Agreement. Borrower shall continue to comply with all the terms and conditions of the Loan Agreement. Without limiting the foregoing, Borrower shall not merge, consolidate or acquire any entities without the prior written consent of CIT. Further, all financial reporting, collateral reporting and other reporting must not be consolidated or combined with the operations of Maui Home Supply or any other Affiliate.

5. Consultant. Borrower has informed CIT that it has hired Mr. Ted Phelps as a consultant to Borrower. If for any reason Borrower determines that Mr. Phelps is not satisfactorily performing his duties, Borrower will only replace Mr. Phelps with another consultant of at least equal qualifications, who is otherwise not unsatisfactory to CIT in CIT's reasonable business judgment.

6. Representation Regarding Supplier Agreements. Borrower represents to CIT that Borrower will purchase inventory from its suppliers on a COD basis only and that Borrower will not be required to pay any antecedent debt owed to its suppliers for any new purchases of inventory.

7. Lock Box and Notification. Borrower shall cooperate with CIT in the creation of a lock box for the receipt and control of all proceeds of Collateral and for direct collection by CIT of all payments by credit cards. In connection with the foregoing, Borrower shall place appropriate stickers on all its invoices directing remittance to the lock box. Without limiting the foregoing, CIT reserves the right to directly notify all account debtors directing payments to the lock box or otherwise. Borrower shall also cause the accounts created from the sale of inventory located at the Maui Facility to be directly remitted to the lock box.

8. In Transit Inventory. To the extent requested by CIT, CIT shall be named as consignee on all bills of lading relating to in transit inventory and shall otherwise have

possession of all original documents and instruments relating to the purchase and transfer of in transit inventory.

9. Inventory Control. Borrower shall retain at its expense Collateral Risk Management ("CRM") to take possession and to otherwise control the inventory for CIT. CRM shall likewise take possession and control of the inventory located at the Maui Facility leased by Borrower.

10. Reporting. Without limiting the reporting under the terms of the Loan Agreement, Borrower shall provide to CIT the following: daily, borrowing base certificates, sales journals with copies of all invoices and corresponding proofs of shipment/delivery, cash receipts journal with copies of all checks deposited and summary inventory perpetual reports by category and location; weekly, detailed accounts receivable agings together with corresponding summary agings and weekly detailed and summary inventory perpetual reports by category and SKU and by location; and monthly, detailed accounts receivable agings along with corresponding summary agings.

11. Cap on the Maximum Credit. In no event shall CIT have any obligation to permit the Maximum Credit to exceed $5,900,000.

12. Representation Regarding Preparation of Financial Information. Borrower represents to CIT that Borrower's consultant, Mr. Ted Phelps, is responsible for and has complete control over the preparation of Borrower's books and records and the financial reports described in paragraph 10 above. In the event that Mr. Ted Phelps does not continue in this capacity, Borrower shall retain forthwith a new consultant or chief financial officer which person shall have complete control over the maintenance of the books and records and financial reporting of Borrower. Such replacement consultant or chief financial officer must be acceptable to Mr. Ted Phelps.

13. Representation Regarding Consignment and Transfer of Inventory. Borrower represents to CIT that, except as disclosed herein, (a) Borrower has not consigned or transferred any inventory to any person and since June 30, 1999 and (b) all inventory reflected on Borrower's books and records as being owned by Borrower is located at 1001 .'.hua Street, Honolulu, Hawaii 96819, except as otherwise provided in paragraph 3(b).

14. Representation Regarding Value of Inventory. Borrower represents to CIT that the aggregate value of all of Borrower's inventory (based on the lower of cost or market value) was at least (a) $6,000,000 as of June 30, 1999 and (b) $5,300,000 as of July 27, 1999.

15. Reduction of Loan Balance. Excluding the collections described in paragraph 3 above, Borrower agrees to reduce the Obligations each day by an amount equal to 10% of the daily collections. In addition, any Obligations in excess of the limitations set forth in the Loan Agreement (currently approximately $1,540,000) shall be reduced (in addition to the reductions from collections described in paragraph 3 above) by an amount equal to (i) $52,000 on each of August 11, 1999, August 18, 1999, August 25, 1999 and September 1, 1999 and (ii) $88,000 on each of September 8, 1999, September 15, 1999, September 22, 1999 and

September 29, 1999; provided, that CIT may waive all or any portion of the foregoing reductions in its sole discretion.

16. Further Documents. Within ten days from the date hereof, Borrower shall cause the following documents and instruments to be delivered to CIT:

(a) Security agreements, financing statements and other related collateral agreements and/or instruments granting to CIT a security interest and/or perfecting a consignment arrangement with each of the following customers: Maui Home Supply, J&J Hardware and F & J Movers.

(b) Continuing guaranties of the Obligations of Borrower to CIT secured by a duly perfected security interest and mortgage in all of the assets respectively of CG Acquisitions, Inc., CG Development, Inc., Maui Home Supply and CGBN, Inc.

17. Guaranty. Concurrently with the execution hereof, Borrower shall cause to be delivered to CIT:

(a) A continuing personal guaranty of Kurt S. Glassman of the Obligations of Borrower to CIT secured by a pledge of all of the stock of CG Acquisitions, Inc., CGBN, Inc., CG Development, Inc. and CG Investments, Inc. owned by Kurt S. Glassman and a deed of trust on the real property generally known as 1656 Paseo Del Mar, Palos Verdes Estates, California 90274, which property shall have a fair market value, less encumbrances, of not less than $700,000.00; and

(b) A continuing corporate guaranty of CG Development, Inc. of the obligations of Borrower to CIT secured by a second leasehold mortgage on the real property at generally known as 400 S. Hana Highway, Kahului, Maui, Hawaii 96732.

18. Assignment of Rights by Shareholder. The undersigned shareholder, CGBN, Inc., represents and warrants that it owns, beneficially and of record, 100% in the aggregate of the issued and outstanding capital stock of Borrower. Each of the undersigned parties hereby assigns to CIT any right it may have hereafter to contribute "new value" to a plan of reorganization of Borrower. As the holder of such right, CIT shall have the exclusive authority to contribute or not contribute new value to a plan of reorganization of Borrower. CGBN, Inc., the sole shareholder of Borrower, hereby acknowledges that CIT is entering into this Agreement in consideration for the foregoing assignment which constitutes reasonably equivalent value for such assignment.

19. Release. For valuable consideration, the receipt of which is hereby acknowledged and in consideration of CIT's agreements hereunder, Borrower and each of the undersigned shareholders do hereby release CIT, its officers, directors, employees, attorneys and agents from any and all claims, demands, liabilities and causes of action of any nature whatsoever, known or unknown, which any of them may now or hereafter have against CIT, its officers, directors, employees, attorneys or agents. Borrower and each of the undersigned shareholders hereby specifically and expressly waive each and all of the provisions of California Civil Code Section 1542, which reads as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known bv him must have materially affected his settlement with the Debtor."

20. Default. An Event of Default shall occur if (a) any term of this Agreement is breached or (b) any representation or warranty made by Borrower hereunder shall prove inaccurate or misleading.

21. Miscellaneous.

(a) Except as modified by the terms herein, the Loan Agreement remains in full force and effect in accordance with its terms.

(b) This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

(c) This Agreement shall be governed by the laws of the State of California.

(d) Borrower shall pay, on demand, all fees and costs incurred by CIT in connection with the negotiation, documentation and execution of this Agreement including the fees and expenses of attorneys and title companies. If any legal action shall be commenced at any time by any party to this Agreement in connection with its interpretation or enforcement, the prevailing party or parties of such action shall be entitled to reimbursement of its reasonable attorneys fees and costs.

(e) Each of the parties hereto waive its rights to a trial by jury in any action to enforce, defend, interpret or otherwise concerning this Agreement.

(f) The parties acknowledge that each party has reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

THE CIT GROUP/CREDIT FINANCE, INC.

By:________________________
Its:

MIDPAC LUMBER CO., LTD.

By:________________________
Its: PRESIDENT

Consented and Agreed to:

CGBN, INC. (as the sole shareholder of Borrower)

By:________________________
Its: PRESIDENT



DOCSLA1:311575.3
6894-103 GDS

C00013