UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WHIRLPOOL CORPORATION, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CIT GROUP/BUSINESS CREDIT, INC., a New York corporation; CGBN, INC., a Hawaii corporation; MICHAEL CLIFFORD; EDWIN BOWLING; FRANCES HALLER-BOWLING; RAYMOND IWAMOTO; KURT GLASSMAN; DOE INDIVIDUALS 1-50; DOE PARTNERSHIPS, CORPORATIONS OR OTHER ENTITIES 1-20,<br><br>Defendants,<br><br>and<br><br>CG DEVELOPMENT, INC., F&J MOVERS, and RENEE K. COSTA,<br><br>Additional Crossclaim Defendants. | CIVIL NO. 01-00187DAE BMK (Tort and RICO)<br><br>COPY<br><br>30(b)(6) Deposition<br><br>(SEALED DEPOSITION)<br><br>Volume II (Pages 62 - 279) |

30(b)(6) DEPOSITION OF CARL SMITH

taken on behalf of the Defendant Raymond Iwamoto at the offices of Ayabe, Chong, Nishimoto, Sia & Nakamura, 1001 Bishop Street, Suite 2500, Honolulu, Hawaii 96813, commencing at 9:10 a.m. on Friday, February 14, 2003, pursuant to the Hawaii Rules of Civil Procedure.

BEFORE: LYNN NISHIMURA, CSR. NO. 273
Notary Public, State of Hawaii

EXHIBIT 4

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | TIMOTHY J. HOGAN, ESQ.<br>WESLEY W. ICHIDA, ESQ.<br>Lynch Ichida Thompson Kim & Hirota<br>1132 Bishop Street<br>Suite 1405<br>Honolulu, Hawaii 96813 |
| For the Defendant Raymond Iwamoto: | CALVIN E. YOUNG, ESQ.<br>Ayabe, Chong, Nishimoto, Sia & Nakamura<br>2500 Pauahi Tower<br>1001 Bishop Street<br>Honolulu, Hawaii 96813 |
| For the Defendant CIT Group/Business Credit, Inc.: | LOUISE K. Y. ING, ESQ.<br>Alston Hunt Floyd & Ing<br>1800 Pacific Tower<br>1001 Bishop Street<br>Honolulu, Hawaii 96813 |
| For the Defendant Michael Clifford, CGBN, Inc. and Third-Party Defendant CG Development, Inc.: | ROGER S. MOSELEY, ESQ.<br>Case Bigelow & Lombardi<br>2600 Mauka Tower<br>737 Bishop Street<br>Honolulu, Hawaii 96813 |
| Also Present: | Debra Clawson, Esq. |

D O N N A B A B A & A S S O C I A T E S

220 South King Street, Suite 919
Honolulu, Hawaii 96813

(808) 537-9975

A. Okay. Because earlier you had asked me would I be able to tell you if the answers were the same. And without going back and referring to that right now, I can't answer that.

Q. No, I understand that. What I intend to do -- and I'll tell you right up front -- is that I'm going to be asking you some questions. And to the extent that I can go to the individual transcript and say that you told me this at that time, is that true in your designated capacity, that's what I intend to do so that I don't have to restate it. And it's not my intent here to try to have you contradict yourself when you already have a transcript. My intention here is to confirm what Whirlpool's position is. That is all my intention is, all right?

A. Okay.

Q. Go ahead.

A. Okay. As I recall, you just asked me to tell you who was involved in the credit decision-making process from...

Q. 1995.

A. 1995 forward.

Q. Well, it's to the present, but it's really -- we know what period it is. You know, it's not in 2003. So with respect to MidPac and Maui Home Supply, who from

Whirlpool was involved in the credit decision-making process?

A. During that time period me, of course; Janet Rowan; Todd Pierce, Paul Butler, Sue Thompson, Dan James, Susan Hutcheson. I think I mentioned Janet Rowan already.

Q. Yes, you did.

A. Melissa Beyer.

Q. Beyer?

A. Yes.

Q. Okay.

A. Jim Morthy, Paul Butler, Michelle Smith, and Ernie Matlock. One additional person, Becky Nicholson.

MR. MOSELEY: Could you indulge me and read those through quickly one more time.

MR. HOGAN: Could we ask the reporter to read it back.

MR. MOSELEY: Okay, that'll be great. I'm sorry.

(The pending answer was read by the reporter.)

BY MR. YOUNG:

Q. Can you please identify for me which of these individuals conducted any underwriting analysis for Whirlpool.

MR. HOGAN: Vague as to time and vague as to

Q. And then with respect to Donna Martin, in order to get ready for today's session what did you discuss with Donna?
A. I don't recall at the moment.
Q. And how about with Ernie Matlock?
A. I talked about a number of things with Ernie. I talked about conversations with Ted Phelps and Kurt Glassman, I talked about approval of credit line. There may have been others, but those are the ones I recall at the moment.
MS. ING: Okay, we're at 12:30. Why don't we take a break 'til 1:30?
MR. HOGAN: 1:30? That'll be fine.
(Lunch recess taken at 12:30 p.m. until 1:37 p.m.)
MS. ING: Back on the record.
Q. Mr. Smith, I wanted to finish up with what you did to prepare for the 30(b)(6), then move on to other topics. But in order to prepare for -- and this is for the December session as well as your session today. But in order to prepare as 30(b)(6) designee to talk about all the topics, did you obtain any facts or information from Mr. Hogan with respect to the topics that are in our 30(b)(6) notice? And I'm not talking about --
A. When you say did I obtain, could you explain what

sales, delivery and shipment of product between January 1998 through January 2000, including determination for each shipment of the entity to bill and ship to." Are you prepared to testify on that topic?

MR. HOGAN: I'm going to object. He wasn't designated for that topic.

MS. ING: Oh, he wasn't?

MR. HOGAN: No.

THE WITNESS: No.

MS. ING: Oh, I'm sorry.

MR. HOGAN: Just for the record, it's Joe Higgins and Alex Holton.

MS. ING: Okay. All right, never mind then.

Q. Then the answer would be you're not prepared to testify, are you?

A. No.

Q. Just testing you. Okay.

The next one, then, I think is No. 15, "Whirlpool's dealings with Ted Phelps".

A. Yes. And yes, I am prepared to...

Q. All right. Now, we had gone over some of your and Ernie Matlock's contacts with Mr. Phelps in your individual deposition.

A. Correct.

Q. And I believe at that time your testimony was

that you had had a number of contacts with Mr. Phelps and they were all telephone contacts, would that be fair to say?

A. Yes, that's correct.

Q. You didn't have any in-person meetings with Mr. Phelps?

A. No, I did not.

Q. All right. And most of those contacts were with Mr. Matlock present on the phone as well?

A. Yes.

Q. Okay.

A. Now, this is 30(b)(6)?

Q. Yes, this is 30(b)(6).

A. Okay.

Q. Other than yourself and Mr. Matlock, I believe the testimony has been that persons who had contact from Whirlpool with Mr. Phelps were Donna Martin and Janet Rowan; is that correct?

A. I believe so.

MR. HOGAN: I'm going to object as to the term "from Whirlpool". You need to be specific about what you mean by that. You mean employees?

MS. ING: Employees of Whirlpool.

Q. Other than the four, yourself and the other three, were there any other Whirlpool employees you are

referring to that Mr. Phelps read to Ernie Matlock over the phone on July 23rd?
A. Okay, give me a moment to read it.
Q. Sure.
A. Yes, it is.
Q. When did you see the letter? You meaning Carl Smith.
A. I believe it was July 23rd.
Q. Okay.
A. I believe when we finally got a faxed copy of it, it was brought to me.
Q. All right. And in fact, the header at the top of the page indicates that -- it looks like a fax transmission date of July 23rd, 1999, Friday?
A. Right.
Q. From Ted Phelps to Janet Rowan.
A. This is what I recall, that it was a Friday, yes.
Q. Okay. And as I understand it, Whirlpool took various actions with respect to the MidPac and Maui Home accounts as a result of receiving this letter; isn't that correct?
A. That's correct.
Q. And one of those actions was to stop shipments?
A. That's correct.
Q. Another was that Janet Rowan was taken off of the

account and you and Ernie Matlock were put in charge of developing a plan to get repaid.

A. Yes.

Q. Okay. And then another action was that it was determined that sales would be made only to Maui Home Supply, not MidPac on a cash basis; would that be fair?

A. That was a decision. I don't know that that was a decision that was made on July 23rd, but that was a decision.

Q. What other actions were taken on July 23rd as a result of receiving Mr. Phelps' letter? I think there were reclamation notices sent out.

A. I believe so, yes.

We notified Jean Penwell of the situation. In addition to stopping all shipments, we made sure no additional orders -- new orders would not be approved or released from credit. Any orders that had been previously released from credit, the shipment would be stopped on those if they had not been shipped. And if there were any that were in process of being shipped and delivered, that the product would be returned at that time.

Q. Do you know if Whirlpool got product returned to it?

A. I don't recall. And I don't recall if we had

A. I don't recall.

Q. Other than that one conversation about getting a credit order released, did you have any other conversations with Mr. Phelps about ordering product?

A. I don't believe --

MR. HOGAN: I'm going to object. Are you talking about him individually or Whirlpool?

MS. ING: Well, I'm going to ask it two ways.

MR. HOGAN: Okay.

THE WITNESS: I don't believe I did.

BY MS. ING:

Q. Okay. Do you know if Whirlpool had any discussions with Mr. Phelps about ordering product?

A. I don't recall. Donna Martin may have, but I'm sorry, I don't recall.

Q. Do you have any information indicating that before July 23rd, 1999, Mr. Phelps was involved in ordering product from Whirlpool on behalf of MidPac or Maui Home?

MR. HOGAN: The date again, please?

MS. ING: Before July 23rd, 1999.

MR. HOGAN: Vague as to "involved".

You can answer if you can.

THE WITNESS: At that point in time I don't believe Ted Phelps was actually involved in any of the

order releases.

BY MS. ING:

Q. Now, during the period from July 23rd to... Well, let me put it this way. I think you testified in your individual deposition in December that sometime around the end of October, like October 28th, Mr. Matlock had a conversation with Mr. Phelps in which he said -- he, Mr. Phelps, said he was CIT's eyes and ears.

A. Yes.

Q. Okay. And I believe it's been your and Ernie Matlock's testimony that before that period of time Mr. Phelps had given no indication that he was acting on behalf of CIT; is that correct?

A. If there were any indications, we certainly didn't pick it up. Prior to that our complete understanding was as it was represented in this letter, that he was employed by MidPac Lumber. However, on that date in October is when we became aware that he actually had some sort of an affiliation with CIT.

Q. And your awareness of some sort of affiliation was based on this alleged comment by Mr. Phelps that he was CIT's eyes and ears.

A. That's correct.

Q. Was there anything else in which you based your

and ears comment from Mr. Phelps; is that correct?

A. Yes.

Q. Okay. Now, as a matter of fact, though, Whirlpool did not actually seek the appointment of a receiver; is that correct?

A. I don't know.

MR. HOGAN: It calls for a legal conclusion.

THE WITNESS: I don't know the answer to that question.

BY MS. ING:

Q. Okay. Do you know if Whirlpool made any effort to get MidPac's business run by somebody other than the MidPac management?

A. We applied to the Court for a receiver within the lawsuit.

Q. Okay. You asked for it in the lawsuit.

A. Right.

Q. Okay. But you don't know whether any further action was taken by Whirlpool to specifically ask the Court for appointment of a receiver; is that fair to say?

A. No, I don't know.

Q. Okay. You and Ernie Matlock you'd said were the team that at least on the business end was charged with developing a plan for repayment.

A. Right.
Q. Were you involved in the process of deciding to file a lawsuit and then deciding where to take it once it was filed?
A. I believe we were involved in the process of making the decision to file a lawsuit, yes.
Q. Okay. And who else was involved in the process to decide whether to file the lawsuit?
A. Jean Penwell.
Q. Anybody else?
A. Deb Clawson.
Q. Anybody else?
A. Tim Hogan.
Q. Anybody else?
A. Not that I recall.
Q. And what input did you have with respect to the decision to file a lawsuit? Well, actually, let me ask it this way. What input did the business folks at Whirlpool, meaning Penwell, Matlock, and yourself, have into the decision to file a lawsuit?
MR. HOGAN: I'm going to object to the extent that it's asking for the disclosure of attorney-client communications. To the extent that he can answer it without that, he can answer the question.
THE WITNESS: I don't believe I can.

STATE OF HAWAII )
) SS.
CITY AND COUNTY OF HONOLULU )

I, LYNN NISHIMURA, CSR NO. 273, Notary Public in and for the State of Hawaii, do hereby certify:

That on Friday, February 14, 2003, at 9:10 a.m. appeared before me CARL SMITH, the witness whose 30(b)(6) deposition is contained herein; that prior to being examined, the deponent was by me duly sworn; that the deposition was taken in machine shorthand by me and was thereafter reduced to typewriting under my supervision; that the foregoing represents, to the best of my ability, a correct transcript of the deposition had at that time;

That the deponent was notified through counsel, by mail or by telephone to appear and sign; that if the deposition is filed without signature, either the reading and signing of the deposition were waived by stipulation of all parties or the deponent has failed to appear, and the deposition is therefore kept on file without signature pursuant to Court rules.

I further certify that I am not counsel for any of the parties hereto nor in any way interested in the outcome of the cause named in the caption.

Date: 2/23/03

LYNN NISHIMURA, CSR NO. 273
Notary Public, State of Hawaii
My Commission Expires: 2-4-07

LYNN NISHIMURA NOTARY PUBLIC STATE OF HAWAII