IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re | ) |
| | ) |
| | ) |
| | ) |
| MIDPAC LUMBER COMPANY, INC., | ) Case No. 00-00136 |
| | ) (Chapter 7) |
| | ) |
| | ) |
| | ) |
| | ) |

EXAMINATION OF THEODORE G. PHELPS

TAKEN ON

THURSDAY, DECEMBER 7, 2000

Reported by: MARLA GORLICK

CSR No. 3767

EXHIBIT 6

Examination of THEODORE G. PHELPS, taken on behalf of Whirlpool Corporation, at 725 South Figueroa Street, Suite 3400, Los Angeles, California 90017-5418 on Thursday, December 7, 2000, at 10:05 a.m., before MARLA GORLICK, CSR No. 3767.

APPEARANCES:

FOR CREDITOR WHIRLPOOL CORPORATION:
LYNCH, ICHIDA, THOMPSON & KIM
BY: TIMOTHY J. HOGAN, ESQ.
1132 Bishop Street
Suite 1405
Honolulu, Hawaii 96813
(Present via telephone)
-and-
ARTER & HADDEN
BY: YALE K. KIM, ESQ.
725 South Figueroa Street
Suite 3400
Los Angeles, California 90017-5418

INDEX

| WITNESS | EXAMINATION |
|---|---|
| THEODORE PHELPS | (By Mr. Hogan) |

| EXHIBITS | PAGE |
|---|---|
| A - Document dated 7-8-99 to Janet Rowan from Theodore Phelps | 61 |
| B - Document dated 7-8-99 to Janet Rowan from Kurt Glassman | 61 |
| C - Facsimile Cover Page dated 7-14-99 | 61 |
| D - Facsimile Cover Page dated 7-23-99 | 61 |
| E - Document dated 11-3-99 to Sharon Spector from Thomas A. Johnson | 90 |

ATTACHMENTS
Midpac Lumber Company, Inc., Debtor Document Binder Volume 1
Midpac Lumber Company, Inc., Debtor Document Binder Volne 2



APPEARANCES (Continued):

FOR WHIRLPOOL CORPORATION LEGAL DEPARTMENT:
DEBRA A. CLAWSON, ATTORNEY AT LAW
2000 North M63
Benton Harbor, Michigan 49022
(Present via telephone)

FOR CIT GROUP/CREDIT FINANCE, INC.:
ORRICK, HERRINGTON & SUTCLIFFE LLP
BY: NEAL L. WOLF, ESQ.
TODD L. PADNOS, ESQ.
777 South Figueroa Street
Suite 3200
Los Angeles, California 90017-5855



LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 7,
10:05 A.M.

THEODORE PHELPS,
having been first duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. HOGAN:

Q. Good morning, Mr. Phelps. My name is Timothy Hogan. I represent Whirlpool Corporation. I think perhaps the other parties that are present can just note an appearance on the record if it hasn't already been stated by the court reporter.

MR. PADNOS: Good morning. My name is Todd Padnos, and I represent the CIT Group/Credit Finance, Inc., and I would ask Mr. Phelps if you would please pause momentarily after Mr. Hogan questions you to give me an opportunity to make any objections to the extent that we --

MR. HOGAN: I'm sorry to interrupt. I couldn't hear what you said. It sounds as if you are either facing towards the phone and turning away, perhaps. I'm wondering if you can get a little closer.

A. Yes.
Q. Are they documents unaltered or changed from the time that they were created?
A. To the best of my knowledge, yes.
Q. Was the information recorded in these documents recorded at or near the time you received it from a person with knowledge of the facts that are contained within these documents?
MR. WOLF: This is Neal Wolf speaking. Mr. Hogan. If you're trying to establish some kind of foundation with respect to documents, I'm going to insist that you do it on a document-by-document basis because to say with respect to two thick volumes of documents to ask him these kinds of questions, I think is highly inappropriate.
MR. HOGAN: I note your objection, sir, but I'd like to at least get a foundation for what he has delivered to the court reporter.
MR. WOLF: But there are many documents here.
MR. HOGAN: I understand that, sir, but in a records deposition, I am not familiar with the practice of going document by document.
MR. WOLF: Well --
MR. HOGAN: You made your objection. I'd like to proceed.



MR. WOLF: I'm going to object on a continual basis then on a document-by-document basis to any attempt that you may seek or may be engaged in here to establish a foundation with respect to a large number of documents without asking or permitting the witness on a one-by-one basis to examine the documents in question.
MR. HOGAN: All right.
Q. Mr. Phelps, I will ask you the question again. Was this information recorded at or near the time you received it from a person with knowledge of the facts that are contained within these records or these documents?
A. With respect to the documents that I created myself, I don't know that your answer is pertinent. With respect to the documents that I received from other people, they are exactly as they were at the time that I received them.
Q. That's for every document that you have produced.
A. Yes.
Q. Is it your custom and practice to keep records of this type in the regular course of your business?
A. Of the type here, yes.
MR. HOGAN: I note your objection, and the ones we address we'll obviously go into further detail as to



how the document came into his possession, Mr. Wolf.
Q. Are there any correspondences in regard to our request that you haven't turned over?
A. No.
Q. Have you received any correspondence from CIT specifically that is not contained in this document turnover?
A. I have not received anything other than what I have given you.
Q. Now, when you -- at some point you had heard of a company called Midpac Lumber; correct, sir?
A. Yes, that's correct.
Q. Would you please tell me when you first heard of Midpac, to the best of your recollection, and how you became to know about it.
A. I was called in the middle of June by Robert Brichacek, Tom Hayes, H-a-y-e-s, and Inbum Hyeon to tell me about a situation that they had become aware of with a company in Hawaii that they suspected that there could be problems and that there can be problems relating to fraud.
Q. Now, did they all contact you on like a conference call of some sort?
A. Yes, they were all on the phone at the same time.



Q. Do you recall when that call occurred, to the best of your recollection?
A. Sometime around June 15th, but I'm not certain of the date.
Q. Okay. Do you recall about how long you spoke to them on the phone?
A. The particular conversation didn't last too long. They were merely trying to ascertain whether or not I would be available.
Q. Okay. Had you any prior dealings with any of the individuals that had contacted you in that telephone conference?
A. Yes.
Q. Who specifically?
A. I had met Tom Hayes briefly at a previous or an earlier loan closing, and I had met Robert Brichacek in connection with that prior loan closing.
Q. Are you able to disclose at least the parties that were involved in the loan closing if there was an escrow, the title of the escrow?
A. The company was the Individual Group. It's a company in California and I had through a loan broker approached CIT to obtain financing for that company.
Q. Had financing been obtained through CIT?
A. Yes.

Page 14

Q. Now, when you met with, I believe it was Mr. Hayes was the first one that you mentioned?
A. Yes. I met him only in passing at that loan closing. I was introduced to him as I was leaving the building that day.
Q. Okay. Did you have any opportunity at that loan closing to discuss the services that you perform and what you do as a professional with any of the individuals that you believed at the time were associated with CIT?
A. Not at that closing, but on, you know, prior occasions, yes, I had.
Q. What prior occasions would those be, sir?
A. During the time that they were going through their underwriting process of putting the loan together for the individual group.
Q. Who had you met prior to that that was associated with CIT?
A. I had met Grace Kim who was at that time their in-house -- excuse me. That's not her name. I cannot remember her last name at this point. Grace -- but she was an in-house attorney at the time. I had met Arthur -- his last name starts with a G, and I'm sorry, I don't remember his name at the time, but he was the head of their audit group. I had not met Tom Hayes. I had met Brad Hall who was at that time the president of that

Page 15

group of CIT and was my primary contact in obtaining the financing.
Q. Would the individual, the attorney named Grace be Grace Bowen?
A. Yes.
Q. In your discussions with Grace Bowen, did you at any time ever discuss what you did professionally?
A. I don't think so with Grace Bowen. I think it was primarily with their audit, their internal audit people and with Brad Hall.
Q. Could you just sort of describe what the subject of the discussions with the audit people and Brad Hall, what sort of things you told them about what you did?
A. Well, if you allow me to explain a few details about the prior case, I think you'll understand how it all came about.
Q. Okay.
A. The prior case also had an element of misappropriation of funds in it at the time that I was brought into that case by another consultant. This company was financed with City National Bank. When we told City National Bank about the problem of the missing money, they demanded to be paid off as soon as possible. The problem had been cured at that point as far as the person who was taking the money was gone. But

Page 16

during the underwriting process, CIT asked me to go back into the company and do some limited audit work to make a determination and to be able to tell them that the misappropriation was no longer going on, and that the books had been pretty much cleaned up and were fairly stating the financial condition of the company. And I have to add here this was not a financial examination in the scope of an audit as it's commonly understood. It was what you would call limited procedures or agreed upon procedures.
Q. Now, had you been retained by CIT to perform that function?
A. No. I did this as part of my work with the company.
Q. Did you report to the company's management in that case?
A. Yes.
Q. Who was that that you reported to?
A. His name was Steven Supowitz, S-u-p-o-w-i-t-z.
Q. What was the name of the company?
A. Individual Group.
Q. Was there any allegation made that Mr. Supowitz, if I have his name correctly, was involved in misappropriation of funds?
A. No, it was another person in the company.

Page 17

Q. So Mr. Supowitz had contacted you to engage your services in that regard?
A. Another person who consulted with the company at times or was a creditor to the company called me and made the introduction.
Q. And the creditor in that case was CIT?
A. No, it was not.
Q. Who was the creditor?
A. His name was Arnie Magadou, M-a-g-a-d-o-u, I think. And he's in the meat business.
Q. Okay. At some point you came in contact with individuals who you believed were employed by CIT?
A. Yes.
Q. When was the first time that you ever met anyone who was employed by CIT?
A. Possibly about September of 1998, and it was Brad Hall when he came out to the company to meet with me and discussed the financing needs of that company.
Q. Was it fair to say that CIT was looking at potentially becoming a lender in regard to this company?
A. Yes.
Q. Did they eventually become a lender to the best of your knowledge?
A. Yes.
Q. Are they continuing to lend, to the best of your